## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PLAINVILLE GENERATING CO., LLC, ) | |
| Plaintiff, ) | |
| vs. ) | |
| DTE BIOMASS ENERGY, INC. ) | CASE NO.    05-11210-GAO |
| AND ) | |
| PLAINVILLE GAS PRODUCERS, INC., ) | |
| Defendants. ) | |

### ASSENTED TO MOTION FOR LEAVE TO AMEND COMPLAINT

Now comes Plaintiff, Plainville Generating Co., LLC and, with the assent of all parties, asks for leave to file the First Amended Complaint attached hereto.  In support of this Motion, the Plaintiff, states as follows:

1.     One of the contracts between the parties at issue in this litigation requires that certain (but not all) claims, against Defendant Plainville Gas Producers, Inc. ("Plainville Gas"), but not against Co-Defendant DTE Biomass Energy, Inc. ("DTE"), be arbitrated rather than made as claims in litigation.

2.     Correspondingly, Plaintiff split its claims in conformance with the arbitration provision in the Contract, such that certain claims against Defendant Plainville Gas were brought in arbitration, and other equitable claims against Plainville Gas and all claims against co-Defendant DTE Biomass, were brought in this instant litigation.

3.      The parties have agreed, after the filing of the Complaint, to waive the arbitration provision and have all claims resolved in this litigation.

4.      Therefore, the parties have agreed that Plaintiff should amend its Complaint to incorporate all its claims into this litigation, and thereafter by mutual agreement dismiss the arbitration; provided, however, that by agreeing to the waiver of the arbitration provision in the Contract and assenting to the filing of Plaintiff's First Amended Complaint, Defendants do not waiver (but rather expressly preserve) any and all defenses to any and all claims asserted by Plaintiff in its First Amended Complaint other than the defense that such a claim is subject to the arbitration provision of the Contract.

5.      WHEREFORE, Plaintiff, with the assent of all parties, moves the Court to allow leave for Plaintiff to file this First Amended Complaint.

Respectfully submitted,

PLAINVILLE GENERATING CO., LLC

By its Attorneys,

_____
Steven Ferrey, Consulting Counsel
Christopher L. DeMayo
LEBOEUF, LAMB, GREENE & MACRAE LLP
260 Franklin Street
Boston, MA 02110
(617) 748-6800

PLAINVILLE GAS PRODUCERS, INC.
DTE BIOMASS ENERGY, INC.
By their Attorneys,

  /s/ W.C. Blanton
W.C. Blanton          MO# 54125
Lori J. Sellers       MO# 47975
BLACKWELL SANDERS PEPER MARTIN LLP
4801 Main Street, Ste. 1000
Kansas City, MO 64112
(816) 983-8000

  /s/ Wesley S. Chused
Wesley S. Chused
Looney & Grossman LLP
101 Arch Street
Boston, MA 02110
(617) 951-2800

2

CERTIFICATE OF SERVICE

I certify that on the 6th of September, 2005, I served the Assented to Motion for Leave to Amend Complaint by mailing a copy thereof, first class mail, postage prepaid to all parties.

_____
Christopher L. DeMayo

BS104280.1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **PLAINVILLE GENERATING CO., LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **DTE BIOMASS ENERGY, INC.** | ) | **JURY TRIAL DEMANDED** |
| **AND** | ) | **CASE NO.   05-11210-GAO** |
| **PLAINVILLE GAS PRODUCERS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

### INRODUCTION

Plaintiff, Plainville Generating Co., LLC ("PGC" or the "Plaintiff"), a family-owned small-business which owns and operates 1 of only 2 landfill gas renewable energy facilities constructed in Massachusetts since deregulation in 1998, brings this action for damages suffered from actions by Defendant DTE Biomass Energy, Inc.'s ("DTE") torts of misrepresentation and in willfully interfering with, and inducing its wholly-owned subsidiary to interfere with, the business relationship of Plaintiff, for unfair and deceptive acts and practices pursuant to M.G.L. c. 93A by both Defendant DTE and its wholly-owned and controlled subsidiary, Plainville Gas Producers, Inc. ("Plainville Gas" or "PGP"), and against Defendant Plainville Gas for breach of contract, breach of the covenant of good faith and fair dealing, misrepresentation, deceit, and equitable and injunctive relief to order it to maintain the gas Collection System, as described herein.  Defendants' extortive bad faith conduct has jeopardized this renewable energy facility and caused Plaintiff significant damages.

## PARTIES

1.      Plaintiff, Plainville Generating Co., LLC, is a Massachusetts limited liability company, having an address at 3 Belcher Street, Plainville, Massachusetts 02762.

2.      Defendant, DTE Biomass Energy, Inc., is a Michigan corporation with its principal offices at 425 South Main Street, Ann Arbor, Michigan.  It is the parent company of Plainville Gas Producers, Inc. located at the same address as DTE.

3.      Defendant Plainville Gas Producers, Inc. is a Michigan corporation also with its principal offices at 425 South Main Street, Ann Arbor, Michigan.

4.      Both Defendants share the same corporate officers and key employees and are engaged in similar businesses operating from the same office.

## JURISDICTION AND VENUE

5.      A Contract between Plainville Gas and Plaintiff described in paragraph 14 herein contains an arbitration clause which provides a party the option to seek injunctive or equitable relief in the "U.S. Federal District Court where the Landfill is located as the exclusive forum to resolve any disputes arising out of or related to this Agreement as they relate to claims for equitable or injunctive relief . . . "  Contract, ¶XV.  A copy of the Contract and amendment are attached hereto as Exhibit B.  The Contract is to be construed pursuant to Massachusetts Law. Contract, ¶1.6.5

6.      After Plaintiff initially brought certain claims in arbitration and other claims before this Court, the parties agreed to consolidate all claims in the Court action, which consolidation of claims is the genesis of this First Amended Complaint.

7.      The Plainville Landfill (the "Landfill"), is owned by Allied Waste Systems, Inc. ("Allied"), and is located on land in Plainville, Massachusetts.

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 in that no defendant is a citizen of the same state as the plaintiff and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

9.      Venue is proper pursuant to 28 U.S.C. §1391(a) because a substantial part of the events and omissions giving rise to the claims herein occurred in the District of Massachusetts.

## FACTS

### The Landfill Gas and Gas Rights Agreement

10.      Pursuant to a contract between DTE Biomass Energy, Inc. and Allied Waste Systems, Inc. dated December 30, 1995, and as amended on December 18, 1996, and November 1, 2000 (the "Gas Rights Agreement"), DTE until November 2000 and Plainville Gas thereafter are obligated to maintain a gas well field and a gas collection and distribution system (the "Collection System") at the Landfill.  A copy of the Gas Rights Agreement and amendment is attached hereto as Exhibit A.

11.      Plaintiff is the operator of an electricity generation facility located in Plainville, Massachusetts, adjacent to the Landfill (the "Facility") that is fueled exclusively by Landfill gas from the Collection System, and which is recognized and promoted by laws of the Commonwealth of Massachusetts as a renewable energy resource.

### The Previous Gas Purchase Agreement

12.      On or about September 1, 1996, Plaintiff's affiliated predecessor in interest (hereinafter "Plaintiff's Affiliated Predecessor") and Defendant Plainville Gas entered into a Contract (the "Previous Gas Purchase Agreement") pursuant to which Defendant Plainville Gas undertook to supply to Plaintiff at the Facility all of the gas produced from the adjacent Landfill for Plaintiff to utilize as a heat fuel for the production of asphalt and related products.

13.     Plainville Gas supplied gas to Plaintiff's Affiliated Predecessor in accordance with the Previous Gas Purchase Agreement from 1996 through November 2002.

The Contract:  The Gas Purchase Agreement

14.     Plaintiff's Affiliated Predecessor and Plainville Gas entered into the Contract by restating and amending the Previous Gas Purchase Agreement on or about November 18, 2002. A copy of the amended Gas Purchase Agreement (the "Contract") is attached hereto as Exhibit B.

15.     The Contract expressly refers to and incorporates by reference the Gas Rights Agreement.  See Contract, ¶1.11.

16.     Plaintiff's Affiliated Predecessor assigned its rights in the Contract to Plaintiff, as allowed by the Contract.

17.     The Contract is an "Output Contract" whereby the Plaintiff agrees to buy and Plainville Gas agrees to sell all of the gas that is produced at the Landfill.  See Contract, ¶5.1.

18.     The Collection System is referred to in the Contract as the "Seller's Facility."  See Contract, ¶1.15.

19.     The express purpose for which the Contract was contemplated by the parties was to supply Landfill gas to enable Plaintiff to install and operate a nominal 5.6 MW seven-engine renewable electricity generator project at the Facility, which is permitted exclusively to consume that Landfill gas.  See Contract, ¶5.3.

The Agreed Modifications To The Collection System

20.     Plainville Gas agreed to make certain modifications to the Collection System (the "Agreed Modifications") to Plaintiff's specifications to increase the pressure of gas delivery and Plaintiff agreed to reimburse such expenses.  See Contract, ¶3.1.

21.    The scope and estimated cost of the Agreed Modifications are shown in Exhibit B to the Contract.

22.    As of the date of this First Amended Complaint, Plainville Gas has failed to properly perform or complete the Agreed Modifications.

<u>Plainville Gas' Maintenance Obligations</u>

23.    Plainville Gas is obligated to "operate and maintain" the Collection System at its expense "in a manner reasonably necessary to deliver" to the Facility all of the gas naturally produced at the Landfill.

24.    Paragraph 5.5 of the Contract provides that:

> Notwithstanding anything in this Agreement to the contrary, nothing in this Article V or any other provision or Article of this Agreement shall be interpreted as Seller guaranteeing the quantity or quality of Landfill Gas or the rate at which Seller can Supply Landfill Gas to Buyer, **only that Seller will use reasonable efforts to supply such Landfill Gas to Buyer** . . . in the quantities set forth in Article 5.1, 5.2 and 5.3 of this Agreement . . . if Seller is reasonably able to produce and deliver the same to Buyer[.]

25.    Plainville Gas technically does not "produce" Landfill Gas in the conventional meaning of this term.  Landfill gas is naturally produced by biological processes at the Landfill.  Plainville Gas collects such gas and conveys it by pipe to Plaintiff.

26.    Under the Contract, pursuant to the amendment, Plainville Gas undertook to reasonably supply and to maintain the existing level of gas services and product as were supplied to Plaintiff's Affiliated Predecessor during the prior six years of the 1996 Previous Gas Purchase Agreement.

Defendants' Commitments to Plaintiff

27.     Plainville Gas breached its obligation to operate and maintain the Collection System.

28.     The volume and pressure of the gas delivered by Plainville Gas to the Facility declined significantly beginning in early 2004.

29.     Plaintiff promptly notified Plainville Gas orally of the supply and pressure decline and the need for maintenance of the Collection System.

30.     Plainville Gas failed to take effective or satisfactory action in response to Plaintiff's oral notification of the need for maintenance and repair.

31.     Plaintiff provided written notice of the need for maintenance and repair in April 2004.  A copy of Plaintiff's April 1, 2004, letter is attached hereto as Exhibit C.

32.     Shortly thereafter, Plainville Gas and DTE through Rick DiGia and Lou Wilkinson, represented to Plaintiff's David LaFlamme that Plainville Gas would fix the Collection System problems.

33.     The remedial maintenance efforts agreed to by the parties included Plainville Gas drilling new gas extraction wells at its expense.

34.     In April, 2004, Plainville Gas committed to promptly hire a maintenance technician to maintain the Collection System.

35.     Plainville Gas, through Mr. DiGia, by letter of April 27, 2004, to Plaintiff, gave assurances of Plainville Gas' pending corrective action at the Collection System.

36.     In April 2004, Plainville Gas also agreed to memorialize the maintenance activities needed and repair protocol, to which the parties had then agreed, in a written maintenance plan that Plainville Gas would follow.

37.     In June 2004, Plainville Gas through Mr. Van Hoy indicated it was preparing information to accomplish the redrilling of certain gas collection wells.

38.     Plaintiff relied on these representations and promises.

Defendant PGP's Unfair Payment Demand

39.     On or about April 23, 2004, Defendant PGP demanded payment from Plaintiff in the amount of $106,063 for the balance of Defendant's work plus interest on the Agreed Modifications.  A copy of Defendant's letter is attached to the Complaint as Exhibit I.

40.     The work on the Agreed Modifications by Defendant was not performed in accordance with Plaintiff's specifications.

41.     Consequently, Defendant's work did not achieve the intended results or effect the Agreed Modifications and no payment by Plaintiff was due or owed to Defendants for the Agreed Modifications.

42.     By letter to Defendant dated July 29, 2004, Plaintiff tendered full payment of any and all amounts owed for Agreed Modifications, subject to Defendant delivering the written maintenance plan promised by Defendants in April 2004, and subject to Defendant demonstrating that the Agreed Modifications had been successfully completed.  A copy of the letter is attached to the Complaint as Exhibit J.

43.     Defendant did not subsequently deliver the written maintenance plan and did not demonstrate that the Agreed Modifications had been successfully completed, nor tender either to Plaintiff.

The July 2004 Ultimatum

44.     On July 30, 2004, Curtis Ranger, President of both Defendants, met at Plaintiff's office next to the Landfill in Massachusetts with Mr. Lorusso, Mr. Grilli and Mr. LaFlamme, all

representatives of Plaintiff, and stated that Plainville Gas would undertake responsibility for maintenance of the Collection System to restore delivery of gas to the Facility at historic levels of volume and pressure, and would agree to share the risk of the gas supply, only if DTE was granted an equity interest in the Facility.

45.     Plaintiff did not agree to this ultimatum.

46.     After July 30, 2004, Plainville Gas did not make additional necessary repairs.

47.     After July 30, 2004, Plainville Gas failed to provide a maintenance technician at the Landfill Collection System.

48.     After July 30, 2004, Plainville Gas failed to provide the requested Collection System data to Plaintiff.

49.     After July 30, 2004, Plainville Gas failed to deliver the promised written maintenance plan.

50.     After July 30, 2004, Plainville Gas failed to take necessary actions to maintain, repair or otherwise restore the Collection System components that had fallen into disrepair and were failing to deliver gas to the Facility.

51.     Plainville Gas' failure to restore the Collection System continues to cause the delivery of significantly less gas volume and pressure to the Facility.

52.     The significant reduction in the gas delivered to the Facility has meant that Plaintiff has not been able to operate all of its seven engines, thereby substantially reducing the amount of electricity that can be generated by renewable energy at the Facility and causing a drop in Plaintiff's revenues.

<u>Defendants' Misrepresentations to Plaintiff</u>

53.     The Landfill owners and/or operators are required to sample, obtain and maintain monthly and other regular periodic data regarding performance of the Landfill Collection System

8

and gas collection wells pursuant to federal and state law, and any requirements of Landfill permits.

54.    On June 18, 2004, the Massachusetts Department of Environmental Protection ("DEP") sent the Landfill owner, Allied, a notice and order ordering immediate evaluation regarding whether landfill gas was not being collected and was instead migrating off-site in violation of legal requirements.  A copy of the June 18, 2004, DEP Notice and Order is attached hereto as Exhibit D.

55.    The June 18, 2004, DEP Notice and Order discusses public health and safety threats from uncaptured Landfill gas migration; and orders additional monitoring of Landfill Collection System and gas well conditions.

56.    The June 18, 2004, DEP Notice and Order threatens "serious legal consequences" if an appropriate response is not timely received.

57.    The June 18, 2004, DEP Notice orders within 30 days of its date (*i.e.*, by July 18, 2004) completion of an additional assessment to determine the extent of landfill gas migration not captured by the Collection System, and submission of a written report documenting the status and operation of the Landfill gas extraction and Collection System.

58.    Defendants collaborated with Allied and third-party consultants after June 18, 2004, to assist in responding to the June 18, 2004, DEP Notice and Order.

59.    Prior to July 30, 2004, consultants working with Defendants and Allied, detected or documented conditions indicative of migrating landfill gas from the Landfill and problems in one or more wells at the Landfill.

60.    Landfill data collected prior to July 30, 2004, reviewed by personnel of Defendants, indicated that quantities of Landfill gas were migrating off-site into the community rather than being delivered by the Collection System to Plaintiff.

61.     On information and belief, Defendants in 2004 were in possession of data and draft and/or the final versions of the Fall 2004 consultant report submitted to DEP in response to the DEP June 18, 2004, Notice and Order regarding the Landfill Collection System.

62.     This consultant report on the Landfill Collection System referenced in the immediately above paragraph determined that more than half of the Landfill Collection System wells surveyed were not functioning properly, and were thereby not collecting or delivering to Plaintiff all or historic levels of the Landfill gas produced at the Landfill.

63.     On November 8, 2004, representatives of Defendants, the consultant and Allied met at the Landfill to discuss Landfill Collection System problems.

64.     On June 22, 2004, July 6, 2004, and again on July 29, 2004, Plaintiff requested in writing from Plainville Gas all Collection System and well sample data in its possession.  Copies of the June 22, July 6 and July 29, 2004, letters are attached as Exhibits E, L and J.

65.     The written requests for data identified in the paragraph immediately above memorialized similar oral requests over the prior six months made by Plaintiff to personnel of Defendants, as referenced in the July 6, 2004, letter to Defendants.  A copy of the July 6, 2004, letter is attached at Exhibit L.

66.     Neither Defendant provided the set of requested data to Plaintiff in response to these requests.

67.     On several occasions in 2004, DTE personnel and PGP personnel made factual representations to Plaintiff regarding the Collection System and repairs of it, on which Plaintiff reasonably relied.

68.     The President of Plainville Gas and of DTE, at the July 30, 2004 meeting with Plaintiff, stated to Plaintiff that the Collection System was delivering all Landfill gas to Plaintiff.

69.    On August 19, 2004, the President of Plainville Gas and of DTE reiterated in writing unequivocally to Plaintiff that "all the LFG [landfill gas] that is being generated by the Landfill is being captured notwithstanding the fact that some wells may not be very productive." A copy of the August 19, 2004, letter to Plaintiff is attached as Exhibit F.

70.    Only captured Landfill gas can be delivered to the Facility.

71.    Defendants knew on July 30, 2004, and on August 19, 2004, that what they stated to Plaintiff, as set forth in paragraphs 68-69 above, was not accurate or complete.

72.    By letter of November 24, 2004, counsel for Plaintiff as part of a formal legal demand again requested from each Defendant all data regarding the Collection System and well performance.  A copy of Plaintiff counsel's November 24, 2004, letter is attached as Exhibit G.

73.    Defendants each separately failed to provide any of the requested data to Plaintiff's counsel as part of their respective formal responses to Plaintiff's counsel's November 24, 2004, demand despite some but not all of that requested data being supplied to DEP prior to their responses to Plaintiff's counsel.  Copies of these December 21, 2004, and December 22, 2004, letters to Plaintiff's counsel are attached hereto as Exhibits H and K.

74.    Defendants have continually failed to provide any data to either Plaintiff's counsel or Plaintiff from November 2004 to the present date.

75.    During the second half of 2004, Defendants were in possession of additional data requested by Plaintiff and Plaintiff's counsel, as set forth in the paragraphs above.

76.    The statements made to Plaintiff by Defendants' President on July 30, 2004, and August 9, 2004, to wit, that there was and continued to be capture and delivery to Plaintiff of all Landfill gas, was inconsistent with the actual data gathered up to that point in time and in possession of and available to Defendants and the consultant working on these Landfill matters.

77.    To this day, Defendants never corrected the July 30, 2004, and August 9, 2004, statements in any communication sent to or statement made to Plaintiff.

78.    Plaintiff reasonably relied on Defendants' statements referenced above and was thereby damaged.  In particular, Plaintiff delayed pursuing other avenues of recourse which allowed Plainville Gas' neglect to cause further deterioration of the system and made Plaintiff an erratic supplier of renewable energy, leading to additional business loss.

<u>Plaintiff's Chapter 93A Demand to DTE and to Plainville Gas</u>

79.    On November 24, 2004, Plaintiff served a Demand for Relief pursuant to M.G.L. c. 93A to Plainville Gas and to DTE Biomass (the "93A Demand"), on the grounds that Plainville Gas' withholding of reasonable maintenance and repair and Defendants' threat to continue such withholding unless the demand to grant an equity interest in the Facility to DTE were met, constituted tortuous and unfair and deceptive acts in violation of the statute.  A copy of the 93A Demand is attached hereto as Exhibit G.

80.    Plaintiff's 93A Demand requested a good faith offer from Plainville Gas and DTE to repair and maintain the Collection System and to compensate Plaintiff for lost revenues resulting from failure to repair and maintain the Collection System.  The Demand requested that Defendants deliver on promises that already had been committed but Defendants had failed to perform, or things required by the Contract:

"(i)    Provide the written memorialization of the agreed maintenance activities, protocol and schedule that PGP committed to provide to PGC [Plaintiff] in April, 2004.

(ii)    Cooperatively provide PGC with all data, documents, analysis, film, pictures, investigative reports, whether in hard copy or electronic form, in the possession of PGP or DTE regarding operation, maintenance and repair of the landfill well field gas collection and delivery system from 1997 to the present date, which corresponds to the period of the original Contract initiated in 1996.

(iii)    Commit to, and commence, maintaining, repairing or replacing all existing nonperforming wells at the landfill and the gas collection and delivery system, including

deferred maintenance, so as to maintain the quantity and quality of landfill gas at traditional existing levels comparable to those historic levels determined as of the time that the amendment to the agreement of the parties was executed in November 2002.

(iv)     Commit to restitute to PGC all of the net operating income permanently lost by PGC during 2004, to the time when existing volume and service is again maintained, to compensate PGC for PGP's failure to maintain the well field and gas collection and delivery system so that historic existing flow was maintained.  This amount was approximately $310,000 as of October 31, 2004, and continues to increase each day.

(v)     Commit to staff the landfill collection system adequately with trained personnel and to maintain same on a going-forward basis so that this 2004 maintenance problem does not occur in the future."

81.     On December 13, 2004, Plainville Gas retaliated by delivering to Plaintiff a ten (10) day Notice of Termination of the gas supply to the Facility (the "Termination Notice"), unless Plaintiff paid Plainville Gas $85,302.30 for Agreed Modifications.

82.     In the Termination Notice, Plainville Gas added to its demand $11,058.00, representing interest at more than 12% of the amount demanded, without any basis in the Contract for doing so.

83.     The work on the Agreed Modifications by Plainville Gas was not performed in accordance with Plaintiff's specifications.

84.     Consequently, Plainville Gas' work did not achieve the intended results or effect the Agreed Modifications and no payment by Plaintiff is due or owed to Plainville Gas for the Agreed Modifications.

85.     The issuance of the Termination Notice and its inclusion of a demand for interest that had not been agreed to, constituted further unfair and deceptive acts and practices by Defendants.

86.     On December 20, 2004, to avoid termination of the gas supply to the Facility of Plaintiff, Plaintiff paid Plainville Gas' demand in full, but under protest and reserving all rights.

87.     In the December 20, 2004, letter including payment Plaintiff denied to Defendants that it owed Plainville Gas this sum.

88.     On December 21, 2004, Plainville Gas replied to the 93A Demand but failed to offer any of the relief sought, provide any of the requested documents, or make any good faith offer whatsoever.  A copy of Plainville Gas' reply is attached hereto as Exhibit H.

89.     Plaintiff received a similar reply from DTE with no documents and no good faith offer.  A copy of the DTE reply is attached hereto as Exhibit K.

## DEFENDANT'S TERMINATION OF THE CONTRACT

90.     Contemporaneously with its Answer to the original Complaint filed in this matter, by a letter dated July 19, 2005, Defendant PGP notified Plaintiff that it was unilaterally terminating both the Gas Rights Agreement and the Contract, and thereafter would not supply Landfill Gas to Plaintiff.  A copy of the July 19, 2005, letter to Plaintiff is attached as Exhibit M.

91.     PGP stated a lack of commercial quantities of Landfill gas produced by the Landfill as the sole rationale for its termination.

92.     As a result of PGP's unilateral termination, to maintain Landfill gas delivery and prevent the bankruptcy of the renewable energy Facility, Plaintiff was forced to assume Defendant PGP's obligations to deliver Landfill gas to the Facility.

## COUNT I

## TORTIOUS INTERFERENCE BY DTE WITH
## A CONTRACTUAL RELATIONSHIP

93.     The allegations and claims contained in paragraphs 1 through 92 are repeated and incorporated herein by reference.

94.     Defendant Plainville Gas was obligated under the Contract to maintain and operate the Collection System, as described above.

14

95.     Defendant DTE was aware of the obligations of its subsidiary, Plainville Gas, pursuant to Plainville Gas' Contract with Plaintiff.

96.     Notwithstanding such knowledge, DTE did intentionally and unlawfully induce Plainville Gas to condition the performance of its maintenance duties under the Contract on Plaintiff's granting DTE an equity interest in the Facility.

97.     Defendant DTE intentionally and unlawfully induced Plainville Gas to breach its Contract with Plaintiff and not honor the commitments Plainville Gas made to Plaintiff, as described herein, related to the fact that Plaintiff refused to grant DTE an equity interest in the Facility.

98.     As a result, Plaintiff lost the benefit of the Contract to have the Collection System maintained and operated, and Plaintiff was thereby damaged by the significant reduction in gas delivered to the Facility.

## COUNT II

## INTENTIONAL MISREPRESENTATION AND DECEIT BY DEFENDANTS

99.     The allegations and claims contained in paragraphs 1 through 98 are repeated and incorporated herein by reference.

100.     Defendants repeatedly misrepresented their intention to cure breaches of the Contract.

101.     Defendants misrepresented to Plaintiff the condition and operation of the Collection System.

102.     Defendants, when directly asked for data on the Collection System which would have demonstrated the non-performance of the Collection System, failed to provide same or to

correct their prior statements that the Collection System was operating to collect all gas generated from the Landfill and deliver all such gas to Plaintiff.

103.    Defendants misrepresented key facts to Plaintiff, upon which Plaintiff relied.

104.    Defendants knew the facts it represented were not true.

105.    Defendants knew or should have known the facts it represented were not true.

106.    In reasonable reliance thereon, Plaintiff delayed seeking other and earlier avenues of judicial or arbitral relief, which led to further deterioration of the system and additional business losses.

107.    Plaintiff has been harmed by Defendants' misrepresentations and is entitled to damages.

## COUNT III
## NEGLIGENT MISREPRESENTATION BY DEFENDANTS

108.    The allegations and claims contained in paragraphs 1 through 107 are repeated and incorporated herein by reference.

109.    Defendants misrepresented to Plaintiff the facts set forth above and neglected and failed to correct such misrepresentations through the current date.

110.    Defendants should have known the facts they represented were not true.

111.    Plaintiff reasonably relied on such misrepresentations to its detriment, in part, by refraining from earlier seeking arbitral or judicial relief, which led to further deterioration of the system and additional business losses.

112.    Claimant has been harmed by Defendants' misrepresentations and is entitled to damages.

## COUNT IV

## BREACH OF CONTRACT BY PLAINVILLE GAS

113.    The allegations and claims contained in paragraphs 1 through 112 are repeated and incorporated herein by reference.

114.    Defendant PGP breached the Contract by failing to perform its maintenance obligations.

115.    Defendant PGP further breached the Contract by failing to properly make and complete the Agreed Modifications.

116.    Defendant PGP further breached the Contract by formally threatening to terminate gas supply unless it was paid for Agreed Modification amounts and interest to which it was not entitled.

117.    Defendant PGP further breached the Contract by terminating the Contract unilaterally by its letter dated July 19, 2005 to Plaintiff.

118.    Plaintiff has suffered injury and loss as a result of Respondent's breach of the Contract for which Claimant is entitled to money damages in an amount to be determined herein.

119.    Plaintiff is entitled to an award of costs, expenses and attorneys fees as authorized by Article XV of the Contract.

## COUNT V

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING BY PLAINVILLE GAS

120.    The allegations and claims contained in paragraphs 1 through 119 are repeated and incorporated herein by reference.

121.    Defendant PGP's conduct has deprived Plaintiff of the benefits of the Contract and, therefore, has breached the Covenant of Good Faith and Fair Dealing.

122.    Defendant PGP further breached the Covenant by attempting to extort money and property from Plaintiff for which Defendant had not bargained.

123.    Defendant PGP further breached the Covenant by terminating the contracts.

124.    Plaintiff has suffered injury and loss as a result of Defendant's breach of the Covenant for which Plaintiff is entitled to money damages in an amount to be determined at trial.

125.    Defendant's breach of the Covenant is ongoing and Plaintiff is entitled to equitable relief from Defendant's wrongful conduct.

## COUNT VI

## DECLARATORY JUDGMENT

126.    The allegations and claims contained in paragraphs 1 through 125 above are repeated and incorporated herein by reference.

127.    An actual controversy exists between the parties regarding Plaintiff Gas' obligations under the Contract to perform the Agreed Modifications and to operate and maintain the Collection System.

128.     Plaintiff seeks a declaration of its rights under the Contract declaring, specifically, (i) what outstanding work Defendant Plainville Gas must perform to complete the Agreed Modifications, (ii) what additional work Defendant Plainville Gas must perform to satisfy its obligation to operate and maintain the Collection System, and (iii) that Plaintiff will continue to be damaged by Plainville Gas' failure to perform said work until the work is performed.


## COUNT VII

## SPECIFIC PERFORMANCE AGAINST PLAINVILLE GAS

129.     The allegations and claims contained in paragraphs 1 through 128 are repeated and incorporated herein by reference.

130.     Defendant Plainville Gas refused to perform its duties under the Contract by failing to perform its maintenance obligations.

131.     Defendant Plainville Gas further refused to perform its duties under the Contract by failing to properly make and complete the Agreed Modifications.

132.     Defendant Plainville Gas further refused to perform its duties under the Contract by formally threatening to terminate gas supply unless it was paid for Agreed Modification amounts and interest to which it was not entitled.

133.     Defendant Plainville Gas further refused to perform its duties under the Contract when it unilaterally terminated the Contract by letter dated July 19, 2005.

134.     Plaintiff has suffered and continues to suffer with each passing day injury and loss as a result of Plainville Gas's refusals to perform duties under the Contract.

135.     No adequate remedy at law exists because the methane molecules in Landfill gas are 2,100% more damaging to the global environment than carbon dioxide ("$CO_2$"), the best known "greenhouse gas." Every molecule of Landfill gas allowed by Defendants to escape into

the atmosphere rather than be delivered by the Collection System to the Facility where it is

converted from very environmentally harmful methane to much less harmful $CO_2$, significantly

and permanently damages the environment by promoting global warming.  As it escapes, it

creates risk of explosion or toxic exposure to humans that a damages remedy cannot address.

136.    No adequate remedy at law exists because the failure to deliver all, or even

traditional levels of, Landfill gas to the Facility causes Plaintiff to produce erratic fluctuations in

its creation and delivery of renewable electric power, which permanently and irreversibly

damages its reputation as a reliable power source in the regional market.  This will damage

Plaintiff's long-term ability to sell power output at values reflecting reliable firm power that it

would achieve if Defendant Plainville Gas honored its Contractual Collection System

maintenance obligations.  This damage to Plaintiff will be difficult to determine or calculate over

the next ten years.

137.    No adequate remedy at law exists where Plainville Gas in retaliation to Plaintiff

initiating litigation can threaten to unilaterally terminate, or actually terminate, as it has, the

Contract, or unilaterally terminate the separate Gas Rights Agreement with Allied as part of a

plan to maximize its profit by underperforming its maintenance covenants to Plaintiff embodied

in the Contract, and then leaving the state.  This would leave a Collection System in disrepair

and dysfunction, with no legal remedy or recourse at law to Plaintiff to restore traditional levels

of gas supply to its newly constructed multi-million dollar renewable energy Facility, which is

designed to have a useful life of twenty years or more.  This would also subvert state policy to

promote these renewable energy facilities.

138.    Defendant Plainville Gas' failure to perform is ongoing and Plaintiff is entitled to

an order for specific performance of Plainville Gas' maintenance obligations.

139.    Plaintiff is entitled to an order for specific performance of Plainville Gas'

obligation to properly make and complete the Agreed Modifications.

## COUNT VIII

## EQUITABLE ORDER FOR SECURITY OF PERFORMANCE

140.    The allegations and claims contained in paragraphs 1 through 139 are repeated

and incorporated herein by reference.

141.    Defendant Plainville Gas unilaterally terminated and abandoned the Gas Rights

Agreement and the Contract.

142.    Defendant Plainville Gas is a project company operating at the Plainville,

Massachusetts location only, with its only assets the contractual rights described herein.

143.    There is a substantial likelihood that Defendant Plainville Gas, as part of a

premeditated plan, will now intentionally close Plainville Gas as a company, so as to cause

Plainville Gas to have no assets to perform or satisfy any injunctive or equitable remedy that may

be ordered by this Court.

144.    As security for undertaking any injunctive action to repair the Collection System

or complete the Agreed Modifications that this Court may order of Defendants as well as satisfy

any judgment, Plaintiff asks this Court to order Defendants to post by letter of credit, or

otherwise, adequate financial assurance or security to guarantee its performance of any equitable

or injunctive order of this Court to repair or maintain the Collection System and to complete the

Agreed Modifications.

## COUNT IX

## UNFAIR AND DECEPTIVE ACTS AND PRACTICES
## BY DTE AND PLAINVILLE GAS

145.    The allegations and claims contained in paragraphs 1 through 144 are repeated and incorporated herein by reference.

146.    Defendants have violated Chapter 93A of the Massachusetts General Laws with their misrepresentations of critical operating facts, status and data to Plaintiff and with their efforts to extort an ownership interest in the Facility from Plaintiff.

147.    Defendant DTE induced or encouraged its Plainville Gas subsidiary to withhold required reasonable maintenance of the Collection System to extract an ownership interest in the Facility from Plaintiff.

148.    By serving the Termination Notice of gas supply and demanding unauthorized interest from Plaintiff in retaliation to Plaintiff's November 24, 2004 demand for data and maintenance, Defendant Plainville Gas committed unfair and deceptive acts.

149.    By unilaterally terminating their Contractual performance by letter to Plaintiff dated July 19, 2005, Defendant PGP committed an unfair and deceptive act.

150.    The relevant acts and conduct have occurred primarily and substantially within the Commonwealth of Massachusetts.

151.    Plaintiff has suffered injury and loss as a result of Defendants' unfair and deceptive conduct for which Plaintiff is entitled to actual damages in an amount to be determined at trial.

152.    Defendants' violations of Chapter 93A were knowing and willful.

153.    Plaintiff is entitled to the award of punitive damages in a multiple of its actual damages.

154.    Plaintiff is entitled to award of costs, interest and attorney's fees as authorized by Chapter 93A, and otherwise as the Court may direct.

**WHEREFORE**, Plaintiff prays for an order of specific performance mandating the performance of reasonable maintenance and repair of the Collection System and the Agreed Modifications by Plainville Gas; damages against DTE for tortuous interference; judgment against PGP for breach of contract and covenants of fair dealing; damages against DTE and PGP for misrepresentation; and an award against both Defendants for violation of M.G.L. c. 93A and that such award be trebled and Plaintiff's attorneys' fees and costs be awarded, as this Court determines.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable as a matter of right.

Respectfully submitted,
PLAINVILLE GENERATING CO., LLC
By its Attorneys,

_____
Steven Ferrey, Consulting Counsel
Christopher L. DeMayo
LEBOEUF, LAMB, GREENE & MACRAE, L.L.P.
260 Franklin Street
Boston, MA 02110
(617) 748-6800

BS104610.6

# EXHIBIT

# A

AMENDMENT DATED AS OF NOVEMBER 1, 2000,
TO PLAINVILLE LANDFILL GAS RIGHTS AGREEMENT

THIS AMENDMENT OF THE PLAINVILLE LANDFILL GAS RIGHTS AGREEMENT
dated as of November 1, 2000, by and between Allied Waste Systems, Inc., formerly known
as Laidlaw Waste Systems, Inc., a Delaware corporation ("Owner") and Plainville Gas
Producers, Inc., a subsidiary of DTE Biomass Energy, Inc. formerly known as Biomass
Energy Systems, Inc., a Michigan corporation ("Producer").

WITNESSETH:

WHEREAS, Owner and Producer entered into a landfill gas rights agreement on December
30, 1995, which was amended and restated by the First Amendment and Restatement of the
Plainville Landfill Gas Rights Agreement, dated December 18, 1996 ("Agreement");

WHEREAS, Owner and Producer desire to extend the terms of this Agreement for an
additional eight years through December 31, 2020;

WHEREAS, Owner and Producer desire to amend this Agreement to permit the assignment
of the Agreement by Producer to Lorusso Corporation at any time without the prior consent of
Owner;

WHEREAS, Owner and Producer agree to the deletion of the existing and the
implementation of certain new operating standards and protocols;

WHEREAS, Owner and Producer stipulate and agree that any modifications made to the gas
collection systems by Owner since the execution of the Agreement shall be included in
Article I definition of the Collection Systems.

NOW THEREFORE, Owner and Producer agree as follows:

1.     Owner and Producer agree the term of the Agreement shall be extended for an
       additional eight years through December 31, 2020. The license and rental fees payable
       each year on September 1 for the successive 12 month period for the exclusive,
       irrevocable gas and lease rights granted by Owner to Producer shall be as follows:
       $210,000 payable September 1, 2001 and on each consecutive September 1 thereafter
       through 2011. On September 1, 2012, $70,000, adjusted as hereinafter provided, shall
       be payable to cover the period from September 1, 2012 through December 31, 2012.
       No license and rental fees shall be due and payable during the period commencing
       January 1, 2013 through December 31, 2020 unless the Production Tax Credits
       currently available pursuant to Section 29 of the Internal Revenue Code are extended
       or a similar provision or provisions providing similar economic tax credit benefits to
       those available under Section 29 have been enacted (together "PTC"). Owner and
       Producer stipulate and acknowledge that even through Producer may not be required
       to make license and rental fee payments during the period from January 1, 2013

through December 31, 2020 that adequate and sufficient consideration between Producer and Owner exists as a result of the continued extraction, collection and utilization of the Landfill Gas. If PTCs are provided for by the Internal Revenue Code the annual license and rental fee commencing with the payment due January 1, 2013 shall be $252,000 (the "base annual fee"), adjusted as hereinafter provided. The base annual fee, and the $70,000 payment for the period from September 1, 2012 through December 31, 2012, shall be adjusted, upward or downward, depending upon the percentage increase or decrease of PTC available per MMBtu using the year 2007 as the base index. For example, if the PTC amount available per MMBtu in the year 2007 is $1 and increased to $1.20 in the year 2013 then the license and rental fee applicable for the year 2014 payable on January 1 of that year shall be $252,000 plus 20% for a total of $302,400. Conversely, if the PTC value is reduced by 20% for the year 2013 the fee due January 1, 2014 would be $252,000 - $50,400 = $201,600.

2.  Owner and Producer acknowledge that Lorusso Corporation, a Massachusetts corporation located at 3 Belcher Street, Plainville, Massachusetts intends to construct a landfill gas to energy project utilizing the Landfill Gas extracted and collected from the Collection Systems at the Landfill. At some time during the term hereof it may be desirable for Producer to assign this Agreement with all its rights and obligations to Lorusso Corporation. Accordingly, Owner agrees and hereby consents to Producer's right to assign the Agreement to Lorusso Corporation, or its affiliate, at any time without acquiring Owner's prior consent. Upon such assignment Lorusso Corporation shall accept all Producer's rights and obligations under the Agreement and Producer shall then be released from same without further liability. Nothing contained in this amendment shall be deemed to be a warranty or representation by Owner concerning the quantity or quality of gas.

3.  Owner and Producer agree that the Operational Standards of Producer contained in Article V B of the Agreement are hereby deleted in their entirety and there is substituted therefor the following:

Operational Standards of Producer. Producer covenants and agrees that its operations will conform to the following standards:

SAME  1.  Producer shall provide proper storage, if required, for all Condensate located on the Plant Site. Owner shall remove and dispose of all Condensate (including any located at the Plant Site) at no cost to Producer.

2.  The Project Facility which is anticipated to be designed and built, and any expansion thereof, shall be designed and built in accordance with all applicable laws, rules, regulations and permits, including any applicable Environmental Laws.

3.  Producer and Buyer shall comply with all laws, rules, regulations and permits applicable to the Project Facility, Plant Site and Landfill.

4.  Producer shall operate and maintain the Flares and the Collection Systems in accordance with the permit issued by the Massachusetts Department of Environmental Protection (the DEP) on June 2, 1998, as modified from

time to time (the "Permit").  Producer shall have personnel on-site whenever necessary to insure that the Flares and Collection Systems are being operated in accordance with said permit.

5.  Producer shall install, operate and maintain an electronic monitoring system on all Flares in order to notify Producer (and Owner) of all malfunctions in the operation of the Flares.  Producer shall be responsible for all installation and operation costs, including telephone and cellular expenses, of such system.

6.  During any periods when Producer does not have personnel on site, Producer shall adhere to the procedures and practices set forth in the Response Protocol, a copy of which is attached hereto as Exhibit A and incorporated herein by reference.

7.  All utility costs for electricity and propane gas associated with operation of the Zink and McGill flares shall be paid by Producer.  All utility expenses associated with the operation of the LFG Specialty flare shall be paid by Owner.

8.  Producer shall perform gas probe monitoring at the Landfill as requested by Owner.  Costs for performance of such monitoring shall be allocated as follows: rate for technician services for such monitoring shall be billed at a rate not to exceed $50.00 per hour.  Producer shall be responsible for the first $600 per month for such services; Owner shall pay only for technician services in excess of $600 per month.   In exchange for such services, and in order to enable Producer to meet its obligations hereunder, Owner shall allow Producer to occupy one office at 14 Belcher Street, Plainville.

9.  Producer shall indemnify and hold Owner harmless against any and all costs, expenses, fines, penalties or other fees imposed or charged to Owner on account of any failure on the part of Producer to comply with the terms of the Permit in connection with operating the Flares.

4.  Owner and Producer stipulate and agree that any modifications made to the gas collection system shall also be included in the definition of Collection Systems in Article I. B. of the Agreement.

5.  Except as amended herein, all terms and conditions are hereby ratified and confirmed.

6.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have caused these presents to be executed and sealed as of the date first written above.

ALLIED WASTE SYSTEMS, INC.                    PLAINVILLE GAS PRODUCERS, INC.

By: _Jo Lynn White_                           By: _____

Title: _Secretary_                            Title: _____
hereunto duly authorized                      hereunto duly authorized

IN WITNESS WHEREOF, the parties have caused these presents to be executed and sealed as of the date first written above.


ALLIED WASTE SYSTEMS, INC.                    PLAINVILLE GAS PRODUCERS, INC.

                                              By: _Curtis T. Ranger_____
By: _____

                                              Title: _President_____
Title: _____
hereunto duly authorized                      hereunto duly authorized

EXHIBIT A to Amendment dated November 1, 2000

RESPONSE PROTOCOL
PLAINVILLE GAS EXTRACTION SYSTEM ALARM CONDITIONS

1. <u>Alarm System</u>.  The monitoring and alarm system shall be operational during all periods when:

> (a)  the Flares are required to be operating (that is, whenever there is no direct transmission of all landfill gas to a third party user), and

> (b)  Producer does not have personnel on site to directly monitor the operation of the Flares.

2. <u>Response Actions</u>.

A.  Upon page or telephonic notification of alarm conditions, Producer shall perform the following actions:

> (i)  Establish computer link to the site to determine validity and extent of the reported alarm condition.

> (ii)  Monitor site conditions for ½ hour via modem link to allow for automatic re-start.

B.  If the system automatically restarts, or it is determined that there was a false alarm:

> (i)  Note time of page and time of system restart for entry into site Daily Maintenance Logs.

> (ii)  Determine the cause of the alarm condition during normal operation hours the following day.

C.  In the event of either Automatic Restart Failure or Remote Link-up Failure:

> (i)  If a link to the site cannot be established, or at the end of a ½ hour the system malfunction persists, travel to the site for visual inspection and repair.

> (ii)  Identify and repair (if possible) the cause of the alarm condition.

> (iii)  Restart the system after repair.

> (iv)  If the system is not immediately repairable, attempt to adjust functional equipment to maintain as much vacuum on the system as achievable.

(v)    Insure all flares are either shut down or operating above minimum allowable temperatures.

(vi)   Note time and cause of event in site Daily Maintenance Logs.

(vii)  Either call or send a telephone page to the individuals listed on the attached Schedule 1(telephone notification).  Owner may amend the page list from time to time by sending a telephone notification list to Producer.

(viii) Compete a Site Incident Report within twelve (12) hours describing the details and status of the event, and fax the report to the individuals listed on the attached Schedule 1 (distribution list). Owner may amend the distribution list from time to time by sending a new distribution list to Producer.

SCHEDULE 1 to Amendment dated November 1, 2000

DISTRIBUTION LIST

In the event that there is an automatic restart failure or remote computer link failure, and a site visit is mandated, the following individuals shall be called or paged:

| Name | Telephone or pager number |
|------|---------------------------|
| 1.  Henry LeDuke | 508-962-2568 |
| 2.  Ralph Larimore | (716) 282-6073 |
| 3.  John DiNapoli | 781-784-7823 |
| 4.  Doug Borro | 480-627-2787 |

Reports shall be sent to the following;

| Name | Fax Number |
|------|-----------|
| Rick DiGia (Biomass) | (734) 668-1541 |
| John DiNapoli (Allied) | (781) 784-7552 |
| Ralph Larimore (Allied) | (716) 282-6073. |

## FIRST AMENDMENT AND RESTATEMENT OF THE
## PLAINVILLE LANDFILL GAS RIGHTS AGREEMENT

THIS AMENDMENT AND RESTATEMENT OF THE PLAINVILLE LANDFILL GAS RIGHTS AGREEMENT ("Agreement"), is made and entered into on December 18, 1996, between Laidlaw Waste Systems, Inc., a Delaware corporation ("Owner"), and Biomass Energy Systems, Inc., a Michigan corporation ("Producer").

### WITNESSETH:

WHEREAS, Owner owns and operates the Landfill, and

WHEREAS, Owner has installed a Collection System at the Landfill prior to December 31, 1995 ("Original Collection System") and recently installed a second Collection System at the Landfill ("Second Collection System") (the Original Collection System and the Second Collection System are collectively referred to as "Collection Systems") to extract Landfill Gas from the Landfill.

WHEREAS, Owner and Producer entered into a Prototype Landfill Gas Rights Agreement and an Adoption and Modification Agreement dated December 30, 1995 (collectively, "Gas Rights Agreement") whereby Producer purchased the Original Collection System and certain other rights and licenses with regard to the Landfill.

WHEREAS, Owner desires to sell the Second Collection System and amend and restate the Gas Rights Agreement, and Producer desires to purchase the Second Collection System and amend and restate the Gas Rights Agreement pursuant to and in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the parties, the parties hereby agree as follows:

### ARTICLE I - DEFINITIONS

Unless the context indicates otherwise, as used herein, the terms set forth below shall be defined as follows:

A.    "Buyer" means the party or parties to which Producer will sell Landfill Gas pursuant to the Fuel Supply Agreement(s).

B.    "Collection Systems" means the network of recovery wells and interconnecting pipes together with attendant valves, pumps, monitoring devices and other extraction related equipment installed for the purpose of extracting and recovering Landfill Gas, including blowers sufficient to deliver the Landfill Gas to the Flares, the Flares and gas meter, including any expansion thereof.

C.    "Commercial Quantities" means Landfill Gas extracted from the Landfill in such quantities and of such quality that it is economically viable and profitable to use the Landfill to produce Landfill Gas for sale to a Buyer pursuant to a Fuel Supply Agreement.

D.    "Compressor Station(s)" means the equipment required for the delivery of the Landfill Gas to Buyer, such equipment to include compression equipment, a condensate knockout tank and related facilities.

E.    "Condensate" means the liquid formed from the condensing of the vapors that occur during the collecting, transporting and processing of Landfill Gas.

F.    "Delivery Point" means the point at which the Landfill Gas enters the Collection Systems.

G.    "Environmental Laws" means any and all applicable federal, state, county, municipal and local laws, statutes, rules, regulations, ordinances, codes, restrictions, permitting requirements, licensing requirements and any other governmental requirements or obligations of any kind or nature relating to (i) environmental pollution, contamination or other impairment of any kind or nature, (ii) the construction, installation, repair, maintenance or operation of the Collection Systems and/or (iii) any hazardous waste or other toxic substances of any nature, whether liquid, solid and/or gaseous, including, without limitation, smoke, vapor, fumes, soot, radiation, acids, alkalis, chemicals, wastes, by-products and recycled materials. These Environmental Laws shall include, but not be limited to, the Federal Solid Waste Disposal Act, the Federal Clean Air Act, the Federal Clean Water Act, the Federal Resource Conservation and Recovery Act of 1976, the Federal Comprehensive Environmental Responsibility Cleanup and Liability Act of 1980, all as amended from time to time, regulations of the Environmental Protection Agency, regulations of the Nuclear Regulatory Commission, regulations of any state department of natural resources or state environmental protection agency now or at any time hereafter in effect and all applicable local ordinances, rules, regulations and permitting or licensing requirements. This Subparagraph G shall exclude the laws relating primarily to health and safety such as the Occupational Safety & Health Association and similar state laws.

H.    "Flare" means the equipment used for the burning of Landfill Gas at the Landfill, which conforms to all applicable federal, state, county, municipal and local laws, statutes, rules, regulations, ordinances, codes, restrictions, requirements, obligations and permitting requirements, including, without limitation, all Environmental Laws.

I.    "Force Majeure" means acts of God; winds, hurricanes, tornadoes, fires, epidemics, landslides, floods; strikes, lock-outs; or other industrial disturbances; acts of public enemies; new laws and/or regulations and changes to existing laws and/or regulations if the same make it economically impractical to operate the Landfill, the Collection Systems, the Project Facility or the Project; acts, failures to act, or orders of any kind of any governmental authorities; insurrections; inability to procure materials or services; military

2

action; war, whether or not it is declared; sabotage; riots; civil disturbances; explosions; equipment breakdowns; or any cause or event, not reasonably within the control of the party claiming Force Majeure other than the financial inability of such party caused by factors other than any of the foregoing factors. An event that satisfies the above definition but which occurs under the Fuel Supply Agreement shall also be a Force Majeure under this Agreement.

J.    **"Fuel Supply Agreement(s)"** means the agreement(s) to be negotiated between Producer and Buyer for the sale of Landfill Gas, which agreement(s) shall be acceptable to Producer in its sole discretion, but which agreement(s) shall be approved by Owner, which approval shall not be unreasonably withheld.

K.    **"Gross Revenue"** means the proceeds actually received from Buyer for sale of Landfill Gas, or related byproducts which require no incremental capital investment above the initial investment, to unrelated third parties, except that, with respect to sales to a related party (i.e. one in which Producer or an affiliate of Producer has an interest), such sales shall be at market value. Producer shall exercise its best efforts to collect such proceeds from Buyer or any third party, as the case may be.

L.    **"Landfill"** means that real estate owned by Owner known as the Plainville Landfill. The term Landfill shall include and refer to any waste disposal cells added to the site following the date of this Agreement.

M.    **"Landfill Gas"** means any and all gases resulting from the decomposition of refuse material within the Landfill, consisting principally of methane and carbon dioxide.

N.    **"Landfill Operating Permit"** means the permit or license that has been or may be obtained by Owner pursuant to applicable Environmental Laws, and any revisions or amendments thereto, that enables Owner to operate the Landfill. Owner will provide copies of the same to Producer when and if obtained.

O.    **"Leachate"** means the liquid that forms in the Landfill other than Condensate.

P.    **"Management and Operation of the Landfill"** means all activities associated with the ownership, development, operation, maintenance, closure and post closure activities at the Landfill, including, without limitation, the installation and development of cells, the receipt, placement, compaction and covering of permitted waste material, the operation and maintenance of environmental protection and monitoring systems, the installation, placement and maintenance of the final cover, and all other activities incidental to the above mentioned activities.

Q.    **"Plant Site"** means the site located at the Landfill upon which portions of the Collection Systems (e.g. blower, Flare and meter) and the Project Facility are or will be located.

3

**R.** "Production Tax Credits" means the tax credit derived from producing fuel from a non-conventional source within the meaning of Section 29 of the Internal Revenue Code of 1986, as amended.

**S.** "Project" means all activities and efforts associated with the production, collection, recovery, processing, consumption, transmission, use, sale and storage of Landfill Gas and resultant products, including, without limitation, any electricity produced therefrom.

**T.** "Project Facility" means any and all machinery, equipment, fixtures, buildings and improvements which are or will be located at the Plant Site owned, leased or constructed by Producer or Buyer necessary or incidental to the processing, transmission, consumption, use or storage of Landfill Gas for any purpose whatsoever, including, but without limitation, the production and transmission of electrical energy, production of steam and Landfill Gas transmission; provided, however, Project Facility shall not include the Collection Systems.

**U.** "Related Agreements and Permits" means all agreements, contracts and permits of any kind or nature necessary to sell the Landfill Gas to Buyer(s) pursuant to the Fuel Supply Agreement(s) and to deliver such Landfill Gas to the Buyer, including, without limitation, any and all agreements relating to financing of the Collection Systems and/or Project Facility and the financing, formation and/or operation of any power generation company.

## ARTICLE II - RIGHTS GRANTED TO PRODUCER

**A.** **Producer's Rights.** During the term of this Agreement, Owner hereby grants to Producer the following exclusive, irrevocable licenses, gas rights and lease rights and sells and conveys to Producer all of the following assets:

1. During the term of this Agreement, Owner hereby grants to Producer the exclusive, irrevocable right and license to extract, collect, process, develop, sell and utilize all Landfill Gas collected by the Collection Systems, free and clear of all security interests, liens, claims, mortgages and encumbrances of any kind or nature. Title and risk-of-loss to the Landfill Gas will pass to Producer at the Delivery Point. Assuming Producer does not own such Flare(s), Owner hereby grants to Producer during the term of this Agreement an irrevocable right and license to use the Flare(s), if any, located at the Landfill now or in the future, to burn or flare the Landfill Gas, at no additional cost to Producer.

2. Owner hereby sells to Producer the Collection Systems, free and clear of all security interests, liens, claims, mortgages and encumbrances of any kind or nature. During the term of this Agreement, Producer shall have the exclusive, irrevocable right and license to design (if

4

applicable), construct, install, modify, operate and maintain the Collection Systems and Project Facility at the Landfill. Such right and license encompasses the right to drill gas wells, install buried pipes and install and operate associated gas collection equipment, etc.; provided, however, that the exercise of such rights shall not unreasonably interfere with the Management and Operation of the Landfill and the exercise of such rights shall not interfere with Owner's obligations to comply with Environmental Laws.

3.   During the term of this Agreement, Owner hereby leases to Producer a Plant Site to install, construct, operate and maintain the applicable portions of the Collection Systems (e.g. blower, Flare and meter) and Project Facility, such Plant Site to be designated at a location to be mutually agreed upon by the parties. Such lease shall commence as of the effective date of this Agreement and terminate at the termination of this Agreement. Owner hereby represents and warrants (i) that it has fee simple title to the Plant Site and Collection Systems, free and clear of all security interests, liens, claims, mortgages and encumbrances of any kind or nature and (ii) that Producer shall have quiet and peaceable possession of the Plant Site and Collection Systems during the term of this Agreement so long as Producer is not in default of its obligations under this Agreement. Owner hereby consents to Producer subleasing a portion of the Plant Site to Buyer so long as the terms of such sublease are consistent with the terms of this Agreement. Producer shall not, however, be relieved of its responsibilities under this Agreement, it being agreed that any such sublease shall be at nominal rent, and Producer shall indemnify and hold harmless Owner from any negligent act, omission or conduct of Buyer.

4.   An irrevocable right-of-way over Owner's property (including the Landfill) for Producer or Buyer to allow the construction, installation, operation and maintenance of a gas transmission line from the Project Facility to Buyer's facility and/or for the installation of utilities and/or the connection of existing utilities to the Collection Systems, Plant Site and Project Facility. The term of this right-of-way shall commence as of the effective date of this Agreement and shall terminate at the termination of this Agreement. The property description of the right-of-way is contained in Exhibit B.

B.   **Access to Landfill**. Producer and Buyer and their employees, representatives and independent contractors shall have unrestricted access to the Plant Site, the Project Facility, Collection Systems and the Landfill on a twenty-four (24) hour per day, seven (7) day per week basis. Access to the Plant Site and Project Facility will be through Owner's means of access to the Landfill. Owner represents and warrants to Producer that access to

the Landfill for ingress and egress exists via public roads. Producer, Buyer and their employees, representatives, and independent contractors shall be allowed the right to transport all goods and services necessary for conducting its operations. Should access to certain routes be denied for any reason, the Owner and Producer shall mutually arrange for alternative access.

Owner further agrees to reasonably maintain all existing means of access and roads within the Landfill and to the Plant Site to permit reasonable access for those parties described above. All of the foregoing rights shall be exercised by Producer in a manner so as not to unreasonably interfere with the Owner's Management and Operation of the Landfill.

C.    Owner's Obligations. It is understood and agreed by the parties hereto that Owner's primary obligation and purpose is the efficient Management and Operation of the Landfill, and that the interests conveyed under Article II A and B shall remain secondary to such landfill management. The operation of the Project Facility and the Collection Systems shall not, therefore, unreasonably interfere with the Management and Operation of the Landfill by Owner.

Subject to these limitations, Owner shall: (i) use its best efforts to cooperate in the design (if applicable), construction, modification, development and operation of its Landfill and the Collection Systems so as to maximize the production of Landfill Gas and the delivery of Landfill Gas to the Delivery Point; (ii) not unreasonably interfere with the Producer's operation of the Plant Facility or knowingly cause the disruption or destruction of the biological decomposition of refuse material within the Landfill; (iii) use its reasonable efforts to prevent any of its independent contractors from committing such interference, disruption, or destruction; (iv) promptly repair all cracks, fissures, erosion or physical changes in, of, or to the interim and final covers at the Landfill which have an adverse material effect on the production of Landfill Gas; to the extent that such problems were caused by Producer's activities, Producer will be responsible for the cost of such repairs, if any; (v) review the design, construction, plans, drawings and specifications (collectively referred to as "Plans") of the Collection Systems or modifications thereof and approve the Plans in accordance with Article II F; (vi) cooperate in the construction, modification, development, operation and maintenance of the Project Facility, Plant Site and the approved Collection Systems at the Landfill; (vii) comply in all material respects with all applicable federal, state, county, municipal and local laws, statutes, rules, regulations, ordinances, codes, restrictions, requirements, obligations and permitting requirements relating to the Management and Operation of the Landfill, including, without limitation, all Environmental Laws; and (viii) promptly disclose to Producer all Buyer(s) or potential Buyer(s) of Landfill Gas which become known to Owner.

Owner hereby warrants to Producer and agrees to defend title to the Plant Site, the Landfill, Collection Systems and the Landfill Gas produced therefrom. Owner further represents and warrants to Producer that no part of the Collection Systems (if the same has

6

been installed) or the Landfill was financed by grants, tax-exempt bonds, subsidized energy financing, or energy credits, as such terms are defined under Section 29 of the Internal Revenue Code of 1986, as amended.  Owner further represents and warrants that the Collection Systems installed at the Landfill is  complete and is in good working condition.

      **D.**    <u>Assistance with Permits/Licenses</u>.  Permits, permit modifications, licenses, and/or approvals (collectively "Permits") may be required by Owner, Producer and/or Buyer to undertake the activities contemplated hereunder.  Owner agrees to obtain, at no expense to Producer, appropriate Permits where required for the design (if applicable), construction, modification, installation, maintenance and/or operation of the Collection Systems and to assist Producer and/or Buyer in obtaining any Permits required by Producer and/or Buyer for the Collection Systems and/or Project Facility, provided, such assistance with respect to the Project Facility is without material expense to Owner.

      **E.**    <u>Documents</u>.  As reasonably requested by Producer, Owner shall:

        1.    Allow Producer to inspect any documents in its possession regarding Landfill Gas production from the Landfill, the quantity and type of refuse in the Landfill, tipping records, etc.; and

        2.    Allow Producer to inspect any applicable environmental information, records, environmental impact reports or studies, closure plans, permits or permit applications, zoning information, including variances or variance applications, and any other available data relating to Producer's activities at the Landfill, and allow Producer to copy any such material or documents as may be in the possession of the Owner or any of Owner's agents, employees, contractors or subcontractors, except any attorney client privileged material or documents.

      **F.**    <u>Collection Systems/Project Facility</u>.

        1.    The parties acknowledge and agree that Owner designed, installed, constructed, operated and maintained the Collection Systems prior to the execution of this Agreement.  The parties agree that the existing Collection Systems may require modifications.  Subject to Owner's approval, which shall not be unreasonably withheld, Producer may, therefore, to the extent it deems necessary, modify the existing Collection Systems at the Landfill.  Any proposed modifications to the Collection Systems by Producer shall be designed and constructed to comply in all material respects with all Environmental Laws as they presently exist.  Such plans and all applicable regulatory compliances shall be submitted to Owner for its review and approval, which shall not be unreasonably withheld.  Owner shall notify Producer in a reasonable time (such time in no event to exceed 30 days) of its acceptance, rejection or requested modifications of the plans.  Where appropriate, any rejections shall be reasonable, based on the design standards set forth in this Agreement and accompanied by a detailed explanation of the reasons for the rejection.  *Owner shall also*

propose reasonable alternatives to Producer to eliminate the reasons for the rejection. Owner recognizes that delays in the approvals of these systems by Owner may delay Producer's construction schedule. Therefore, Owner agrees to exercise reasonable efforts to expedite the review and approval process. Producer will provide Owner with a complete set of "as built" plans. Owner shall have the sole responsibility, liability and expense of any further modifications or changes to the Collection Systems to the extent the modifications or changes are made to comply with any Environmental Laws or any changes, modifications or amendments to any Environmental Laws. Producer shall have the sole responsibility for all modifications and improvements made to the Collection Systems for the sole purpose of improving the quality and quantity of Landfill Gas produced at the Landfill.

2.     Producer and Buyer shall, if the Go/No Go Decision is exercised in favor of proceeding with the Project, design, install, construct, modify, operate and maintain a Project Facility at the Landfill; provided, however, the same shall not be undertaken until a Go Decision is made.

## ARTICLE III - TERM

A.     **Agreement Term**. The term of this Agreement shall commence on the date of this Agreement and end on December 31, 2012. At the end of the term, this Agreement shall terminate, unless extended for an additional period by mutual agreement of the parties.

B.     **Memorandum of Agreement**. Promptly after the execution of this Agreement, Owner and Producer shall execute a Memorandum of Agreement in an appropriate form satisfactory to Owner and Producer. Owner or Producer shall immediately thereafter record said Memorandum in the appropriate county office.

C.     **Caveats**.

1.     It is understood and agreed by Producer that Producer is relying on its own calculations and evaluation of the Landfill with respect to the rates of production of Landfill Gas. Owner does not warrant or guarantee the ability of Owner to continue operations under any Landfill Operating Permit if applicable to the Landfill.

2.     In the event the rights of Producer to extract Landfill Gas are diminished, suspended or terminated because Owner has been forced to discontinue operations at the Landfill as a result of a suspension, termination or loss of the Landfill Operating Permit for any reason whatsoever, then subject to the provisions of this subparagraph and subparagraph 3 below, Owner shall have no liability to Producer as a result of the same, and Producer hereby waives, releases and forever discharges Owner from any and all claims or obligations relating to any such diminishment, suspension or termination of Producer's ability to extract Landfill Gas; provided, however, that thereafter Owner shall exercise its best efforts to obtain for Producer or to assist Producer in obtaining the right to continue to collect, process, develop, sell and utilize all Landfill Gas collected by the Collection Systems.

8

3.      Owner hereby agrees, as a condition of the enforceability of the waiver in subparagraph 2 above, that if Owner's rights hereunder are diminished, suspended or terminated as a result of the suspension, termination or loss of the Landfill Operating Permit, Owner will use its best efforts to have the Landfill Operating Permit reissued, reinstated (or the suspension lifted) and resume operations as soon as possible.  If the same cannot be obtained or achieved within a reasonable period of time, not to exceed ninety (90) days, then Producer shall have the right to terminate this Agreement and sell the Collection Systems to Owner pursuant to paragraph 2 of Article VI of this Agreement.  The parties hereby acknowledge and agree that events set forth in subparagraph 2 of this Article III C shall not constitute a breach of this Agreement (even though Producer shall be allowed to terminate this Agreement as provided above) and to the extent such events may be interpreted to be a breach, Producer hereby waives and releases and forever discharges Owner from all claims or obligations relating to any liability arising out of such events described in subparagraph (2); provided, however, that Owner complies with its obligation to attempt to remedy the situation described in subparagraph 2 and in this subparagraph 3.

D.      **Fuel Supply Agreement.** As soon as reasonably possible after execution of this Agreement, Producer agrees to commence negotiations and to negotiate in good faith an acceptable Fuel Supply Agreement with Buyer.

## ARTICLE IV - PAYMENTS

A.      **Purchase Price for the Original Collection System.**  Upon execution of this Agreement, Producer shall pay Owner the sum of Five Hundred Forty-Five Thousand and 00/100 ($545,000.00) Dollars for the Original Collection System, as originally constructed by Owner, excluding blowers and Flares, which Original Collection System was previously purchased and conveyed on December 30, 1995.

B.      **Purchase Price for the Second Collection System.**  Upon execution of this Agreement, Producer shall pay Owner the sum of Two Hundred Seventy-Five Thousand Nine Hundred Ten and 67/100 ($275,910.67) Dollars for the Second Collection System, which has been installed, substantially completed and constructed by Northeast Contractors, Inc., pursuant to a contract dated July 10, 1996, with Owner and the final completion/acceptance shall be July 1, 1997.

C.      **License and Rental Fee.**  For all rights granted to Producer in Article II, including, without limitation, the license to extract Landfill Gas from the Landfill (except the purchase of the Collection System and lease rights to the Plant Site), Producer shall pay to Owner the following license and rental fees:

1.      A license and rental fee in the amount of Two Hundred Ten Thousand and 00/100 ($210,000.00) Dollars ("Annual License Fee") for every twelve month period, payable in advance.  The first Annual License Fee payment shall be payable upon ejection of this Agreement.  The

9

second Annual License Fee payment and each subsequent Annual License Fee payment thereafter shall be due on the anniversary date of the first sale of Landfill Gas pursuant to a Fuel Supply Agreement, with the payment in the last year being prorated based on the number of remaining days in such year.

2.  An additional license and rental fee equal to a percentage of annual Gross Revenue, as calculated on a calendar year basis, from the sale of Landfill Gas in excess of the Excluded Amount, as set forth in the attached schedule (the "Additional License Fee"). Owner and Producer agree that Owner shall not have any right, title or interest in or to Gross Revenues from the sale of Landfill Gas, but shall only have a right to the Additional License Fee measured by the annual Gross Revenue, as calculated on a calendar year basis, generated from the sale of Landfill Gas, which is indicated on the schedule attached hereto in excess of the Excluded Amount.

D.  **Commercial Operation Payment.** Producer shall pay to Owner a Commercial Operation Payment in the amount of Three Hundred Fifty Thousand and 00/100 ($350,000.00) Dollars once the following two conditions are satisfied, if ever: (1) the Companies (as defined below) or their successors and assigns (e.g. New England Power Company) approves the assignment of the Power Purchase Agreement (as defined below) from Laidlaw Gas Recovery Systems to Producer pursuant to an acknowledgement and consent agreement reasonably acceptable to Producer, and (2) Lorusso Corporation uses the Landfill Gas extracted from the Landfill as a replacement of fossil fuel in its asphalt plant pursuant to a Fuel Supply Agreement.

The "Power Purchase Agreement" shall mean the power purchase agreement dated September 7, 1994, by and between Laidlaw Gas Recovery Systems, on the one hand, and the Narragansett Electric Company ("Narragansett"), Massachusetts Electric Company ("Mass. Electric") and Granite State Electric Company ("Granite") (Narragansett, Mass. Electric and Granite are collectively referred to as the "Companies"), on the other hand.

E.  **Late Payment.** If a payment is not paid within twenty (20) days of the due date, any unpaid amounts due Owner shall bear interest at a rate of two (2%) percent above the prime rate (First Chicago NBD Bank, N.A.) in effect at the time the payment was due; provided, however, that the late payment fee shall not exceed the maximum interest rate permitted by law.

If Producer does not make payment of any amount described in paragraph A, B, C or D above within sixty (60) days of the original due date and fails to cure within ten (10) days of receipt of notice from Owner of such non-payment, such non-payment shall be considered a material default by Producer.

F.    Metering.   Producer agrees to install, maintain, and operate appropriate metering or other measuring devices so that the amount of Landfill Gas extracted by the Producer under this Agreement may be determined by Owner or its representatives.

## ARTICLE V - OPERATIONS AND STANDARDS

A.    Planning and Expansion.   Producer recognizes that future development of the Landfill may include additional facilities. Owner and Producer agree to exchange information for planning and coordination of such facilities to promote the safe and orderly development and operation of the Landfill.

B.    Operational Standards of Producer.   Producer covenants that its operations will meet the following standards:

1.    Producer shall provide proper storage, if required, for all Condensate located on the Plant Site.  Owner shall remove and dispose of all Condensate (including any located at the Plant Site) at no cost to Producer.

2.    Producer shall design and build or shall cause Buyer to design and build the Project Facility in accordance with all applicable laws, rules, regulations and permits, including any applicable Environmental Laws.

3.    Producer shall comply and shall cause Buyer to comply with all laws, rules, regulations and permits applicable to the Project Facility, Plant Site and Landfill.

C.    Interest Retained By Owner.   All materials, minerals, water, natural gas, and other items existing in, on, or under the Landfill (including, but not by way of limitation, the refuse, cell liners, the Landfill Gas until title passes to Producer at the Delivery Point, leachate, leachate collection system, Condensate, and cover) shall at all times remain the property and responsibility of Owner.

## ARTICLE VI - MIGRATION CONTROL

Except for damages caused by Producer's negligent or intentional acts or omissions, Owner shall be solely responsible for the control and containment of Landfill Gas, including, without limitation, subsurface migration and surface emission. Owner shall also have the sole responsibility and liability relating to (i) compliance with all Environmental Laws relating to Landfill Gas subsurface migration and/or surface emission, including, without limitation, monitoring activities and the handling of any remediation relating to subsurface migration or surface emission and/or (ii) any damages and liabilities of any kind or nature arising out of or relating to the violation of any such Environmental Laws by Owner and/or the failure of Owner to control or contain any Landfill Gas subsurface migration or surface emission

11

beyond or within the ground or boundaries of the Landfill.  Owner shall indemnify, hold harmless and upon request, defend Producer from and against all liability relating to the same pursuant to the indemnifications set forth herein.  Producer agrees that it will flare the Landfill Gas collected  from any migration or emission control systems if such Landfill Gas is delivered to the Flare by Owner through such migration or emission control system and if flaring such Landfill Gas is permitted under applicable Environmental Laws.  Owner's method of controlling subsurface migration and/or surface emission shall not cause the Landfill Gas supply to fall below 450 BTU per standard cubic foot of Landfill Gas at the Gas Meter ("450 BTU").

If Owner's method of controlling of subsurface migration or surface emission shall cause Landfill Gas to fall below 450 BTU or if the events described in Article III C 2 occur, then Producer shall have the option, in its sole discretion, to terminate this Agreement.  If termination for such reason occurs, then Producer's sole remedy, in addition to the foregoing termination rights, shall be to require Owner to buy the Collection Systems from Producer for a purchase price calculated as follows: if termination occurs after a Go Decision is made and before January 1, 1998, the purchase price shall equal the Purchase Price paid by Producer for such Collection Systems plus Producer's Total Construction Costs for the Collection Systems, which amounts shall have been previously approved by Owner (the "Base Price"); if termination occurs between January 1, 1998 and December 31, 2000, the purchase price shall equal the Base Price, minus an amount equal to 1/36th of the Base Price times the number of months after December, 1997 that have lapsed before Producer exercises its right to terminate.  If termination occurs on or after January 1, 2001, the foregoing provisions shall no longer be applicable and the provisions of Article IX (Removal) shall apply.

For purposes of this Agreement, the term "Total Construction Costs" shall mean all of Producer's costs and expenses reasonably and properly incurred (including a 10% markup for overhead, administration and general office expenses) relating to the design, installation, construction, modification and permitting of the Collection Systems, including, without limitation, all architect fees, engineering fees, consulting fees, labor costs, material costs associated with the design, construction, modification and permitting of the Collection Systems, all as approved by Owner in accordance with Article II F.

## ARTICLE VII - TESTING AND EVALUATION/PROJECT VIABILITY

The parties acknowledge and agree that Producer, after evaluating the economic viability and/or profitability of the Project, elected to make a Go Decision on November 25, 1996 pursuant to Article VIII of the Gas Rights Agreement, prior to its amendment by this Agreement.

## ARTICLE VIII - SURRENDER

If after a Go Decision has been made, Landfill Gas cannot be or is not being recovered or sold from the Landfill in Commercial Quantities as determined by Producer in its absolute discretion averaged over a period of forty-five (45) successive days, Producer may give Owner a Notice of Intent To Surrender. If during the next forty-five (45) days, Landfill Gas cannot be or is not being recovered or sold from the Landfill in Commercial Quantities as determined by Producer in its sole discretion, then upon written notice to Owner, Producer may, in its sole discretion, terminate this Agreement without any further liability. Upon such termination, and except for any payments owing as of the date of such termination and for any provisions of this Agreement which, by their language, survive termination, Producer and Owner shall be relieved of all obligations under this Agreement.

## ARTICLE IX - REMOVAL

During the term of this Agreement, the Project Facility and the Collection Systems and related equipment at the Landfill shall remain the personal property of Producer or Buyer (collectively, "Producer's Equipment"), notwithstanding the method or mode of installation or attachment to real property. Upon written request by Producer or Buyer, Owner shall provide a waiver or estoppel certificate from Owner or any lessee operator of the Landfills, in a form satisfactory to Producer and Owner, acknowledging that Producer's Equipment is personal property owned by Producer or Buyer and subject to right of removal by Producer.

Upon the expiration or termination of this Agreement under Article VIII or Article X A and C, but not under Article VI, the Collection Systems (which the parties acknowledge does not include any Compressor Station) shall become the personal property and responsibility of Owner and Producer shall convey the Collection Systems to Owner, free and clear of all security interests, liens, claims, mortgages and encumbrances of any kind or nature, and Producer shall have no further rights and/or responsibility with respect to the Collection Systems.

In addition, Owner shall have an option to purchase the Compressor Station and Project Facility for fair market value. This option may be exercised, if at all, within fifteen (15) days of termination or expiration of this Agreement. The Owner shall exercise such option by giving notice to Producer within such fifteen (15) day period. The notice shall specify a date for closing of the purchase, which shall not be more than fifteen (15) days after the date such notice of exercise is given. Owner must pay the purchase price in cash or in immediately available funds. If the option is not exercised by Owner, Producer may (i) sell the Project Facility and the Compressor Station to a third party and cause the third party to remove the Compressor Station and Project Facility from the Plan Site within sixty (60) days after the lapse of the option period, or alternatively, (ii) Producer shall remove the Compressor Station and Project Facility from the Plant Site within sixty (60) days after the lapse of the option exercise period.

13

## ARTICLE X - TERMINATION

**A.    Producer's Default.**  In the event that Producer at any time fails to materially perform or observe any of the material provisions of this Agreement required to be performed or observed by Producer, Owner shall notify Producer in writing of the facts relied upon as constituting a default hereunder. Producer, if in default, shall have thirty (30) days after receipt of such notice in which to complete or substantially complete compliance with such provisions, except with respect to the obligations to make payments which shall be governed by the provisions of Article IV. Owner shall have the right to terminate this Agreement upon written notice to Producer if Producer fails to complete or substantially complete such compliance efforts within the thirty (30) day period, unless (i) such failure is excused under the provisions of Article XVI hereof or (ii) compliance within thirty (30) days is not reasonably possible and so long as Producer has commenced and is diligently pursuing such compliance efforts.

**B.    Owner's Default.**  In the event that Owner at any time fails to materially perform or observe any of the material provisions of this Agreement required to be performed or observed by Owner, Producer shall notify Owner in writing of the facts relied upon as constituting a default hereunder. Owner, if in default, shall have thirty (30) days after receipt of such notice in which to complete or substantially complete compliance with such provisions. Producer shall have the right to terminate this Agreement upon written notice to Owner if Owner fails to complete or substantially complete such compliance efforts within the thirty (30) day period, unless (i) such failure is excused under the provisions of Article XVI hereof or (ii) compliance within thirty (30) days is not reasonably possible and so long as Owner has commenced and is diligently pursuing such compliance efforts.

**C.    Termination for Convenience.**  At any time after a Go Decision has been made under Article VII B, Producer may terminate this Agreement upon thirty (30) days written notice without any further obligation or liability if Producer determines in its sole discretion that the Project is not economically viable or profitable for any reason, including, without limitation, the following: (i) the Landfill can no longer produce Commercial Quantities of Landfill Gas as determined by Producer in its sole discretion; (ii) there is no Fuel Supply Agreement (on terms and conditions acceptable to Producer in its sole discretion); (iii) any Related Agreement or Permit terminates or lapses or all Related Agreements and Permits have not or cannot be obtained, as determined by Producer in its sole discretion; (iv) there is any change in the federal tax laws relating to the availability of Production Tax Credits with respect to the Project; (v) Producer at any time during the term of this Agreement shall be declared a public utility or public service corporation by any governmental body and thereby become regulated as such; (vi) financing for the Collection Systems or Project Facility terminates or lapses; and/or (vii) any other commercially legitimate business purpose or reason relating to the Project that Producer deems reasonable under the circumstances, including, without limitation, the failure of Producer to qualify for Production Tax Credits with respect to the Project or the Internal Revenue Service

14

determines or asserts that such Production Tax Credits are not available for the Project. Upon such termination, and except for any payments owing as of the date of such termination and for any provisions of this Agreement which, by their language, survive termination, Producer and Owner shall be relieved of all further obligations under this Agreement.

## ARTICLE XI - FINANCING AFFECTING THE PREMISES

Owner acknowledges that Producer may desire to finance the Project Facility and/or the Collection Systems and hereby consents to any encumbrance or lien on the machinery, equipment, fixtures and buildings that make up the Collection Systems and Project Facility for such financing, provided:

1.   Producer shall give Owner notice of the existence of such encumbrance or lien together with the name and address of the holder of such encumbrance or lien and a copy of the encumbrance or lien.

2.   That the existence of such encumbrance or lien shall not relieve Producer from any liability or responsibility for the performance of its obligations under this Agreement.

If necessary, Owner shall execute appropriate lien waivers with regard to the assets of the Collection Systems and the Project Facility. Under no circumstances, however, shall Producer cause any mortgage or other encumbrance of record to exist on the Landfill or Plant Site, except that there may be a security interest or other encumbrance such as fixture filings or collateral assignment of lease rights and other rights under this Agreement with respect to the assets constituting the Collection Systems, Project Facility and this Agreement. It is further understood and agreed that Producer shall not cross collateralize any debt relating to the Project Facility and Collection Systems with any debt relating to non-Laidlaw landfill projects, unless such debt contains a provision that the lender shall give a partial release relating to a lien on the assets of the Project Facility and Collection Systems if Owner pays an amount not to exceed the then fair market value of the assets of the Project Facility. Producer further agrees that any financing associated with the Collection Systems and/or Project Facility shall not contain a cross default provision with regard to any non-Laidlaw landfill projects. Producer shall use reasonable efforts to request and obtain from any lender who provides financing for the Project Facility or Collection Systems a non-disturbance and attornment agreement. Owner shall use reasonable efforts to request and obtain a non-disturbance and attornment agreement from any lender who provides financing for the Landfill or Owner's facility at the Landfill.

15

## ARTICLE XII - ASSIGNMENT

Except as expressly provided herein, this Agreement may not be transferred or assigned by one party without written consent of the other party, which consent shall not be unreasonably withheld.

Producer may assign this Agreement without Owner's consent to: (i) any subsidiary, parent or affiliated company or any limited liability company, partnership, corporation or other entity in which Biomass Energy Systems, Inc. has an interest of 50% or more (collectively, "Related Entity"); (ii) any limited liability corporation, partnership, corporation or other entity controlled by Producer and/or any Related Entity; or (iii) a lending institution pursuant to a collateral assignment; provided that any such assignment shall not unduly interfere with Owner's operations and rights under this Agreement and further provided that such assignee (except a lending institution) agrees to be bound by the terms of this Agreement to the same extent as Producer. No assignment by Producer shall relieve Producer of its obligations under this Agreement. Producer shall give Owner thirty (30) days prior notice of its intent to convey that interest, which notice shall contain the name and address of the proposed grantee, purchaser, or successor in interest, which information shall be kept confidential by Owner.

Owner may convey any or all of its interest in the Landfill without Producer's consent, provided that: (1) Owner shall also assign this Agreement; (2) any conveyance and assignment shall not unduly interfere with Producer's operations and rights under this Agreement, and (3) such assignee, grantee, purchaser or successor in interest agrees to be bound by the terms of this Agreement to the same extent as Owner. No assignment by Owner shall relieve Owner of its obligations under this Agreement. Owner shall give Producer thirty (30) days prior notice of its intent to convey that interest, which notice shall contain the name and address of the proposed assignee, grantee, purchaser, or successor in interest, which information shall be kept confidential by Producer. In the event of any termination of this Agreement for whatever reason, Producer agrees that, at the request of Owner, this Agreement will be assigned to a party selected by Owner. The assignment will be such to protect to the extent possible the Production Tax Credits and will relieve Producer of any further obligations. However, Producer makes no representation or warranty whatsoever with respect to availability of Production Tax Credits for the Collection Systems or this Project or any part thereof.

## ARTICLE XIII - INDEMNITY

A.    **Indemnification by Producer.** Producer shall indemnify, save harmless and, upon request, defend Owner, its officers, employees, servants, agents and independent contractors, successors and/or assigns, from and against any and all costs, claims, liabilities, damages, expenses, causes of action, suits, or judgments, including, without limitation, reasonable attorney's fees of in-house and outside counsel and all court costs and experts fees, incurred in connection with or arising out of or relating to (1) any breach of this

16

Agreement by Producer, (2) the Producer's use, occupancy, conduct or management of the Project Facility, including (i) the failure of Producer or any of Producer's officers, employees, servants, agents or independent contractors to comply in any material respects with any applicable federal, state, county, municipal and/or local laws, rules, regulations, ordinances, permits and/or requirements, with regard to the maintenance and operation of the Project Facility, including, without limitation, any Environmental Laws; (ii) the operations, acts, or omissions of any person (a) who is either controlled by or affiliated with Producer or invited onto any part of the Landfill by Producer, and (b) parties invited onto the Landfill by the Producer who are neither controlled by nor affiliated with Owner nor invited onto any part of the Landfill by Owner; (iii) any contamination or other environmental problems or difficulties whether now known or hereafter discovered that arises from any negligent, grossly negligent or intentional act or omission of Producer of any of Producer's officers, employees, servants, agents or independent contractors; and (iv) any negligent, grossly negligent or intentional act or omission of Producer or its officers, employees, servants, agents or independent contractors related to the operation of the Project Facility or (3) (i) any negligent, gross negligent, or intentional acts or omissions or Producer or its officers, employees, servants, agents or independent contractors relating to the operation of the Collection Systems (but this provision shall not apply to or impose any indemnification obligation or liability with respect to a violation of any Environmental Laws in connection with the operation of the Collection Systems) or (ii) any of Producer's officers, employees, servants, agents or independent contractors' failure to comply in any material respect with any permit requirements relating solely to the maintenance and operation of the Collection Systems.  This indemnity shall include fines directed at the Owner arising from (a) the Producer's use, occupancy, conduct or management of the Project Facility and (b) the Collection Systems to the extent liability is imposed under this Article XIII A.

Producer's indemnification of Owner under this Article XIII A shall not be applicable to the extent that liability arises from any the negligent, grossly negligent or intentional acts or omissions of Owner or any of Owner's officers, employees, servants, agents or independent contractors.

B.    Indemnification by Owner.  Owner shall indemnify, save harmless and, upon request, defend Producer, its officers, employees, servants, agents, independent contractors, Buyer, any assignee of Producer pursuant to Article XII, and parties to the Fuel Supply Agreement, successors and assigns, from and against any and all costs, claims, liabilities, damages, expenses, causes of action, suits, or judgments, including, without limitation, reasonable attorney's fees of in-house and outside counsel and all court costs and experts fees, incurred in connection with or arising out of or relating to the following: (1) the Management and Operation of the Landfill by Owner, including any violation of any Environmental Laws by Owner or any of Owner's officers, employees, servants, agents and independent contractors; (2) any breach of this Agreement by Owner; (3) any previous agreement involving the sale of Landfill Gas at the Landfill; (4) Owner's use or activities upon the Landfill prior to Producer's use thereof; (5) the subsurface migration or surface emission of Landfill Gas within or beyond the Landfill; (6) Owner's operations on or near the Landfill; (7) the operations, acts, or omissions to act of any person (a) who is either

17

controlled by or affiliated with Owner or invited onto any part of the Landfill by Owner, or (b) invited onto the Landfill by the Owner and is neither controlled by nor affiliated with Producer nor invited onto any part of the Landfill by Producer; (8) any negligent, grossly negligent or intentional act or omission of Owner or its officers, employees, servants, agents, or independent contractors; (9) the design of the Collection Systems; (10) the failure of Owner or any of Owner's officers, employees, servants, agents or independent contractors to comply with all applicable federal, state, county, municipal or local law, statute, rule, regulation, ordinance, code restrictions, permitting requirements, licensing requirements or other governmental requirements or obligations of any kind or nature (including, without limitation, any and all Environmental Laws); or (11) any contamination or other environmental problems or difficulties whether now known or hereafter discovered that arises from any negligent, act or omission of Owner or any of Owner's officers, employees, servants, agents or independent contractors or Owner's Management and Operation of the Landfill, including, without limitation, any subsurface migration or surface emission of Landfill Gas. This indemnity shall include fines directed at the Producer arising from the Owner's use, occupancy, conduct or management of the Landfill and Collection Systems to the extent liability is imposed under this Article XIII B.

Owner's indemnification of Producer under this Article XIII B shall not be applicable to the extent that liability arises from any negligent, grossly negligent or intentional act or omission of Producer or any of Producer's officers, employees, servants, agents or independent contractors.

C.    **Producer's Limitation of Liability**. Except as may be provided below, in no event shall Producer be liable to Owner with respect to any claim for breach of this Agreement for any indirect, special, incidental or consequential damages. This paragraph shall not be interpreted to eliminate or limit the Producer's indemnification obligations pursuant to subparagraph (2) and (3) of Article XIII A.

If Producer breaches this Agreement, the sole and exclusive remedy of Owner shall be to recover from Producer the actual damages for which Owner is entitled to indemnification under Article XIII A above, plus an amount equal to the present value of the payments that would have been received by Owner under this Agreement, but for such breach, assuming the Collection Systems and Project Facility would have operated at full capacity.

D.    **Owner's Limitation of Liability**. Except as may be provided below, in no event shall Owner be liable to Producer or any Buyer with respect to any claim for breach of this Agreement under Article XIII B (2) for any indirect, special, incidental or consequential damages. This paragraph shall not be interpreted to eliminate or limit the Owner's indemnification obligations pursuant to subparagraphs (1) and (3) through (11) of Article XIII B.

JAN-18-2000  15:38        BES/EES                        313 6681541    P.20/28

If Owner breaches this Agreement, the sole and exclusive remedy of Producer or any Buyer shall be to recover from Owner the actual damages for which Producer and/or Buyer are entitled to indemnification under Article XIII B above, plus an amount equal to the present value of the profits that would have been received by Producer under this Agreement and the present value of profits that would have been received by Buyer under any power purchase agreement or similar agreement (if and to the extent that Producer, Biomass Energy Systems, Inc. and/or any Related Entity has an interest in Buyer), but for such breach. As used above, "profits" shall include Production Tax Credits to the extent available. For purposes of determining the lost profits, it will be assumed that the Collection Systems and the Project Facility was operating at full capacity.

   E.    **Exclusiveness of Remedies for Breach or Termination**.  Owner and Producer expressly agree that the remedies set forth in Article XIII C and XIII D (and the indemnification obligations under Article XIII A and XIII B incorporated therein by reference) are intended to be the sole and exclusive remedies for a breach of this Agreement by the other party; notwithstanding the foregoing or anything to the contrary in this Agreement, Owner and Producer, respectively, shall each also have the right to terminate this Agreement pursuant to and subject to the conditions of Article X A and Article X B, respectively, which remedies shall be cumulative.  No other damages shall be recoverable by Owner from Producer or by Producer or such Buyer from Owner for such breach.  Notwithstanding anything to the contrary, the language of this Article XIII shall not prevent Owner, Producer or such Buyer from (i) pursuing injunctive relief or specific performance, or (ii) from arbitrating or litigating (as the case may be) any liability or indemnification matter without terminating this Agreement (i.e. the party shall not be required to terminate this Agreement in order to seek redress for a breach of the Agreement or any other matter to which the party is entitled to indemnification under the provisions of this Article XIII).

   F.    **Survival**.  All provisions of this Article XIII shall survive termination of this Agreement, by default or otherwise.

_____
Producer's Initials
(acknowledging review of indemnity)

_____
Owner's Initials
(acknowledging review of indemnity)

## ARTICLE XIV - INSURANCE

   Producer shall, at its cost and expense, at all times during the term of this Agreement, maintain in force, for the joint benefit of Owner and Producer, a broad form comprehensive coverage policy of public liability insurance by the terms of which Owner and Producer are named as an additional insured and are indemnified against liability for damage or injury to the property or person (including death) of any employee or invitee of Producer or any other person entering upon or using the Project Facility, or any structure thereon, or any part thereof, and arising from the use and occupancy thereof by Producer. Such insurance policy or policies shall be maintained in the amount of Five Million and 00/100 ($5,000,000.00)

Dollars for damage to property and Five Million and 00/100 ($5,000,000.00) Dollars for bodily injury or death in any one accident. Such insurance policy or policies shall be stated to be primary and noncontributing with any insurance which may be carried by Owner. Producer shall deliver to Owner the certificate of each insurance carrier as to each such insurance policy.  Producer will cause Buyer to maintain identical insurance coverage.

Owner agrees to name Producer and Buyer as an additional named insured on any and all comprehensive and/or public liability insurance policies maintained by Owner and related in any way to the Landfill and further agrees that such policies shall comply in all respects with the obligations imposed on Producer in the preceding paragraph under this Article XIV.  Owner shall deliver to Producer the certificate of each insurance carrier as to each such insurance policy.

Each party shall use its best efforts to obtain from their respective insurers under all policies set forth above a waiver of all rights of subrogation which the insurer might have against the other party and any party failing to do so, shall indemnify the other party against any loss or expense, including reasonable attorney fees, resulting from the failure to obtain such waiver as a result of not using such best efforts. So long as such waiver is outstanding and valid, the parties waive, to the extent of the proceeds received under such policy, any right of recovery against the other party for any loss for which it receives payment under the policy containing such waiver. Provided, however, that if at any time the insurer(s) shall refuse to permit waivers of subrogation or such waivers of subrogation cannot be obtained or are not effective, the waiver of rights of subrogation and the limitation on the right of recovery under this Article XIV shall be of no force and effect whatsoever.

## ARTICLE XV - TAXES

Producer shall, during the term of this Agreement, pay all taxes that may be levied upon or assessed against the Collection Systems, Project Facility and/or Landfill Gas used by the Project Facility, equipment and improvements constructed or installed by Producer in, on, or adjacent to the Landfill under this Agreement and/or against Producer's interest herein.

Owner shall, during the term of this Agreement, pay or arrange for the payment of all taxes that may be levied upon or assessed against the property, land, facilities, equipment and improvements owned, constructed, located or installed by Owner in, on or adjacent to the Landfill. Owner shall pay all other taxes assessed against the Landfill, except as provided in the preceding paragraph.

Each party shall be entitled to all income tax deductions, credits and benefits relating to equipment or property owned by it.

## ARTICLE XVI - FORCE MAJEURE

If by reason of Force Majeure either party is unable to carry out, either in whole or in part, its obligations herein contained, such party shall not be deemed in default during the continuation of such inability, provided that (i) the non-performing party, within two weeks after the occurrence of the Force Majeure, gives the other party written notice describing the particulars of the occurrence; (ii) the suspension of performance be of no greater scope and of no longer duration than is required by the Force Majeure; (iii) no obligations of either party which arose prior to the occurrence causing the suspension of performance be excused as a result of the occurrence; and (iv) that the non-performing party shall use its best efforts to remedy with all reasonable dispatch the cause or causes preventing it from carrying out its obligations. Producer shall have no obligation to make payments under this Agreement during the period of any Force Majeure event. Notwithstanding the foregoing, the performing party may, at its option, terminate this Agreement after six months of any such suspension of performance. Neither party shall be required to settle strikes, lockouts, or other industrial disturbances by acceding to the demands of the opposing party or parties when such course is, in its judgment, not in its best interest. A Force Majeure, as that term is defined herein, under any Fuel Supply Agreement shall be a Force Majeure under this Agreement.

## ARTICLE XVII - WAIVER

Failure on the part of Owner or Producer to complain of any action or non-action on the part of Producer or Owner no matter how long the same may continue, shall not be deemed to be a waiver by Owner or Producer of any of Owner's or Producer's rights hereunder. Further, it is covenanted and agreed that no waiver at any time of any of the provisions hereof by Owner or Producer hereunder shall be construed as a waiver at any subsequent time of the same provisions. The consent or approval of Owner or Producer to or of any action or non-action by Producer or Owner requiring Owner's or Producer's consent or approval, shall not be deemed to waive or render unnecessary Owner's or Producer's consent or approval to or of any subsequent similar action or non-action by Producer or Owner. A waiver of any of the provisions of this Agreement shall only be effective if made in writing.

## ARTICLE XVIII - RECORDS

Owner shall, upon five business days prior notice to Producer, have the right, at Owner's expense, to examine, during normal business hours and at the Plant Site the records relating to (i) the quantity and energy content of the Landfill Gas, and (ii) the revenues and adjustments, if any, received from Buyer for the sale of Landfill Gas and related byproducts.

Producer will obtain for Owner such right of inspection of Buyer's records as may be necessary to provide Owner access the records described above that are in Buyer's possession.

21

JAN-18-2000   15:39          BES/EES                          313 6681541    P.23/28

## ARTICLE XIX - CONTACTS

From time to time various administrative and technical matters may arise in connection with the terms and conditions of this Agreement which will require the cooperation and consultation of the parties and the exchange of information. As a means of providing for such cooperation, consultation and exchange, the following personnel from both parties are identified as having authority to address the situation and render a decision as a representative of that party:

        For Owner:        Vice President, Landfill Operations

        For Producer:      Curtis T. Ranger, P.E., President

## ARTICLE XX - MISCELLANEOUS

A.    Notices. All notices, demands, and other communications provided for herein shall be in writing and shall be deemed properly delivered if delivered by hand or when mailed, if sent by United States registered or certified mail, return receipt requested, postage prepaid, in either case:

    If to Owner, to:         Vice President, Landfill Operations
                                  Laidlaw Waste Systems
                                  9001 Airport Freeway, Suite 500
                                  North Richland Hills, Texas 76180

    With a copy to:       Dick Van Wyck, Esq.
                                    Laidlaw Waste Systems, Inc.
                                    3221 North Service Road
                                    P. O. Box 5028
                                    Burlington, Ontario, Canada L7R 3Y8

    If to Producer, to:      Curtis T. Ranger
                                    Biomass Energy Systems, Inc
                                    425 S. Main Street, Suite 201
                                    P. O. Box 8614
                                    Ann Arbor, Michigan 48107

    With a copy to:       Stephen Carpman, Esq.
                                    425 South Main Street
                                    Ann Arbor, Michigan 48104

Either party may specify a different address by sending the other a notice thereof in the manner provided in this Article XX A.

**B.**    <u>Severability.</u>  If any term or provision of this Agreement or the application thereof to any person or circumstance be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such terms and provisions to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby and each term and provision of this Agreement shall be valid and be enforceable to the fullest extent permitted by law.

**C.**    <u>Headings.</u>  The headings appearing in this Agreement are intended for convenience and reference only, and are not to be considered in construing this Agreement.

**D.**    <u>Disclaimer of Joint Venture, Partnership and Agency.</u>  This agreement shall not be interpreted or construed to create an association, joint venture, or partnership between Owner and Producer or to impose any partnership obligation or liability upon such parties. Neither Owner nor Producer shall have any right, power or authority to enter into any agreement or undertaking for, or act on behalf of, or to act as or be an agent of representative of, or to otherwise bind, the another party.

**E.**    <u>Governing Law.</u>  All questions with respect to the construction of this Agreement and the rights and liabilities of the parties hereunder shall be determined in accordance with the laws of the State in which the Landfill is located.

**F.**    <u>Amendment to Agreement.</u>  This Agreement may be amended or modified only by a written instrument signed by both parties hereto.

**G.**    <u>Entire Agreement.</u>  This Agreement constitutes the entire agreement between the parties hereto and supersedes and replaces all prior oral or written agreements and understandings between the parties, including, without limitation, the Gas Rights Agreement relating to the subject matter hereof.

**H.**    <u>Successors and Assigns.</u>  All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.

**I.**    <u>Producer Right to Project Facility Design.</u>  It is acknowledged that the Producer and Buyer have or will have expended considerable time and expense in developing the design for the Project Facility, and considers that design to be proprietary. The Owner agrees on behalf of itself and its agents and representatives to maintain the proprietary nature of the design by not constructing like facilities without the prior written approval of the Producer and Buyer.

**J.**    <u>Arbitration.</u>  Any and all controversies, claims or disputes arising out of or relating to this Agreement or a breach of this Agreement shall be settled by binding arbitration in the metropolitan area in which the Landfill is located in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof,

pursuant to applicable law. The parties agree that after an arbitration notice has been filed, they shall, before the hearing, make discovery and disclosure of all matters relevant to such dispute. All questions that may arise with respect to discovery and disclosure obligations (including the assertion of any privileges and protective orders regarding such discovery material) shall be referred to the arbitrator and his determination shall be final and conclusive. Notwithstanding the foregoing, a party may file a claim for equitable or injunctive relief in the appropriate court.

K.    **Consent to Jurisdiction.** Owner and Producer agree and consent to the jurisdiction of the United States Federal District Court in which the Landfill is located as the exclusive forum to resolve any disputes arising out of or relating to this Agreement as they relate to claims for equitable or injunctive relief or to enforce any arbitration award or to resolve any dispute as to whether the claim should be arbitrated, regardless of whether Owner and Producer are corporations formed under the laws of another state. Both parties further acknowledge and agree that service may be affected upon them by serving the complaint or other legal document, together with the summons, by certified mail, return receipt requested, to the address indicated in this Agreement. If either party institutes a lawsuit in any jurisdiction other than such counties, the other party shall have the right to terminate such lawsuit and remove the same to the above courts and the party initially filing the lawsuit shall be responsible for all costs and expenses, including reasonable attorney fees, incurred by the party removing the case to the forum agreed upon in this Agreement.

L.    **Authorization.** Each individual signing this Agreement warrants and represents that he has carefully read this Agreement, understands its terms and conditions and executes the same of his own free will. Any corporation or limited liability company signing this Agreement represents and warrants that the execution, delivery and performance of this Agreement by such corporation or limited liability company has been duly authorized by all necessary action of such corporation or limited liability company and is valid and binding upon such corporation or limited liability company. Upon request, each party will provide appropriate resolutions to the other party which authorize the execution of this Agreement by the individuals signing this Agreement.

M.    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute one and the same instrument. Each party shall receive a duplicate original of the counterpart copy or copies executed by it.

N.    **Further Assurances.** In addition to the agreements and notices to be delivered as herein provided, each of the parties hereto shall, from time to time upon the reasonable request of the other party, execute and deliver such additional certificates, notices and documents and shall take such other action as may reasonably be required to more effectively carry out the terms of this Agreement.

O.    **Joint and Several.** The obligations of the corporations identified as the "Owner" in this Agreement shall be joint and several.

24

**P.    Survival.**  All provisions of this Article XX shall survive termination of this Agreement by default or otherwise.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed by their respective officers duly authorized on the dates indicated below.

WITNESS:

Karen S. Mullins

Kirsten J. Reusch

Karen S. Mullins

Kirsten J. Reusch

BIOMASS ENERGY SYSTEMS, INC., a Michigan corporation

By: _____
      Curtis T. Ranger

Its: President and Authorized Representative

DATED: December 18, 1996

LAIDLAW WASTE SYSTEMS, INC., a Delaware corporation

By: _____
      Michael J. Bragagnolo

Its: Executive Vice President and Authorized
       Representative

DATED: December 18, 1996

STATE OF MICHIGAN        )
                                        ) ss.
COUNTY OF OAKLAND   )

       The foregoing instrument was acknowledged before me this 18th day of December, 1996, by Curtis T. Ranger, President of Biomass Energy Systems, Inc., a Michigan corporation, on behalf of said corporation.

_____
Nadia Denysenko, Notary Public
Macomb County, Michigan
acting in Oakland County

My commission expires: 11/29/2000

25

STATE OF MICHIGAN      )
                       ) ss.
COUNTY OF OAKLAND      )

The foregoing instrument was acknowledged before me this 18th day of December, 1996, by Michael J. Bragagnolo, Executive Vice President of Laidlaw Waste Systems, Inc., a Delaware corporation, on behalf of said corporation.

Nadia Denysenko, Notary Public
Macomb County, Michigan
acting in Oakland County

My commission expires: 11/29/2000

26

## ARTICLE IV - PAYMENTS

**C.    Additional Payments**

| GROSS REVENUE | | | ADDITIONAL LICENSE FEE BASED ON PERCENTAGE OF GROSS REVENUE IN SUCH REVENUE BRACKET |
|---|---|---|---|
| $0.00 | - | $ 260,000.00 | 0% |
| $ 260,000.01 | - | $ 487,500.00 | 30% |
| $ 487,500.01 | - | $ 731,250.00 | 35% |
| $ 731,250.01 | - | $1,218,750.00 | 40% |
| $1,218,750.01 and greater | | | 45% |

EXCLUDED AMOUNT                     $260,000.00

96-103\amendgas.pl2\121896\7

27

# EXHIBIT

# B

# RESTATED AND AMENDED GAS PURCHASE AGREEMENT

## TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS | 2 |
| ARTICLE II | PRELIMINARY ACTS OF THE PARTIES | 4 |
| ARTICLE III | FACILITIES AND RISK OF LOSS | 5 |
| ARTICLE IV | TERM | 6 |
| ARTICLE V | PURCHASE AND DELIVERY OBLIGATIONS | 6 |
| ARTICLE VI | PRICE, BILLING AND PAYMENT | 7 |
| ARTICLE VII | GAS QUALITY | 8 |
| ARTICLE VIII | UNIT OF VOLUME - MEASUREMENT | 10 |
| ARTICLE IX | OPERATIONS COORDINATION | 11 |
| ARTICLE X | FORCE MAJEURE | 12 |
| ARTICLE XI | RIGHTS AND REMEDIES UPON DEFAULT | 12 |
| ARTICLE XII | RIGHTS TO TERMINATE; SPECIAL RIGHTS TO TERMINATE; LIMITATIONS ON REMEDY | 13 |
| ARTICLE XIII | INDEMNIFICATION | 15 |
| ARTICLE XIV | INSURANCE | 16 |
| ARTICLE XV | ARBITRATION AND CHOICE OF FORUM | 16 |
| ARTICLE XVI | MISCELLANEOUS | 17 |

## RESTATED AND AMENDED GAS PURCHASE AGREEMENT

THIS RESTATED AND AMENDED GAS PURCHASE AGREEMENT ("Agreement") is made this *18* day of *November* 2002, by and between Plainville Gas Producers, Inc., a Michigan corporation, with its principal offices at 425 South Main Street, Ann Arbor, Michigan ("Seller") and Lorusso Corporation, a Massachusetts corporation, with its principal offices at 3 Belcher Street, Plainville, Massachusetts ("Buyer").

### W I T N E S S E T H:

WHEREAS, Buyer and Seller entered into a certain Gas Purchase Agreement dated September 1, 1996 which, among other things provided for the sale and purchase of landfill gas to Buyer's adjacent facility;

WHEREAS, Buyer and Seller desire to amend and restate the terms of the Gas Purchase Agreement and replace it in its entirety with this Restated and Amended Gas Purchase Agreement;

NOW, THEREFORE, In consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, Seller and Buyer agree as follows:

### ARTICLE I

### DEFINITIONS

In this Agreement, the following terms shall have the following meanings and definitions:

**1.1** **Applicable Laws**. The term "Applicable Laws" shall mean any and all applicable federal, state, county and local laws, statutes, rules, regulations and permits, including, without limitation, any and all applicable Environmental Laws.

**1.2** **BTU**. The term "BTU" shall mean British Thermal Unit and is defined as a unit of energy equal to the heat needed to raise the temperature of one pound of water from sixty (60) degrees Fahrenheit to sixty-one (61) degrees Fahrenheit at a constant pressure of one standard atmosphere. The BTU equivalent on a dry basis at 14.65 psia may be obtained by multiplying the BTU so measured by the factor 1.012.

**1.3** **Buyer's Facility**. The term "Buyer's Facility" shall mean and consist of Buyer's operations, which are adjacent to the Landfill, including, without limitation, any additional metering stations installed by Buyer, any pipeline for the delivery of Landfill Gas after the Delivery Points and processing equipment.

**1.3.1** **Buyer's Electric Generation Facility**. The term "Buyer's Electric Generation Facility" shall mean that equipment purchased and installed by Buyer, or an affiliate of Buyer in which Buyer has an interest of sixty (60%) percent or more, to generate electricity. For purposes of this Agreement, Buyer's Electric Generation Facility shall be considered part of Buyer's Facility. All costs for construction and operation of Buyer's Electric Generation Facility

shall be incurred and paid for by Buyer. Seller shall have no obligation to incur or pay for any expenses or costs associated with Buyer's Electric Generation Facility, notwithstanding any other provision of this Agreement.

    **1.4**   **Commercial Quantities**. The term "Commercial Quantities" shall mean the amount of Landfill Gas that can be extracted from the Landfill by Seller of such quantity and/or quality that it is economically viable and profitable for Seller to sell the Landfill Gas to Buyer under this Agreement, as determined by Seller in its sole discretion.

    **1.5**   **Delivery Year**. The term "Delivery Year" shall mean a one year period commencing on September 1.

    **1.6**   **Delivery Points A and B**. The term "Delivery Points" shall mean Delivery Point A and Delivery Point B shall mean the discharge side of Seller's meter located at each respective Delivery Point. A diagram showing the approximate location of Buyer's Facility, Flare, the two meter locations Delivery Point A and Delivery Point B, is set forth on Exhibit A.

    **1.7**   **Easements and Permits**. The term "Easements and Permits" shall mean all permits, licenses, approvals, consents, authorizations, easements from any third parties (including any governmental authorities), agreements and rights of way required for or reasonably necessary for either of the parties to perform their respective obligations under this Agreement, including, without limitation, all easements, approvals, consents, plant site designations and agreements to be obtained and/or executed by Seller under the Gas Rights Agreement.

    **1.8**   **Environmental Laws**. The term "Environmental Laws" shall mean any and all applicable federal, state, county, municipal and local laws, statutes, rules, regulations, ordinances, codes, restrictions, permitting requirements, licensing requirements and any other governmental requirements or obligations of any kind or nature relating to (1) environmental pollution, contamination or other impairment of any kind or nature, (ii) the construction, installation, repair, maintenance or operation of either Buyer's Facility or Seller's Facility and/or (iii) any hazardous waste or other toxic substances of any nature, whether liquid, solid and/or gaseous, including, without limitation, smoke, vapor, fumes, soot, radiation, acids, alkalis, chemicals, wastes, by-products and recycled materials. These Environmental Laws shall include, but not be limited to, the Federal Solid Waste Disposal Act, the Federal Clean Air Act, the Federal Clean Water Act, the Federal Resource Conservation and Recovery Act of 1976, the Federal Comprehensive Environmental Responsibility Cleanup and Liability Act of 1980, all as amended from time to time, regulations of the Environmental Protection Agency, regulations of the Nuclear Regulatory Commission, regulations of any state department of natural resources or state environmental protection agency now or at any time hereafter in effect and all applicable local ordinances, rules, regulations and permitting or licensing requirements.

    **1.9**   **Flare**. The term "Flare" means the equipment used for the burning of Landfill Gas with subsequent emission into the atmosphere. Such Flare may also be used for the treatment of condensate.

    **1.10**   **Force Majeure**. The term "Force Majeure" or "Force Majeure Event(s)" shall mean acts of God; wind, hurricanes, tornadoes, fires, epidemics, landslides, floods; strikes, lock-outs; or other industrial disturbances; acts of public enemies; new laws and/or regulations and changes to existing laws and/or regulations if the same make it economically impractical to operate the Landfill, the gas collection system at the Landfill, or Seller's Facility or Buyer's

Facility; acts, failures to act, or orders of any kind of any governmental authorities; insurrections; inability to procure materials or services; military action; war, whether or not it is declared; sabotage; riots; civil disturbances; explosions; equipment & breakdowns; or any cause or event, not reasonably within the control of the party claiming Force Majeure other than the financial inability of such party caused by factors or events other than any of the factors and/or events set forth in this Article 1.11. In addition, the occurrence of any of the events set forth in Article 12.2(c) through Article 12.2(h) shall also constitute Force Majeure events for Seller under this Agreement, thereby providing Seller with right to suspend performance under this Agreement pursuant to and in accordance with Article X of this Agreement as well as the right to terminate this Agreement pursuant to and in accordance with Article 12.2 of this Agreement.

**1.11   Gas Rights Agreement**.  The term "Gas Rights Agreement" shall mean the Plainville Landfill Gas Rights Agreement dated December 18, 1996 between DTE Biomass Energy, Inc., ("Biomass") and Allied Waste Systems, Inc. formerly known as Laidlaw Waste Systems ("Laidlaw"),as amended in the Amendment Dated November 1, 2000 and as the same may be amended from time to time.  Buyer acknowledges that he is in possession of the Gas Rights Agreement, has read the same and understands the terms and conditions contained therein.

**1.12   Landfill**.  The term "Landfill" shall mean the Plainville Landfill currently owned by Allied Waste Systems in Plainville, Massachusetts.

**1.13   Landfill Gas**.  The term "Landfill Gas" shall mean landfill gas, consisting primarily of methane and carbon dioxide that is produced from decomposing refuse within the Landfill.

**1.14   MMBTU**.  The term "MMBTU" shall mean one million BTUs.

**1.15   Seller's Facility**.  The term "Seller's Facility" shall mean a Landfill Gas transmission facility, a pipeline for delivery of Landfill Gas to Buyer at Buyer's Facility, metering equipment and any miscellaneous or ancillary equipment necessary for the transmission of the Landfill Gas.

## ARTICLE li

## PRELIMINARY ACTS OF THE PARTIES

**2.1   Easements and Permits.**  Buyer and Seller have obtained all Easements and Permits.  Each party shall use reasonable efforts to support and assist the other party in obtaining any other Easements and Permits which may be needed for the purposes of this Agreement and to maintain in full force and effect all existing Easements and Permits. Included, without limitation, among the Permits that Buyer shall obtain and keep in full force and effect shall be the air permit that Buyer needs to obtain, maintain or update to use Landfill Gas as a fuel source (the "Air Permit").

Buyer and Seller have executed an easement agreement granting to Seller an exclusive easement during the term of this Agreement, along a mutually agreeable route determined by Seller and Buyer, twenty-five feet in width, together with necessary access and working area, extending from the boundary of Buyer's Facility. Such easement shall only be for the purpose of Seller complying with its obligations under this Agreement, including, but not limited to, constructing, operating, inspecting, maintaining, protecting, marking, relocating, repairing,

4

replacing and changing the size of a pipeline for the purpose of transporting Landfill Gas to the Delivery Points. Seller shall have reasonable right of ingress and egress to and from such easement, on, over and across Buyer's property, for the duration of said easement.

The easement provides that, upon termination of this Agreement, Seller shall, at its sole cost and expense, execute all documents necessary to terminate the easement, and shall properly close and seal or remove said pipeline consistent with all Applicable Laws and substantially restore Buyer's property to its original condition, normal wear and tear excepted. The easement shall not terminate until Seller completes these activities, which Seller agrees to conduct with all dispatch.

  **2.2    Public Utility Status.** Seller does not intend to be a public utility or public service corporation by reason of the extraction, delivery, sale or purchase of Landfill Gas under this Agreement or any other agreement or contract under the laws of the State of Massachusetts or be subject to the jurisdiction of the Massachusetts Department of Public Utilities. Seller may seek to obtain a ruling from the appropriate governmental or regulatory agency that Seller will not be regulated as a public utility or public service corporation.

  **2.3    Supply of Landfill Gas.** Seller represents and warrants that, for the period of time covered by the term of this Agreement, Seller generally has the right to extract and sell all the Landfill Gas at the Landfill, pursuant to, subject to, and in accordance with the terms and conditions of the Gas Rights Agreement, including the Landfill owner's obligation to control surface emission and subsurface migration of Landfill Gas for environmental reasons.

  **2.4    Assumption of Risk by Buyer.** Notwithstanding anything in this Agreement to the contrary, Buyer understands and agrees that in entering into this Agreement, Seller is not guaranteeing the delivery of Landfill Gas to Buyer, that the supply of Landfill Gas may be interrupted or the delivery of the Landfill Gas may become commercially impracticable and Buyer willingly and knowingly accepts these risks.

## ARTICLE III

### FACILITIES AND RISK OF LOSS

  **3.1    Seller's Facility.** Subject to the terms and conditions of this Agreement, Seller shall, at Seller's expense (except as provided in this Article 3.1) operate and maintain Seller's Facility in a manner reasonably necessary to deliver the Landfill Gas to Buyer at Buyer's Facility. Seller represents and warrants that Seller shall operate and maintain Seller's Facility in material compliance with all Applicable Laws.

  Buyer and Seller agree that modifications to Seller's Facility are required to deliver Landfill Gas to Buyer's Electric Generation facility. The scope and estimated cost of the necessary modifications to Seller's Facility are shown in Exhibit B. Buyer agrees that Buyer will reimburse Seller for Seller's actual costs for completion of these modifications within 30 days of receipt of invoices documenting such costs. Seller agrees to coordinate with Buyer the completion of such modifications and to accommodate Buyer's requests regarding the scope of such modifications, subject to compliance with Seller's standard practices for completion of such modifications to Seller's facilities.

  **3.2    Buyer's Facility.** Subject to the terms and conditions of this Agreement, Buyer shall construct, operate and maintain Buyer's Facility in material compliance with all Applicable

Laws, including any modifications made to Buyer's Facilities to allow Buyer to use the Landfill Gas. Except for any expenses Seller agrees to pay under Article 3.1, Buyer shall bear all expenses of the construction, maintenance and operation of Buyer's Facility.

    **3.3**    **Construction Schedule**. The parties agree that they will cooperate with each other in good faith with respect to the modifications to Seller's Facility with the goal, but not the contractual commitment, to complete such construction by December 31, 2002. Each party shall have the right to inspect the other's Facility and the progress of construction during normal business hours upon reasonable notice, provided that such inspection does not interfere with the construction of the applicable Facility or normal business operations and provided further that a representative of both Buyer and Seller is present during such inspection

    **3.4**    **Risk of Loss**. For all Landfill Gas delivered to Delivery Point A, title, risk of loss and assumption of liability shall pass to Buyer when it passes through Delivery Point A and is accepted by Buyer. Buyer shall accept all Landfill Gas delivered to Delivery Point A that meets or exceeds the quality and specifications set forth in Article 7.1. For all Landfill Gas delivered to Delivery Point B, title, risk of loss and assumption of liability shall pass to Buyer when it passes through Delivery Point B.

## ARTICLE IV

## TERM

    This Agreement shall be effective from the date of this Agreement and, unless terminated as otherwise provided herein, shall continue in full force and effect until December 31, 2017. At the end of the original term of this Agreement, this Agreement shall automatically terminate, unless extended by mutual agreement of the parties.

## ARTICLE V

## PURCHASE AND DELIVERY OBLIGATIONS

    **5.1**    **Delivery Volumes**. Subject to the terms and conditions of this Agreement, Seller agrees to sell to Buyer and Buyer agrees to buy from Seller, all of the Landfill Gas that is actually produced by Seller from the Landfill.

    **5.2**    **Pricing of Landfill Gas**. The pricing of Landfill Gas shall be subject to the take or pay provisions set forth in Article VI below.

    **5.3**    **Buyer's Obligation To Buy All Fuel Requirements**. If Seller complies with the standards set forth in Article 7.1, Buyer shall purchase all of the "fuel " (as defined below) for Buyer's Facility from Seller. If Seller is unable to deliver the Landfill Gas, or any part thereof at the rate needed for Buyer's fuel consumption at Buyer's Facility, Buyer will use Landfill Gas as the fuel source of first choice to the extent it is delivered by Seller and satisfies the standards of Article 7.1, except as provided in the last paragraph of this Article 5.3. This provision will not relieve Buyer of its obligation to buy all the Landfill Gas as provided in Article 5.1.

    Buyer and Seller agree that Buyer may need to use other fuels (rather than Landfill Gas) in connection with (1) the start-up of the operations at Buyer's facility after a shutdown of such power plant(s), (2) a situation where a future federal, state, local or county permit limits the

6

usage of Landfill Gas, (3) periodic air emissions testing under applicable law or (4) similar other unexpected limited circumstances, limited in terms of scope and duration, relating to technical, operational matters unique to the operation of Buyer's facilities and in such circumstances, the use of such alternative fuels (i.e. Number 2 fuel oil or waste oil) shall not be a violation of Buyer's obligations under this Article 5.3. Buyer represents and warrants to the best of its knowledge none of Buyer's Facility is subject to any present state, federal, county or local permit limitations of any kind or nature that would restrict the use of Landfill Gas as Buyer's fuel source.

5.4    **Disclaimer Regarding Landfill Gas.**    Notwithstanding anything in this Agreement to the contrary, nothing in this Article V or any other provision or Article of this Agreement shall be interpreted as Seller guaranteeing the quantity or quality of Landfill Gas or the rate at which Seller can supply Landfill Gas to Buyer, only that Seller will use reasonable efforts to supply such Landfill Gas to Buyer (as distinguished from another buyer) in the quantities set forth in Article 5.1, 5.2 and 5.3 of this Agreement (but not necessarily at the rate needed by Buyer) if Seller is reasonably able to produce and deliver the same to Buyer, and Seller's obligation to deliver Landfill Gas shall at all times be subject to the terms and conditions of this Agreement. Moreover, Seller's failure to deliver Landfill Gas, in whole or in part, at any time during the term of this Agreement, including, without limitation, the failure to deliver the quantity or quality of Landfill Gas to Buyer and the failure to deliver at the rate needed by Buyer, shall not be a breach of Seller's obligations under this Agreement, shall not be a default or event of default by the Seller under this Agreement, shall not entitle Buyer to terminate this Agreement and shall not give rise to any choses in actions, lawsuits or claims of any kind or nature by Buyer against Seller under this Agreement, at law or in equity or otherwise, including, without limitation, any claim for direct, consequential or special damages, which are hereby expressly excluded and disclaimed.

## ARTICLE VI

## PRICE, BILLING AND PAYMENT

6.1    **PRICE**

(a)    **Landfill Gas Delivered to Delivery Point A.**

During the term of this Agreement, Buyer shall pay to Seller an amount equal to the Price (as defined below) per MMBTU for each MMBTU of Landfill Gas delivered by Seller to Buyer at Delivery Point A and accepted by Buyer (as defined in Section 6.1 (c) below). The Price, on a MMBTU basis, for all volumes of Landfill Gas delivered to Delivery point A and accepted by Buyer shall be fifty cents (50¢) per MMBTU.

(b)    **Landfill Gas Delivered to Delivery Point B.**

During the term of this Agreement, Buyer shall pay to Seller an amount equal to ten cents ($.10) per MMBTU for each MMBTU of Landfill Gas delivered by Seller to Buyer at Delivery Point B.

(c)    **"Accepted by Buyer".**  As used in this Agreement, the term "accepted by Buyer" shall mean that Buyer shall accept the Landfill Gas at Delivery Point A if the Landfill

Gas satisfies the requirements of Article 7.1, and Buyer shall not have the discretion to reject or to refuse to use such Landfill Gas as its energy source as Buyer has agreed in this Agreement to purchase and use the Landfill Gas as its fuel source pursuant to and as provided in Article V of this Agreement.

6.2    **Taxes**.  No taxes of any kind or nature with respect to the sale of Landfill Gas are contemplated as of the date of this Agreement, including, without limitation, any federal, state, municipal and local sales taxes, use taxes, transportation taxes, delivery taxes imposed upon the sale, use, transportation and/or delivery of Landfill Gas by Seller to Buyer under this Agreement, excluding, however, any taxes measured by Seller's income (collectively, "Landfill Gas Sales Taxes").  If Landfill Gas Sales Taxes exist under applicable law as of the date of this Agreement ("Existing Landfill Gas Sales Taxes"), Seller shall pay such Existing Landfill Gas Sales Tax.  If any Landfill Gas Sales Taxes are enacted, imposed or assessed after the date of this Agreement ("Future Landfill Gas Sales Taxes"), Buyer shall pay or reimburse Seller for such Future Landfill Gas Sales Taxes, even if such Future Landfill Gas Sales Taxes are applied retroactively to sales of Landfill Gas occurring before the enactment, assessment or imposition of such Future Landfill Gas Sales Taxes.  Future Landfill Gas Sales Taxes shall be paid by Buyer to Seller as part of the monthly invoices for the Landfill Gas.  Upon request, Seller shall provide Buyer with reasonably appropriate documentation that such taxes have been assessed or imposed and/or paid by Seller.

6.3    **Billing and Payment**.  Sales of Landfill Gas (including any taxes to be reimbursed under this Agreement) shall be invoiced monthly, which sales shall be measured and billed on a MMBTU basis by multiplying the BTU content of the Landfill Gas by the volume of Landfill Gas.  Payment is due within thirty (30) days from invoice date.  Delinquent payments are subject to a late payment charge of one (1%) percent per month (commencing thirty days after the invoice date), and, subject to the provisions of Article XI, Buyer shall reimburse and indemnify Seller for all costs and expenses, including costs, expenses and reasonable attorney's fees, incurred by Seller in collecting such amounts.

## ARTICLE VII

## GAS QUALITY

7.1    **Specifications With Respect to Delivery Point A and B**.

(a)    Seller shall use reasonable efforts to deliver the Landfill Gas at Delivery Point A and at Delivery Point B at a BTU content range of four hundred (400) to five hundred and fifty (550) BTU per cubic foot of Landfill Gas when the gas is saturated with water vapor, at a temperature of sixty degrees (60°) Fahrenheit and at an absolute pressure equivalent to thirty inches (30") of mercury at thirty-two degrees (32°) Fahrenheit.

(b)    Seller shall use reasonable efforts to deliver Landfill Gas to Buyer at a pressure of ten (10) psig at Delivery Point A, plus or minus twenty (20%) percent.

(c)    Buyer and Seller will mutually agree on the delivery pressure at Delivery Point B.  The final delivery pressure at Delivery Point B will influence those modifications to Seller's Facility discussed in Article 3.1 above which shall be mutually agreed upon by Buyer and Seller and the cost of which will be paid by Buyer to Seller.

8

7.2    Failure to Meet Quality Specification.  If the Landfill Gas delivered hereunder to Delivery Point A fails (1) to contain a minimum of four hundred (400) BTU per cubic foot of Landfill Gas, computed as provided above, or (ii) the Landfill Gas is delivered at a pressure that does not satisfy Article 7.1(b) ("Nonconforming Gas") for a period of time of not less than seven (7) consecutive days, either party shall immediately notify the other party orally (and in writing within five (5) days thereafter) of the Nonconforming Gas.  Buyer shall have the right to (i) purchase the Nonconforming Gas for the purchase price set forth in Article VI or (ii) refuse to accept the Nonconforming Gas, in which event the Nonconforming Gas shall be diverted to Delivery Point B and Buyer shall not have to pay for any Nonconforming Gas so diverted, notwithstanding anything in Article VI to the contrary.  The parties agree to work in good faith and cooperate to remedy any problems that caused the Landfill Gas to become Nonconforming Gas.  If Buyer has previously elected not to purchase Nonconforming Gas, Buyer shall resume purchasing the Landfill Gas as soon as reasonable possible, but in no event more than seven (7) days after Buyer's receipt of notification from Seller that Seller is able to deliver Landfill Gas containing at least four hundred (400) BTU per cubic foot at the pressure set forth in Article 7.1 (b), which notice need not be in writing.

Notwithstanding anything in this Agreement to the contrary,

(a)    Seller's delivery of Nonconforming Gas shall not be a breach of Seller's obligations under this Agreement, shall not be a default or event of default under this Agreement, shall not entitle Buyer to terminate this Agreement and shall not give rise to any choses in action, lawsuits or claims of any kind or nature by Buyer against Seller under this Agreement, at law or in equity or otherwise, including, without limitation, any claim for direct, consequential or special damages, which are hereby expressly excluded and disclaimed; and

(b)    In the event of delivery of Nonconforming Gas for seven (7) consecutive days and Buyer has elected not to purchase such Nonconforming Gas, all as provided above, Buyer's sole and exclusive remedy shall be to not pay for such Nonconforming Gas diverted to Delivery Point B until such time as and when, if ever, the Landfill Gas conforms to the specifications in Article 7.1.

7.3    Disclaimer of Warranties.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLER IS NOT MAKING ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE AS TO THE LANDFILL GAS, HEREBY EXCLUDING, WITHOUT LIMITATION, ANY AND ALL REPRESENTATIONS AND/OR WARRANTIES AS TO THE QUANTITY, THE RATE AT WHICH SELLER CAN PRODUCE AND/OR DELIVER LANDFILL GAS TO BUYER, THE QUALITY OF THE LANDFILL GAS DELIVERED BY SELLER TO BUYER PURSUANT TO THIS AGREEMENT AND SELLER'S ABILITY TO DELIVER ANY LANDFILL GAS DURING THE ENTIRE TERM OF THIS AGREEMENT. THE PARTIES AGREE THAT ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, ARE EXCLUDED FROM THIS TRANSACTION AND DO NOT APPLY TO ANY LANDFILL GAS SOLD HEREUNDER.

)

## ARTICLE VIII

## UNIT OF VOLUME - MEASUREMENT

**8.1    Unit of Volume.**  Except for the determination of heating value, the unit of volume for measurement of Landfill Gas delivered hereunder will be one (1) cubic foot of Landfill Gas at a base temperature of sixty degrees (60) Fahrenheit and at an absolute pressure of fourteen and seventy-three hundredths (14.73) pounds per square inch.  All fundamental constants shall be in accordance with the standards prescribed in the American Gas Association Manual with any subsequent amendments which may be mutually acceptable to Buyer and Seller.  All quantities set forth in this Agreement, unless otherwise expressly stated, are in terms of one thousand (I 000) of such units (MCF).

### 8.2    Metering

(a)    **Meter Station.**  Seller shall, at its own expense, install two metering stations for the measurement of the Landfill Gas delivered under this Agreement; one metering station will be located at Delivery Point B and the other shall be located at Delivery Point A. The approximate location of the metering stations is set forth on __Exhibit A__.  Such meter stations shall include a continuous recording device to measure heating value and a flow meter, compensated for pressure and temperature, capable of measuring the volume of Landfill Gas delivered each hour.

Buyer may also install, at Buyer's expense, metering stations for the measurement of the Landfill Gas delivered to Buyer which shall not unreasonably interfere with Seller's metering stations nor interfere with the flow of the Landfill Gas.  Each Party shall have access to the other's metering equipment at all reasonable times; provided, however, that Seller's metering station shall be controlling in determining the Landfill Gas volumes and MMBTUs delivered during a delivery period, unless such metering equipment is not accurate, in which event, the provisions of Article 8.2 (b) below shall govern.

Buyer shall reimburse Seller for all reasonable costs and expenses incurred by Seller in connection with operation, maintenance, testing, readings, calibrations and adjustments of Buyer's meters (if Buyer has requested such services of Seller and Seller has agreed to perform such services), including, without limitation, salaries, engineering costs and the cost of repairing and maintaining Buyer's metering system.

(b)    **Meter Tests.**  Seller shall keep metering equipment accurate and in repair, making such periodic tests by a third party acceptable to both parties as Seller deems necessary, but at least once each year.  At either parties' option and expense, a subsequent test in advance of the next scheduled test may be ordered, Seller shall give Buyer reasonable advance notice of any such test so that Buyer may have 'its representatives present.  Buyer may request a special test of either party's equipment at any time.  The expense of such special test shall be borne by Buyer if the equipment is found to be inaccurate by less than five (5%) percent.  If, upon any test, the equipment is found to be inaccurate so that it affects the measurement accuracy by more than five (5%) percent, meter readings shall be corrected for a period extending back to the time such inaccuracy first occurred if that time can be ascertained. If that time is not ascertainable, corrections shall be made based upon Buyer's meters, provided they can be proven to be accurate for the period of time in dispute, failing which corrections shall be made based on one-half of the elapsed time since the last previous meter calibration of Seller's meters.

10

## ARTICLE IX

## OPERATIONS COORDINATION

**9.1.    Meetings**.  Representatives of both parties shall meet regularly and develop procedures for coordination of the parties' operations and maintenance of their respective facilities during the term of this Agreement.  Each party shall designate the individual who should receive communications regarding operational matters, scheduling of maintenance, etc.

**9.2    Buyer's Rights to Support Seller**.

**(a)    Collection System Upgrades**.  Buyer may request Seller to make improvements or upgrades ("Upgrades") in the gas collection system, other than those required to maintain the existing level of services and product as provided in this agreement, at the Landfill at Buyer's expense.  Seller will review the request for Upgrades and if such request is acceptable to Seller and complies with the provisions of the Gas Rights Agreement, Seller will provide Buyer with a cost estimate for the requested Upgrades and a payment schedule including the timing and scope of payments to be made by Buyer.  Buyer will pay Seller for all such costs including, direct costs incurred by Seller, subcontractor costs plus a 20% construction management fee to Seller.  Upon Buyer's approval, Seller will proceed with the implementation of the requested Upgrades.  If Seller fails to respond to any such request for Upgrades made under this provision in Article 9.2(a) within 45 days, then Buyer will be free to proceed with implementation of its desired Upgrade at its own expense.  Any such Upgrades will be made consistent with and in accordance with the provisions of the Gas Rights Agreement and all applicable Environmental Laws and other applicable laws and regulations.  Buyer will be solely responsible for the costs to repair or replace any portion of Seller's Facility or the Landfill owner's property damaged as a result of any actions by Buyer in making such upgrades and will indemnify and hold Seller harmless from any claims against Seller resulting from Buyer's implementation of such Upgrades.

**(b)    Routine Operation of Seller's Facility**.  Buyer may, from time to time, request approval from Seller to assist Seller in the operation of Seller's Facility.  It is anticipated that this assistance would include such tasks as equipment start up.  Seller agrees to develop procedures for notification and approval of such operational assistance to be provided by Buyer.  Buyer will be solely responsible for any costs it incurs with regard to any such operational assistance.  Buyer will be solely responsible for the costs to repair or replace any portion of Seller's Facility damaged as a result of any actions by Buyer in providing such operational assistance.  If Seller fails to respond to any such request to provide operational assistance made under this provision in Article 9.2(b) within 21 days, or shorter time as determined by the Buyer under the circumstances, then Buyer will be free to proceed with such operational assistance at its own expense.  Any such operational assistance will be made consistent with and in accordance with the provisions of the Gas Rights Agreement and all applicable Environmental Laws and other applicable laws and regulations.  Buyer will be solely responsible for the costs to repair or replace any portion of Seller's Facility or the Landfill owner's property damaged as a result of any actions by Buyer in such operational assistance and will indemnify and hold Seller harmless from any claims against Seller resulting from Buyer's implementation of such operational assistance.

## ARTICLE X

## FORCE MAJEURE

If by reason of any Force Majeure event (including, without limitation, a Technological Force Majeure) either party is unable to carry out, either in whole or in part, its obligations herein contained, such party shall not be deemed in default during the continuation of such inability, provided that: (i) the non-performing party, within two weeks after the occurrence of the Force Majeure event, gives the other party written notice describing the particulars of the occurrence; (ii) the suspension of performance be of no greater scope and of no longer duration than is required by the Force Majeure event; (iii) no obligations of either party which arose prior to the occurrence causing the suspension of performance be excused as a result of the occurrence; and (iv) that the non-performing party shall use all reasonable efforts to remedy with all reasonable dispatch the cause or causes preventing it from carrying out its obligations. Notwithstanding the foregoing, the performing party may, at its option, terminate this Agreement after eighteen (18) months of any such suspension of performance. Neither party shall be required to settle strikes, lockouts, or other industrial disturbances by acceding to the demands of the opposing party or parties when such course is, in its judgment, not in its best interest.

## ARTICLE XI

## RIGHTS AND REMEDIES UPON DEFAULT

**11.1    General Provisions**. Except for the failure of Buyer to pay any amounts owed to Seller under this Agreement ("Payment Default"), in the event of a breach of or default under this Agreement by either party, the non-defaulting party shall provide written notice to the breaching or defaulting party and allow such party ninety (90) days to cure such breach or default ("Cure Period"). If such breach or default is not cured within the Cure Period, the non-defaulting party shall have the right to pursue any and all rights and remedies available under this Agreement, at law or, in equity or otherwise, except to the extent that such right and remedies are limited, excluded or disclaimed by this Agreement. Subject to the exclusions and limitations set forth in this Agreement, all rights and remedies shall be cumulative and shall be in addition to, and not in lieu of, any other rights and remedies available to the non-defaulting party and the election to pursue one remedy shall not preclude the election to pursue another remedy.

Notwithstanding the first paragraph of the Article 11.1, if Buyer breaches or defaults under this Agreement by refusing to accept or to purchase the Landfill Gas or any part thereof in accordance with this Agreement, Buyer shall be liable to Seller solely for liquidated damages in an amount equal to all costs and expenses of any kind or nature incurred by Seller in connection with construction of Buyer's Facility and modifications to Seller's Facility, including, without limitation, all fees of engineers and consultants, permitting costs, attorneys fees, and all related costs and expenses, as well as all costs and expenses, including costs and reasonable attorneys fees and arbitrator fees incurred in collecting such liquidated damages. The parties acknowledge and agree that at this time, it is not possible to determine accurately Buyer's actual damages with a reasonable degree of certainty, and therefore, these liquidated damages are reasonable under the circumstances and not a penalty. The parties further acknowledge and agree that Seller shall not have any further liabilities or claims against Buyer under this Agreement, at law or in equity, including any claim for direct, special or consequential damages, which are hereby expressly excluded and disclaimed, except that Buyer shall be

12

obligated to pay Seller any amounts otherwise owed to Seller under this Agreement as of the date of termination and the parties shall continue to be liable for those tort based actions, and only those tort based actions, for which indemnification is to be provided under Article XIII below.

Notwithstanding the first paragraph of the Article 11.1, Buyer's sole and exclusive remedy for Seller's breach or default (after the lapse of any applicable cure period) is to terminate this Agreement as provided for and subject to the limitations and exclusions set forth in Article 12.1 below. The parties further acknowledge and agree that in light of Seller's incurrence of substantial financial obligations and the fact that it is not possible to determine accurately at this time Buyer's actual damages, if any, with a reasonable degree of certainty, Buyer's sole and exclusive remedy is reasonable under the circumstances and not a penalty.

**11.2    Payment Defaults**. With respect to any Payment Default by Buyer, Seller shall also have the rights and remedies referred to in the preceding paragraph of this Article and the following additional rights and remedies:

(a)    The right to suspend performance under this Agreement until payment is received by Seller, without terminating the Agreement and without any liability or obligation to Buyer; and

(b)    The right to obtain the amounts owed to Seller by proceeding to arbitration as provided in this Agreement, without terminating this Agreement and without any liability or obligation to Buyer.

With respect to a Payment Default by Buyer, Seller shall provide Buyer with written notice of such default and Buyer shall have a Cure Period of ten (10) days from the date of mailing such notice.

Buyer shall not be in Payment Default under this Agreement if Buyer timely pays the undisputed portion of any amount owed to Seller, and Buyer pays the disputed portion into escrow with the arbitrator within sixty (60) days of the invoice date, who shall resolve the dispute pursuant to the provisions of this Agreement: provided that Buyer's determination of the disputed portion of any amount owed to Seller must be made in good faith. The prevailing party in the arbitration proceeding with respect to the disputed portion of any amount owed to Seller shall be awarded all costs, expenses and reasonable attorney fees by the arbitrator, notwithstanding anything in this Agreement to the contrary.

All provisions of Article XI shall survive termination of this Agreement, by default or otherwise.

### ARTICLE E XII

### RIGHTS TO TERMINATE: SPECIAL RIGHTS TO TERMINATE; LIMITATIONS ON REMEDY

**12.1    Buyer's Right To Terminate.**  Buyer may terminate this Agreement by written notice to Seller submitted not later than ten (10) days following the occurrence of the initiation of any involuntary proceeding against Seller under the bankruptcy or insolvency laws, which involuntary proceeding is not dismissed for sixty (60) consecutive days, or the initiation by Seller of a voluntary proceeding under the bankruptcy or insolvency laws.

If Seller breaches or defaults under this Agreement, Buyer shall notify Seller in writing of such breach or default, whereupon Seller shall have the right to cure such breach or default as provided in Article XI above. If Seller does not cure such breach or default within the applicable Cure Period, Buyer's sole remedy shall be limited to terminating this Agreement by providing thirty (30) days written notice to Seller of Buyer's intention to terminate this Agreement, and Buyer shall not have any claim against Seller whatsoever for any damages, liabilities, losses, costs or expenses, whether direct, special or consequential, arising out of Seller's breach or default, whether such claim is based in contract, tort or another legal or equitable basis or otherwise. Buyer's sole and exclusive remedy in the event of default shall be to terminate this Agreement pursuant to Section 1 2.1 as full and final liquidated damages. If Buyer terminates this Agreement as a result of Seller's breach or default, neither party shall have any further obligations, liabilities or claims against the other party under this Agreement, at law or in equity or otherwise, including any claim for direct, special or consequential damages, which is hereby expressly excluded and disclaimed, except that Buyer shall be obligated to pay Seller any amounts owed to Seller under this Agreement as of the date of termination and the parties shall continue to be liable for those tort based actions, and only those tort based actions, for which indemnification is to be provided under Article XIII below.

**12.2    Seller's Right To Terminate**. Seller may terminate this Agreement by written notice to Buyer following the occurrence of one or more of the following events:

(a)    Buyer breaches or defaults under this Agreement after notice from Seller and the lapse of the applicable Cure Period, if any, as provided in this Agreement; Seller shall provide thirty (30) days written notice of its intention to terminate this Agreement after lapse of the applicable Cure Period, if any, for any breaches or defaults by Buyer, except Payment Defaults, for which no further notice shall be required beyond the original ten (10) day notice required by Article XI;

(b)    The initiation of any involuntary proceeding against Buyer under the bankruptcy or Insolvency laws, which involuntary proceeding is not dismissed for sixty (60) consecutive days, or immediately in the event of the initiation by the Buyer of a voluntary proceeding under the bankruptcy or insolvency laws;

(c)    At any time during the term of this Agreement, the Massachusetts Department of Public Utilities, or any other regulatory or governmental body asserts jurisdiction over Seller as a public utility or public service corporation;

(d)    Any change in the federal tax laws or regulations thereunder after the date of this Agreement relating to the availability of tax credits derived from producing fuel from a non-conventional source within the meaning of Section 29 of the Internal Revenue Code of 1 986, as amended ("Production Tax Credits"), and such change affects in any respect the availability of such Production Tax Credits with respect to the sale of any Landfill Gas under this Agreement or the project at the Landfill;

(e)    Any change in any laws, rules, regulations, statutes or governmental orders that require Seller to modify its gas collection system or Seller's Facility to the extent that it would be economically impossible or unfeasible to operate a gas collection system or Seller's Facility at the Landfill, as determined by Seller in its sole discretion;

(f)    The failure of Seller to qualify for Production Tax Credits, in whole or in part, with respect to the sale of any Landfill Gas under this Agreement or Seller's project at the Landfill or the Internal Revenue Service determines or asserts that Production Tax Credits are not available, in whole or in part, for the sale of any Landfill Gas under this Agreement or Seller's project at the Landfill;

(g)    Seller loses its right to extract Landfill Gas at the Plainville Landfill for any reason whatsoever or Seller's right to extract such Landfill Gas is diminished or impaired for any reason whatsoever; and/or

(h)    The Landfill ceases to produce Commercial Quantities of Landfill Gas, as determined by Seller in its sole discretion.

12.3    **Exclusion Of Damages**.  If Seller terminates this Agreement under Article 12.2 (c) through (h), neither party shall have any further obligations, liabilities or claims against the other party under this Agreement, at law or in equity, including any claim for direct, special or consequential damages, which are hereby expressly excluded and disclaimed, except that Buyer shall be obligated to pay Seller any amounts owed to Seller under this Agreement as of the date of termination and the parties shall continue to be liable for those tort based actions, and only those tort based actions, for which indemnification is to be provided under Article XIII below.

12.4    **Survival**.    All provisions of this Article XII shall survive termination of this Agreement, by default or otherwise.

## ARTICLE XIII

## INDEMNIFICATION

Seller shall indemnify, hold harmless and, upon request, defend Buyer from and against any and all claims, demands, actions, proceedings, liabilities and losses of any kind or nature (including reasonable attorney fees, costs and expenses) arising out of or relating to any injury, illness or death to persons or any damage or loss to tangible property occurring during the performance of this Agreement and resulting from the negligence or willful misconduct of Seller, its contractors, subcontractors, agents or employees.

Buyer shall indemnify, hold harmless and, upon request, defend Seller from and against any and all claims, demands, actions, proceedings, liabilities and losses of any kind or nature (including reasonable attorney fees, costs and expenses) arising out of or relating to any injury, illness or death to persons or any damage or loss to tangible property occurring during the performance of this Agreement and resulting from the negligence or willful misconduct of Buyer, its contractors, subcontractors, agents or employees.

The parties agree that (l) their respective indemnification obligations under this article XIII shall only apply to tort based actions arising out of the negligent or willful misconduct of the parties and their respective contractors, subcontractors, agents and employees and (2) this Article XIII does not, and shall not be interpreted to, modify the disclaimers, exclusions and limitations of liability set forth elsewhere in this Agreement.

All provisions of this Article XIII shall survive termination of this Agreement, by default or otherwise.

15

## ARTICLE XIV

## INSURANCE

Buyer shall, at its cost and expense, at all times during the term of this Agreement, maintain in force, for the joint benefit of Buyer and Seller, a broad form comprehensive coverage policy of public liability insurance by the terms of which Buyer and Seller are named as an additional insured and are indemnified against liability for damage or injury to the property or person (including death) of any employee or invitee of Seller or any other person entering upon or using Buyer's Facility, or any structure thereon, or any part thereof. Such insurance policy or policies shall be maintained on the maximum basis of $5,000,000 for damage to property and $5,000,000 for bodily injury or death in any one accident. Such insurance policy or policies shall be stated to be primary and noncontributing with any insurance which may be carried by Seller. Buyer shall deliver to Seller the certificate of each insurance carrier as to each such insurance policy.

Seller shall, at its cost and expense, at all times during the term of this Agreement, maintain in force, for the joint benefit of Buyer and Seller, a broad form comprehensive coverage policy of public liability insurance by the terms of which Buyer and Seller are named as an additional insured and are indemnified against liability for damage or injury to the property or person (including death) of any employee or invitee of Seller or any other person entering upon or using Seller's Facility, or any structure thereon, or any part thereof. Such insurance policy or policies shall be maintained on the maximum basis of $5,000,000 for damage to property and $5,000,000 for bodily injury or death in any one accident. Such insurance policy or policies shall be stated to be primary and noncontributing with any insurance which may be carried by Buyer. Seller shall deliver to Buyer the certificate of each insurance carrier as to each such insurance policy.

Each party shall use reasonable efforts to obtain from their respective insurers under all policies set forth above a waiver of all rights of subrogation, which the insurer might have against the other party. So long as such waiver is outstanding and valid, the parties waive, to the extent of the proceeds received under such policy, any right of recovery against the other party for any loss for which it receives payment under the policy containing such waiver. Provided, however, that if at any time the insurer(s) shall refuse to permit waivers of subrogation or such waivers of subrogation cannot be obtained or are not effective, the waiver of rights of subrogation under this Article XIV shall be of --lo force and effect whatsoever.

All provisions of this Article XIV shall survive termination of this Agreement, by default or otherwise.

## ARTICLE XV

## ARBITRATION AND CHOICE OF FORUM

Any and all controversies, claims or disputes arising out of or relating to this Agreement or a breach of this Agreement shall be resolved by binding arbitration in the metropolitan area in which the Landfill is located in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The determination of the arbitrators shall be final and binding on the parties, and judgment upon the award rendered by the arbitrators) may be entered in any

16

court having jurisdiction thereof, pursuant to applicable law. The parties agree that after an arbitration notice has been filed, they shall, before the hearing, make discovery and disclosure of all matters relevant to such dispute. All questions that may arise with respect to discovery and disclosure obligations (including the assertion of any privileges and protective orders regarding such discovery material) shall be referred to the arbitrators), whose determination shall be final and conclusive. Notwithstanding the foregoing, a party may request that the arbitrator grant a claim for specific performance of this Agreement or other form of equitable relief (the parties hereby stipulating that such arbitrator shall have such authority) or such party may file a claim for equitable or injunctive relief in the appropriate forum specified below. The arbitrator shall have the authority to award costs and expenses, including, without limitation, reasonable attorneys fees, to the prevailing party.

Subject to the preceding paragraph of this Article XV, Seller and Buyer agree and consent to the jurisdiction of the United States Federal District Court in which the Landfill is located as the exclusive forum to resolve any disputes arising out of or relating to this Agreement as they relate to claims for equitable or injunctive relief or to enforce any arbitration award or to resolve any dispute as to whether the claim should be arbitrated, regardless of whether Seller and Buyer are entities formed under the laws of another state. Both parties further acknowledge and agree that service may be affected upon them by serving the complaint or other legal document, together with the summons, by certified mail, return receipt requested, to the address indicated in this Agreement. If either party institutes a lawsuit in any jurisdiction other than such United States Federal Court, the other party shall have the right to terminate such lawsuit and remove the same to the above court and the party initially filing the lawsuit shall be responsible for all costs and expenses, including reasonable attorney fees, incurred by the party removing the case to the forum agreed upon in this Agreement.

All provisions of this Article XV shall survive termination of this agreement, by default or otherwise.

## ARTICLE XVI

## MISCELLANEOUS

**16.1** <u>Notices</u>. Any notice, request, demand, statement and or payment provided for in this Agreement shall be in writing and, except as otherwise provided herein, shall be sent to the parties hereto at the following address:

<table>
<tr><td>Seller:</td><td>Curtis Ranger, P.E.<br>Plainville Gas Producers, Inc.<br>425 S. Main Street, Suite 201<br>P. 0. Box 8614<br>Ann Arbor, Michigan 48107</td></tr>
<tr><td><u>With copy to</u>:</td><td>James Russell, Esq.<br>DTE Energy Resources, Inc.<br>525 S. Main St.<br>Ann Arbor, Michigan 48107</td></tr>
</table>

<table>
<tr><td>Buyer:</td><td>Gerard Lorusso<br>President<br>Lorusso Corporation<br>3 Belcher Street<br>Plainville, Massachusetts 02762</td></tr>
<tr><td>With copy to:</td><td>Steven Ferrey, Esq.<br>LeBoeuf, Lamb, Greene & MacRae, L.L.P.<br>260 Franklin Street<br>Boston, Massachusetts 021 1 0</td></tr>
</table>

Such notices, etc. shall be deemed to have been given and received when personally delivered or 'upon receipt as evidenced by a U.S. Postal Service Receipt for Certified Mail or evidence of delivery by a private express mail service. Either party may change the address to which notices, etc. are to be sent by written notice to the other party.

**16.2    Severability.** Each term, provision and Article of this Agreement shall be valid and be enforceable to the fullest extent permitted by law. If any term, provision or Article of this Agreement or the application thereof to any person or circumstance is invalid or unenforceable to any extent, the remainder of this Agreement and the application of such terms, provisions and Articles to persons or circumstances (other than those to which it 'is held ' invalid or unenforceable) shall not be affected thereby, and the remaining terms, provisions and Articles of this Agreement shall continue to be enforced, with such invalid or unenforceable term, provision or Article deemed to be deleted from this Agreement.

**16.3    Headings.** The headings appearing in this Agreement are intended for convenience and reference only, and are not to be considered in construing this Agreement.

**16.4    Disclaimer Of joint Venture, Partnership And Agency.** This Agreement shall not be interpreted or construed to create an association, joint venture or partnership between Buyer and Seller or to impose any partnership obligation or liability upon such parties. Neither Buyer nor Seller shall have any right, power or authority to enter 'into any agreement or undertaking for, or act on behalf of, or to act as or be an agent or representative of, or to otherwise bind, the other party.

**16.5    Governing Law.** All questions with respect to the construction of this Agreement and the rights and liabilities of the parties hereunder shall be determined in accordance with the laws of the State of Massachusetts.

**16.6    Amendment To Agreement.** This Agreement may be amended or modified only by a written instrument signed by both parties.

**16.7    Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written agreements and understandings between the parties relating to the subject matter hereof.

**16.8    Successors And Assigns.** All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto and their respective permitted successors and assigns.

16.9 _Assignment_. Except as expressly provided herein, this Agreement may not be transferred or assigned by one party without the prior written consent of the other party, which consent shall not be unreasonably withheld.

Notwithstanding the foregoing, Seller may assign this Agreement without Buyer's consent to (i) any subsidiary, parent or affiliated company or any limited liability company, partnership, corporation or other entity in which Seller has an interest of 50% or more (collectively, "Related Entity"), (ii) any limited liability corporation, partnership, corporation or other entity controlled by Seller and/or any Related Entity or (iii) a lending institution pursuant to a collateral assignment; provided that any such assignment shall not unduly interfere with Buyer's rights under this Agreement, and further provided that such assignee (except a lending institution) agrees to be bound by the terms of this Agreement to the same extent as Seller. No assignment by Seller shall relieve Seller of its obligations under this Agreement. Seller shall give Buyer thirty (30) days prior notice of its intent to assign that interest, which notice shall contain the name and address of the proposed assignee, purchaser or successor in interest, which information shall be kept confidential by Buyer.

Notwithstanding the foregoing, Buyer may assign this Agreement without Seller's consent to (i) any subsidiary, parent or affiliated company or any limited liability company, partnership, corporation or other entity in which Buyer has an interest of 50% or more (collectively, "Related Entity"), (ii) any limited liability corporation, partnership, corporation or other entity controlled by Buyer and/or any Related Entity or (iii) a lending institution pursuant to a collateral assignment; provided that any such assignment shall not unduly interfere with Seller's rights under this Agreement, and further provided that such assignee (except a lending institution) agrees to be bound by the terms of this Agreement to the same extent as Buyer. No assignment by Buyer shall relieve Buyer of its obligations under this Agreement. Buyer shall give Seller thirty (30) days prior notice of its intent to assign that interest, which notice shall contain the name and address of the proposed assignee, purchaser or successor in interest, which information shall be kept confidential by Seller.

16.10 _Authorization_. Each individual signing this Agreement warrant and represents that he has carefully read this Agreement, understands its terms and conditions and executes the same of his own free will. Any corporation or limited liability company signing this Agreement, and each person signing on behalf of such corporation or limited liability company, represents and warrants, jointly-and severally, that the execution, delivery and performance of this Agreement by such corporation or limited liability company has been duly authorized by all necessary action of such corporation or limited liability company and is valid and binding upon such corporation or limited liability company. Upon request, each party will provide appropriate resolutions to the other party which authorize the execution of this Agreement by the individuals signing this Agreement.

16.11 _Counterparts_. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute one and the same instrument. Each party shall receive a duplicate original of the counterpart copy or copies executed by it.

16.12 _Further Assurances_. In addition to the agreements and notices to be delivered as herein provided, each of the parties hereto shall, from time to tome upon the reasonable request of the other party, execute and deliver such additional certificates, notices and documents and shall take such other action as may reasonably be required to more effectively carry out the terms of this Agreement.

**16.13** <u>Survival</u>.    All provisions of this Article XVI shall survive termination of this Agreement, by default or otherwise.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have caused the execution of this contract by the authorized representatives whose names appear below as of the date first written above.

WITNESS:

*Kathleen Vaidic*

PLAINVILLE GAS PRODUCERS, INC.,
A Michigan corporation

By: _____
       Curtis T. Ranger
Its:    President and Authorized
       Representative

"Seller"

WITNESS:

*Mary E. Coogan*

LORUSSO CORPORATION,
A Massachusetts corporation

By: _____
       Gerard Lorusso
Its:    President and Authorized
       Representative

"Buyer"



EXHIBIT A

DIAGRAM

METER A-1 GARAGE → GARAGE

DELIVERY POINT A

METER B-1 PIPELINE → GENERATOR STATION

METER B-2 LFG FLARE

METER B-3 MCGILL FLARE

LANDFILL WELLFIELD → METER B-4 ZINK FLARE

DELIVERY POINT B
= (B-1 + B-2 + B-3 + B-4) - (A-1)

| McNAMEE INDUSTRIAL SERVICES | McNAMEE FIRST—CHOICE FIRM SINCE 1914 | DTE BIOMASS ENERGY, INC. ALLIED WASTE & LORUSSO CORP. PLAINVILLE, MASSACHUSETTS | CONTRACT . |
|---|---|---|---|
| | | EXHIBIT A GAS DELIVERY POINTS | SHEET 1 OF 1 |

SCALE: --- | DATE 11-06-02
DESIGNED jlh | CHECKED .

CADD PART 0:\1166022\01\plainville_6-2002\m\exhibit-a.dwg2 JLH 2

22

ESTIMATED SCOPE AND COST OF MODIFICATIONS TO BUYER'S FACILITY

## Estimated Scope and Cost of Modifications to Seller's Facility

| Item No. | Project Tasks | Contractor | Cost ($) |
|---|---|---|---|
| 1 | Control Panel Fabrication | Control 7, Inc. | 17,171 |
| 2 | Replacement of 2" HDPE force main at Power Plant | Falbo Landscaping and Contracting | 3,400 |
| 3 | Remove KO tank at Sump 3; flange off subsurface connections to asphalt plants | Falbo Landscaping and Contracting | 2,250 |
| 4 | Fabricate/install stainless steel piping components | R.I. Baker Company | 31,975 |
| 5 | Electrical components, installation and service tasks | Hi Voltage Associates | 60,460 |
| 6 | Construction Management | Brown & Caldwell | 49,350 |
| 7 | Engineering Design | McNamee Industrial Services, Inc. | 32,660 |
| | Subtotal | | 197,266 |
| | Contingency (10%) | | 19,727 |
| | **TOTAL** | | 216,993 |

Note: Cost are estimates based on time and materials not-to-exceed basis
Other contractors/equipment may be substituted based on cost and availability to
perform stated scope of work.

23

# EXHIBIT

# C

April 1, 2004

Mr. James A. Van Hoy, P.E.
DTE Energy
P.O. Box 8614
Ann Arbor, MI 48107

Dear Mr. Van Hoy:

This letter is a follow up on our March 2nd conference call between you, Brian Lawrence and I regarding the gas quality and quantity delivered to Plainville Generating since the 15th of January. As you know, the energy plant has been operating at a reduced output rate of (78-86%) for this period, which has caused a substantial revenue loss. I have attached two months of methane readings for your review. There are at least three readings taken daily and this is an average of those values. Brian Lawrence checked our gas analyzer for calibration during his last visit and agreed that it is accurate.

The plant has the capacity to operate at 5.95 MW/hr + when appropriate gas is available. Lately the output rate has averaged 4.72 MW/hr due to existing conditions at the landfill that are to be corrected soon according to our phone conversation. Also I am to receive weekly status reports via fax on Monday mornings until these problems are rectified. It is my understanding that these status reports will contain updates on the corrective actions to be taken, parties engaged to perform the actions, time frames for the corrective procedures and the status of completion of these actions. To date this is not being done to our satisfaction. Other than receiving information about gas production, problem resolution in the form of actions, schedules and procedures have not been forthcoming.

We are now at the end of March (11 wks) with minor improvements in gas quality. However, our production rates overall are still down due to a lack of quantity with quality. By this I mean that as we attempt to increase the kW, the well field vacuum exceeds your target value of 50", thus substantially reducing the quality of gas. As I review the history of invoiced quantities and quality delivered, I think we both agree the gas quantity is in the hill and we are unable to access it for several reasons.

I know that if you are not drawing from all points of the hill then gas is migrating out somewhere because it cannot be contained or stored within. BEI operates several landfill sites around the country for energy recovery and this site should be no different. Over the past year, the onsite maintenance and repair of the gas system has been lacking. At best the level of on-site personnel devoted to the landfill gas system has been part-time.

There seems to have been little attention in diagnosing and resolving matters by your corporate group.

It is also evident that this site has been neglected for a long time and the attrition of problems have come to a head that requires immediate attention and comprehensive actions. The agreement between BEI and Lorusso Corp. states that "reasonable efforts will be engaged to rectify gas flow interruptions or problems upon occurrence". I do not consider the part time efforts witnessed thus far to be a reasonable response to what is apparently becoming a major problem. I have been hearing a fair amount of discussion, but small amounts of effort and or action to date.

Production at the landfill prior to the operation of the electric power plant indicated large quantities of gas of sufficient quality to more than operate our facility. Now that we have a constant load and quality demand on the landfill collection system, we find that it cannot keep up with the prior purported gas levels. At best we have experienced a couple of short-term periods of quality gas production and the balance periods have been very erratic.

In light of the response to date, I am concerned that this problem will continue for a considerable time before it is resolved resulting in substantial financial losses to us. It would certainly be to everyone's advantage that this situation be aggressively addressed and resolved immediately.

I look forward to a cooperative effort in resolving the existing deficiencies at the landfill in a timely fashion.

Sincerely,



David J. LaFlamme
V.P. Engineering


Enclosure: As noted

Cc:     Gerard C. Lorusso/LC
        Henry G. Grilli/LC
        Richard M. DiGia/BEI
        Curtis Ranger/BEI

# EXHIBIT

# D



**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
SOUTHEAST REGIONAL OFFICE
20 RIVERSIDE DRIVE, LAKEVILLE, MA 02347 · 508-946-2700



MITT ROMNEY
Governor

KERRY HEALEY
Lieutenant Governor

ELLEN ROY HERZFELDER
Secretary

ROBERT W. GOLLEDGE, Jr.
Commissioner

June 18, 2004

Ralph Larimore, Regional Environmental Manager
Allied Waste Industries, Inc.
5600 Niagara Falls Boulevard
Niagara Falls, New York 14304

RE:    Landfill Soil Gas Migration
       Exceedance of 25 Percent Lower Explosive Limit at Point of Compliance
       Assessment of Landfill Soil Gas Migration

AT:    Plainville Sanitary Landfill
       Plainville, Massachusetts

Dear Mr. Larimore:

### THIS IS AN IMPORTANT NOTICE.
### FAILURE TO RESPOND AND TAKE ADEQUATE ACTION IN RESPONSE TO THIS NOTICE COULD RESULT IN SERIOUS LEGAL CONSEQUENCES

The Department of Environmental Protection, Solid Waste Management Section (the "Department") has reviewed Landfill Soil Gas Monitoring Data collected in 2003 and 2004 for the closed Plainville Sanitary Landfill (the "Landfill"). The Department's review was undertaken in order to determine if any additional monitoring/corrective actions are required under 310 CMR 19.000, Solid Waste Management Regulations.

The Massachusetts Solid Waste Management Regulations specified that [310 CMR 19.142 Landfill Post Closure Requirements] the owner/operator shall conduct environmental monitoring at the site during the post closure period.  Allied Waste Industries, Inc. ("Allied") is the owner/operator and is required to conduct Post Closure Environmental Monitoring in accordance with *Environmental Monitoring Plan for the Plainville Landfill*, Revision 4, as amended, (the "Plan") by Eckenfelder/Brown and Caldwell of Mahwah, New Jersey. Solid Waste Management Regulations (310 CMR 19.132(4).

This information is available in alternate format. Call Donald M. Gomes, ADA Coordinator at 617-556-1057. TDD Service - 1-800-298-2207.

DEP on the World Wide Web: http://www.mass.gov/dep
♻ Printed on Recycled Paper

The Department has determined the following: (1) landfill soil gas monitoring is being conducted in accordance with the Plan, and (2) landfill soil gas monitoring results necessitate additional assessment and corrective actions to protect public health, safety and the environment.

I. Submittals:

The following documents were submitted on behalf of Allied by its consultants and represents the information the Department has reviewed pursuant to 310 CMR 19:000 *Solid Waste Management Facility Regulations, 310 CMR 19.143 Post Closure Use of Landfills* and the *Department's Landfill Technical Guidance Manual, May 1997* (the "Manual"):

    A. An Allied letter report which contained biweekly landfill soil gas monitoring well readings from January 2004 to May 24, 2004 that was received by the Department by fax on May 26, 2004.

    B. A Brown and Caldwell letter report which contained quarterly landfill gas soil gas monitoring data conducted on March 31, 2004 and was received by the Department by fax on March 31, 2004,

    C. A draft letter from Allied regarding summary of work performed to reduce landfill soil gas readings in soils along the East side of the landfill, received by the Department on March 26, 2004,

    D. A Brown and Caldwell letter report which contained quarterly landfill soil gas monitoring well results for the landfill conducted on Jan. 26, 2004 under a cover letter dated February 9, 2004 and received by the Department on February 10, 2004,

    E. A Brown and Caldwell letter report which contained quarterly landfill soil gas monitoring well results for the Landfill conducted on January 10, 2004 under a cover letter dated January 14, 2004 and received by the Department on January 16, 2004,

    F. A Brown and Caldwell report which contained new source performance standard walkover data and quarterly landfill soil gas perimeter monitoring data. The report was dated October 24, 2003 and was for monitoring conducted on September 24-25, 2003 and was received by the Department on November 3, 2003.

    G. Two (2) Brown and Caldwell letter reports that contained quarterly landfill soil gas monitoring well results for the Landfill conducted on June 11, 2003 and March 27, 2003 under cover letters dated July 11, 2003 and April 15, 2003, respectively.

    H. Gas probe installation and monitoring report prepared by URS Corporation dated February 27, 2003 and received by the Department on March 3, 2003,

II. Landfill Gas Monitoring Plan: Allied is conducting landfill soil gas monitoring in accordance with the following plan:

    1. Landfill Gas Monitoring Wells:
        a. The following fourteen (14) landfill soil gas monitoring wells are being sampled quarterly:
            • GP-A, -B, -C, -E, -F, -G, -H, -I, -J, -K, -N, -O, -P, -Q,
        b. The following three (3) landfill soil gas monitoring wells are being sampled twice a week:
            • GP-D, -L, -M.

2. Landfill Gas Sampling Parameters: The landfill soil gas monitoring wells are being analyzed for methane, carbon dioxide, oxygen, hydrogen sulfide, and volatile organic compounds,

3. <u>Utility and Structures:</u> All on-site occupied buildings are equipped with permanent continuous gas monitoring devices. The following buildings are located on-site; office, scale house, recyclables transfer station, and the maintenance garage.

III. Landfill Gas Monitoring Data: Landfill gas was detected in soil gas monitoring wells/probes GP-O, GP-J, GP-E, GP-P, GP-Q, and GP-N at concentrations greater than 25 percent of the lower explosive limit (LEL) during the March 30, 2004 sampling event. As a result of previous landfill gas exceedances at the aforementioned landfill soil gas monitoring wells, two (2) combustible gas alarms were installed in the two closest buildings (Daniels Street) in August 2002.

Additionally, landfill gas was detected at landfill soil gas monitoring probe/well GP-M at twenty-four (24) percent and twenty (20) percent of the LEL during the March 30, 2004 and April 2, 2004 landfill soil gas-sampling events, respectively. Since April 2, 2004 GP-M has been sampled 15 times and methane has not been detected. GP-M is located in the northeast corner of the landfill. The closest residents are approximately 200 feet from the northeast corner of the landfill. The two landfill soil gas-monitoring wells GP-L and GP-M were installed directly between the Landfill and the two nearest residents in the northeast corner of the site. The reappearance of landfill gas in landfill soil gas monitoring well GP-M has not been an issue since upgrades to the landfill gas extraction system were made in 2000.

IV. Landfill Gas Environmental Monitoring and Notification Requirements: The landfill gas environmental monitoring requirements are specified in Solid Waste Management Regulations at 310 CMR 19.000:

a. <u>Solid Waste Management Notification & Regulatory Requirements for Landfill Gas in Soils:</u> Exceedances of twenty-five (25) percent of the LEL within soil gas at the point of compliance require the owner/operator to:

> "1. take immediate action to protect human health and safety [1];
> 2. notify the Department within two hours of the findings; and
> 3. undertake the action specified under 310 CMR 19.150, Landfill Assessment and Corrective Action, as required by the Department."

If a gas well(s)/probe(s) with an exceedance is in close proximity to buildings, structures and/or utility conduits, the Department strongly recommends the buildings, structures and/or utility conduits be immediately screened for landfill gas. If landfill gas is detected in a building, structure and/or utility conduits refer to section IV, subsection b of this letter.

In order to comply with Solid Waste Management guidance/regulations, upon an exceedance of twenty-five (25) percent of the LEL, the owner/operator shall determine whether the presence of landfill gas in soils at concentrations greater than twenty-five (25) percent of the LEL poses an Imminent Hazard.

An Imminent Hazard as defined in the Massachusetts Contingency Plan (MCP) (refer to 310 CMR 40.000) "is a hazard which would pose a significant risk of harm to health, safety, public welfare or the environment if it were present for even a short period of time." A release to the environment which results in the presence of oil and/or hazardous material vapors within buildings, structures or underground utility conduits at a concentration equal to or greater than 10 percent of the lower explosive limit poses or could pose an Imminent Hazard (refer to 310 CMR 40.0321 Releases and Threats of Release That Pose or Could Pose an Imminent Hazard).

Screening for landfill gas in adjacent buildings, structures and utility conduits immediately upon discovering an exceedance of 25% LEL (from a point of compliance monitoring location) may not always be possible due to an inability to gain legal access to abutting properties/easements or equipment limitations. However, the following factors may be useful in determining whether an exceedance of 25 percent of the LEL at the point of compliance may pose an Imminent Hazard:

- Distance to receptors from exceedance,
- Soil gas concentration,
- Geology,
- Historic monitoring data.

If the extent of migration of landfill gas in soils can be determined it should be possible to quickly determine whether an Imminent Hazard may exist. This can be accomplished through the immediate installation of probe(s)/well(s) beyond the point of compliance, in order to determine the extent of soil-gas migration. Please note: landfill gas does not have to be present within the building to pose an Imminent Hazard (e.g. landfill gas present beneath foundation but not in utility conduits or structures).

**If it is determined that there may be an Imminent Hazard associated with an abutting building, structure or utility conduit, an attempt shall be made to obtain access as soon as possible and subsequently screen any/all potentially affected basement(s) and/or utility conduit(s) on abutting properties.** All confined spaces within any (on-site or off-site) buildings/structures, should be screened for combustible gases. Wherever there are penetrations/cracks in building/structure foundations, the area in it's immediate vicinity should be screened for combustible gases. If possible wells/probes should be immediately installed adjacent to the foundation to determine if landfill gas is present.

If owner/operator can conclude that there is No Imminent Hazard, the exceedance report shall be forwarded to the Department and include such a statement and associated reasoning. The exceedance report shall also include a specific description of

and easement parties (notification requirements, identification of health impacts, Department, corrective actions, etc.). Regardless of whether an imminent hazard exists the extent of landfill gas migration shall have to be determined and both abutters and easement holders (e.g. utilities) shall be notified.

b. <u>Solid Waste Management Notification and Regulatory Requirements for Landfill Gas in Buildings, Structures or Underground Utility Conduits:</u> Allied's obligations in response to an exceedance of ten (10) percent of the LEL within buildings, structures or Underground utility conduits are specified in solid waste management regulations at 310 CMR 19.132 (4) (g),

> *"(g) When, at any time, the concentration of explosive gases exceeds 10% of the lower explosive limit (LEL) in any building, structure, or underground utility conduits, excluding gas control, gas recovery and leachate collection system components, the owner/operator shall:*
>
> > *1. take immediate action to protect human health and safety;*
> > *2. notify the Department within two hours of the findings; and*
> > *3. undertake the actions specified under 310 CMR 19.150, Landfill Assessment and Corrective Action, as required by the Department."*

In addition to the requirements regarding exceedances of ten percent of the LEL specified at 310 CMR 19.132 (4) g, the owner/operator shall notify the Department's Bureau of Waste Site Cleanup-Emergency Response Section regarding exceedances of ten percent LEL within two (2) hours of the exceedance as per 310 CMR 40.0321(1)(a) of the regulations.

If it is determined that an Imminent Hazard exist, an Immediate Response Action (corrective action) shall be submitted in a timely manner (as warranted by the specific release). Immediate Response Actions (IRAs) in response to two (2) hour notification must be done in accordance with MCP provisions of 310 CMR 40.0404 to 40.0429.

After identification of the Immediate Hazard and notification of the Department, the next step is to undertake response actions quickly to prevent or abate exposures that resulted in the Imminent Hazard. The buildings, structures and any utility conduits should be monitored for methane (total % and % LEL), carbon dioxide (%), oxygen (%), hydrogen sulfide (ppm), and VOCs (ppm).

<u>V. Department Findings:</u> As a result of its review, the Department has determined that additional assessment/corrective actions are required to address landfill gas migration beyond the point of compliance. Accordingly, in accordance with its authority granted pursuant to Massachusetts General Laws, Chapter 111, Section 150A (M.G.L., C.111, §150A) Allied is required undertake the following additional landfill assessment and corrective actions:

1. *Utility Conduits and Structures*: Within ten (10) days of the date of this letter, Allied is required to monitor all underground utility conduits (e.g. catch basins, water shutoff valve manholes, electrical conduit manholes, etc.) located within Thurston Street and Daniels Street east of landfill gas monitoring probes GP-M, -P, -N, -E, and -J. Additionally, the Department requires that if a soil gas well(s)/probe(s) with an exceedance of 25 percent LEL is in close proximity to buildings, structures and/or utility conduits the owner/operator shall monitor the interior of the buildings, structures and/or utility conduits for landfill gas.

    i.      Additionally, Allied shall take all actions necessary to ensure public health and safety due to the off-site/on-site landfill gas migration (refer to section IV Landfill Gas Environmental Monitoring and Notification Requirements).

    ii.     Wherever, there are penetrations of the foundation, the area in the immediate vicinity should be screened for combustible gases.

    iii.    All confined spaces within all buildings should be screened for combustible gases.

    iv.    If at any time monitoring detects the presence of any combustible gases at or in excess of 10% of the Low Explosive Limit at any location within the buildings or within any utility conduits on-site or off-site Allied shall notify the Department's Bureau of Waste Site Cleanup-Emergency Response Section within two (2) hours of the exceedance as per 310 CMR 40.0321(1)(a) of the regulations.

    v.     The buildings/utility conduits should be monitored for percent methane, volatile organic compounds, oxygen and hydrogen sulfide.

2. Additional landfill gas monitoring: Within ten (10) days of the date of this letter, Allied is required to monitor all landfill soil gas monitoring wells/probes located along the eastern landfill perimeter: GP-O, GP-J, GP-E, GP-P, GP-Q, GP-N, GP-L, GP-D, GP-F and GP-K, at a minimum.

3. *Extent of Landfill Gas Migration:*

a) Within thirty (30) days of the date of this letter, Allied is required conduct additional assessment activities to determine the extent of landfill soil gas migration. This should include the installation of landfill soil gas monitoring wells/probes to determine the lateral and vertical extent of landfill soil gas migration east of the Plainville Landfill. Please note that up-gradient groundwater monitoring wells may be used to monitor landfill soil gas migration if a portion of the well screen is located above the water table (e.g. check well logs for DMW-3, -4, -5, -6, PZ-24R, CD-1A, MW-20DR, MW-20R etc.). Wells/probes should be monitored for percent methane, volatile organic compounds, oxygen, and hydrogen sulfide, at a minimum. The purpose of the monitoring wells/probes is to determine the limits of the landfill soil gas migration, assess

the risk posed by the landfill gas migration and an evaluation of remedial alternatives to control landfill gas migration.

b) _Assessment Report:_ Within forty-five (45) days of the date of this letter, Allied is required to submit the findings of the additional assessment work referenced in paragraph #3(a) to the Department for review. The landfill gas assessment report should include the following:

- A site plan depicting all current landfill soil gas monitoring probes/wells, groundwater monitoring wells adjacent to the Landfill, nearby residents and structures (Daniels and Thurston Street), subsurface utility conduits (located within Thurston Street and Daniels Street), edge of waste, property lines with current owner information to the east and northeast of the Landfill,
- Thickness of the unsaturated zone immediately east of the Landfill, a description of unsaturated zone geology along the east and northeast side of the landfill along, include a discussion of the liner, final cover and landfill gas extraction system along the eastern boundary of the Landfill and indicate the elevation of the bottom of waste in this area,
- In the summer and fall 2003 landfill gas probes were connected to the landfill gas extraction system (referenced in Submittal B). Please submit the results of the testing associated with the multilevel gas probes,
- Meteorological data shall be submitted with the sampling results as specified in the Manual,
- Recommendations for additional assessment work,
- A schedule for submittal of a Corrective Action Alternative Analysis and Corrective Action Design permits to address the landfill gas migration.

4. _Landfill Gas Extraction System Status:_ Within thirty (30) days of the date of this letter, Allied is required to submit a report describing the status of the landfill gas extraction system at the Plainville Landfill. Please list any problems or maintenance issues associated with operation of the landfill gas extraction system. Please indicate if the system is operating normally or whether problems with the system are likely contributing to off-site landfill gas migration. The report should include but not be limited to a discussion of number of landfill gas extraction wells previously installed, number of landfill gas extraction wells no longer functioning (e.g. breaks, blockages etc.). There should be a discussion of recent wellfield balancing activities that includes landfill gas extraction well data (e.g. methane, carbon dioxide, oxygen, vacuum measurements, etc.) with a narrative that describes where and how vacuum measurements were measured. There should be a discussion of surface methane walkover results as well as any significant changes in landfill gas production.

5. _Quarterly Environmental Monitoring Reports:_ Allied shall comply with environmental monitoring requirements specified herein and landfill gas LEL reporting requirements specified at 310 CMR 19.132 and 310 CMR 40.0321. All standard quarterly soil-gas monitoring reports must be submitted within sixty (60) days of sampling and include summary tables of analytical data, a site map showing all monitoring locations, and a discussion of the results.

6. *Notification:* Allied is responsible for notifying all potentially responsible parties of the landfill gas exceedances detected in landfill soil gas monitoring wells GP-O, GP-J, GP-F, GP-P, GP-Q, and GP-N.

7. *Limitations:* The issuance of this letter is limited to the landfill soil gas monitoring/corrective action design as described herein, and does not relieve the Applicant from the responsibility to comply with all other regulatory or permitting requirements. The Department reserves the right to require additional assessment or action, as deemed necessary to protect and maintain the environment free from nuisance conditions, dangers or threats to public health, safety or the environment.

8. *Federal, State and Local Regulations:* It is Allied's responsibility to complying with all other applicable federal, state and local statutes and regulations, ordinances and agreements relative to the activities associated with this project. Applicable federal regulation shall include, but are not limited to 29 CFR Part 1910, OSHA standards governing employee health and safety in the workplace.

9. *Future Submittals:*

   a. Within **ten (10) days** of the date of this letter, landfill gas monitoring data associated with condition #2 referenced herein, shall be submitted to Department for its review.
   b. Within **thirty (30) days** of the date of this letter, a Report associated with condition #3(a-b) referenced herein, shall be submitted to Department for its review and approval.
   c. Within **forty-five (45) days** of the date of this letter, a report associated with condition #4 refefenced herein, shall be submitted to Department for its review and approval.

If you have any questions or comments regarding this letter, please contact me at (508) 946-2833 or Mark Dakers at (508) 946-2847 or at the letterhead address.

Very truly yours,

David B. Ellis, Chief
Solid Waste Management Section

E/MD/lm
P:\Plainville 2004\Plainville LFG061604 draft.doc

cc:    Foxboro Board of Health

       Lorusso Corporation
       3 Belcher Street
       Plainville, MA 02762
       Attention: David J. Laflamme

8



admin@plainvilleboardofhealth.org
Wrentham Board of Health, William Domey wrd@rcn.com
Wrentham Board of Health, Jan Gould JGould214@AOL.com
Samuel Chapin, P.E. schapin@brwncald.com

# EXHIBIT

# E



## PLAINVILLE GENERATING COMPANY, LLC.

**3 BELCHER STREET**
**PLAINVILLE, MA 02762**

:: 508.695.3252                                                        FACSIMILE: 508.695.1130

June 22, 2004

Mr. Richard M. DiGia, Vice President
DTE Biomass Energy Systems, Inc.
425 S. Main Street, Suite 201
Ann Arbor,  MI  48107

Dear Richard:

It appears we are all in agreement on the general proposal format to resolve some of the outstanding issues at the landfill.  Although I have not heard from Lou or received a draft of the agreement, I would anticipate seeing something later on this week.

When we last spoke, we discussed getting the condition of the well inventory and I was not sure if that had been completed.  Gas volume has dropped over the last few weeks although gas quality is remaining fairly constant.

I am looking forward to resolving all our issues.


Very truly yours,
Plainville Generating Company, LLC


Gerard C. Lorusso
President


GCL/m

# EXHIBIT

# F

# PLAINVILLE GAS PRODUCERS, INC.

August 19, 2004

**VIA FACSIMILE
& MAIL**

Gerard C. Lorusso
President
Plainville Generating Company, LLC
3 Belcher Street
Plainville, MA  02762

Dear Mr. Lorusso,

As you know, I spent the day before our meeting on July 30, 2004, at the landfill to assess why Plainville Generating Company, LLC (PGC) is receiving less landfill gas (LFG) at its plant than its expectations.  In that connection I examined certain records relating to the landfill before my departure to Plainville which might explain that event.  My visit confirmed my opinion that the efficacy of the synthetic cap plays a role and the landfill was damaged from a substantial underground fire caused by erratic overpulling of the wellfield by the electric generating plant.  I am aware of other landfills with similar caps and there too, the gas volumes have declined a little more than would otherwise be anticipated.  When the electric plant compressor was operated at the high vacuums, it exacerbated the fire potential within the landfill, plus it caused more condensate to enter the system.

This does not necessarily mean we have to expect unpleasant surprises in the future.  In fact, operating the wellfield within the 40 to 45 inch vacuum has stabilized flows, improved gas quality and eliminated condensate vacuum surges.  The wellfield functions as expected albeit at a level below your desires.

I must reiterate language in our agreement that goes to great length to disclaim any warranties or representations with respect to the rate of delivery, quantity and quality of LFG.  The reason for the inclusion of that language is all too obvious.  All PGP can do is its very best in operating and maintaining the wellfield.  I believe we have done that in the past and will continue to do so in the future.

The economic terms of our restated and amended agreement contemplates that PGC has the right to cause improvements or upgrades to the wellfield at PGC's cost with a view toward improving gas generation.  Whereas other sites pay $2 to $4 per MBTU of LFG, PGC pays only a dime per MBTU in order to permit it to implement such upgrades.

425 S. Main Street, Suite 201; Ann Arbor, MI  48104
PH:  (734) 913-2080; FAX:  (734) 668-1541

PGC's proposal that we redrill certain wells with a bit smaller in diameter than the existing casing is not a realistic one because that cannot be done without compromising the rock packing and completely destroying the well integrity. The reality is that all the LFG that is being generated by the landfill is being captured notwithstanding the fact that some wells may not be very productive. I cannot in good conscience recommend that any wells be redrilled even if PGC were paying for it. The nature of the field is such that one well will capture the LFG that another doesn't. In short, to engage in redrilling at the Plainville landfill would be a speculative venture at best and cannot be cost justified.

We're not seeing the condensate related vacuum surges recently noted by Dave LaFlamme. Although this situation can occur at landfills, we regularly monitor for it. We asked our contractor to recheck the field and report back to us. Another possible cause that you should look at, however, is one thing we have observed at other LFG fired reciprocating engine plants. We think the surging conditions Dave reports may be related to the engine control system. We suggest Dave investigate resetting the engine control parameters. You may also want to check the variable speed drive on PGC's compressor, as this could also cause pressure swings at the engines.

During our meeting, I also mentioned that gas production can be increased by the introduction of a bioreactor. Although such action requires the approval of state authorities, it could accelerate the collection of finite quantities of LFG within the landfill. It might also interest the landfill owner since it could help reduce leachate handling expenses.

At our meeting, we also proposed creating a new business structure between PGP and PGC (e.g. DTE could buy into PGC). This would enable PGP to share the LFG volume risk with PGC, or even under certain circumstances assume all the fuel supply risk. You didn't seem overly excited by our suggestion, but if you think its worth pursuing, I would be pleased to do so.

Finally, I feel very strongly that there is no basis for PGC to withhold any monies due PGP. We installed a system as dictated by Pete Zeliff's design criteria with the clear understanding that it would be modified at your expense. Please remit the amount due us according to the statement that I handed you at our meeting.

Very Truly Yours,

Curt Ranger
President

# EXHIBIT

# G

LeBoeuf, Lamb, Greene & MacRae COPY
L.L.P.
A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
HARRISBURG
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
NEWARK
PITTSBURGH
SALT LAKE CITY
SAN FRANCISCO

260 FRANKLIN STREET
BOSTON, MA 02110-3173
(617) 748-6800
FACSIMILE: (617) 439-0341

LONDON
(A LONDON-BASED
MULTINATIONAL PARTNERSHIP)
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
(AFFILIATED OFFICE)
BISHKEK
ALMATY
BEIJING

November 24, 2004

**Certified Mail No. 7001 1940 0005 3491 7861**
**Return Receipt Requested**

Curtis T. Ranger
President, DTE Biomass and
President, Plainville Gas Producers, Inc.
425 South Main Street, Suite 201
Ann Arbor, MI 48107

Re:    Demand Letter Upon DTE Biomass Energy Inc. and
       Plainville Gas Producers, Inc. Pursuant to M.G.L. Chapter 93A

Dear Mr. Ranger:

This firm represents Plainville Generating Co. ("PGC"), on whose behalf this letter is sent to you. This letter is a demand, pursuant to Massachusetts General Laws Chapter 93A, §2, upon Plainville Gas Producers, Inc. ("PGP") and DTE Biomass Energy, Inc. ("DTE"), which requires your response.

FACTS

The facts underlying the legal claims of an unlawful and deceptive act or practice in this letter are as follows.

PGP has a responsibility to maintain the gas well field and collection and distribution system at the Plainville Landfill owned by Allied Waste Systems, Inc., pursuant to the Gas Rights Agreement between DTE Biomass Energy, Inc. and Allied Waste Systems, Inc., as amended November 1, 2000. Pursuant to the Restated and Amended Gas Purchase Agreement between PGP and PGC, as amending on November 18, 2002 the original Agreement entered by the parties in 1996, PGP undertook to supply, and "to maintain the existing level of services and

Curtis T. Ranger
November 24, 2004
Page 2

product" as were supplied to PGC during the prior six years of the original 1996 contract for the purpose of PGC operating its renewable "electric generation facility" on its "adjacent facility." Under these agreements, PGP has an obligation at its expense to maintain the well field and gas collection and distribution system and to use reasonable best efforts to supply historic existing levels of gas and service to PGC. This obligation includes normal maintenance and repair of the well field and the gas collection and distribution system.

The gas collection and distribution system operating under normal conditions through 2002 established the historic level of services and product. In early 2004, there was a dramatic decline in gas volumes and pressures delivered to PGC by PGP. Personnel from PGC in early 2004 immediately notified PGP of the failure and need for maintenance of the well field and system. There were repeated contacts by PGC to PGP personnel; PGP has not repaired the deficiency nor maintained existing service or product. Oral complaints about the failure to take corrective action or perform maintenance of the non-performing wells in the field were made by PGC personnel to PGP, which after unsatisfactory response were made thereafter in writing in April 2004.

PGP represented to PGC in April 2004 that PGP would fix the problem. During one teleconference with Lou Wilkinson and Rick DiGia, representatives of PGP and DTE, Mr. Wilkinson agreed to memorialize in writing for both parties the unperformed maintenance activities and protocol that PGP had agreed to pursue. PGP committed to create ten new wells to replace existing wells that may have failed. In June 2004, PGP/DTE official Mr. Van Hoy communicated that he was preparing information to accomplish redrilling certain non-performing wells. PGC relied on these representations. PGP never followed through on these commitments. PGP has never maintained, redrilled or repaired the existing wells that were indicated to be non-performing or in disrepair from the well survey. After committing to prepare in writing and follow the agreed written maintenance plan, PGP has not fulfilled this promise on which PGC has relied.

By letter of April 27, 2004, to David LaFlamme of PGC, DTE Biomass Vice President, Richard M. DiGia, stated that some corrective action was undertaken and stated "We do not intend to stop there." He stated that his goal was "bringing to bear our extensive experience with other landfill gas facilities, as described in your letter, confirms that coordination of efforts to match generation production is of paramount importance." This letter indicates that PGC could upgrade the PGP collection system at its own expense if it wished.

In response to Mr. DiGia's letter, Mr. LaFlamme of PGC responded by letter of May 11, 2004, documenting that PGC was operating its renewable electric generating facility in the normal design mode, but that the PGP well field was not being maintained to yield traditional or existing gas volumes of greater than 2,200 cfm at 2.5 psi. He indicated that the lack of maintenance of the well field and collection system by PGP was causing grossly inadequate gas pressure and volume to be delivered. He reiterated prior points made by PGC that this was

Curtis T. Ranger
November 24, 2004
Page 3

causing PGC not to achieve design targets in its electricity sale and renewable energy credit ("REC") sale contracts and causing a significant day-after-day loss of contract revenue to PGC. In response to Mr. DiGia's comment that PGC could upgrade the collection system at its own expense, Mr. LaFlamme noted that the upgrade provision in the contract was for improvements for higher volumes or service above and beyond the maintenance obligations on PGP to preserve the existing level of service. He stressed that PGC had never, and was not then, requesting that any improvements or upgrades be made to the system for higher levels of service or gas volume, but rather merely that the collection and delivery system of PGP be maintained at the pre-existing levels of service and product.

PGC requested from PGP all data on inventories of well condition and flow; PGP promised to provide this data but never did provide a complete inventory. This information requested is that to which PGC is entitled under the Agreement.

PGP did not maintain or repair non-performing wells in the well field. Gas volumes remained below historic existing levels of flow. Despite earlier 2003 improvements to the flare station to handle excess gas delivery, made at the election of PGP but partially funded by PGC, those improvements never performed as represented by PGP to deliver positive 2.5 psi gas pressure to PGC. As a result of the failure of PGP to maintain the gas collection and delivery system, PGC had to modify its electric generation facility to achieve pressurized supply of gas and pull the gas to it rather than take gas delivered under positive pressure from PGP.

In a letter to Mr. Ranger dated July 6, 2004, from Gerard Lorusso, President of PGC, PGC again stated the urgency of the situation and the failure, for more than six months, of PGP to maintain or repair the well field and collection system so as to restore it to traditional existing flow. In July 2004, PGC learned that PGP had reneged on its earlier commitment and in fact had suspended all efforts to hire and assign a technician for the Plainville landfill well field and collection system. This has exacerbated the situation.

You, President of DTE Biomass and PGP, met at the landfill with representatives of PGC on July 30, 2004. At this meeting, representatives of PGC informed you that under the agreement, PGP had an obligation to perform reasonable maintenance activities over the prior eighteen months and going forward so as to attempt to maintain existing levels of gas delivery service. Representatives attending the meeting relate the following: At the meeting on July 30, you stated that no additional maintenance activities would be undertaken to restore flow and pressure, and that PGP had no obligation under the agreement to restore gas flows to the traditional existing levels that had been delivered from the landfill for the six years prior to the 2002 amendment. You did not provide the information on well field performance which had been requested months earlier. You stated that PGP would only undertake additional maintenance of the well field collection and delivery system to deliver historic existing volumes and pressure of gas to PGP if DTE were provided equity ownership in PGC's existing electric

Curtis T. Ranger
November 24, 2004
Page 4

generation facility. You stated to PGC that PGC seriously consider providing an equity position to DTE if PGC wanted to restore historic existing gas supply levels.

When additional maintenance activity by PGP was not forthcoming, Mr. Lorusso of PGC suggested by letter to you of August 6, 2004, very specific maintenance activities to restore the existing normal production from the well field. These reiterated suggestions previously made by PGC to PGP. This involved, *inter alia*, redrilling or replacing specific identified wells that had not been maintained and were not performing at their normal existing levels. The letter reiterated that such maintenance was the responsibility of PGP and that with PGP having failed to produce the agreed written maintenance activity protocol, PGC was helping PGP to identify what maintenance activities would help restore the existing levels of production.

By return letter to Mr. Lorusso of August 19, 2004, you stated that because PGP was getting "only a dime per MBTU" for selling gas to PGC under the agreement, while at other landfill sites DTE affiliates received "$2 to $4 per MBTU of LFG," notwithstanding the agreement, PGP would not invest in expenditures for maintenance or repair to restore the well field to existing levels. You again stated that if there were created "a new business structure between PGP and PGC (e.g. DTE could buy into PGC)," PGP could assume the fuel supply risk and undertake necessary maintenance and repair expenditures to deliver and realize existing normal landfill gas delivery levels from the well field to the then jointly-owned electricity project so as to allow it to again operate at its prior levels of full production of renewable energy. Additional efforts in October by follow-up email and letter of PGC to PGP to try to obtain a commitment from PGP to maintain the well field at existing levels of production as per the agreement were met by refusals of PGP to provide the agreed written maintenance protocol, hire a maintenance technician, or expend additional efforts in maintenance activities under the current contractual agreement.[1]

PGC's repeated requests to have PGP maintain the well field and collection system to deliver gas at existing levels have been rebuffed by PGP now for approximately ten months. The effort of PGC to try to resolve this amicably has been met with a refusal by PGP to perform reasonable maintenance to maintain existing flow and gas service, unless PGC provided DTE with an equity position in the separate electric generation project as a *quid pro quo* that it is not entitled to.

---

[1] Instead, PGP demanded payment of monies from PGC for 2003 investments in the flare station despite the fact that those PGP-managed investments did not achieve their intended results. By letter to you dated July 29, 2004, PGC tendered full payment of any and all amounts owed for these flare station improvements, subject only to PGP providing the required and promised maintenance protocol and that the improvements to the flare stations working as intended. That tender was not reciprocated by a tender of maintenance obligation on the part of PGP.

Curtis T. Ranger
November 24, 2004
Page 5


<u>M.G.L. c. 93A</u>

By this letter, PGC states that this conduct of PGP in concert with DTE is a violation of Massachusetts General Laws, Chapter 93A. Attempting to leverage or extract an equity interest in another project or a better deal under an existing contract, by refusing to perform essential and necessary obligations under that existing contract, is a clear violation of Massachusetts statute. See, *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451 (1991).

There can be no reasonable dispute as to what are historic existing levels of gas volume and pressure produced from the landfill. We have approximately seven years of data that demonstrate this existing baseline which was incorporated into the 2002 amendment of the agreement between the parties. PGP covenanted in the agreement at Sections 3.1 and 9.2 to use reasonable efforts to maintain the well field at existing levels, to work in good faith to remedy any gas delivery non-conformities from existing levels and quality, and (Section 7.2) to work in good faith with PGC to resolve these problems. PGP also covenanted in Section 9.1 of the agreement to meet regularly with PGC to resolve operation and maintenance issues. PGP has not honored its April 2004 commitment to PGC that PGP would embody the ongoing maintenance commitment in a consensual written maintenance protocol. PGP needs to cooperate with PGC to share necessary data regarding well field operations, maintenance procedures, and well field and collection system status.

These failures to maintain the well field and gas collection and delivery system, as DTE and PGP and their affiliates well know as operators of other landfill gas-to-energy facilities, is causing a significant and severe loss of revenue every day to PGC. Because of the failure of maintenance, to date during just 2004 PGC has lost more than $300,000 in contractually committed revenues, and is continuing to lose significant additional amounts every day that this maintenance by PGP is not performed. PGC has informed PGP of this ongoing loss numerous times over the phone, in person, by letter and by electronic transmission over the last ten months and pleaded for PGP to undertake the required maintenance activities.

Revenues lost resulting from this failure of maintenance of the field are revenues that can never be reclaimed or recaptured: The ability to utilize the permitted "envelope" of allowed air emissions associated with operating the electric generation facility are limited annually and cannot be carried over to the subsequent year. Once 2004 ends, the unused revenues are lost forever. Therefore, even if and when gas supply is restored to historic existing levels, the air emission limitations on the facility would not allow the running of extra engines or extra hours to somehow "recapture" lost 2004 revenues. Similarly, revenues lost from the sale of electric output or Renewable Energy Credits in Massachusetts, once lost in any given month, cannot somehow be recreated at another time. These are direct economic losses and damages suffered by PGC because of the contractual and M.G.L. c. 93A breaches and violations of PGP and DTE.

Curtis T. Ranger
November 24, 2004
Page 6


<u>Legal Demand</u>

To date PGC has provided PGP several months to honor its obligation and cooperatively work to maintain the well field and the gas collection and distribution system. PGC alleges that PGP and DTE have employed unfair and deceptive acts and practices in their failure to maintain historic existing gas delivery levels at the landfill unless PGC provided them with an equity share in PGC's unrelated electric generation project assets. This unfair and deceptive act and practice has directly damaged PGC and its electric generation project.

By this letter, PGC makes demand on PGP and DTE to do the following immediately:

(1)     Provide the written memorialization of the agreed maintenance activities, protocol and schedule that PGP committed to provide to PGC in April, 2004.

(2)     Cooperatively provide PGC with all data, documents, analysis, film, pictures, investigative reports, whether in hard copy or electronic form, in the possession of PGP or DTE regarding operation, maintenance and repair of the landfill well field gas collection and delivery system from 1997 to the present date, which corresponds to the period of the original contract initiated in 1996.

(3)     Commit to, and commence, maintaining, repairing or replacing all existing nonperforming wells at the landfill and the gas collection and delivery system, including deferred maintenance, so as to maintain the quantity and quality of landfill gas at traditional existing levels comparable to those historic levels determined as of the time that the amendment to the agreement of the parties was executed in November 2002.

(4)     Commit to restitute to PGC all of the net operating income permanently lost by PGC during 2004, to the time when existing volume and service is again maintained, to compensate PGC for PGP's failure to maintain the well field and gas collection and delivery system so that historic existing flow was maintained. This amount was approximately $310,000 as of October 31, 2004, and continues to increase each day.

(5)     Commit to staff the landfill collection system adequately with trained personnel and to maintain same on a going-forward basis so that this 2004 maintenance problem does not occur in the future.

PGC states again that it has the capacity and intent to pay any balances due to PGP for 2003 improvements to the flare station, and tenders any such amounts to be paid when system maintenance allows the delivery of gas at "existing levels of service and product as provided in [the] Agreement . . . ," as is the contractual arrangement between the parties.

Curtis T. Ranger
November 24, 2004
Page 7


     Pursuant to M.G.L. c. 93A, you are required to make a good faith offer of settlement regarding this matter to me no later than thirty days after our mailing of this letter.  Your failure in bad faith to make a reasonable tender of settlement pursuant to the statute allows the court to order you to pay double or triple PGC's damages and PGC's attorneys' fees and costs.  During this thirty day period, I am willing to meet with PGP to discuss this matter more fully and to work cooperatively.

                            Sincerely,


                            Steven Ferrey
                            Consulting Counsel


SF:leh

BS98793.1

Curtis T. Ranger
November 24, 2004
Page 8


bcc:     Gerard Lorusso, Lorusso Corporation

BS98793v2

# EXHIBIT

# H

# PLAINVILLE GAS PRODUCERS, INC.

December 21, 2004

Steven Ferrey, Esquire
LeBoeuf, Lamb, Greene & MacRae
260 Franklin Street
Boston, Massachusetts 02110-3173

*By Federal Express*

Re:    **Demand Letter on Plainville Gas Producers, Inc. ("PGP") by Plainville Generating Company ("PGC") dated November 24, 2004**

Dear Mr. Ferrey:

I represent PGP. Your above-referenced demand letter to Curtis T. Ranger has been referred to me for response.

PGP denies that it has engaged in any unlawful or deceptive practices as alleged in your demand letter.

While I doubt that any useful purpose would be served by attempting a point-by-point rebuttal of the allegations of your demand letter, I note that it appears to be premised on the assumption that PGP has a contract with PGC in which "PGP undertook to supply, and 'to maintain the existing level of services and product' as were supplied to PGC during the prior six years ..." (Demand letter, pp.1-2). Your letter appears to refer to the Restated and Amended Gas Purchase Agreement dated November 18, 2002 ("Agreement") as the source of this obligation.[1]

Your demand letter does not cite the provision of the Agreement referred to in the language quoted in the preceding paragraph and I am unable to locate it in the Agreement. The only reference in the Agreement to maintaining "the existing level of services and product" appears in Article 9.2.a[2], which allocates responsibility for the cost of upgrades to PGC's gas collection system. I am unable to locate any reference to the maintenance of historic production levels anywhere in the Agreement. On the contrary, the entire tenor and numerous specific terms of the Agreement make clear that PGP has no such obligation. I would refer you to Article 5.1 ("Delivery Volumes"), Article 5.4 ("Disclaimer Regarding Landfill Gas"), Article 7.3 ("Disclaimer of Warranties"), and

---

[1] The Agreement is actually between PGP and Lorusso Corporation, a Massachusetts corporation. If Lorusso Corporation has assigned its rights under the Agreement to PGC, I would remind your client that under Article 16.9 of the Agreement any assignment of rights under the Agreement, even to a Related Entity (as defined in that article) requires 30 days written notice to the other party. As far as I am aware, Lorusso has never notified PGP of any proposed assignment of the Agreement.

[2] Unless otherwise specified, all references herein to "Articles" are to the numbered articles of the Agreement.

425 S. Main Street, Suite 201; Ann Arbor, MI  48104
PH:  (734) 913-2080; FAX:  (734) 668-1541

Steven Ferrey, Esquire
December 21, 2004
Page 2

Article 2.4 ("Assumption of Risk by Buyer"). None of the provisions you specifically refer to, Articles 3.1, 7.2, 9.1 or 9.2, contains any requirement that PGP produce or deliver any specific quantity of gas or refers to "historic existing levels" of gas production. Since the quantities of gas produced at a closed landfill site typically decline over time, it would be surprising if the Agreement *had* contained such a provision, but in any event it does not.

I have also reviewed the correspondence from which your demand letter selectively quotes. Again, I have no intention of attempting a point-by-point rebuttal, but will give one example to illustrate why I cannot accept your characterizations of the parties' correspondence. Your demand letter states that in Mr. Ranger's August 19, 2004 letter to Gerald Lorusso of PGC, "[Ranger] stated that because PGP was getting 'only a dime per MBTU' for selling gas under the agreement, while at other landfill sites DTE affiliates received '$ 2 to $ 4 per MBTU', notwithstanding the agreement, PGP would not invest in expenditures for maintenance and repair to restore the well field to existing levels." (Demand letter, p. 4) The actual paragraph from which the quotes are taken is as follows:

> "The economic terms of our restated and amended agreement contemplates [*sic*] that PGC has the right to cause improvements or upgrades to the wellfield at PGC's cost with a view toward improving gas generation. Whereas other sites pay $ 2 to $ 4 per MBTU of LFG, PGC pays only a dime per MBTU in order to permit it to implement such upgrades."

(Letter of C. T Ranger to G. C. Lorusso, August 19, 2004, p. 1). In context, it is clear that Mr. Ranger was simply explaining why the Agreement allocated the cost of system upgrades to the buyer. I would also note that in the same letter, Mr. Ranger explained that redrilling existing wells as suggested by Mr. Lorusso "cannot be done without compromising the rock packing and completely destroying the well integrity. … I cannot in good conscience recommend that any wells be redrilled even if PGC were paying for it." (*Ibid.*, p. 2)

You allege that PGP threatened not to honor its alleged obligations under the Agreement to "maintain historic existing gas delivery levels at the landfill unless PGC provided them with an equity share in PGC's unrelated electric generation project assets." (Demand letter, p. 6) A review of the actual language of Mr. Ranger's August 19, 2004 letter (p. 2) reveals that Ranger had actually offered to explore buying into PGC's project as a way to share the risk of inadequate fuel supply — a risk the Agreement places on the buyer of the gas. The offer was not pursued and PGP has no interest in acquiring any interest in your client's generating plant.

I believe that a fair review of the entire correspondence reveals nothing more than a disagreement between the parties as to what measures could usefully be taken to improve gas production under the Agreement and which party had the responsibility to

Steven Ferrey, Esquire
December 21, 2004
Page 3

pay for them.    Characterizing these disagreements as "unfair and deceptive acts and practices" under M.G.L. Chapter 93A is unwarranted and unhelpful.

What does appear to qualify clearly as unfair and deceptive acts under M.G.L Chapter 93A is the withholding of payments due under a contract in order to coerce favorable settlement of other issues.  *See e.g., Arthur D. Little, Inc. v. Dooyang Corp.,* 147 F.3d 47, 55-56 (1st Cir. 1998).  Your client has failed to pay all of the cost of modifications to the gas production facility made at your client's request.  While not denying that the money is owed, your client has conditioned its offer to pay the remaining balance owed (part has already been paid) on PGP agreeing to various items, including "PGP's written commitment to promptly and timely implement such maintenance plan and repairs so as to capture and deliver gas from the field as per the contract at traditional and 'existing levels of service and product as provided in [the] Agreement...'"  (Letter of G.C. Lorusso to C. T. Ranger, dated July 29, 2004, p. 2)  PGP's most recent invoice to your client, dated December 13, 2004, reflected an unpaid balance of $ 85,302.30 including interest through that date.  Your client's withholding partial payment of this undisputed debt in an effort to coerce PGP to agree in writing to your client's unjustified interpretation of PGP's obligations under the Agreement appears in itself to qualify as a violation of M.G.L. Chapter 93A.

Under the circumstances, my client has not authorized me to extend any offer in settlement of the claims set forth in your demand letter.  If your client elects to pursue those claims, I would remind your client of the provisions of Article XV of the Agreement.  If you wish to discuss this matter, please feel free to contact me.

Very Truly Yours,

David R. Joest
Attorney

# EXHIBIT

# I

# Plainville Gas Producers, Inc.

**STATEMENT**

Customer Name:

Loruso Corp.
3 Becher Street
Plainville, MA 02762

Attn: Dave Laflamme

| Billing Period | Customer No. | Date | Terms | Amount Due |
|---|---|---|---|---|
|  | L00001 | 4/23/2004 | Net 30 Days | $      110,293.09 |

Description

Facility modification
(see attached documentation)

| | | |
|---|---|---|
| Budget | $ | 134,239.39 |
| Amount previously billed | $ | 28,176.05 |
| Balance | $ | 106,063.34 |
| Interest | | 4,229.75 |
| Amount Due | $ | 110,293.09 |

REMIT TO:     Plainville Gas Producers, Inc.
425 S. Main Street, Suite 201
Ann Arbor, MI 48104

If you have any questions regarding this
invoice, please contact Tara Jedele at
(734) 913-2092.

TOTAL P.04

# EXHIBIT

# J



# PGC

## PLAINVILLE GENERATING COMPANY, LLC.

**3 BELCHER STREET**
**PLAINVILLE, MA 02762**

HONE: 508.695.3252

FACSIMILE: 508.695.1130

July 29, 2004

Curtis Ranger, P.E.
Plainville Gas Producers, Inc.
425 S. Main Street, Suite 201
P.O. Box 8614
Ann Arbor, MI 48107

Re:    Plainville Obligations

Dear Curt:

Over the last several months, we have had discussions and exchanged correspondence regarding the supply of gas by Plainville Gas Producers, Inc. (PGP) to Plainville Generating Company, L.L.C. (PGC), and required maintenance of the landfill gas field in Plainville that supplies fuel on an "all requirements" basis to PGC pursuant to our agreement. Matters seem to have stalled.

Let me reprise where I think we are. PGP undertook certain gas collection system modifications pursuant to the Restated and Amended Gas Purchase Agreement. Although those modifications described were completed, they do not produce the intended results. Subsequent discussions among the parties ensued regarding this matter and the general decline in the gas at the landfill. PGC agreed to reimburse the initial modifications dependent upon PGP preparing for implementation a mutually agreeable maintenance plan for the gas collection system and furnishing data on well flow and pressure. The scope of this maintenance plan was agreed to by representatives of the two companies. PGC paid approximately 30% of the remaining modification cost amounts to PGP earlier in 2004 based on this understanding. In late May 2004, PGP stated to PGC that it would not deliver these items.

The agreement between the parties contains no provision as to how to resolve this particular impasse on previously agreed PGP deliverables and commitments short of arbitration or litigation. PGC's commitment to pay the balance is dependent upon PGP's performance of its

Curtis Ranger, P.E.
Plainville Gas Producers, Inc.

July 29, 2004
Page 2 of 2

agreed maintenance undertakings, and PGP has balked at delivering its previously promised plans and commitments. PGC has the capacity and intent to pay the balance and has in fact written the check contingent upon PGP going forward as previously agreed. Consequently, by this letter, PGC hereby tenders to PGP the balance of the amount it agreed to pay to PGP $74,244.34, contingent upon PGP providing PGC the following:

- A mutually agreeable written maintenance plan for the gas field and collection system.

- PGP's written commitment to promptly and timely implement such maintenance plan and repairs so as to capture and deliver gas from the field as per the contract at traditional and "existing levels of service and product as provided in [the] Agreement . . . ."

- All historic data in the possession of PGP for the period 1997-2004 (during which time PGC or its affiliates have purchased gas from PGP under this or prior agreements) that document flow rates from each of the wells in the landfill and related pressure and volume data.

- A commitment of PGP and a schedule to "meet regularly and develop procedures for coordination of the parties' operations and maintenance . . ." to repair and maintain the collection system at historic "existing levels of service," as required by the Agreement.

I look forward to receiving the previously agreed deliverables from PGP and releasing to you the payment I hereby tender, dependent on PGP completing its part of the agreement. I hope to resolve this matter amicably.

Sincerely,
Plainville Generating Company

Gerard C. Lorusso
President

# EXHIBIT

# K

P.O. Box 8614, 425 South Main Suite 201
Ann Arbor, Michigan 48107
Tel: 734.913.2080  Fax: 734.668.1541



**DTE Energy**

*DTE Biomass Energy*

December 22, 2004

Steve Ferrey, Esquire
LeBoeuf, Lamb, Green, & MacRae, LLP
260 Franklin Steet
Boston, MA 02110-3173

RE: <u>Demand Letter Upon DTE Biomass Energy, Inc. Pursuant to M.G.L. Chapter 93A</u>

Dear Mr. Ferrey:

I am responding to your letter dated November 24, 2004, as General Counsel of DTE Biomass Energy Inc. ("DTEBI").

DTEBI has not and is not engaged in any unlawful and deceptive act or practice contemplated by the above referenced chapter of the Massachusetts General Laws.

While DTEBI is prepared to attempt to resolve any true dispute in good faith, there is no legal or factual basis to the claims of Plainville Generating Company's set forth in your letter. Accordingly, the demands enumerated as items (1) through (5) of page 6 of your letter cannot be accommodated.

Very truly yours,

Gerald Endler
Vice President and General Counsel

# EXHIBIT


# L





**PLAINVILLE GENERATING COMPANY, LLC.**

**3 BELCHER STREET
PLAINVILLE, MA 02762**

PHONE: 508.695.3252

FACSIMILE: 508.695.1130

July 6, 2004

Mr. Curtis T. Ranger, President
Plainville Gas Producers, Inc.
425 S. Main Street, Suite 201
Ann Arbor,  MI  48107

Dear Curt:

Thank you for your letter of July 1st.  I look forward to meeting with you this month to resolve our outstanding issues.  I agree with you that this is most disconcerting.  I must, however, take exception to your contention that you have "gone the extra mile for us."

For six months, we have been stonewalled in our efforts to receive information which may lead to a solution to the sudden and continued decline in gas quantities from the landfill that occurred in mid-January.    What should have been routine requests concerning the status of the well field, that is (an inventory of well condition) and an output inventory on a per well basis, have not been made available.  It would appear that this information has never been developed.    In fact, for a good portion of the last 15 months, the well field has been run unattended.

As to the unpaid balance for modifications made to the flare station, let me be clear, the modifications designed for you are not working.  The modifications were not made at our request.  We asked several times why these changes were required and we were told they were required to deliver the gas via existing flare blowers and that they would have no problem delivering gas at 2.5 psi. Most of the funds expended went into PLC controls which still do not function as expected.

These modifications were made to provide our generating facility with a positive pressure supply.  This has never occurred.    Additionally, we spent three times the budget you estimated as a result of the "deferred maintenance" in evidence at the flare station.  We have had to modify our facility from the original design to compensate for the inability of the flare station to provide a pressurized supply and effectively pull the gas through the flare station to the plant rather than receive the gas from a pressurized supply.

Although the modifications were not effective, in good faith, I agreed with Rick DiGia and Lou Wilkinson to a partial payment of the outstanding balance.  I did this as it appeared we had arrived at a solution to the maintenance issues we have witnessed.  Lou was to prepare a letter summarizing the maintenance issues and protocol to follow.  That was six weeks ago.  I sent the partial payment but have yet to receive either the letter agreement or a return telephone call.  I feel as though our actions in good faith have not been reciprocated.

Mr. Curtis T. Ranger, President
Plainville Gas Producers, Inc.

July 6, 2004
Page 2 of 2

As you can see, this lack of response and communication again makes me question the notion you have gone the extra mile. All that aside, I am willing to meet with you to amicably work out the issues which continue to hamper the ability of our facility to operate as based on reasonable projections and expectations. Please note, however, these issues have existed for over six months and must quickly be brought to a resolution.

Please contact my assistant, Mary Coogan, to set up a date and time. With the exception of July 22 through 26th, I am available to meet with you.

Very truly yours,
Plainville Generating Co., LLC.

Gerard C. Lorusso

GCL/m

Cc:
Rick DiGia
Lou Wilkinson

# EXHIBIT

# M

**Plainville Gas Producers, Inc.**
425 S. Main Street, Suite 201
Ann Arbor, MI  48104


July 19, 2005

Gerard C. Lorusso
President
Plainville Generating Company, LLC
3 Belcher Street
Plainville, MA 02762

     Re:    Notice of Termination of Gas Purchase Agreement

Dear Mr. Lorusso:

By this notice letter, Plainville Gas Producers, Inc. ("Seller") hereby notifies Lorusso Corporation ("Buyer") that Seller hereby terminates the Restated And Amended Gas Purchase Agreement between Seller and Buyer dated November 18, 2002 ("Gas Purchase Agreement") pursuant to Section 12.2(h) of Article XII of the Gas Purchase Agreement, which termination shall be effective at midnight, August 31, 2005, as the Seller has determined that the Plainville Landfill located in Plainville, Massachusetts ("Landfill") owned by Allied Waste Systems, Inc. ("Owner") has ceased to produce landfill gas, consisting primarily of methane and carbon dioxide that is produced from decomposing refuse within the Landfill ("Landfill Gas"), in such amounts that the Landfill Gas can be extracted from the Landfill by Seller of such quantity and quality that it is economically viable and profitable for Seller to sell the Landfill Gas to Buyer under the terms of the Gas Purchase Agreement.

Although Seller has no obligation to do so under the terms of the Gas Purchase Agreement or otherwise, Seller hereby further notifies Buyer that Seller offers to assign to Buyer Seller's rights in the Plainville Landfill Gas Rights Agreement dated December 18, 1996

KC-1307842-1

between DTE Biomass Energy, Inc. ("DTE Biomass"), formerly known as Biomass Energy Systems, Inc., and Owner, formerly known as Laidlaw Waste Systems, Inc., as amended by the Amendment thereto dated November 1, 2000 ("Gas Rights Agreement"), subject to Buyer assuming all of Seller's obligations to Owner under the provisions of the Gas Rights Agreement, Seller having been assigned all of the rights and obligations of DTE Biomass, provided that Buyer accepts this assignment of rights and obligations by (1) fully executing the Assignment enclosed herein and (2) providing Seller actual notice of such acceptance by delivery to Seller either the original or a copy of said Assignment so that it is received by Seller on or before noon EDT on Friday, July 29, 2005. For the purposes of Buyer's acceptance of this offer by Seller of an assignment of Seller's rights and obligations under the provisions of the Gas Rights Agreement, the delivery of such acceptance as required by this paragraph of this notice letter may be made by U.S. Mail, private courier, facsimile, or e-mail.

By this notice letter, Seller further notifies Buyer that Seller intends to terminate the Gas Rights Agreement pursuant to Article X. C. of that agreement on July 29, 2005 if Buyer does not accept Seller's offer to assign it rights and obligations under the Gas Rights Agreement to Buyer pursuant to and in accordance with the terms and conditions of that offer as set forth in the immediately preceding paragraph of this notice letter.

By this notice letter, Seller further notifies Buyer that Article IV. C. 1. of the Gas Rights Agreement requires Seller or its assigns to pay Owner in advance an annual license and rental fee in the amount of Two Hundred Ten Thousand Dollars ($210,000.00) on or before September 1, 2005 unless Seller or its assigns terminates the Gas Rights Agreement pursuant to Article X. C. of that agreement on or before August 1, 2005. Accordingly, in order for Buyer to maintain the rights of Seller and/or its assigns under the provisions of the Gas Rights Agreement pursuant to

the Assignment offered by Seller to Buyer in the immediately preceding paragraph of the notice letter, Buyer must make the $210,000.00 payment required of Seller or its assigns under the provisions of the Gas Rights Agreement on or before September 1, 2005.

Very truly yours,

Curtis T. Ranger
President, Plainville Gas Producers, Inc.

cc:    Stephen Ferrey, Esquire

KC-1307842-1

## ASSIGNMENT OF GAS RIGHTS

This Assignment of Gas Rights is made effective this _____ day of _____, 2005, by Plainville Gas Producers, Inc., a Michigan corporation ("Assignor"), to Lorusso Corporation, a Massachusetts corporation ("Assignee").

WHEREAS Assignor is the holder of certain rights to collect and market Landfill Gas generated within the Plainville Landfill located in Plainville, Massachusetts and owned and operated by Allied Waste Systems, Inc., a Delaware corporation formerly known as Laidlaw Waste Systems, Inc. ("Owner") under that certain First Amendment and Restatement of the Plainville Landfill Gas Rights Agreement between Owner and Assignor's parent, DTE Biomass Energy, Inc., a Michigan corporation formerly known as Biomass Energy Systems, Inc. ("Biomass") and that certain Amendment Dated as of November 1, 2001 to Plainville Landfill Gas Rights Agreement between Owner and Assignor (collectively the "Gas Rights Agreement"); and

WHEREAS Assignor wishes to assign its rights under the Gas Rights Agreement to Assignee without payment of any monetary consideration to Assignor, provided that Assignee assumes and agrees to perform all of Assignor's obligations under the Gas Rights Agreement, which assumption and agreement shall constitute consideration for the assignment;

NOW THEREFORE the Parties agree as follows:

1. All capitalized terms used in this Assignment without being defined herein shall have the meaning assigned to them in the Gas Rights Agreement.

2. Assignor hereby assigns to Assignee all of its right, title and interest under the Gas Rights Agreement and assigns and conveys to Assignee all of its right, title and interest in the Collection System.

3. Assignee accepts the assignment of Assignor's rights under the Gas Rights Agreement, assumes all of the obligations of the Producer thereunder, and agrees to be bound by the terms thereof.

4. Biomass joins in the assignment of rights under the Gas Rights Agreement to the extent of any interest it may have therein.

5. **NEITHER ASSIGNOR NOR BIOMASS MAKE ANY WARRANTY AS TO THE NATURE OR EXTENT OF THE RIGHTS ASSIGNED HEREBY, THE QUANTITY OR QUALITY OF LANDFILL GAS, THE CONDITION OF THE COLLECTION SYSTEM, THE AVAILABILITY OF TAX CREDITS UNDER STATE OR FEDERAL LAW IN CONNECTION WITH THE COLLECTION AND SALE OR USE OF LANDFILL GAS, OR ANY OTHER MATTER RELATING TO THIS ASSIGNMENT.**

6.     Assignee undertakes and agrees to indemnify and hold Assignor and Biomass harmless from and against any liability to or claim by Owner arising out of Assignee's failure to perform the Producer's obligations under the Gas Rights Agreement, or any of them, from and after the effective date of this Assignment.

7.     This Assignment contains the entire agreement and understanding of the parties hereto with respect to the assignment of rights under the Gas Rights Agreement, superseding any and all prior agreements, understandings, negotiations, representations and discussions.


IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed as of the day and year first written above.


PLAINVILLE GAS PRODUCERS, INC.          LORUSSO CORPORATION


By: _____          By: _____

Printed Name: _____          Printed Name: _____

Title: _____          Title: _____


DTE BIOMASS ENERGY, INC.


By: _____

Printed Name: _____

Title: _____