UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————
                                                    )
PLAINVILLE GENERATING CO., LLC,    )
                                                    )
    Plaintiff,                          )
                                                    )
vs.                                                 )        C.A. No. 05-11210-GAO
                                                    )
DTE BIOMASS ENERGY, INC.           )
AND                                                 )
PLAINVILLE GAS PRODUCERS, INC.,    )
                                                    )
    Defendants.                         )
———————————————————)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (1) ORDERING DEFENDANTS TO TURN OVER HARDWARE, SOFTWARE, KEYS AND DOCUMENTS NECESSARY TO OPERATE THE LANDFILL COLLECTION SYSTEM AFTER THEIR SUDDEN ABANDONMENT AND (2) POSTING SECURITY FOR JUDGMENT

Plaintiff Plainville Generating Co., LLC ("Plaintiff") operates one of Massachusetts' few

renewable energy projects.  Plaintiff requests this preliminary injunctive order because

Defendant, Plainville Gas Producers, Inc. ("Plainville Gas"), in retaliation to Plaintiff filing this

litigation, on July 21, 2005 served Plaintiff with a Notice of Termination of all contracts at issue

in this litigation (*See* "Notice of Termination" attached to Lorusso Aff.), and is running away

from its substantial legal obligations and imperiling operation of the critical Landfill Gas

Collection System.  Plainville Gas announced in this Notice, that it was arbitrarily and

unilaterally terminating two contracts and abandoning its obligations in bad faith before the

Court could reach the merits of the litigation, which litigation, *inter alia,* asks the Court to

construe the parties' obligations pursuant to these contracts.  To avoid loss of all gas, which

would have destroyed Plaintiff's operating renewable energy project and Plaintiff's company,

Plaintiff, was forced on short notice to accept Defendant's non-negotiable ultimatum to step into the Gas Supply Agreement Defendant abandoned.

However, after making this assignment to Plaintiff, Defendants have refused to cooperate with Plaintiff to turn over keys, provide hardware or software, provide necessary data for required government monitoring and reporting, or provide operating diagrams, schematics and information essential for operation. This has imperiled operations, and could cause Plaintiff to violate state or federal laws, or become in breach of its newly-assumed agreement with the Plainville Landfill owners, thereby damaging that valuable relationship. Moreover, Defendant's failure to provide information needed to maintain and tune the 117 wells will inevitably result in decreased capture of natural gas, and increased quantities of harmful methane escaping into the environment. These are harms for which money damages are inadequate. Plaintiff accordingly requests an immediate order that Defendants be compelled to meet with Plaintiffs at the Landfill to cooperate to transition operational matters, documents, hardware and software regarding the complex 117–well Collection System that Defendants abandoned.

Moreover, now that Defendants have severed the contractual relationship that is the subject of this litigation, Defendant Plainville Gas's only remaining assets are its substantial federal tax credits and it will likely try to unwind its business before a judgment of this Court can be rendered on the merits. Lorusso Aff. at 7. There is a pattern of bad faith and unfair dealing in this conduct, set forth in more detail below. It is essential to preserve the financial status quo that existed at the start of this litigation a few weeks ago, so that manipulations by Plainville Gas do not shift remaining assets to its parent, declare bankruptcy, and frustrate the remedies to which parties are entitled. Lorusso Aff. at 6. By best estimates, Plainville Gas has accrued federal tax credits in excess of $5 million during the period it sold gas to Plaintiff. Lorusso Aff., ¶ 7. This amount is in addition to what Plaintiff pays Plainville Gas each year for purchase of the

gas. The annual expenditures under the Gas Rights Agreement with Alled are $210,000 per year, plus any maintenance actually performed by Plainville Gas, which appears to be minimal. These expenses add up to approximately $2 million. Therefore, the cash value of the tax credit, plus the sums Plaintiff has paid for gas over the past nine years, may be three times the amount of the expenditures. With Plainville Gas' cash-equivalent revenues at $3 to $4 million more than expenditures incurred by Plainville Gas, a bond or letter of credit for $3 million is not disproportionate. Therefore, to preserve the status quo, Plaintiff also moves the Court to order on an interim basis that Defendants supply a letter of credit or other appropriate form of security for $3 million, their potential liability in this matter.

### The Underlying Dispute

**The Legal Obligations.** Plaintiff is the operator of one of only two new renewable electric generating facilities successfully completed in the state since 1998 (the "Facility"), which is located in Plainville, Massachusetts, adjacent to the Plainville Landfill (the "Landfill"). Lorusso Aff. at ¶2. It is a small, family-owned business, which has never before done an electric energy venture. Lorusso Aff. at ¶1. The renewable energy Facility is permitted only to be fueled *exclusively* by Landfill gas from the Landfill collection system ("Collection System"). Lorusso Aff. at ¶2. There is no other source of gas available at this location. *Id.* If that gas is not provided reliably, the renewable energy Facility can not operate and will default on its long-term electricity supply contracts with third-party buyers of renewable power. *Id.* at ¶3.

Defendant Plainville Gas is a project company, and 100% subsidiary of Defendant DTE, which exists solely to administer contracts relating to the Plainville gas sale, whereby landfill gas is collected from the Landfill owned by Allied and supplied to Plaintiff's nearby renewable energy Facility. Both Defendants are ultimate subsidiaries of DTE Energy, a large electric utility and energy company in Michigan, which also owns Detroit Edison Company.

3

There are two contracts at the Landfill that Defendant Plainville Gas operated pursuant to the commencement of this litigation, which constitute all of Plainville Gas' assets. Lorusso Aff. at ¶7. First, under the Gas Rights Agreement, Defendant DTE until November 2000, and Defendant Plainville Gas thereafter, are obligated to Allied, the Landfill owner, to operate the Collection System at the Landfill (a copy of the Gas Rights Agreement and amendment is attached as Exhibit A to the Complaint in this action). Second, under an agreement dated on or about September 1, 1996, and amended on or about November 18, 2002 (the "Contract;" a copy of the Contract is attached as Exhibit B to the Complaint), Defendant Plainville Gas supplies to Plaintiff's Facility all the gas produced from the adjacent Landfill. The Contract is an "output contract" whereby the Plaintiff agrees to buy and Plainville Gas agrees to sell all of the Landfill gas that is produced from the Landfill until 2017. *See* Contract at ¶5.1.

Under the Contract, Defendant Plainville Gas is obligated to maintain the Collection System at its expense "in a manner reasonably necessary to deliver" to the Facility all of the gas naturally produced at the Landfill. *See* Contract at ¶3.1. Another provision of the Contract, ¶ 5.5, provides that Defendant Plainville Gas "will use reasonable efforts to supply such Landfill Gas to Buyer . . . in the quantities set forth in Article 5.1, 5.2 and 5.3 of this Agreement" [which include "all of the Landfill Gas" produced at the Landfill]. Defendants cannot allow 25% of this Landfill gas to escape the Collection System into the environment due to lack of reasonable maintenance, without liability under the Contract.

Moreover, the Massachusetts Department of Environmental Protection ("DEP") is threatening violations and requiring repair to remedy this escape and potential damage to the environment. *See* Complaint, Ex. D. Thus, under the Contract, as amended in 2002, Defendant Plainville Gas undertook to reasonably maintain the Collection System so that it would supply

the existing level of Landfill gas services and product as were supplied under the Contract during the original Contract period of 1996-2002.

**The Lack of Reasonable Collection System.** Maintenance  The volume and pressure of the gas delivered by Defendant Plainville Gas to the Facility declined significantly in early 2004. Adams Aff. at ¶ 3, 5.  Plaintiff promptly notified Defendant Plainville Gas orally of the supply and pressure decline and the need for maintenance of the Collection System to fulfill the Contract.  In April 2004 and thereafter, Plaintiff provided written notice of the need for maintenance. *See* Complaint, Ex. C.

In April 2004, Defendants provided assurances to Plaintiff that they would fix the Collection System problems and the parties agreed to memorialize the maintenance activities needed and protocol, to which the parties had then agreed, in a written maintenance plan that Plainville Gas would follow.  *See* Lorusso Aff. at ¶6 and Complaint at ¶¶32-38 and 53-78. Defendant Plainville Gas, however, failed to take effective or satisfactory action to repair the dysfunctions, drill new wells, provide a maintenance technician for the Collection System or provide the written plan. Lorusso Aff. at ¶¶6, 8.  All the while, Defendants were assuring Plaintiff that the approximately 117 gas collection wells which are the heart of the Collection System at the Landfill were operating properly and sufficiently to collect <u>all</u> gas for delivery to the Facility, and that no gas was escaping elsewhere to the environment.  Lorusso Aff. at ¶9. This statement now is known to be a material misrepresentation: At that time, data known to Defendants, but refused by Defendants to be shared with Plaintiff, demonstrated that approximately half of the wells at the Landfill were dysfunctional.  Adams Aff. at 6; Lorusso Aff. at ¶9).  On June 18, 2004, the DEP had sent the Landfill owner, Allied, a Notice and Order ordering immediate evaluation regarding landfill gas that was not being collected by the Collection System and was instead migrating off-site and escaping into the environment in

violation of legal requirements. *See* Complaint, Ex. D. Defendants collaborated with owner

Allied and third-party consultants to assist in responding to the June 18, 2004, DEP Notice and

Order. Landfill data collected in 2004 indicated that substantial quantities of Landfill gas were

migrating off-site into the community rather than being delivered by the Collection System to

Plaintiff. A consultant report determined that approximately *half* of the Landfill Collection

System wells surveyed were not functioning properly, and were thereby not collecting or

delivering to Plaintiff all, and far below historic, levels of Landfill gas. Adams Aff. at ¶5;

Lorusso Aff. at ¶9. Defendants were aware of this dysfunction and failure, but misrepresented

this to Plaintiff.

**The First Attempt to Extort Plaintiff.** In fact, Plainville Gas did none of these

maintenance or repair activities it promised. Instead, it tried to extort Plaintiff into granting it an

equity stake in Plaintiff's renewable energy Facility, as a *quid pro quo* for finally supplying all

gas produced at the Landfill, as required by Contract. On July 30, 2004, Curtis Ranger,

President of both Defendant Plainville Gas and Defendant DTE, met with Gerard Lorusso,

president of Plaintiff, and other representatives of Plaintiff at Plaintiff's office next to the Landfill

in Massachusetts. At this meeting, Mr. Ranger stated that Plainville Gas would undertake

responsibility for maintenance of the Collection System to restore delivery of gas to the

renewable energy Facility to historic levels of volume and pressure - - but only if co-Defendant

DTE was granted an equity interest in the Facility. Lorusso Aff. at ¶5. Plaintiff did not agree to

this ultimatum. *Id.* After July 30, 2004, Plainville Gas did not perform additional necessary

maintenance, nor did it provide a maintenance technician at the Collection System, or fulfill any

of its earlier promises. *Id.*

**The Second Extortion.** Defendants have continued to employ strong-arm tactics to try

to block Plaintiff from seeking effective redress in the Court. On November 24, 2004, counsel

for Plaintiff made a formal legal demand to Defendants, pursuant to M.G.L. c. 93A. Defendants responded with a Notice of Termination threatening to shut off forever all Landfill gas supply within 10 days if Plaintiff did not pay a sum of almost $100,000, that it did not owe Defendants. Lorusso Aff. at ¶4. Plaintiff was forced to pay under protest to maintain the necessary gas supply long enough until it could get to Court with this instant action, reserving its rights to bring this action to recover those funds. *Id.*

**The July 19, 2005 Threat and Third Extortion That is the Subject of This Request for Injunctive Relief.** In June 2005, Plaintiff initiated this action. After obtaining a three-week extension, so that it would essentially dove-tail concurrently in time with the filing of its Answer to the Complaint, Defendant Plainville Gas sent notice dated July 19, 2005, that it unilaterally was permanently terminating the Contract, as well as the separate Gas Rights Agreement, within a week of Plaintiff's receipt of that Notice, irrevocably cutting off Plaintiff's only supply of gas, which would kill the renewable energy project and destroy Plaintiff's business. Plaintiff had no choice to avoid ruin of its multi-million dollar renewable energy Facility but to step into the Gas Rights Agreement as an assignee to keep gas flowing and its project viable, on the non-negotiable terms imposed by Defendant with its Notice of Termination (attached to Lorusso Aff.).

Defendant Plainville Gas' explanation for terminating the two contracts is yet another attempt to unfairly avoid its contractual obligations. It claims that its termination is based on the Landfill ceasing to "produce Commercial Quantities of Landfill Gas . . . ." However, after declining steeply by about 20% in early 2004 due to lack of reasonable maintenance, the amount of delivered gas levels from the Landfill have remained constant over the past year. See Adams Aff. at ¶¶3-4. There is no decrease in the past 15 months regarding the quantities of gas delivered and sold. *Id.* The quantities of gas now being produced and delivered are well within

7

the range of "commercial quantities" by industry standards and norms. *Id*. at ¶¶4, 7. There is no failure of commercial quantities of supply under any objective basis. *See* Adams Aff. at 4.

The only reason Defendant unilaterally terminated its contracts in July 2005, after over a year of constant gas production levels within industry ranges for "commercial quantities," is to retaliate against Plaintiff for commencing this litigation. There is no coincidence that this Notice of Termination was sent contemporaneously with Defendants' Answer to the Complaint, just as there was no coincidence that Defendant's December 2004 Notice of Termination to Plaintiff was sent contemporaneously after Plaintiff made its 93A demand (which was prerequisite to filing this action now before the Court). There is no objective or fair basis for this contract termination now; it is an unfair and deceptive unilateral act and violates the implied duties of good faith and fair dealing specifically at issue in this litigation.

**The Failure to Turn Over.** On two separate occasions during August 2005, counsel for Defendants informed counsel for Plaintiffs that Defendants were going to meet with Plaintiffs at the Facility during specific weeks in August to provide documents, maps, information, keys and materials necessary for an orderly transition of Plaintiff or its affiliate into the responsibilities of the gas supplier function being unilaterally suddenly abandoned by Defendant PGP. These materials would include ongoing 2005 data necessary for regular reporting requirements to government authorities. Plaintiff in August 2005 requested in writing to Defendants, cooperation and necessary documents and plans but Defendants did not cooperate or reply. Lorusso Aff. ¶5. Defendants did come to the Landfill in August, had to pass by Plaintiff's front door to get there, but did not meet with or contact Plaintiff. Lorusso Aff. ¶5. This was a breach and a breach of the most basic good faith requirements for any assignment of such major responsibilities under an existing contract – let alone one forced on Plaintiff.

Essential information and materials to enable Plaintiff to satisfy federal and state legal requirements, operating permit requirements, and prudent operating protocols, which should have been turned over cooperatively by Defendants, but were not, include, but are not limited to:

- As-built record drawings of gas Collection System and flare station with detailed drawings included

- Copies of all current air and solid waste operating permits for the Facility

- Operation and maintenance plan for the Facility

- Keys and lock combinations

- Existing Gas Collection System site plan, with all gas extraction points identified and labeled

- Electronic gas flare monitoring system hardware and software

- Incident report forms and distribution lists

- All data, whether in electronic or hard copy, originally collected from the approximately 117 Landfill gas monitors regarding Landfill gas well balancing for the past 2 years

- All data or communications regarding maintenance and repair issues

- All contracts and modifications with Landfill owner

- Gas well logs prepared at times wells were installed or logs for documentation of modification to wells

- Manual and specifications for the pneumatic compressed air pump condensate system

- Copies of all photos or in-pipe video images of wells or gas conveyance piping

- Mechanical drawings and electrical schematic diagrams

- Copies of communications with any consultants at the Landfill tasked to evaluate well field performance and gas migration

- Emergency contact information

- Surface scan monitoring data or communications relevant to fugitive gas emissions not captured by the Collection System

- Meeting schedules and protocols

- Data on flare control systems, and as-built record drawings for the flare control systems

- Specifications for the blower system

- Flare and blower operation and maintenance manual

- All contracts with subcontractors which may be assignable to new operators

- Data regarding measured liquid levels in gas extraction wells

- Data regarding measured available vacuum at each gas extraction well

- Manufacturer and OEM operation and service manuals for all equipment and information systems

- Inventory of equipment and spare parts

- Reports to government agencies or to Landfill owner

- Replacement schedule for key components of Collection System and compressor station

- List of all equipment and service vendors

- Maintenance reports and logs

- Startup, Shutdown, Malfunction (SSM) Plan

- Semi-annual SSM reports

*See* Adams Aff. at ¶7; Lorusso Aff. at ¶5.

There no doubt is more than this list that Plaintiff, a family-run business that has never before operated a landfill gas collection system, needs to have from Defendants. Defendants may also have removed parts of the Landfill related to the Agreed Modifications that Plaintiff had paid for, and are at issue in this litigation. Defendants are abandoning their responsibilities without observing even the most basic cooperation imposed by the Contract and the implied covenant of good faith and fair dealing.

10

The above information falls into basically five categories. First, schematics, keys and historic tuning data needed to tune each of the 117 wells according to the unique characteristics of that well as demonstrated over time. Second, repair logs, reports, and intra-pipe videos of the 117 wells needed to repair well blockage and other damage. Third, computer hardware and software, as well as operations manuals necessary to operate blowers, flares, and other parts of the Collection System operation. Fourth, historical data required to be kept and periodically submitted to comply with government reporting requirements and conditions of the operating permit, which itself has not been supplied. Fifth, the current contract between Allied and Plainville Gas which plaintiff assumed. Lack of information from the first three categories has led to decreased flow of gas to the Facility, decreased energy generation, and decreased profits.

More important to this motion, however, Plaintiff's lack of access to these five categories of routine operator information is causing damages that are not amenable to award of money damages. Defendants' refusal to turn over historical data and other information that Plaintiff must maintain under state and Federal laws could cause Plaintiff to be cited and penalized by the government. Also, Plaintiff has important new obligations to the Landfill owner, Allied, as a result of the assignment which Defendants have forced on Plaintiff, and Plaintiff will be unable to meet these obligations if it is denied access to the data and is forced to continue administering the Collection System in the present manner. Moreover, Plaintiff does not even fully understand all of its obligation because Defendants have refused to supply the contract presently in effect. Finally, Plaintiff's inability to effectively tune the 117 wells is causing increased escape of methane gas, which is harmful to the environment; this is, moreover, another basis for Plaintiff to potentially become liable under state and federal law.

Analyzed alone, this is a violation of the Contract, of the implied covenant of good faith and fair dealing, and singularly unfair. *See Anthony's Pier 4, infra.* Analyzed as a part of the

pattern of (1) Defendants misrepresentations about the Collection System, (2) the December 2004 Notice to Terminate unless cash was paid, and (3) the attempt to extort an equity interest in the renewable energy Facility before Defendants would maintain flow of all gas to the Facility, this is part of a pattern of unfair and deceptive acts and practices by Defendants. Plainville Gas is now attempting to jettison its contractual duties unfairly, unwind itself and transfer assets before the Court can reach the merits of this case.

## Analysis

Under the familiar four-part inquiry for issuance of a preliminary injunction, this Court will issue a preliminary injunction based upon:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of the relative impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. *Charlesbank Equity Fund II, LP v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

As shown below, each of these criteria support Plaintiff.

Plaintiff's requested relief, that Defendants supply a letter of credit for the amount of three million dollars, is governed by Fed. R. Civ. P. 64. Under that Rule "all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held . . . The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies . . ." Massachusetts courts will order prejudgment security where "needed to satisfy a likely judgment, and . . . there is clear danger that the defendant will put the property to be attached beyond the reach of creditors." *Shamrock, Inc. v. Federal Deposit Ins. Corp.*, 36 Mass. App. Ct. 162, 165 n.4 (1994) (discussing attachment under Mass. R. Civ P. 4.1). Where

attachment of a defendant's assets is impossible or impracticable, Massachusetts courts will order a defendant to post other appropriate security. See *Excel Staffing, Inc. v. Atlas Metal Products Co., Inc.*, 2005 Mass. Super. LEXIS 69, *4 (Feb. 16, 2005) ("[T]he Order of Attachment will be amended . . . provided (and only provided) that . . . The Defendants obtain a bond in the amount of $250,000 as further security in a form satisfactory to the Plaintiff, such satisfaction not to be unreasonably withheld."). The *Shamrock* analysis is thus very similar to the four-part inquiry used for preliminary injunctions, which is discussed below.

The injunctive request for cooperation in turning over necessary information, materials, documents, maps and keys, is at the core of fair dealing and industry norms. Moreover, unless security is posted now, Defendant Plainville Gas is abandoning its two contractual assets which contracts do not expire until 2017 and 2020, respectively, and preparing to run from this jurisdiction. There is no reason for it or its co-Defendant parent not to post security. Only with security posted will Plaintiff's rights be protected as the Defendant tries to flee.

### A.    Likelihood of Success on the Merits

Plaintiff is likely to succeed on its breach of contract, tort, and M.G.L 93A claims. The bad faith tactics of Defendants to date are testament to how Defendants really think that they will fair if a tribunal gets to the merits of this dispute. Defendant Plainville Gas is obligated under the Contract to "operate and maintain" the Landfill Collection System at its expense "in a manner reasonably necessary to deliver" to Plaintiff's Facility "all of the Landfill Gas" naturally produced at the Landfill. See Contract at ¶3.1. A related provision, ¶5.5, requires Plainville Gas to "use reasonable efforts to supply such Landfill Gas to Buyer . . . in the quantities set forth in Article 5.1, 5.2 and 5.3 . . ." [which expressly includes "all of the Landfill Gas" produced at the Landfill]. Defendants cannot allow 25% of this Landfill gas to escape the Collection System into the environment due to lack of maintenance, without liability under the Contract. Moreover, the

Massachusetts Department of Environmental Protection ("DEP") is threatening violations and requiring repair to remedy this escape and potential damage to the environment, creating health, safety, and environmental protection concerns for the state.  See Complaint, Ex. D.

The Landfill's own data recently supplied to the Massachusetts Department of Environmental Protection, gathered by consultants to the Landfill, now provide clear and compelling evidence that there was not reasonable maintenance of the Collection System.  See Adams Aff. at ¶7.  These reports submitted to the DEP indicate that approximately *half* of the Landfill gas collection wells are not performing as designed to collect Landfill gas and deliver it to Plaintiff's facility.  See Adams Aff. at ¶6.  This very high percentage of well dysfunction demonstrates that that Plainville Gas has not used "reasonable efforts" to maintain the Collection System as required by the Contract to deliver all Landfill gas, and explains why Landfill gas has been escaping to the environment rather than being delivered to Plaintiff's Facility.  See Adams Aff. at ¶7.

All renewable energy projects involve a much higher capital investment that is then bolted to the ground and not movable, compared to conventional fossil-fuel fired projects. Plaintiff's renewable energy project has been operating for only 2 years, and has many years to go to even recover its very large capital investment.  Lorusso Aff. at ¶2.  The Contract, without the arbitrary unilateral termination by Defendants, has a term designed to run until 2017.

Defendants have no viable defense to these claims.  Rather than allow the Court to reach the merits, Plainville Gas is attempting to preempt Court remedy by immediately abandoning all its contracts, transferring assets to co-Defendant DTE before the Court can get to the merits. Lorusso Aff. at ¶6.  Under the Contract, Defendant Plainville Gas may terminate the Contract where "the Landfill ceases to produce Commercial Quantities of Landfill Gas, as determined by Seller in its sole discretion."  Contract at ¶12.2(h).  While it can make that determination solely

without Plaintiff's consent, it must do so in good faith and cannot do so as a retaliatory litigation tactic. In point of fact, the Landfill can and does produce Commercial Quantities of Landfill gas. Adams Aff. at ¶¶5, 7. Those quantities have not declined at all for the past year. Id. at ¶¶3-4. There is no justification under the Contract to terminate now coincident with commencement of litigation.

It is not fair dealing to fail to perform one's Contractual reasonable maintenance obligations, then invoke the result of that failed maintenance (lesser gas actually collected and delivered from the relatively constant amount of gas produced at the Landfill) as the pretext to terminate the Contract so as to avoid litigation consequence on that very issue of failed maintenance. In Massachusetts every contract contains an implied covenant of good faith and fair dealing. *See Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471-72 (1991). The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract." *Id.* (citation omitted). It would obviously deprive Plaintiff of its rights under the Contract if Plainville Gas not only failed to use the promised reasonable efforts to maintain the Collection System, but uses the resulting fall-off in gas amounts it collects and delivers from the gas actually produced (letting the rest migrate into the environment) as a smoke screen at the point of litigation to terminate the Contract.

Moreover, there still are abundant commercial quantities of landfill gas being produced. As a point of scientific fact, commercial quantities of Landfill gas are still being produced. Adams Aff. at ¶¶4, 7. It is clear under Massachusetts law, which governs the Contract (See Contract ¶16.5), that a party may only exercise its discretion under a contract in "a reasonable and honest fashion." *Computer Systems of America, Inc. v. Western Reserve Life Assurance Co.*, 19 Mass. App. Ct. 430, 438 (1985). The scientific data, as verified by affidavit, shows that

Defendant Plainville Gas' excuse for abandoning the contracts, to wit that the Landfill does not produce "commercial quantities" of gas, is neither reasonable nor honest.

**B.      The Potential for Irreparable Harm**

There is potential for irreparable harm to Plaintiff:  First, Defendants have refused to turn over historical data and other information that Plaintiff must maintain to be in compliance with State and Federal laws.  A citation by the authorities could injure Plaintiffs operations and reputation in an unquantifiable way.  Second, Plaintiff has important new obligations to the Landfill owner, Allied, as a result of the assignment which Defendants have forced on Plaintiff, and Plaintiff will be unable to meet these obligations if it is denied access to the data and is forced to continue administering the Collection System in the present manner.  Aside from damages stemming from any breach by Plaintiff, the Landfill is the only source of gas to power the Facility, and is vital to Plaintiff's business, therefore any damage to Plaintiff's relationship with the Landfill's owner could be extremely serious.  Finally, as noted, Plaintiff's inability to effectively tune the 117 wells is causing increased escape of methane gas, which is a harm to the environment for which there is no legal remedy.

If Defendants can arbitrarily abandon and terminate their Contractual obligations extending to 2017, force Plaintiffs to take an assignment to prevent collapse of the renewable energy project, and then refuse to cooperate as promised to turn over necessary materials and information, they again threaten irreparable injury to Plaintiff and its project.  If Defendant is permitted to sever the contracts and take steps to transfer assets to avoid responsibility for this litigation, it would later be unable to perform any injunctive relief or awards ordered by the Court.  This would leave Plaintiff without any effective remedy, which is certainly an irreparable harm.  *Cf. Excel Staffing*, 2005 Mass. Super. LEXIS 69, * 5 ("The Court notes the frequency that meritorious claims end up at the conclusion of our regrettably protracted litigation process as

empty victories due to the losing parties having become judgment proof in the time between the case being filed and ultimately disposed of.").

### C.    The Balance of the Relative Impositions

The balance of the relative impositions strongly favors Plaintiff. The move on July 19, 2005 by Defendants to terminate all of their Massachusetts contracts put Plaintiff's Facility and entire business in jeopardy, only two years after completing this renewable energy project designed to have decades more of useful life necessary to recover the huge capital investment in the project. Lorusso Aff. at ¶2. As noted, when Defendants cut off the relevant contracts and severed Plaintiff's only source of gas, the business would have shut down, employees would have lost their jobs, and Massachusetts would have lost one of only two new renewable energy landfill gas resources since 1998, but for Plaintiff, out of sheer necessity, jumping into the breach against its volition. After telling Plaintiff's counsel that Defendants would meet at the Landfill with Plaintiffs to turn over information, keys, and materials necessary to operate the Collection System, Defendants abrogated this promise. This now again immediately threatens the Facility. This conduct cannot be harmonized with fair dealing or good faith.

Defendants, on the other hand, have little or nothing to lose. The evidence submitted to the Massachusetts DEP as part of its current action against the Landfill evidences that:

1.    The commercial quantities of Landfill gas produced have not changed appreciably. What has changed is that a lack of maintenance is capturing and delivering less of the commercial quantities of the gas actually produced to Plaintiff, and allowing more of this gas to escape to the environment contrary to federal and state environmental requirements. Adams Aff. at ¶¶3-5.

2.    The commercial quantities of Landfill gas delivered to Plaintiff have been constant over the past year. There is no recent event to allow any party to claim that there is some immediate justification now to make a claim of changed commercial quantities of gas. Adams Aff. at ¶¶3-4.

There is no justification for Defendants to have run from the Contracts. There is no justification for Defendants not to have cooperated with Plaintiff to transition operation. Defendants would not be greatly inconvenienced by the requirement to engage in an orderly transition or to supply a letter of credit or comparable security. This $3 million amount is calculated conservatively to cover potential direct economic loss to Plaintiff (not including any multiple damage claims or awards) an amount of $1 million as may be necessary for deferred maintenance and repair of the collection system. *See* Lorusso Aff. at ¶7.

On information and belief, the Section 29 federal tax credit, has been taken by Defendants since it first began selling Landfill gas from the Landfill to Plaintiff or its affiliate in approximately 1997. The value of these tax credits, depending on the amount of gas sold, on information and belief, ranges between about $500,000-$1,000,000 annually. This amount is a direct credit not a deduction. Therefore, between 1996 and the present, these Section 29 tax credits would be worth in excess of $5 million to Defendants. Lorusso Aff. at ¶7. Just during 2004-2005, they should be worth about $1 million or more.

It certainly is not a burden for Defendants to segregate some of the value of these credits as the down payment on a bond or letter of credit here, or have their ultimate parent, a large utility holding company, post security. There would be no need for this request to post security in the first place except for Defendants' bad faith election to terminate unilaterally the relevant contracts and not turn over necessary information, software and materials. The hardship on Defendants of meeting with Plaintiffs for an orderly operational transition and posting financial security is minor compared with what Plaintiff would bear if the motion were denied.

Finally, it would not be burdensome for Defendants to transfer to Plaintiff the information, keys, maps, etc. set forth above, which they were reasonably required to hand over

as part of the agreement, and which, on information and belief, they maintain at their offices in Ann Arbor, Michigan.

### D.    The Public Interest

The public interest is served in two ways by granting this relief:  It preserves an important project for the citizens and ratepayers of the Commonwealth, and it prevents environmental damages that could otherwise result.  The public interest favors the continuation of the Plainville renewable energy Facility, which Defendants are endangering with their abandonment of their contractual duties and their pattern of extortive demands.  This project is one of only two renewable energy projects in Massachusetts powered by landfill gas successfully completed since the Commonwealth began promoting such renewable energy technologies as part of its electric power restructuring legislation in 1998.  Lorusso Aff. at ¶2.  It produces enough electricity from renewable Landfill gas every day to power approximately 2,000 homes.  In the deregulated and restructured New England energy supply market with supplies of power now tight, the loss permanently of the Facility will put upward pressure on electric prices and is not in the public interest.  Defendants' failure to provide the information necessary to operate the Collection Facility in compliance with state and federal regulations raises the risk that the government will shut down the Collection System flow of gas to the Facility, or that the Landfill owner, Allied, will take steps under the relevant to contracts to take similar action.

Second, the Landfill gas delivered to Plaintiff's facility contains approximately 50% methane, a potent and harmful of the so-called "Greenhouse Gases" that the vast majority of climate scientists believe are responsible for global warming.  When Plaintiff's Facility utilizes the Landfill gas, in the process it converts the methane to oxygen and carbon.  This process reduces by approximately 2100% the global warming impact of the "Greenhouse gases" emitted to the environment by the Landfill, compared to allowing the methane to migrate into the

environment, as appears to now be occurring to a significant degree. Adams Aff. at ¶6.

Massachusetts has adopted specific state regulations to require reduction of the emission of these

"Greenhouse gases." See 310 C.M.R. §7. The public interest weighs in favor of avoiding an

environmental and health hazard. As noted above, Defendants' wrongful failure to provide

schematics and data has hampered Plaintiff's ability to effectively tune the wells, and is leading

to inefficient operation of the Collection Facility and the inevitable escape of methane.


        **WHEREFORE**, Plaintiff respectfully requests the Court grant its motion in all respects,

and provide such other relief the Court deems just and appropriate.


                        Respectfully submitted,
                        PLAINVILLE GENERATING CO., LLC
                        By its Attorneys,


                        _____
                        Steven Ferrey, Consulting Counsel (BBO No. 163600)
                        Christopher L. DeMayo (BBO No. 653481)
                        LEBOEUF, LAMB, GREENE & MACRAE, L.L.P.
                        260 Franklin Street
                        Boston, MA 02110
                        (617) 748-6800

## CERTIFICATE OF SERVICE

     I, Christopher L. DeMayo, hereby certify that this 18th day of October, 2005, I caused a true copy of the foregoing Motion for Preliminary Injunction to be served on counsel of record for Plainville Gas Producers, Inc. and DTE Biomass Energy, Inc. at the following addresses:

> Wesley S. Chused, Esq.
> Looney & Grossman, LLP
> 101 Arch Street
> Boston, MA 02110
> (617) 951-2800
> **(via hand delivery)**
>
> W.C. Blanton, Esq.
> Blackwell, Sanders, Peper & Martin, LLP
> 4801 Main Street
> Suite 1000
> Kansas City, MO 64112
> 816-983-8000
> **(via FedEx overnight delivery)**

Christopher L. DeMayo

*B104001.9*

21

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PLAINVILLE GENERATING CO., LLC,    )
    Plaintiff,    )
        )
        )
vs.    )    C.A. No. 05-11210-GAO
        )
DTE BIOMASS ENERGY, INC.    )
AND    )
PLAINVILLE GAS PRODUCERS, INC.,    )
    Defendants.    )

## AFFIDAVIT OF GERARD LORUSSO IN SUPPORT OF MOTION FOR INJUNCTION

Now comes Gerard Lorusso, and states as follows.

1. My name is Gerard Lorusso, and I am Treasurer and an owner of Plaintiff Plainville Generating Co., LLC ("PGC" or the "Company"), which is part of a family-owned business in Plainville, Massachusetts.

2. My Company constructed and began operating in 2003 of one of the few renewable energy projects (the "Facility") in Massachusetts powered by landfill gas that has been created since the Commonwealth of Massachusetts began promoting such renewable energy technologies in 1998 as part of its electric power restructuring legislation. The fact that only a few such Landfill gas renewable energy facilities have been successfully completed in the state since 1998, despite a vigorous state push and the presence of more than 700 landfills in Massachusetts, is testament to the challenging economics of such renewable energy facilities. Renewable energy projects in general, and my Facility in particular, require capital investments per unit of electricity generation capacity significantly greater than for a conventional electric generation facility. Therefore, my Company has a very substantial and irretrievable capital

investment "in the ground" in this Facility that will be lost if the supply of landfill gas from the adjacent Plainville Landfill was terminated by Defendants in retaliation for my Company initiating this litigation. My Company is permitted by the Commonwealth of Massachusetts to turn that Landfill gas into renewable electricity, which is sold through the electric grid in Massachusetts. We are not permitted by the state or the federal Environmental Protection Agency to operate using any alternative fuel other than Landfill gas from the Plainville Landfill, and in fact there is no pipeline in the vicinity to deliver natural gas to our Facility even if we were permitted to use alternative fuels, which we are not. Therefore, we are entirely dependent upon the good faith delivery of Landfill gas to operate our renewable energy Facility. If the Facility were closed by the cessation or substantial diminution of Landfill gas flow, there would be loss of jobs and future lost revenues that would be difficult to calculate and would be irreplaceable.

3. On approximately the same date that Defendants answered the original Complaint in this matter, Defendant PGP initiated an action that would have destroyed my renewable energy Facility and my Company, and caused us to default on long-term renewable electric supply contracts unless I immediately stepped in to the void that Defendant created within one week from their ultimatum. They sent me a Notice of Termination unilaterally terminating our entire Landfill gas supply, and abandoning their contracts at issue in this litigation. They terminated permanently my entire renewable fuel supply with one week notice. (See letter and assignment attached.) This forced me to step into the supply contract abandoned by the Defendant, as my only means of keeping Landfill gas flowing to my Facility and to incur an additional cost of $210,000.00 due in six weeks.

4. This latest tactic is very similar to Defendants' earlier conduct that necessitated Plaintiff's recourse to this litigation. In December 2004, in response to a formal November 24,

2004 demand from our Company to Defendants pursuant to M.G.L. Chapter 93A to provide

required information and undertake reasonable maintenance of the Landfill Collection System,

Defendant PGP retaliated by delivering to us a ten day Notice of Termination of all gas supply to

the Facility, unless our Company paid them $96,360 that we did not owe. This ultimatum and

threat is almost identical to the ultimatum and July 19, 2005 Termination Notice received on July

21, 2005 from the same Defendant. Both were triggered by my Company initiating steps to

bring this litigation. To avoid the Defendants' unfair termination of all gas supply and

destruction of my Facility by this prior ultimatum, I was forced on December 20, 2004, to pay

Defendant's demand, but under protest and reserving all rights to commence this litigation to

contest not only the amount I did not owe but also Defendants' pattern of bad faith in this current

litigation. Similarly, we were forced to capitulate to this new July 19, 2005 ultimatum at the end

of July 2005 to again avoid destroying the renewable energy Facility and the Company.

     5.  I was told by our counsel that Defendants' counsel stated to him on two separate

occasions that Defendants were coming to the Landfill to meet with us in August 2005 to turn

over necessary documents, data, software and keys to allow us to assume Defendant's abandoned

gas supply role. No representative of Defendant ever showed up for any meeting. An officer of

Plaintiff wrote to Rick DiGia, Vice President of the Defendant Company, on August 23, 2005,

to request cooperation and data provision. This request contained a specific list of requested

documents and information (letter and data/document list attached hereto). No representative of

Defendants ever showed up, responded or turned over such necessary information. Based on

information and belief, Defendants came to the Landfill on one or more occasions in August

2005 for meetings with the Landfill owner, consultants, or others, but did not come to our office,

which they would have to drive past to access the Landfill. None of the essential information,

documents, and data that we still require to comply with law and the assumed contractual

obligations was provided.  These necessary data and documents include, but are not limited to the following:

- As-built record drawings of gas Collection System and flare station with detailed drawings included

- Copies of all current air and solid waste operating permits for the Facility

- Operation and maintenance plan for the Facility

- Keys and lock combinations

- Existing Gas Collection System site plan, with all gas extraction points identified and labeled

- Electronic gas flare monitoring system hardware and software

- Incident report forms and distribution lists

- All data, whether in electronic or hard copy, originally collected from the approximately 117 Landfill gas monitors regarding Landfill gas well balancing for the past 2 years

- All data or communications regarding maintenance and repair issues

- All contracts and modifications with Landfill owner

- Gas well logs prepared at times wells were installed or logs for documentation of modification to wells

- Manual and specifications for the pneumatic compressed air pump condensate system

- Copies of all photos or in-pipe video images of wells or gas conveyance piping

- Mechanical drawings and electrical schematic diagrams

- Copies of communications with any consultants at the Landfill tasked to evaluate well field performance and gas migration

- Emergency contact information

- Surface scan monitoring data or communications relevant to fugitive gas emissions not captured by the Collection System

- Meeting schedules and protocols

- Data on flare control systems, and as-built record drawings for the flare control systems

- Specifications for the blower system

- Flare and blower operation and maintenance manual

- All contracts with subcontractors which may be assignable to new operators

- Data regarding measured liquid levels in gas extraction wells

- Data regarding measured available vacuum at each gas extraction well

- Manufacturer and OEM operation and service manuals for all equipment and information systems

- Inventory of equipment and spare parts

- Reports to government agencies or to Landfill owner

- Replacement schedule for key components of Collection System and compressor station

- List of all equipment and service vendors

- Maintenance reports and logs

- Startup, Shutdown, Malfunction (SSM) Plan

- Semi-annual SSM reports

6. Defendants made material misrepresentations to me upon which I and our Company relied, that resulted in our delaying this litigation (as set forth in paragraphs 32-38, 53-78 of the Amended Complaint), which coupled with the extension taken by Defendants in answering the Complaint, allowed them to coordinate their termination ultimatum that they issued, with their delayed answer so as to undercut this litigation and set up an exit strategy for Defendant PGP. In the July 19, 2005 Termination Notice (attached), Defendant states that they are terminating or stepping out of both of their Plainville Landfill contracts simultaneously.

7. The dollar amount of our damages mount each day that the gas Collection System is not maintained or repaired. In November 2004, in our Chapter 93A demand to Defendants

(Attachment G to the Complaint), we quantified our direct economic loss to that date during just part of 2004 at in excess of $300,000. As of today, that direct loss has more than doubled and will continue rising until the remedy of reasonable Collection System maintenance sought in this litigation is achieved. If it were to take two additional years to conclude this litigation, the economic damages could approach $2 million. In addition, for deferred maintenance of the Collection System at the Landfill there should be security posted by Defendants of an additional $1 million. As Defendant has terminated its gas supply contracts and is preparing to terminate activities after it enjoyed large federal tax credits from this sale of gas up to the present, the injury to the Facility and Company is immediate, irreversible, and irreparable. Based on the amount of Landfill gas our company has purchased from Defendant since 1997, the Defendant may have realized or accrued federal tax credits on this project with a value in excess of $5 million. To the extent of my knowledge and belief, the only two significant assets of Defendant PGP are the two now-abandoned contracts at the Landfill and these federal tax credits.

8. Despite Defendant PGP's obligation under the Contract, and despite repeated oral and written notices to Defendants over more than a year and Defendants' commitment to our Company in response to undertake reasonable and agreed remedial maintenance of the gas Collection and Delivery System, Defendant PGP failed to take effective reasonable maintenance action before abandoning its agreements by the July 19, 2005 Notice.

9. While Defendants were repeatedly assuring me in 2004 orally and in writing that the collection wells at the Landfill were operating sufficiently to collect all Landfill gas and deliver it to our renewable energy Facility (see August 19, 2004 letter of Defendants' President, at Attachment F to the Complaint), on which information we relied in various ways including by not commencing this litigation, Defendants had available to them monitoring information that painted a contrary picture. In fact, I since have learned that the Massachusetts Department of

6

Environmental Protection (DEP) at that time was concerned that just the opposite facts as

Defendant stated to me were true, and the DEP required monitoring, the results of which show

the opposite of what Defendants were representing to me as the truth.  I since learned that the

DEP, suspecting problems with collection and delivery of Landfill gas that threatened public

health and safety,  required immediate evaluation as early as June 2004 (A copy of the June 18,

2004, DEP Notice and Order is attached to the Complaint as Exhibit D).  The Defendants never

shared this data with me or my Company, and never corrected their misrepresentations that the

Landfill Collection System was operating properly.  I now have learned that this actual data on

the Landfill Collection System from 2004 to the present determined that more than half of the

Landfill Collection System wells surveyed were not functioning properly, and were thereby not

collecting or delivering to our Company all or even historic levels of Landfill gas.  Only after I

learned about this data on Collection System dysfunction and Defendants' misrepresentation of

key facts, did we initiate litigation.  Defendants broke off communication and cooperation with

Plaintiff in 2004, and never corrected their misrepresentations.

I declare under the pains and penalties of perjury, that the foregoing statements are true

and correct to the best of my personal knowledge and belief.

_____            Dated: ___10/11/05_____, 2005
Gerard Lorusso

On this _11th_ day of _October_, 2005, before me, the undersigned notary public, personally appeared Gerard Lorusso, proved to me through satisfactory evidence of identification, which were _PERSONAL Knowledge_, to be the person whose name is signed on the attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

_Mary E Coogan_
(Official signature and seal of Notary)

My commission Expires: _10-02-09_

MARY E. COOGAN
NOTARY PUBLIC
COMMONWEALTH of MASSACHUSETTS
MY COMMISSION EXPIRES
OCTOBER 02, 2009

B104087.3

VIA FACSIMILE TRANSMISSION 734.668.1541

August 23, 2005

Mr. Richard M. DiGia, Vice President Operations
Plainville Gas Producers, Inc.
425 South Main St., Suite 201
Ann Arbor, MI 48104

RE:    Assignment of Gas Rights Agreements
       First Amendment and Restatement of Plainville Landfill Gas Rights
       Agreement dated December 18, 1996 and Amendment Dated as of November 1,
       2000 To Plainville Landfill Gas Rights Agreement

Dear Rick:

Thank you for speaking with me last week regarding the assignment of the above
referenced agreements. We hope to have a smooth transition of the assignment
and be able to provide Allied with the same information and level of operation
that currently exist.

We would appreciate your assistance in obtaining a better understanding of the
operations at the site. We have prepared a list of items and clarifications to
the current operations and related assets and request your response to those
items.

I will contact you in a few days to follow-up on the list and I thank you in
advance for your assistance and cooperation in this matter.

Very truly yours,

Henry G. Grilli
Chief Financial Officer

Enclosure.

**PLAINVILLE GAS PRODUCERS**
**LORUSSO CORPORATION**
**ASSIGNMENT OF GAS RIGHTS AGREEMENTS**

---

The following is a list of the items we would ask you to provide or for which
we seek clarification in connection with the orderly transition of the
assignment of the Gas Rights Agreements, which consist of the following
documents:

  1. First Amendment and Restatement of Plainville Landfill Gas Rights
     Agreement dated December 18, 1996
  2. Amendment Dated as of November 1, 2000 To Plainville Landfill Gas Rights
     Agreement

Items:

  1. Additional amendments, modifications or changes to the documents, if any.
  2. Documents of the current practices and protocols in place to comply with
     the Gas Rights Agreements including but not limited to
        a. Reporting of information
        b. Repair & maintenance
        c. Company contact information
        d. Communication and meeting schedules
        e. Other Communication links
        f. Response Protocol Plainville Gas Extraction System Alarm Conditions
        g. Non-routine events
        h. Extraordinary events
  3. Copies of all reports submitted to Allied during the period of the Gas
     Rights Agreements including:
        a. Well conditions and production data
        b. Maintenance reports
        c. Operating reports
  4. Copies of all reporting and maintenance logs, files and forms.
  5. Separately listed for both the "Original Collection System" and "Second
     Collection System", detailed definitions and detailed schedules of the
     equipment, inventory and assets making up:
        a. The collection system
        b. Compressor station
        c. Project Facility
  6. Manufacturer and OEM operating and service manuals for all equipment,
     information systems and assets at the site.
  7. All mechanical drawings, electrical schematics and plans for the flare
     station, collection system and related systems.
  8. Contracts in place between you and subcontractors in connection with the
     execution of the Gas Rights Agreements, which may be assignable to us.
  9. List of all equipment and service vendors' names, addresses, phone
     numbers and contacts.

plainvillegasproducersitemslist.doc

**Plainville Gas Producers, Inc.**
425 S. Main Street, Suite 201
Ann Arbor, MI  48104

July 19, 2005

Gerard C. Lorusso
President
Plainville Generating Company, LLC
3 Belcher Street
Plainville, MA 02762

     Re:     Notice of Termination of Gas Purchase Agreement

Dear Mr. Lorusso:

     By this notice letter, Plainville Gas Producers, Inc. ("Seller") hereby notifies Lorusso Corporation ("Buyer") that Seller hereby terminates the Restated And Amended Gas Purchase Agreement between Seller and Buyer dated November 18, 2002 ("Gas Purchase Agreement") pursuant to Section 12.2(h) of Article XII of the Gas Purchase Agreement, which termination shall be effective at midnight, August 31, 2005, as the Seller has determined that the Plainville Landfill located in Plainville, Massachusetts ("Landfill") owned by Allied Waste Systems, Inc. ("Owner") has ceased to produce landfill gas, consisting primarily of methane and carbon dioxide that is produced from decomposing refuse within the Landfill ("Landfill Gas"), in such amounts that the Landfill Gas can be extracted from the Landfill by Seller of such quantity and quality that it is economically viable and profitable for Seller to sell the Landfill Gas to Buyer under the terms of the Gas Purchase Agreement.

     Although Seller has no obligation to do so under the terms of the Gas Purchase Agreement or otherwise, Seller hereby further notifies Buyer that Seller offers to assign to Buyer Seller's rights in the Plainville Landfill Gas Rights Agreement dated December 18, 1996

between DTE Biomass Energy, Inc. ("DTE Biomass"), formerly known as Biomass Energy

Systems, Inc., and Owner, formerly known as Laidlaw Waste Systems, Inc., as amended by the

Amendment thereto dated November 1, 2000 ("Gas Rights Agreement"), subject to Buyer

assuming all of Seller's obligations to Owner under the provisions of the Gas Rights Agreement,

Seller having been assigned all of the rights and obligations of DTE Biomass, provided that

Buyer accepts this assignment of rights and obligations by (1) fully executing the Assignment

enclosed herein and (2) providing Seller actual notice of such acceptance by delivery to Seller

either the original or a copy of said Assignment so that it is received by Seller on or before noon

EDT on Friday, July 29, 2005.  For the purposes of Buyer's acceptance of this offer by Seller of

an assignment of Seller's rights and obligations under the provisions of the Gas Rights

Agreement, the delivery of such acceptance as required by this paragraph of this notice letter

may be made by U.S. Mail, private courier, facsimile, or e-mail.

By this notice letter, Seller further notifies Buyer that Seller intends to terminate the Gas

Rights Agreement pursuant to Article X. C. of that agreement on July 29, 2005 if Buyer does not

accept Seller's offer to assign it rights and obligations under the Gas Rights Agreement to Buyer

pursuant to and in accordance with the terms and conditions of that offer as set forth in the

immediately preceding paragraph of this notice letter.

By this notice letter, Seller further notifies Buyer that Article IV. C. 1. of the Gas Rights

Agreement requires Seller or its assigns to pay Owner in advance an annual license and rental fee

in the amount of Two Hundred Ten Thousand Dollars ($210,000.00) on or before September 1,

2005 unless Seller or its assigns terminates the Gas Rights Agreement pursuant to Article X. C.

of that agreement on or before August 1, 2005.  Accordingly, in order for Buyer to maintain the

rights of Seller and/or its assigns under the provisions of the Gas Rights Agreement pursuant to

KC-1307842-1

the Assignment offered by Seller to Buyer in the immediately preceding paragraph of the notice

letter, Buyer must make the $210,000.00 payment required of Seller or its assigns under the

provisions of the Gas Rights Agreement on or before September 1, 2005.

Very truly yours,

Curtis T. Ranger
President, Plainville Gas Producers, Inc.


cc:    Stephen Ferrey, Esquire

ASSIGNMENT OF GAS RIGHTS

This Assignment of Gas Rights is made effective this _____ day of _____, 2005, by Plainville Gas Producers, Inc., a Michigan corporation ("Assignor"), to Lorusso Corporation, a Massachusetts corporation ("Assignee").

WHEREAS Assignor is the holder of certain rights to collect and market Landfill Gas generated within the Plainville Landfill located in Plainville, Massachusetts and owned and operated by Allied Waste Systems, Inc., a Delaware corporation formerly known as Laidlaw Waste Systems, Inc. ("Owner") under that certain First Amendment and Restatement of the Plainville Landfill Gas Rights Agreement between Owner and Assignor's parent, DTE Biomass Energy, Inc., a Michigan corporation formerly known as Biomass Energy Systems, Inc. ("Biomass") and that certain Amendment Dated as of November 1, 2001 to Plainville Landfill Gas Rights Agreement between Owner and Assignor (collectively the "Gas Rights Agreement"); and

WHEREAS Assignor wishes to assign its rights under the Gas Rights Agreement to Assignee without payment of any monetary consideration to Assignor, provided that Assignee assumes and agrees to perform all of Assignor's obligations under the Gas Rights Agreement, which assumption and agreement shall constitute consideration for the assignment;

NOW THEREFORE the Parties agree as follows:

1.   All capitalized terms used in this Assignment without being defined herein shall have the meaning assigned to them in the Gas Rights Agreement.

2.   Assignor hereby assigns to Assignee all of its right, title and interest under the Gas Rights Agreement and assigns and conveys to Assignee all of its right, title and interest in the Collection System.

3.   Assignee accepts the assignment of Assignor's rights under the Gas Rights Agreement, assumes all of the obligations of the Producer thereunder, and agrees to be bound by the terms thereof.

4.   Biomass joins in the assignment of rights under the Gas Rights Agreement to the extent of any interest it may have therein.

5.   **NEITHER ASSIGNOR NOR BIOMASS MAKE ANY WARRANTY AS TO THE NATURE OR EXTENT OF THE RIGHTS ASSIGNED HEREBY, THE QUANTITY OR QUALITY OF LANDFILL GAS, THE CONDITION OF THE COLLECTION SYSTEM, THE AVAILABILITY OF TAX CREDITS UNDER STATE OR FEDERAL LAW IN CONNECTION WITH THE COLLECTION AND SALE OR USE OF LANDFILL GAS, OR ANY OTHER MATTER RELATING TO THIS ASSIGNMENT.**

6.    Assignee undertakes and agrees to indemnify and hold Assignor and Biomass harmless from and against any liability to or claim by Owner arising out of Assignee's failure to perform the Producer's obligations under the Gas Rights Agreement, or any of them, from and after the effective date of this Assignment.

7.    This Assignment contains the entire agreement and understanding of the parties hereto with respect to the assignment of rights under the Gas Rights Agreement, superseding any and all prior agreements, understandings, negotiations, representations and discussions.

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed as of the day and year first written above.

PLAINVILLE GAS PRODUCERS, INC.          LORUSSO CORPORATION

By: _____          By: _____

Printed Name: _____          Printed Name: _____

Title: _____          Title: _____


DTE BIOMASS ENERGY, INC.

By: _____

Printed Name: _____

Title: _____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PLAINVILLE GENERATING CO., LLC,<br>    Plaintiff,<br><br>vs.<br><br>DTE BIOMASS ENERGY, INC.<br>AND<br>PLAINVILLE GAS PRODUCERS, INC.,<br>    Defendants. | C.A. No. 05-11210-GAO |

AFFIDAVIT OF DAVID E. ADAMS
IN SUPPORT OF MOTION FOR INJUNCTION

Now comes David E. Adams, and states as follows of his own personal knowledge and belief.

1. My name is David E. Adams. I am employed by Sanborn Head & Associates, Inc., ("SHA") a firm of consulting engineers and scientists. I, as well as others at SHA, specialize in landfill gas collection system matters. I, and my firm, have worked on many landfills and landfill gas collection systems in New England and other locations in the United States. I am an expert on landfill gas ("LFG") collection system design, construction, operation, and evaluation. I hold a Bachelor of Science degree in Mechanical Engineering from the University of Vermont and a Master of Science degree in Civil Engineering from Colorado State University. I am a Professional Engineer licensed in the states of New Hampshire, New York, and Vermont.

2. During 2005, I reviewed data and materials in the files of the Massachusetts Department of Environmental Protection ("DEP") regarding the operation of the landfill gas collection system ("LGCS") at the Plainville Landfill ("Landfill") in Plainville, Massachusetts. The Landfill is owned by Allied Waste Systems ("Allied") and the LGCS has been operated by Defendant, Plainville Gas

Producers ("PGP") and Defendant, DTE Biomass. The DEP file data that I reviewed includes enforcement actions and correspondence of the DEP and submissions by consultants to Allied and/or Defendants regarding the performance of the LGCS.

3. I reviewed data in the DEP files that was prepared by URS Corporation concerning the amount of LFG collected and delivered from the Landfill to the renewable energy facility owned by the Plaintiff, Plainville Generating Co., LLC ("PGC").

Based on information in a June 1, 2005 URS Corporation letter regarding "Plainville Sanitary Landfill, CAAA Requirement #7," the following table is a summary of the quantity of LFG delivered to Plaintiff PGC's renewable energy facility on the first day of each calendar quarter from April 1, 2005 (the most recent month of data included in the DEP's files when I visited the DEP's offices in July 2005) extending back to July 1, 2003.

| Date | LFG Delivered to PGC's Renewable Energy Facility (MMBtus) | LFG Delivered to PGC's Renewable Energy Facility (% Change 4/1/05:7/1/04) | LFG Delivered to PGC's Renewable Energy Facility (Average MMBtus) | LFG Delivered to PGC's Renewable Energy Facility (% Change Post-4/1/04: Pre-4/1/04) |
|---|---|---|---|---|
| April 1, 2005 | 1,397.68 | | | |
| January 1, 2005 | 1,312.43 | + 2.5 | 1,362.46 | |
| October 1, 2004 | 1,376.07 | | | |
| July 1, 2004 | 1,363.66 | | | - 20 |
| April 1, 2004 | 1,622.01 | | | |
| January 1, 2004 | 1,649.58 | | 1,706.55 | |
| October 1, 2003 | 1,629.42 | | | |
| July 1, 2003 | 1,925.21 | | | |

4. As reported by URS Corporation, the heat input rate (i.e., MMBtus) of LFG collected and delivered to PGC's renewable energy facility for commercial use on April 1, 2005 was about 2.5

percent more than the heat input rate reported to have been collected and delivered for PGC's commercial use on July 1, 2004.

The data in the June 1, 2005 URS Corporation letter shows that the quantities of landfill gas collected at the Landfill and delivered to PGC's renewable energy facility for commercial use did not change appreciably from July 1, 2004 to April 1, 2005. Therefore, based on the data presented above, there is no pattern to suggest a significant reduction in the quantities of LFG collected and delivered for PGC's commercial use during the period from July 1, 2004 through April 1, 2005. I have not reviewed, nor am I aware of data indicating that there has been a significant reduction over that same time period in the quantity of LFG collected and delivered to PGC's renewable energy facility.

5. Based on the data presented above, there appears to have been a significant decline in the quantity of LFG delivered to the PGC's renewable energy facility during the second quarter of 2004. (A more detailed review of the daily data presented in the URS Corporation letter indicates that a downward trend in gas collection was also documented in the first quarter of 2004). The average heat input rate was 1,706.55 MMBtus for the first four days listed in the table above, including April 1, 2004. The average heat input rate was 1,362.46 MMBtus for the four days listed in the table above after April 1, 2004. As such, the average heat input rate decreased by approximately 20 percent from the period evaluated on or before April 1, 2004 relative to the period after April 1, 2004.

6. I reviewed two data submissions by Allied's consultants prepared in response to a request by DEP regarding the status of the LGCS. The first, "Corrective Action Alternatives Analysis, Report #1, Plainville Sanitary Landfill" submitted by URS Corporation and dated November 2004, presents a summary of URS Corporation's evaluation of 39 of the 117 vertical gas extraction wells reported to be part of the LGCS. The report indicates that more than 50 percent of the evaluated

wells "may not be operating at their full capacity." As such, it is likely that some of the gas produced by the Landfill is not being collected by the LGCS. This uncollected LFG appears to be migrating off-site (based on extensive gas migration from the Landfill reported in DEP correspondence) potentially causing health and safety threats, and escaping to the environment.

The second report, a June 20, 2005 letter from URS Corporation to the DEP, concerns an evaluation of the gas extraction wells (approximately 78 wells) not considered in the first report. The June 20, 2005 correspondence indicates that there was little or no gas being collected from about 35 of the 78 gas wells evaluated.

In total, approximately half of the LFG extraction wells are reportedly not providing gas collection at rates typically expected for similarly constructed wells. This high percentage of improperly functioning gas extraction wells explains, at least in part, why LFG has been escaping to the environment rather than being delivered to the renewable energy facility. This migration of LFG could result in adverse impacts to groundwater quality and the release to the atmosphere of methane - a compound that has been linked to global warming. The U.S. EPA states that methane is the second-most prevalent of six identified greenhouse gases, and has a global warming impact on the environment, twenty-one times that of carbon dioxide on a molecule-by-molecule basis. The operation of a landfill gas-to-electricity facility mitigates the emission of otherwise escaping greenhouse gases that are linked to global warming, by converting methane in the landfill gas to by-products that reportedly have lesser adverse global warming impacts. If this same gas were captured and delivered to PGC's renewable energy facility, the LFG would also be used for the beneficial purpose of generating electricity.

7. My understanding is that PGC's renewable energy facility was designed to operate with seven Caterpillar Model 3516 engine/generator sets, and that seven such units comprise the existing

4

renewable energy facility. I further understand that the number of engine/generator sets installed was based on the amount of gas collected by the LFGCS prior to the installation of the engine/generator sets, and based on LFG generation and collection estimates predicted by computer modeling.

The apparent deterioration in the performance of a large percentage of the gas collection wells correlates to a lesser amount of gas delivered to the renewable energy facility, and a corresponding reduction in energy production. The deterioration of approximately half of the existing gas collection wells at the Landfill, in my opinion, could have been mitigated by reasonably expected maintenance and repair of the LGCS over the last few years.

As a result of the deterioration in the performance of the LGCS, I understand that, at times, there have been insufficient quantities of LFG delivered to PGC's renewable energy facility to operate the seven engine/generator sets. PGC has had to operate fewer engines, thereby generating less renewable energy than would otherwise have been the case if sufficient quantities of LFG were delivered for operation at full commercial capacity.

It is my opinion that reasonably expected maintenance and repair of the LGCS over the last few years could have improved the LFG collection efficiency such that sufficient quantities of LFG could currently be delivered to operate the seven engine/generator sets.

It should be stated that the amount of LFG produced at the Landfill in any of the years discussed above was in such quantities to generally be considered sufficient for the commercial operation of an LFG-fueled renewable energy facility; albeit a facility running at less than the rated capacity of PGC's renewable energy facility.

8. The types of data, documents, hardware and software necessary to be transferred from a former to a new entity taking over responsibility to operate the LGCS in Plainville, so as to allow continuity of operation, would include at least the following:

- As-built record drawings of LFGCS and flare station;

- Copies of all current air and solid waste operating permits for the Facility;

- Operation and maintenance plan for the Facility;

- Keys and lock combinations;

- Existing LFGCS site plan, with all gas extraction points identified and labeled;

- Base and Final Landfill Grading Plans;

- Electronic gas flare monitoring system hardware and software;

- Incident report forms and distribution lists;

- All gas well balancing data, whether in electronic or hard copy,  collected from the approximately 117 LFG extraction wells during the past two years;

- Gas well logs prepared at times wells were installed or modified;

- Manual and specifications for the pneumatic condensate pump system;

- Copies of all photos or in-pipe video images of wells or gas conveyance piping;

- All data or communications regarding maintenance and repair issues;

- All contracts and modifications with Landfill owner;

- Copies of communications with consultants at the Landfill tasked to evaluate well field performance and gas migration;

- Emergency contact information;

- Surface scan monitoring data or communications relevant to fugitive gas emissions not captured by the LFGCS;

- Data on the two flare control systems, and as-built record drawings for the two flare control systems;

- Specifications for the blower system;

- Flare and blower operation and maintenance manual;

- All contracts with subcontractors which may be assignable to new operators;

- Data regarding measured liquid levels in gas extraction wells;

- Data regarding measured available vacuum at each gas extraction well;

- Inventory of equipment and spare parts;

- Reports to government agencies or to Landfill owner;

- Replacement schedule for key components of LFGCS and compressor station;

- Maintenance reports and logs;

- Startup, Shutdown, Malfunction (SSM) Plan; and

- Semi-annual SSM reports.

I declare under the pains and penalties of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

_____    Dated:   October 14, 2005
David E. Adams

On this 14th day of October, 2005, before me, the undersigned notary public, personally appeared David E. Adams proved to me through satisfactory evidence of identification, which was personal acquaintance, to be the person whose name is signed on the preceding document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

_____
Notary Public                                    (SEAL)
My commission expires: Feb 10, 2007

\\Ranserv03\RANDATA\RANDATA\2533.00\Correspondence\2005\101405 dea affidavit.DOC