## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PLAINVILLE GENERATING CO., LLC,  )
                                 )
                     Plaintiff,  )
                                 )
vs.                              )          Case No. 05-11210-GAO
                                 )
DTE BIOMASS ENERGY, INC. and     )          Case No. 05-12168-GAO
PLAINVILLE GAS PRODUCERS, INC.,  )
                                 )
                    Defendants.  )

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
### MOTION FOR PRELIMINARY INJUNCTION

Defendants, DTE Biomass Energy, Inc. ("DTE Biomass"), and Plainville Gas Producers, Inc. ("Plainville Gas"), hereby set forth their opposition to Plaintiff's motion for preliminary injunction,[1] as follows:

**I.    INTRODUCTION AND OVERVIEW**

This lawsuit arises out of a series of disputes between Plaintiff, Plainville Generating Co., LLC ("Plainville Generating"), and Plainville Gas related to a business relationship between them pursuant to which Plainville Gas collected landfill gas generated at the Plainville Landfill in Plainville, Massachusetts ("Landfill") and delivered it for use as fuel at the electricity generating plant ("Generating Plant") located on property adjacent to the Landfill. Those disputes are described in detail below.

In these actions,[2] Plaintiff has asserted claims against Defendants based upon legal theories of negligent misrepresentation, intentional misrepresentation and deceit, unfair and

---

[1] Plaintiff's Motion For Preliminary Injunction (1) Ordering Defendants To Turn Over Hardware, Software, Keys And Documents Necessary To Operate The Landfill Collection System After Their Sudden Abandonment And (2) Posting Security For Judgment, filed October 18, 2005 ("Plaintiff's Motion").

deceptive acts and practices in violation of Chapter 93A of the Massachusetts General Laws, breach of contract (as to Plainville Gas only), breach of implied covenant of fair dealing (as to Plainville Gas only), and tortious interference with a contractual relationship (as to DTE Biomass only). Plaintiff seeks relief in the nature of money damages, a declaratory judgment as to certain provisions of the written contract between Plainville Generating and Plainville Gas, and equitable relief in the form of orders directing Plainville Gas to specifically perform certain alleged duties under that contract and directing at least one of the Defendants to post some financial security to cover the cost of any money damages judgment and equitable relief that might ultimately be ordered by the Court.

Despite the breadth of Plaintiff's claims and requests for relief, Plaintiff's Motion is both limited and specific. By that motion, Plaintiff moved the Court only for the entry of a preliminary injunction requiring:

- "Defendants [to] meet with Plaintiff and immediately cooperate with Plaintiff to provide the materials, hardware, software, parts, information, data, diagrams, schematics, and keys, that Plaintiff requires for assuming the role of gas supplier at the Landfill Collection System, including but not limited to those items identified in the bullet list on pages 10-11 of Plaintiff's Memorandum of Law [in support of Plaintiff's Motion], and report back to the Court;" and

- "Either defendant [sic] [to] supply a letter of credit, bond, guarantee or other security for three million dollars, or otherwise provide adequate financial assurance and security to guarantee its payment of damages as awarded in this Court, as well as its performance of any equitable or injunctive order of this Court."

---

[2]  Plaintiff has agreed to dismiss Case No. 05-11210-GAO in light of its filing Case No. 05-12168-GAO in order to resolve issues of subject matter jurisdiction that have arisen in connection with the earlier-filed case.

For the following reasons, Plaintiff should be denied the relief sought.

II.    **FACTS**[3]

The facts relevant to Plaintiff's motion for preliminary injunction are as follows:[4]

A.    **As To Landfill, Gas Generation**

The Landfill is a typical municipal landfill at which municipal solid wastes and construction and demolition debris was disposed of from approximately 1974 until a few years ago.  As waste disposal areas at the Landfill were closed over time, some of those areas were covered by a synthetic cap (i.e., an impermeable plastic sheet), which in turn was covered by several feet of soil that supports a grass cover.  The effect of this cap and cover system is to inhibit the infiltration of rainfall into the closed disposal areas.

As is the case with all such landfills, landfill gas consisting primarily of methane and carbon dioxide is generated in certain waste disposal areas as the result of an anaerobic microbe-driven decomposition process.  At such landfills, the generation of landfill gas begins shortly after waste disposal, increases to a peak volume, and decreases over time as the supply of waste material involved in the process is used up.  The rate and total amount of landfill gas generation is affected, among other things, by the amount of moisture present in the waste disposal areas where the decomposition process is occurring.  In general, though, both too much and too little moisture inhibits the process and thus the amount of landfill gas being generated.

---

[3]    As used herein, "Lorusso Depo." refers to the deposition of Gerard C. Lorusso, taken in connection with this action on November 8, 2005; "Adams Depo." refers to the deposition of David E. Adams, also taken in connection with this action on November 8, 2005; and "LaFlamme Depo." means the deposition of David LaFlamme, taken in connection with this action on November 10, 2005.

[4]    Defendants anticipate the parties offering detailed testimony in support of their respective contentions as to the issues raised by Plaintiff's Motion at the upcoming hearing on that motion.  Consequently, except to the extent there are citations to the record below, the facts stated herein either are undisputed or will be established by the evidence offered by Defendants at that hearing.

B.    As To Parties, Relationships

Laidlaw Waste Systems, Inc. was the original owner of the Landfill.  Sometime after 1996, Allied Waste Systems, Inc. ("Allied") acquired the Landfill and now holds the permits issued by the Massachusetts Department of Environmental Protection ("MDEP") that authorize operations at the Landfill.[5]  As the owner of the Landfill, Allied is responsible to operate it in accordance with all applicable environmental laws.

DTE Biomass is in the business of developing and operating, through operating subsidiaries, alternative methane fuel projects and landfill gas-to-energy conversion systems. DTE Biomass through its operating subsidiaries has more than thirty such projects operating or in development in 16 states.  DTE Biomass also provides contract administrative and operating services to its subsidiaries.  The DTE Biomass personnel primarily involved in this case are Curtis T. Ranger, its President; Richard M. DiGia, its Vice President Operations & Construction; and James A. Van Hoy, a Project Manager.

Plainville Gas is a wholly-owned subsidiary of DTE Biomass.  Beginning in late 1995 and continuing through August 31, 2005, Plainville Gas owned and operated the landfill gas collection and delivery system at the Landfill ("Gas System").  Plainville Gas has no employees. It contracts with DTE Biomass for the services necessary for it to carry out its business activities.

Lorusso Corporation ("Lorusso Corp.") is one of several business entities through which Gerard C. Lorusso carries out an extensive network of successful business enterprises.  Lorusso Corp. and certain of its affiliates are the vehicles by which Mr. Lorusso has conducted his business activities that are the subject of this action.  In addition to Mr. Lorusso, the primary Lorusso Corp. personnel involved in this case are David LaFlamme, who had the responsibility

---

[5]    There are references in the record to a company named "Allied Waste Industries, Inc."  It is not clear to Defendants whether this is a misnomer of Allied or whether it is a separate but affiliated company.

for constructing the Generating Plant and now has the responsibility for managing Plainville Generating's assumption of responsibility for operating the Gas System, and Henry Grilli, the company's chief financial officer.

Plainville Generating is an affiliate of Lorusso Corp.  For some time prior to 1996, Lorusso Corp. (or an affiliate) had owned and operated an asphalt production plant located on property located adjacent to the Landfill ("Asphalt Plant").  Beginning in late 1996, the Asphalt Plant utilized landfill gas from the Landfill delivered by Plainville Gas via the Gas System as fuel for its business.

In 2001, Lorusso Corp. sold the Asphalt Plant.  Thereafter, Lorusso Corp. constructed the Generating Plant.  Since early 2003, when the Generating Plant was completed, that facility has used landfill gas from the Landfill delivered by Plainville Gas as fuel for the Caterpillar engines that drive the generators that produce electricity for sale to the Generating Plant's customer(s).  The Generating Plant always has been operated by Plainville Generating pursuant to an agreement with Lorusso Corp.

C.    As To Contracts

The Gas Rights Agreement

On December 30, 1995, Laidlaw and DTE Biomass[6] entered into a Prototype Landfill Gas Rights Agreement and an Adoption And Modification Agreement, pursuant to which DTE Biomass purchased the original gas collection system at the Landfill that was installed by Laidlaw and certain other rights and licenses relating to the Landfill.  On December 18, 1996, Laidlaw and DTE Biomass (as BESI) entered into a First Amendment And Restatement Of The Plainville Landfill Gas Rights Agreement ("Gas Rights Agreement"), which established the basic terms and conditions under which DTE Biomass and then Plainville Gas operated the Gas

---

[6]  At that time, the company was named Biomass Energy Systems, Inc. ("BESI").

System through August 31, 2005.  On November 1, 2000, Allied, as the successor to Laidlaw, and Plainville Gas, as the assignee of DTE Biomass, entered into an amendment to the agreement by which the term of the contract was extended, the parties agreed that Plainville could assign the contract to Lorusso Corp. at any time without Allied's prior consent, the parties agreed that any modifications that had been made to the Gas System would be covered by the contract, and the parties agreed to certain changes in operating standards and protocols not relevant to any issues in this case.

## The Gas Supply Agreements

On September 1, 1996, after protracted negotiations, Plainville Gas and Lorusso Corp. entered into a Gas Purchase Agreement ("1996 Gas Supply Agreement"), pursuant to which Plainville Gas sold landfill gas collected by the Gas System to Lorusso Corp. for use as fuel at the Asphalt Plant.  In April 2001, those parties entered into a Letter Agreement by which they agreed to modify the 1996 Gas Supply Agreement to accommodate changes to the Gas System that would be necessary in order for Lorusso Corp. to use landfill gas delivered by the Gas System as fuel for its then-proposed Generating Plant.  On November 18, 2002, the parties entered into a Restated And Amended Gas Purchase Agreement ("2002 Gas Supply Agreement"), which superseded and replaced in their entireties both the 1996 Gas Supply Agreement and the April 2001 Letter Agreement insofar as the relationship between Plainville Gas and Lorusso Corp. with respect to landfill gas generated at the Landfill is concerned.  Some time after January 14, 2005, Lorusso Corp. assigned its rights and obligations under the 2002 Gas Supply Agreement to Plainville Generating.

## Relevant 2002 Gas Supply Agreement Provisions

At its heart, this is a contract case.  All of the unresolved disputes between Plaintiff and Plainville Gas that are now the subject of this action are rooted in those parties' strongly

differing the views of their respective rights and obligations under the terms and conditions of the 2002 Gas Supply Agreement. Consequently, all of Plaintiff's claims asserted in this action are based upon or otherwise arise directly or indirectly out of various provisions of that contract.[7] Against this background, a complete understanding of both the relevant terms and conditions of the 2002 Gas Supply Agreement and the context in which that contract was negotiated and agreed to by the parties is critical to an accurate evaluation of Plaintiff's claims and contentions.

First, it is significant that the contract terms at issue here resulted from extensive arms length negotiations between the parties. Most of these provisions were imported into the 2002 Gas Supply Agreement from the 1996 Gas Supply Agreement that was the product of months of negotiations involving details and extensive exchanges of the parties' differing views regarding contract language. See Affidavit Of Michael J. Hainer Relating To Plaintiff's Motion For Preliminary Injunction, dated November 15, 2005, filed herewith. It can not reasonably be disputed that there was a complete meeting of the parties' minds with respect to the contractual provisions at issue.

Second, a major driving force in the shaping of the 1996 Gas Supply Agreement, and therefore the 2002 Gas Supply Agreement, is the fundamental nature of the landfill gas generation process addressed in those contracts. How that process plays out at any municipal solid waste landfill like the Landfill is to a great extent beyond the control of anyone charged with management of such a facility. That is, the composition, amount, and rate of generation of landfill gas produced results from a complex interplay of ongoing subsurface physical, biological, and chemical processes not reasonably subject to control. Consequently, the 2002 Gas Supply Agreement is fundamentally structured, and its provisions are designed, to shield

---

[7]   Relevant provisions of the 2002 Gas Supply Agreement are set forth in the Appendix hereto.

Plainville Gas from any liability to Lorusso Corp. (or its assigns) based upon either the quantity or quality of landfill gas failing to satisfy the customer's expectations and needs.

Plaintiff's emphasis here upon the alleged adverse financial consequences to it from Defendant's conduct complained of fundamentally misapprehends the identity of the party whose basic economic interests are most effectively protected by the parties' contract, i.e., Plainville Gas. Any fair reading of the 2002 Gas Supply Agreement as a whole discloses that the contract places the risk of loss of Lorusso Corp.'s investment in the Generating Plant primarily on its shoulders if its reliance on landfill gas generated at the Landfill as a fuel source turns out to be misplaced.[8] Conversely, the contract minimizes at every turn the possibility that Plainville Gas might be saddled with the responsibility either (a) to continue to provide extremely low-cost landfill gas for the Generating Plant's use regardless of the quantity or quality of available landfill gas or the cost of collecting and delivering that gas or (b) to compensate its customer for failing to do so.

The 2002 Gas Supply Agreement contains repeated disclaimers of any warranty or guarantee by Plainville Gas that any particular quantity or quality of landfill gas will be delivered to the Generating Plant. (2002 Gas Supply Agreement, Articles 3.4, 5.4, 7.2(a), 7.3) Furthermore, any failure by Plainville Gas to deliver any quantity or quality of landfill gas is not a breach of its obligations under the contract, is not a default under the contract and does not give rise to any claims or remedies whatsoever in favor of Lorusso Corp./Plainville Generating. (Id., Article 5.4)

---

[8]  According to Mr. Lorusso, the cost of building and equipping the Generating Plant was approximately $6 million. (Lorusso Depo., p. 13) That facility has already generated several million dollars in income for its owner(s), at a total gas cost of "maybe $175,000." (Lorusso Depo, pp. 45, 114)

In stark contrast, the only obligation of Plainville Gas under the provisions of the 2002 Gas Supply Agreement in this regard is to use "reasonable efforts" to supply all of the landfill gas generated at the Landfill to the Generating Plant, including operating and maintaining the Gas System in a manner "reasonably necessary to deliver" that gas to the Generating Plant.  (Id., Articles 3.1, 5.4)  That is, contrary to Plaintiff's apparent contention, Plainville Gas had no obligation to spend whatever was required to place and maintain the Gas System in the operating condition necessary to keep all seven engines at the Generating Plant running.[9]

Furthermore, the contract provides that the Plaintiff's only remedy if Plainville Gas breaches the contract is to terminate the agreement.  The agreement expressly provides that in the event of breach by Plainville Gas, Plainville Generating "shall not have any claim … whatsoever for any damages, liabilities, losses, costs or expenses, or the direct, special or consequential, arising out of [such] breach or default, whether such claim is based in contract, tort or another legal or equitable basis or otherwise."  (2002 Gas Supply Agreement, Article 12.1)  In short, all of Plaintiff's claims in this action are squarely and wholly barred by the exclusive remedy provisions of the contract upon which it bases those claims; and all of Plaintiff's contentions of "unfair" and "extortionate" conduct by Defendants are falsely based on assertions of contract-based duties that do not exist.

---

[9]  The costs of the modifications to the Gas System sought by Plaintiff are substantial.  According to Plaintiff's witness David E. Adams, the direct cost of installing a new collection well at the Landfill can amount to as much as $10,000, the cost of repairing the synthetic cap in the area of the new well would amount to several thousand dollars, and the cost of tying a new well into the Gas System would be significant.  Even installing a pump in a well to clear it of accumulated water involves a cost of as much as $8,000.  (Adams Depo., pp. 71-74)  Obviously, the cost of replacing a substantial number of the more than fifty wells alleged by Plaintiff to be damaged would be a major expense.  Placing pumps in a large number of wells in order to compensate for a rising water table over a significant area of the Landfill, as Mr. Adams suggests might be required to increase the capture of landfill gas, (Id., pp. 167-169), also obviously would be quite expensive.  Defendants respectfully suggest that the "reasonable efforts" requirement of the 2002 Gas Supply Agreement does not mean that Plainville Gas must lose money in such amounts in order that Plainville Generating/Lorusso Corp. can earn even greater amounts.

Finally, the unilateral termination of the 2002 Gas Supply Agreement by Plainville Gas, characterized by Plaintiff as an "abandonment," is expressly authorized by the contract. Plainville Gas had the right to unilaterally terminate the contract once it determined "in its sole discretion" that the Landfill was producing insufficient quantities of landfill gas to maintain Plainville Gas in an economically viable situation. (Id., Articles 1.4, 12.2(h))

### D.     As To Additional Modifications Issue

Lorusso Corp. did not timely reimburse Plainville Gas for the modifications to the Gas System to which Lorusso Corp. agreed under the provisions of the 2002 Gas Supply Agreement and which were carried out by Plainville Gas ("Agreed Modifications"). Plainville Gas made numerous efforts to secure payment of this obligation in full during 2003 and 2004 but was able to obtain only a partial payment against the total amount owed.

Contrary to Plaintiff's contention, these "Agreed Modifications" were carried out by Plainville Gas in accordance with all applicable specifications and the parties' express agreement pursuant to Article 3.1 of the 2002 Gas Supply Agreement. Consequently, on December 13, 2004, Plainville exercised its contractual right to place Lorusso Corp. on notice of its default with respect to the unpaid principal amount, plus reasonable interest. Lorusso Corp. then paid the amount sought by Plainville Gas.

Plaintiff contends that the Agreed Modifications were intended to result in landfill gas being delivered to the Generating Plant under sufficient pressure to be used as fuel for the Caterpillar engines upon receipt. Defendants, however, contend that the Agreed Modifications were intended to result in the gas being delivered to the Generating Plant only under sufficient pressure to reach the Generating Plant and that equipment installed by Lorusso Corp. at the Generating Plant was intended to raise the pressure of gas received to a level sufficient for operation of the engines.

### E.    As To Diminished Volume Issue

In late 2003, the volume rate of gas delivered to the Generating Plant via the Gas System declined as compared to the volume rate of gas that had been delivered to the Asphalt Plant and to the Generating Plant during its first few months of operation.  According to Plaintiff, this resulted in there being insufficient gas to fuel all seven engines at the Generating Plant so that the facility could generate electricity at full capacity.

Plaintiff contends that the primary, if not sole, reason for this diminished gas delivery is the failure of Plainville Gas to reasonably maintain and repair the Gas System.  However, Defendants contend that Plainville Gas has fulfilled its contractual obligation to use reasonable efforts to collect and deliver all of the landfill gas produced at the Landfill to the Generating Plant and that the diminished gas volume delivery rate is due primarily to reduced gas generation.

Plaintiff further contends that representatives of Plainville Gas agreed at some point in the parties' discussions regarding this issue to undertake a specific enhanced maintenance and repair program for the Gas System.  Defendants, though, deny that any such agreement was ever reached in this regard.

### F.    As To "Takeover" Issue

On July 30, 2004, Curtis T. Ranger, President of both DTE Biomass and Plainville Gas, and William Van Slingerlandt, acting on behalf of Plainville Gas, met with Gerard Lorusso, David LaFlamme, and Henry Grilli of Lorusso Corp. to discuss the ongoing dispute regarding diminished gas deliveries to the Generating Plant.  According to Mr. Lorusso, Mr. Ranger stated during the course of that meeting that Plainville Gas would not undertake any efforts to maintain or repair the Gas System unless Lorusso Corp. granted Plainville Gas an equity position in the Generating Plant.  However, Defendants categorically deny that at any time during the July 30

meeting or at any other time did Mr. Ranger ever state or otherwise indicate to any person affiliated with Lorusso Corp. that Plainville Gas would not undertake repairs or maintenance of the Gas System reasonably required to collect landfill gas generated at the Landfill for delivery to the Generating Station unless Lorusso Corp. provided Plainville Gas an equity interest in the Generating Station operation.

**G.      As To Termination, Assignment Of Contracts**

In mid-2005, Plainville Gas determined that the amount of landfill gas being generated at the Landfill was not sufficient to generate economic benefits to Plainville Gas of such magnitude as to exceed the costs to Plainville Gas of owning and operating the Gas System and delivering landfill gas collected by the Gas System to the Generating Plant.  Therefore, Plainville Gas exercised its right under Article 12.2(h) of the 2002 Gas Supply Agreement to unilaterally terminate that agreement, effective at midnight, August 31, 2005.  By Mr. Ranger's letter to Mr. Lorusso dated July 19, 2005 ("Termination Letter"), Plainville Gas notified Lorusso Corp. of that termination.

By the Termination Letter, Plainville Gas also offered to assign to Lorusso Corp. all of the rights and obligations of Plainville Gas under the Gas Rights Agreement.  On July 27, 2005, Lorusso Corp. accepted the Plainville Gas offer of assignment of the Gas Rights Agreement.

As a result, Plaintiff is now the owner of a Gas System for which Plainville Gas paid Allied a total of more than $800,000.  Thus, Plaintiff now has control of its own fate with respect to the maintenance, repair, and operation of the Gas System.

Plaintiff already has hired an engineering firm to carry out the "tuning" of individual collection wells.  Even before assuming responsibility for operating the Gas System, Plaintiff hired an environmental engineer to evaluate the operation of the Gas System and conditions generally at the Landfill.  Furthermore, Mr. LaFlamme has acknowledged that he has been

assigned the responsibility for evaluating the condition of the Gas System and to determine what maintenance and/or repairs might be undertaken by Plaintiff, taking into account both technical and financial aspects of such a program.  Finally, Mr. LaFlamme has testified that Plaintiff has encountered no difficulty in operating the Gas System for more than two months now, most notably without any decrease in the quantity of gas delivered to the Generating Plant.

Despite the foregoing, Plaintiff contends that Plainville Gas by its conduct complained of is guilty of "irrevocably cutting off Plaintiff's only supply of gas, which would kill the renewable energy project and destroy Plaintiff's business" so that "Plaintiff had no choice to avoid ruin of its multi-million renewable energy Facility but to step into the Gas Rights Agreement as an assignee to keep gas flowing and its project viable, on the non-negotiable terms imposed by Defendant with its Notice of Termination. . . ."  (Plaintiff's Memorandum at 7).  Defendants, though, contend that Plainville Gas has merely exercised its right to unilaterally terminate the 2002 Gas Supply Agreement and assigned Lorusso Corp. the Gas Rights Agreement — just as the parties contemplated might happen at the time they executed the 2001 Letter Agreement.[10]

## III.    DISCUSSION

### A.    As To Applicable Legal Standards

The standards applicable to Plaintiff's request for relief pursuant to Plaintiff's Motion are well established.  First, in order to obtain the preliminary injunction requested, Plaintiff must show a likelihood of success on the merits, irreparable injury, and a favorable balance of the equities, including effects on the public interest.  Rhode Island Dept. of Environmental Mgt. v. United States, 304 F.3d 31, 45 (1st Cir. 2002), reh. and suggestion for reh. en banc denied (2002); Ocean Spray Cranberries, Inc. v. Pepsico, Inc., 160 F.3d 58, 60-61 (1st Cir. 1998).

_____

[10]    Significantly, the 2002 Gas Supply Agreement does not incorporate all of the changes to the 1996 Gas Supply Agreement contemplated by the 2001 Letter Agreement.  Among the provisions not incorporated was an agreement by Plainville Gas to assign its rights in the Gas Rights Agreement to Lorusso Corp. if Plainville Gas were to terminate the 2002 Gas Supply Agreement under the provisions of Sections 12.2(c), (d), (e), (f), or (h).

Second, Plaintiff's request that the Court order either Plainville Gas or DTE Biomass to provide a $3 million financial assurance may be granted only if the Court determines that such prejudgment security is authorized by Massachusetts law.  Fed. R. Civ. P. 64.

Defendants are confident that, for many reasons, Plaintiff cannot satisfy either of these standards.  However, because the Court has agreed to conduct an evidentiary hearing in connection with Plaintiff's Motion, Defendants respectfully suggest that it is premature for them to set forth their point-by-point rebuttal of Plaintiff's discussion of these standards in light of the limited evidentiary submission in support of Plaintiff's Motion.  Rather, Defendants will address these standards below only to the extent that such discussion is unlikely to be affected by the subsequent creation of a more extensive evidentiary record.

### B.    As To Operational Materials

Plaintiff's request for certain specific and limited injunctive relief is predicated upon its contention that "Defendants" have failed to turn over to any of the information, materials, documents, maps or keys necessary for Plaintiff to operate the Gas System and to satisfy its legal requirements and its obligations to Allied under the terms of the Gas Rights Agreement. According to Mr. Lorusso, "none of the essential information, documents, and data that we still require to comply with law and the assumed contractual obligations was provided."  (Affidavit Of Gerard Lorusso In Support Of Motion For Injunction, dated October 11, 2005, ¶ 5) Mr. Lorusso has set forth a nearly two page listing of such "necessary data and documents." (Id.)  However, according to Mr. LaFlamme, Mr. Lorusso's sworn statements in this regard are not accurate.

Mr. LaFlamme was deposed by Defendants on November 10, 2005.  At that time, he testified that Lorusso Corp. presently possesses flare operational manuals, all necessary keys, a site plan with gas extraction points, instructions for the electronic flare monitoring system, some

A14

mechanical drawings, operation and maintenance manuals for all equipment and systems except the condensate pumps, and a plan of the Gas System piping as built. (LaFlamme Depo., p. 130, 135-141) Furthermore, Mr. LaFlamme testified that the Plaintiff does not require any of the other items listed by Mr. Lorusso in order to operate Gas System on a day-to-day basis; indeed, Plaintiff has done so since the first day it assumed responsibility for the Gas System, i.e., September 1, 2005. (Id., pp. 130-131) Furthermore, Mr. LaFlamme testified that Plaintiff has retained an engineering firm to "tune" the individual wells of the Gas System. (Id., pp. 115-118, 132, 144-145) Finally, with respect to this point, Mr. LaFlamme testified that there has been no reduction in the volume of gas delivered to the Generating Plant. (Id., pp. 125-126, 133)

As Mr. LaFlamme explained in his deposition, many of the materials on Mr. Lorusso's list are in the nature of background information that he believes would be helpful (1) in troubleshooting the Gas System in the event that some "problem" develops, and (2) in evaluating the Gas System to determine what maintenance and repairs might be necessary or useful, taking costs into account. (Id., pp. 126, 130-134, 141-142, 145-146) All of these materials, of course, to the extent that Plainville Gas possesses them, can be easily obtained by Plaintiff in the ordinary discovery process in this case.

Furthermore, Plaintiff's recitation of page 11 of Plaintiff's Memorandum as to why "Plaintiff's lack of access to these five categories of routine operator information is causing damages that are not amenable to award of money damages" consists entirely of assertions that are either speculative or false. In short, Plaintiff's parade of horrors is non-existent.[11]

First, Plaintiff asserts: "Defendants' refusal to turn over historical data and other information the Plaintiff must maintain under state and Federal laws could cause Plaintiff to be

---

[11] As an initial matter, Plaintiff repeatedly complains about the conduct of "Defendants" in this regard. Plaintiff's only contractual relationships relevant to this action, though, were with Plainville Gas.

cited and penalized by the government."  However, Plaintiff has not identified any category of historical data or other information that Plaintiff now has a legal obligation to maintain. Therefore, Plaintiff's suggestion that it is at risk of being "cited and penalized by the government" is completely speculative.

Second, Plaintiff asserts that it "has important new obligations to the Landfill owner, Allied, as a result of the assignment which Defendants have forced on Plaintiff, and Plaintiff will be unable to meet these obligations if it is denied access to the data and is forced to continue administering the Collection System in the present manner."  However, Plaintiff has identified no such obligations; nor has it identified any data purportedly possessed by either Defendant that actually Plaintiff requires to meet these unidentified obligations.  Therefore, Plaintiff's assertion that it "will be unable to meet" any such obligations also is completely speculative.

Third, Plaintiff asserts that it "does not even fully understand all of its obligation [sic] because Defendants have refused to supply the contract presently in effect."  However, the record shows that Plaintiff knows full well what constitutes the current Gas Rights Agreement.

The documents that constitute the Gas Rights Agreement are identified at Article 1.11 of the 2002 Gas Supply Agreement itself.  Moreover, Mr. Ranger's July 19 letter to Mr. Lorusso, a copy of which was attached both as Exhibit M to Plaintiff's First Amended Complaint filed in Case No. 05-11210-GAO and as Exhibit M to Plaintiff's Complaint filed in Case No. 05-CV-12168-GAO specifically identifies the documents that constitute the Gas Rights Agreement, as does the Assignment itself.  Most significantly, any doubt that Plaintiff has the ability to ascertain its obligations to Allied under the provisions of the Gas Rights Agreement is fully dispelled by Plaintiff attaching copies of that contract as Exhibit A to both its original Complaint and its First Amended Complaint in Case No. 05-11210-GAO and to its Complaint in Case No. 05-CV-12168-GAO.

Finally, Plaintiff asserts that its "inability to effectively tune the 117 wells is causing increased escape of methane gas, which is harmful to the environment; this is, moreover, another basis for Plaintiff to potentially become liable under state and federal law."   However, Mr. LaFlamme testified that Plaintiff has retained a consultant to tune the wells that constitute part of the Gas System and that there has been no decrease in gas delivery volume since September 1.   Furthermore, there is no evidence in the record that there has been any "increased escape of methane gas" from the Landfill since Plaintiff took over operation of Gas System. Moreover, Plaintiff offers no grounds for its supposed potential liability under state and federal law with respect to any such escape of methane gas.   Again, then, Plaintiff's statements are either undisputedly inaccurate or completely speculative.

It is important to note that there is no public interest implicated by Plaintiff's request for the specific and limited injunctive relief sought by Plaintiff's Motion.   As Mr. LaFlamme has testified, Plaintiff has encountered no difficulties in operating the Gas System for more than two months now.   Furthermore, Plaintiff has more than adequate access to consultants and engineering firms that can assist it in continuing to do so.[12]   Moreover, as Plaintiff itself notes, the Landfill is producing commercial quantities of landfill gas, and there has been no change in the volume of gas delivered from the Landfill to the Generating Plant for nearly two years now.

For these reasons, Plaintiff's suggestion that the Generating Plant will close down, thereby either leaving approximately 2,000 homes without electricity or putting upward pressure

---

[12]    In light of Mr. LaFlamme's testimony regarding these matters, it is hard to understand how Plaintiff can seriously contend that it has no adequate remedy at law in the nature of money damages in the event that it should prevail on any of its claims against Defendant.   See also Plainville Generating Co., LLC's Initial Disclosures Pursuant To Fed. R. Civ. P. 26(a), containing Plaintiff's statement regarding its alleged damages, a copy of which is Exhibit D to the Affidavit Of W.C. Blanton Relating To Plaintiff's Motion For Preliminary Injunction, dated November 15, 2005, filed herewith.   In any event, given the level of hostility toward Defendants exhibited by Plaintiff in its filings in this case, the Court should be loathe to order the parties into an ongoing working relationship.   See Lawless v. Melone, 350 Mass. 440, 443, 214 N.E.2d 881 (1996); Westinghouse Broadcasting Co., Inc. v. New England Patriots Football Club, Inc., 10 Mass. App. Ct. 70, 406 N.E.2d 399, 402 (1980).

on electric prices in New England is wildly exaggerated speculation. So, too, is Plaintiff's suggestion that global warming will be exacerbated if it does not receive all of the items on Mr. Lorusso's list by means of an injunction.[13] As Plaintiff acknowledges, the MDEP is addressing any escape of methane from the Landfill in amounts or concentrations in excess of applicable regulations; and Plaintiff has offered no evidence to suggest that Allied will not comply with its legal obligations to manage the gas generated at the Landfill, whether or not that management involves delivery of the gas to the Generating Plant.

As a final note on this subject, Plaintiff's assertion that "Defendants may also have removed parts of the Landfill related to the Agreed Modifications Plaintiff had paid for, and are at issue in this litigation" cannot go unchallenged. (Plaintiff's Memorandum at 10). This is a particularly egregious assertion by Plaintiff made with no evidentiary support whatsoever and therefore is but completely speculative defamation.

## C.    As To Financial Assurances

Plaintiff's request that the Court order Defendants to supply a letter of credit, bond, guarantee, or other security in the amount of $3,000,000 as security for a possible judgment has no support in law. Pursuant to Fed. R. Civ. P. 64, such a remedy is only available "under the circumstances and in the manner provided by the law of the state in which the district court is held."

---

[13] Plaintiff's use of the "global warming" card to support its contention that it has no adequate remedy at law for Defendants' alleged transgressions is legally as well as factually without merit. (Plaintiff's Memorandum at 19-20). Even if Plaintiff could demonstrate that there is methane escaping from the Landfill for which Defendants are responsible and that this escaping methane is contributing to global warming, proof of such matters fails to establish the occurrence of any legally cognizable injury to Plaintiff. "A 'generalized grievance' that affects the entire citizenry cannot satisfy the injury-in-fact requirement even though it aggrieves the plaintiff along with everyone else." Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 204 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 573-74 (1992)). Cf. United States v. AVX Corp., 962 F.2d 108 (1st Cir. 1992). The Supreme Court further noted that "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but *injury to the plaintiff*." Id., 528 U.S. at 181 (emphasis added). As Plaintiff therefore has no standing to assert a claim based upon the escape of methane molecules from the Landfill to the atmosphere, it is entitled to no remedy based upon any such occurrence that it might be able to prove.

Plaintiff has not identified any provision of Massachusetts law that supports its request. However, the Massachusetts law apparently relied upon by Plaintiff is Mass R. Civ. P. 4.1, which does <u>not</u> authorize the relief Plaintiff requests. Rather, Rule 4.1 provides only for the attachment of property, <u>i.e.</u> "real estate, goods and chattels and other property" to be held to satisfy a likely judgment. Nothing in the language of Rule 4.1 authorizes the Court here to order Defendants to produce a letter of credit, bond, or other security as Plaintiff seeks.

<u>Excel Staffing, Inc. v. Atlas Metal Products Co., Inc.</u>, No. 041096B, 2005 Mass. Super. LEXIS 69, *4; 2005 WL 704949, *2 (Mass. Super. Feb. 16, 2005), does not support Plaintiff's contention that "[w]here attachment of a defendant's assets is impossible or impracticable, Massachusetts courts will order a defendant to post other appropriate security." (Plaintiff's Memorandum at 13). In <u>Excel Staffing</u>, the court did not require the defendants to obtain a bond. Rather the defendants moved to amend a previous attachment on several parcels of real property. Because the value of the property was in question, the court agreed amend the attachment "so as to exclude the Suffolk County Property, "provided (and only provided) that:

1.    Mrs. Berman [the wife of a defendant] waives her rights pursuant to her tenancy by the entirety . . .

2.    The Defendants obtain a bond in the amount of $250,000, as further security in a form satisfactory to the Plaintiff, such satisfaction not to be unreasonably withheld."

<u>Excel Staffing</u>, 2005 WL 704949 *2. (emphasis added).

Clearly this was not an order pursuant to Rule 4.1 requiring the defendants to procure a bond. Rather, the bond was optional. In fact, the court subsequently offered the defendants a second option to satisfy the original attachment, <u>i.e.</u> placing a portion of the proceeds from the

sale of the property in an escrow account.  See Excel Staffing, Inc. v. Atlas Metal Products Co. Inc., No. 041096B, 2005 WL 1008915 (Mass. Super. March 10, 2005).

Plaintiff's reliance upon Excel Staffing is not well founded.  Plaintiff cites no other case to support its proposition that Rule 4.1 authorizes letters of credit or bonds.  In short, Plaintiff's request for financial assurances fails as a matter of law.

The second fundamental flaw in Plaintiff's request for financial assurance is the complete absence of any evidence that such assurances are necessary "so that manipulations by Plainville Gas do not shift remaining assets to its parent, declare bankruptcy, [sic] and frustrate the remedies to which parties are entitled."  (Plaintiff's Memorandum at 2).  Instead, Plaintiff supports its claim for this relief solely upon its consistently false defamatory  characterizations of the events that give rise to this litigation.

First, Plaintiff does not even allege any conduct by DTE Biomass or any other fact relating to that company that could serve as the basis for a conclusion that there exists a clear danger that it will put its property beyond the reach of Plaintiff if it should eventually become a creditor.  Therefore, Plaintiff's request should be summarily denied to the extent that it is directed to DTE Biomass.

Second, Plaintiff supplies no evidence to support its assertion that Plainville Gas is planning to undertake some fraud upon a potential creditor, declare bankruptcy, or otherwise become judgment proof before this case is completed.  All that Plaintiff offers in this regard are complaints that Plainville Gas allegedly has acted badly in the past towards Plaintiff and the contention that it therefore is likely to do so in the future.  These complaints, though, merely reflects the differences of opinion between Plaintiff and Plainville Gas as to their relative rights and obligations under the terms and conditions of the 2002 Gas Supply Agreement.

It is not extortion for a party like Plainville Gas to exercise its rights pursuant to contract provisions established by arms-length bargaining of the parties. That Plainville Gas has done so is no basis to conclude that it will undertake improper efforts to avoid any obligations that may be imposed upon it in connection with this litigation. Thus, Plaintiff's request for financial assurances is factually, as well as legally, defiant.

Finally, the complete evidentiary record will show that it is unlikely that Plaintiff's claims will succeed on the merits. Thus, Plaintiff's request for financial assurances is not well taken.

## IV.     <u>CONCLUSION</u>

For the reasons stated above, Plaintiff's Motion should be denied in all respects. Therefore, Defendants respectfully request the Court to deny Plaintiff's Motion and to grant them all further appropriate relief.

Date:  November 15, 2005

Respectfully submitted,

*/s/ W.C. Blanton*
W.C. Blanton              MO# 54125
Lori J. Sellers            MO# 47975
Blackwell Sanders Peper Martin LLP
4801 Main St., Ste. 1000
Kansas City, MO  64112
(816) 983-8000
(816) 983-8080 ( fax )
Admitted *pro hac vice*

*/s/ Wesley S. Chused*
Wesley S. Chused          BBO # 083520
Looney & Grossman LLP
101 Arch Street
Boston, MA  02110
**Attorneys for Defendants**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2005, I served a copy of the foregoing pleading upon all parties hereto electronically, via facsimile or by mailing copies thereof, via first class mail, postage prepaid, properly addressed to:

> Steven Ferrey, Esq.
> Christopher L. DeMayo, Esq.
> LeBoeuf, Lamb, Greene & MacRae, L.L.P.
> 260 Franklin Street
> Boston, MA 02110
> (617) 748 6800

> */s/ Wesley S. Chused*
> Wesley S. Chused

# <u>APPENDIX</u>

**Relevant 2002 Gas Supply Agreement Provisions**

# — <u>INDEX TO APPENDIX</u> —

<u>**Contract Article**</u>                                                                                                    <u>**Page**</u>

1.4   COMMERCIAL QUANTITIES........................................................................................A1

1.12  LANDFILL ..............................................................................................................A1

1.13  LANDFILL GAS .......................................................................................................A1

1.15  SELLER'S FACILITY ...............................................................................................A1

2.4   ASSUMPTION OF RISK BY BUYER..........................................................................A1

3.1   SELLER'S FACILITY ...............................................................................................A1

5.1   DELIVERY VOLUMES .............................................................................................A2

5.4   DISCLAIMER REGARDING LANDFILL GAS ............................................................A2

6.3   BILLING AND PAYMENT.........................................................................................A2

7.2   FAILURE TO MEET QUALITY SPECIFICATION ......................................................A2

7.3   DISCLAIMER OF WARRANTIES .............................................................................A3

9.2   BUYER'S RIGHTS TO SUPPORT SELLER ..............................................................A4

11.1  GENERAL PROVISIONS ..........................................................................................A4

12.1  BUYER'S RIGHT TO TERMINATE..........................................................................A5

12.2  SELLER'S RIGHT TO TERMINATE.........................................................................A5

12.3  EXCLUSION OF DAMAGES .....................................................................................A5

16.6  AMENDMENT TO AGREEMENT...............................................................................A6

16.7  ENTIRE AGREEMENT.............................................................................................A6

16.8  SUCCESSORS AND ASSIGNS ..................................................................................A6

16.9  ASSIGNMENT ........................................................................................................A6

## Relevant 2002 Gas Supply Agreement Provisions

## Article 1.4

Commercial Quantities.  The term "Commercial Quantities" shall mean the amount of Landfill Gas that can be extracted from the Landfill by Seller of such quantity and/or quality that it is economically viable and profitable for Seller to sell the Landfill Gas to Buyer under this Agreement, as determined by Seller in its sole discretion.

## Article 1.12

Landfill.  The term "Landfill" shall mean the Plainville Landfill currently owned by Allied Waste Systems in Plainville, Massachusetts.

## Article 1.13

Landfill Gas.  The term "Landfill Gas" shall mean landfill gas, consisting primarily of methane and carbon dioxide that is produced from decomposing refuse within the Landfill.

## Article 1.15

Seller's Facility.  The term "Seller's Facility" shall mean a Landfill Gas transmission facility, a pipeline for delivery of Landfill Gas to Buyer at Buyer's Facility, metering equipment and any miscellaneous or ancillary equipment necessary for the transmission of the Landfill Gas.

## Article 2.4

Assumption of Risk by Buyer.  Notwithstanding anything in this Agreement to the contrary, Buyer understands and agrees that in entering into this Agreement, Seller is not guaranteeing the delivery of Landfill Gas to Buyer, that the supply of Landfill Gas may be interrupted or the delivery of the Landfill Gas may become commercially impracticable and Buyer willingly and knowingly accepts these risks.

## Article 3.1

Seller's Facility.  Subject to the terms and conditions of this Agreement, Seller shall, at Seller's expense (except as provided in this Article 3.1) operate and maintain Seller's Facility in a manner reasonably necessary to deliver the Landfill Gas to Buyer at Buyer's Facility.  Seller represents and warrants that Seller shall operate and maintain Seller's Facility in material compliance with all Applicable Laws.

Buyer and Seller agree that modifications to Seller's Facility are required to deliver Landfill Gas to Buyer's Electric Generation facility.  The scope and estimated cost of the necessary modifications to Seller's Facility are shown in Exhibit B.  Buyer agrees that Buyer will reimburse Seller for Seller's actual costs for completion of these modifications within 30 days of receipt of invoices documenting such costs.  Seller agrees to coordinate with Buyer the completion of such modifications and to accommodate Buyer's requests regarding the scope of

such modifications, subject to compliance with Seller's standard practice for completion of such modifications to Seller's facilities.

## Article 5.1

Delivery Volumes.  Subject to the terms and conditions of this Agreement, Seller agrees to sell to Buyer and Buyer agrees to buy from Seller, all of the Landfill Gas that is actually produced by Seller from the Landfill.

## Article 5.4

Disclaimer Regarding Landfill Gas.  Notwithstanding anything in this Agreement to the contrary, nothing in this Article V or any other provision or Article of this Agreement shall be interpreted as Seller guaranteeing the quantity or quality of Landfill Gas or the rate at which Seller can supply Landfill Gas to Buyer, only that Seller will use reasonable efforts to supply such Landfill Gas to Buyer (as distinguished from another buyer) in the quantities set forth in Article 5.1, 5.2 and 5.3 of this Agreement (but not necessarily at the rate needed by Buyer) if Seller is reasonably able to produce and deliver the same to Buyer, and Seller's obligation to deliver Landfill Gas shall at all times be subject to the terms and conditions of this Agreement. Moreover, Seller's failure to deliver Landfill Gas, in whole or in part, at any time during the term of this Agreement, including, without limitation, the failure to deliver the quantity or quality of Landfill Gas to Buyer and the failure to deliver at the rate needed by Buyer, shall not be a breach of Seller's obligations under this Agreement, shall not be a default or event of default by the Seller under this Agreement, shall not entitle Buyer to terminate this Agreement and shall not give rise to any choses in actions, lawsuits or claims of any kind or nature by Buyer against Seller under this Agreement, at law or in equity or otherwise, including, without limitation, any claim for direct, consequential or special damages, which are hereby expressly excluded and disclaimed.

## Article 6.3

Billing and Payment.  Sales of Landfill Gas (including any taxes to be reimbursed under this Agreement) shall be invoiced monthly, which sales shall be measured and billed on a MMBTU basis by multiplying the BTU content of the Landfill Gas by the volume of Landfill Gas.  Payment is due within thirty (30) days from invoice date.  Delinquent payments are subject to a late payment charge of one (1%) percent per month (commencing thirty days after the invoice date), and subject to the provisions of Article XI, Buyer shall reimburse and indemnify Seller for all costs and expenses, including costs, expenses and reasonable attorney's fees, incurred by Seller in collecting such amounts.

## Article 7.2

Failure to Meet Quality Specification.  If the Landfill Gas delivered hereunder to Delivery Point A fails (1) to contain a minimum of four hundred (400) BTU per cubic foot of Landfill Gas, computed as provided above, or (ii) the Landfill Gas is delivered at a pressure that does not satisfy Article 7.1(b) ("Nonconforming Gas") for a period of time of not less than seven (7) consecutive days, either party shall immediately notify the other party orally (and in writing within five (5) days thereafter) of the Nonconforming Gas.  Buyer shall have the right to (i)

purchase the Nonconforming Gas for the purchase price set forth in Article VI or (ii) refuse to accept the Nonconforming Gas, in which event the Nonconforming Gas shall be diverted to Delivery Point B and Buyer shall not have to pay for any Nonconforming Gas so diverted, notwithstanding anything in Article VI to the contrary.  The parties agree to work in good faith and cooperate to remedy any problems that caused the Landfill Gas to become Nonconforming Gas.  If Buyer has previously elected not to purchase Nonconforming Gas, Buyer shall resume purchasing the Landfill Gas as soon as reasonable possible, but in no event more than seven (7) days after Buyer's receipt of notification from Seller that Seller is able to deliver Landfill Gas containing at least four hundred (400) BTU per cubic food at the pressure set forth in Article 7.1(b), which notice need not be in writing.

Notwithstanding anything in this Agreement to the contrary,

(a)     Seller's delivery of Nonconforming Gas shall not be a breach of Seller's obligations under this Agreement, shall not be a default or event of default under this Agreement, shall not entitle Buyer to terminate this Agreement and shall not give rise to any choses in action, lawsuits or claims of any kind or nature by Buyer against Seller under this Agreement, at law or in equity or otherwise, including, without limitation, any claim for direct, consequential or special damages, which are hereby expressly excluded and disclaimed; and

(b)     In the event of delivery of Nonconforming Gas for seven (7) consecutive days and Buyer has elected not to purchase such Nonconforming Gas, all as provided above, Buyer's sole and exclusive remedy shall be to not pay for such Nonconforming Gas diverted to Delivery Point B until such time as and when, if ever, the Landfill Gas conforms to the specifications in Article 7.1.

## Article 7.3

Disclaimer of Warranties.     EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLER IS NOT MAKING ANY EXPRESSOR IMPLIED REPRESENTATIONS OR WARRANTIES OF ANY KINE OR NATURE AS TO THE LANDFILL GAS, HEREBY EXCLUDING, WITHOUT LIMITATION, ANY AND ALL REPRESENTATIONS AND/OR WARRANTIES AS TO THE QUANTITY, THE RATE AT WHICH SELLER CAN PRODUCE AND/OR DELIVER LANDFILL GAS TO BUYER, THE QUALITY OF THE LANDFILL GAS DELIVERED BY SELLER TO BUYER PURSUANT TO THIS AGREEMENT AND SELLER'S ABILITY TO DELIVER ANY LANDFILL GAS DURING THE ENTIRE TERM OF THIS AGREEMENT.  THE PARTIES AGREE THAT ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL OTHER WARRANTEIS, EXPRESS OR IMPLIED, ARE EXCLUDED FROM THIS TRANSACTION AND DO NOT APPLY ANY LANDFILL GAS SOLD HEREUNDER.

## Article 9.2

<u>Buyer's Rights to Support Seller</u>.

(a)     <u>Collection System Upgrades</u>.  Buyer may request Seller to make improvements or upgrades ("Upgrades") in the gas collection system, other than those required to maintain the existing level of services and product as provided in this agreement, at the Landfill at Buyer's expense.  Seller will review the request for Upgrades and if such request is acceptable to Seller and complies with the provisions of the Gas Rights Agreement, Seller will provide Buyer with a cost estimate for the requested Upgrades and a payment schedule including the timing and scope of payments to be made by Buyer.  Buyer will pay Seller for all such costs including, direct costs incurred by Seller, subcontractor costs plus a 20% construction management fee to Seller.  Upon Buyer's approval, Seller will proceed with the implementation of the requested Upgrades.  If Seller fails to respond to any such request for Upgrades made under this provision in Article 9.2(a)within 45 days, then Buyer will be free to proceed with implementation of its desired Upgrade at its own expense.  Any such Upgrades will be made consistent with and in accordance with the provisions of the Gas Rights Agreement and all applicable Environmental Laws and other applicable laws and regulations.  Buyer will be solely responsible for the costs to repair or replace any portion of Seller's Facility or the Landfill owner's property damaged as a result of any actions by Buyer in making such upgrades and will indemnify and hold Seller Harmless from any claims against Seller resulting from Buyer's implementation of such Upgrades.

\* \* \*

## Article 11.1

<u>General Provisions</u>.  Except for the failure of Buyer to pay any amounts owed Seller under this Agreement ("Payment Default"), in the event of a breach of or default under this Agreement by either party, the non-defaulting party shall provide written notice to the breaching or defaulting party and allow such party ninety (90) days to cure such breach or default ("Cure Period").  If such breach or default is not cured within the Cure Period, the non-defaulting party shall have the right to pursue any and all rights and remedies available under this Agreement, at law or, in equity or otherwise, except to the extent that such right and remedies are limited, excluded or disclaimed by this Agreement.  subject to the exclusions and limitations set forth in this Agreement, all rights and remedies shall be cumulative and shall be in addition to, and not in lieu of, any other rights and remedies available to the non-defaulting party and the election to pursue one remedy shall not preclude the election to pursue another remedy.

\* \* \*

Notwithstanding the first paragraph of the [sic] Article 11.1, Buyer's sole and exclusive remedy for Seller's breach or default (after the lapse of any applicable cure period) is to terminate this Agreement as provided for and subject to the limitations and exclusions set forth in Article 12.1 below.  The parties further acknowledge and agree that in light of Seller's incurrence of substantial financial obligations and the fact that it is not possible to determine accurately at this time Buyer's actual damages, if any, with a reasonable degree of certainty, Buyer's sole and exclusive remedy as reasonable under the circumstances and not a penalty.

## Article 12.1

Buyer's Right To Terminate.  Buyer may terminate this Agreement by written notice to Seller submitted not later than ten (10) days following the occurrence of the initiation of any involuntary proceeding against Seller under the bankruptcy or insolvency laws, which involuntary proceeding is not dismissed for sixty (60) consecutive days, or the initiation by Seller of a voluntary proceeding under the bankruptcy or insolvency laws.

If Seller breaches or defaults under this Agreement, Buyer shall notify Seller in writing of such breach or default, whereupon Seller shall have the right to cure such breach of default as provided in Article XI above.  If Seller does not cure such breach or default within the applicable Cure Period, Buyer's sole remedy shall be limited to terminating this Agreement by providing thirty (30) days written notice to Seller of Buyer's intention to terminate this Agreement, and Buyer shall not have any claim against Seller whatsoever for any damages, liabilities, losses, costs or expenses, whether direct, special or consequential, arising out of Seller's breach or default, whether such claim is based on contract, tort or another legal or equitable basis or otherwise.  Buyer's sole and exclusive remedy in the event of default shall be to terminate this Agreement pursuant to Section 12.1 as full and final liquidated damages.  If Buyer terminates this Agreement as a result of Seller's breach or default, neither party shall have any further obligations, liabilities or claims against the other party under this Agreement, at law or in equity or otherwise, including any claim for direct, special or consequential damages, which is herby expressly excluded and disclaimed, except that Buyer shall be obligated to pay Seller any amounts owed to Seller under this Agreement as of the date of termination and the parties shall continue to be liable for those tort based action, and only those tort based actions, for which identification is to be provided under Article XIII below.

## Article 12.2

Seller's Right To Terminate.  Seller may terminate this Agreement by written notice to Buyer following the occurrence of one or more of the following events:

\* \* \*

(h)    The Landfill ceases to produce Commercial Quantities of Landfill Gas, as determined by Seller in its sole discretion.

## Article 12.3

Exclusion Of Damages.  If Seller terminates this Agreement under Article 12.2(c) through (h), neither party shall have any further obligations, liabilities or claims against the other party under this Agreement, at law or in equity, including any claim for direct, special or consequential damages, which are hereby expressly excluded and disclaimed, except that Buyer shall be obligated to pay Seller any amounts owed to Seller under this Agreement as of the date of termination and the parties shall continue to be liable for those tort based actions, and only those tort based actions, for which indemnification is to be provided under Article XIII below.

### Article 16.6

<u>Amendment To Agreement</u>.  This Agreement may be amended or modified only by a written instrument signed by both parties.

### Article 16.7

<u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written agreements and understandings between the parties relating to the subject matter hereof.

### Article 16.8

<u>Successors And Assigns</u>.  All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto and their respective permitted successors and assigns.

### Article 16.9

<u>Assignment</u>.  Except as expressly provided herein, this Agreement may not be transferred or assigned by one party without the prior written consent of the other party, which consent shall not be unreasonably withheld.

\* \* \*

Notwithstanding the foregoing, Buyer may assign this Agreement without Seller's consent to (i) any subsidiary, parent or affiliated company or any limited liability company, partnership, corporation or other entity in which Buyer has an interest of 50% or more (collectively, "Related Entity"), (ii) any limited liability corporation, partnership, corporation or other entity controlled by Buyer and/or any Related Entity or (iii) a lending institution pursuant to a collateral assignment; provided that any such assignment shall not unduly interfere with Seller's rights under this Agreement, and further provided that such assignee (except a lending institution) agrees to be bound by the terms of this Agreement to the same extent as Buyer.  No assignment by Buyer shall relieve Buyer of its obligations under this Agreement.  Buyer shall give Seller thirty (30) days prior notice of its intent to assign that interest, which notice shall contain the name and address of the proposed assignee, purchaser or successor in interest, which information shall be kept confidential by Seller.