UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

PLAINVILLE GENERATING CO., LLC,  )
                                 )
            Plaintiff,           )
                                 )
vs.                              )        Case No. 05-11210-GAO
                                 )
DTE BIOMASS ENERGY, INC. and     )        Case No. 05-12168-GAO
PLAINVILLE GAS PRODUCERS, INC.,  )
                                 )
            Defendants.          )

## AFFIDAVIT OF MICHAEL J. HAINER RELATING TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Michael J. Hainer, being first duly sworn, states as follows:

1.    The statements made herein are based upon my personal knowledge, and I am competent to testify thereto.

2.    I am an attorney. I was admitted to practice in the State of Michigan in 1985; and I have remained a member in good standing of the Michigan Bar from the time of my admission to present. I am presently a partner in Hainer & Berman, P.C.; and I conduct my practice from that firm's offices in Bingham Farms, Michigan.

3.    In Spring 1996, I was retained by Plainville Gas Producers, Inc. ("Plainville Gas") to assist that company in negotiating the terms of a contract with Lorusso Corporation ("Lorusso Corp."), a company based in the Boston, Massachusetts area, pursuant to which gas generated at the Plainville Landfill located in Plainville, Massachusetts ("Landfill") and collected by Plainville Gas would be delivered to Lorusso Corp. for use as fuel in connection with the nearby

asphalt manufacturing plant owned and operated by Lorusso Corp. or an affiliate of that company.

4.    During these contract negotiations, I had extensive contact with Steven Ferrey, an attorney representing Lorusso Corp. Over a substantial period of time, Mr. Ferrey and I discussed in detail and at length both concepts and specific language relating to various provisions that might be contained in a contract, thereby providing each party repeated opportunities to consider and comment upon specific language proposed by the other. Such comments were transmitted both orally and in writing. For example, Exhibit A hereto is a copy of a memorandum from Mr. Ferrey to me dated August 2, 1996, by which Mr. Ferrey commented on a draft version of a proposed contract.

5.    The parties eventually agreed to the terms of a contract. Those terms were memorialized in the written Gas Supply Agreement dated September 1, 1996 ("1996 Gas Supply Agreement"). A copy of this contract is attached as Exhibit B.

Further Affiant sayeth not.

_____
Michael J. Hainer

STATE OF MICHIGAN     )
                      ) ss.
COUNTY OF OAKLAND     )

Subscribed and sworn to before me, a notary public in and of said County and State, this 15th day of November 2005.

_____
Notary Public

AMYLEEBETH K.D. SZOSTEK
Notary Public, Oakland County, MI
My Commission Expires 05/07/2007

My Commission Expires: _acting in Oakland County_

# LeBoeuf, Lamb, Greene & MacRae

### L.L.P.

A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

260 FRANKLIN STREET.
BOSTON, MA 02110

August 2, 1996

VIA TELECOPIER

TO:     Michael Hainer, Esquire

FROM:   Steven Ferrey

RE:     July 25, 1996, Revised Gas Purchase Agreement

---

I appreciate receipt of the July 25 Gas Purchase Agreement draft. It is quite comprehensive and, I believe, forms a solid basis on which to proceed to finalize this deal. As I know that you are anxious to proceed as expeditiously as possible, below I have listed, very briefly, those issues that I believe still require resolution. Rather than expound on the specific point raised, the list below briefly identifies the Article and issue in more of a "check-list" format. This will get in front of all of us an agenda of items to discuss and resolve. There are some smaller wording and/or type notations that I have that I will not list below. I assume that we can work out what remains through phone calls. I am out much of next week. Thanks again for your good efforts in reworking this draft contract.

## ISSUES AND QUESTIONS

1.  What is the distinction between BES and BES/LES Gas Producers? LoRusso will contract through a subsidiary.

2.  Article 1.9 and Article 2.3. The Gas Rights Agreement still is inter-linked substantively in many places with this agreement. You were going to inquire about providing me a look at the terms of that contract. Where do we stand on this?

3.  Article 1.13. I want to take care in this contract to designate that by operating the "Flare," Buyer does not become an "operator" of the landfill or of any "facility" pursuant to Massachusetts hazardous waste laws. The Flare is on Seller's property. Let's discuss language.

EXHIBIT A

Michael Hainer, Esquire
August 2, 1996
Page 2

4.  Article 1.14 and Article 12.  With regard to Force Majeure,
    we had discussed allocation of the business risk where the
    energy content of the Landfill Gas would not be sufficient
    or appropriate to produce current and/or future products at
    Buyer's Facility, or where Buyer's orders fall off.  This
    should be a "requirements" contract.  As of now, this is not
    reflected in either the Force Majeure, termination, or
    default provisions of the contract.

5.  Article 3.4, Article 5, and Article 6.  For delivery and
    risk of loss provisions, because there are gas quantity and
    quality conditions elsewhere in the draft agreement, I would
    like the agreement to specify that the delivery and risk of
    loss occur when Seller delivers and Buyer accepts Landfill
    Gas as it passes through (not "at") the respective Delivery
    Points.  We should make clear in Article 5.4 that the "take
    or pay provisions" are subject to Force Majeure, as well as
    rights to terminate.

6.  Article 6.  As we have discussed, I have some clarifying
    language changes to this Article.  The pricing formula is
    off.  In addition, the agreement needs to specify whether
    the recalculation of the pricing index on the first business
    day of each month operates retrospectively or prospectively.

        With regard to the tax provision in Article 6.2, the
    taxes covered should correspond to those taxes itemized in
    Article 6.1(a)(iii), and specify taxes actually paid and not
    otherwise offset by countervailing deductions (i.e. actual
    impacts on project cash flow).  We need a reference point:
    the agreement should specify that there are no such taxes at
    the moment, if that is your understanding.

        There should be a clause stating that under the pricing
    formula, Buyer will always receive a price less than that at
    which it can otherwise obtain No. 2 fuel oil or natural gas
    (on a BTU-adjusted basis).  It still does not seem crystal
    clear that billing is based on MMBTU as opposed to cubic
    feet of gas.  Let's state this as the basis of billing.  If
    Buyer reimburses costs necessary to collect delinquent
    payments, Seller should reimburse any costs occasioned by
    claims for payment that prove not to be worthy of
    collection; there should be neutral reciprocity.

7.  Article 7.1.  We have discussed the necessity to provide for
    changes over the term of the agreement in the good faith
    operating requirements of Buyer's Facility.  This might
    occur over time.  If the Landfill Gas supplied cannot
    satisfy the operating requirements in the future for Buyer's
    product mix, there must be some relief, just as there is

Michael Hainer, Esquire
August 2, 1996
Page 3

relief for Seller being unable to produce Landfill Gas.
This should be a "requirements" contract. We need to verify
the feasiblity of 400 BTU gas. Article 7.1(c) is
inconsistent with the prior statement that neither party is
forced to make any particular expenditures to modify the
facilities. While neither party may terminate the
agreement, certainly the ability to suspend obligations of
both parties should be provided.

The extremely one-sided damages provisions, pancaking
of multiple remedies, and concessions of remedies by Buyer
do not satisfy our target of mutuality and reciprocity in
remedies. A confession of consequential damages, including
lost profits, economic benefits, tax credits, and an
additional $500,000 do not comport with my understanding of
the deal to be embodied in the agreement. Buyer's base
liability is Seller's capital expenditures. Again these
must be mutual terms that provide for reciprocity.

6.   Article 8.2. Seller's meter station is not so much
"controlling" as the first priority for determination of
delivered and accepted quantities, so long as it satisfies
the accuracy band. The accuracy band of plus/minus 5% is
broad. Let's discuss.

9.   Article 11. A default provision also is triggered by the
risk that the Landfill Gas will not produce the product.
The rights of Seller regarding non-payment should be
qualified to refer to non-payment of disputed amounts. The
right to withhold this disputed amount until arbitration
should be specified. There is an oddity here that
consequential damages, which are almost always damages
suffered by the Buyer, are specifically disclaimed, while
consequential damages which are seldom incurred by Sellers
are specifically inserted. In Article 12.2(d), we need to
establish a baseline for changes in the tax credit.

10.  All permit costs should be born by Seller.

11.  Article 4. The term should extend if Seller extends its
Landfill Gas rights.

hs/29535

TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| ARTICLE I | DEFINITIONS | 2 |
| ARTICLE II | PRELIMINARY ACTS OF THE PARTIES | 5 |
| ARTICLE III | FACILITIES AND RISK OF LOSS | 6 |
| ARTICLE IV | TERM | 8 |
| ARTICLE V | PURCHASE AND DELIVERY OBLIGATIONS | 8 |
| ARTICLE VI | PRICE, BILLING AND PAYMENT | 10 |
| ARTICLE VII | GAS QUALITY | 13 |
| ARTICLE VIII | UNIT OF VOLUME - MEASUREMENT | 15 |
| ARTICLE IX | OPERATIONS COORDINATION | 16 |
| ARTICLE X | FORCE MAJEURE | 16 |
| ARTICLE XI | RIGHTS AND REMEDIES UPON DEFAULT | 17 |
| ARTICLE XII | RIGHTS TO TERMINATE; SPECIAL RIGHTS TO TERMINATE; LIMITATIONS ON REMEDY | 18 |
| ARTICLE XIII | INDEMNIFICATION | 21 |
| ARTICLE XIV | INSURANCE | 22 |
| ARTICLE XV | ARBITRATION AND CHOICE OF FORUM | 23 |
| ARTICLE XVI | MISCELLANEOUS | 24 |

EXHIBIT B

## GAS PURCHASE AGREEMENT

THIS GAS PURCHASE AGREEMENT ("Agreement") is made this 1st day of September, 1996, by and between Plainville Gas Producers, Inc., a Michigan corporation, with its principal offices at 425 South Main Street, Ann Arbor, Michigan ("Seller") and Lorusso Corporation, a Massachusetts corporation, with its principal offices at 3 Belcher Street, Plainville, Massachusetts ("Buyer").

## W I T N E S S E T H:

WHEREAS, Seller owns the rights to extract and sell all of the Landfill Gas at the Landfill pursuant to and in accordance with the Gas Rights Agreement;

WHEREAS, Seller has purchased and/or intends to construct and operate facilities to extract the Landfill Gas from the Landfill and deliver the Landfill Gas to Buyer pursuant to and in accordance with the terms and conditions of this Agreement;

WHEREAS, Buyer owns and operates Buyer's Facility adjacent to the Landfill;

WHEREAS, Buyer, during its peak operation period, requires and demands all of the Landfill Gas to operate its bituminous concrete plants and other operations at Buyer's Facility;

WHEREAS, Buyer, in addition to using the Landfill Gas to operate Buyer's Facility, has found or intends to find additional productive applications for such Landfill Gas including, without limitation, treating condensate and possibly power generation;

WHEREAS, in light of these uses and needs, Buyer desires to have (a) a commitment from Seller to supply all the Landfill Gas for a period of two (2) years, as well as a certain base volume of Landfill Gas thereafter and (b) the ability to continually reserve additional volumes of Landfill Gas on a shorter term basis, with the possibility of subsequently converting such additional volume(s) to a longer term arrangement;

WHEREAS, in order to maximize revenue from the sale of Landfill Gas, Seller is willing to commit to supplying all Landfill Gas to Buyer for a two year period, and thereafter to commit only a certain base volume to Buyer with the additional volume to be negotiated between the parties, as set forth in and subject to the terms and conditions of this Agreement; and

WHEREAS, in the future, Seller may sell some or all of the Landfill Gas to a power plant that may be constructed by Buyer, Laidlaw Waste Systems, Inc. ("Laidlaw"), Seller or another entity, and the parties understand and agree that this Agreement shall be subordinate in all respects to any gas purchase agreement that may be entered into to supply Landfill Gas to such power plant (hereafter referred to as "Gas Purchase Agreement To Supply Power Plant").

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, Seller and Buyer agree as follows:

## ARTICLE I

## DEFINITIONS

In this Agreement, the following terms shall have the following meanings and definitions:

1.1    **Additional Volume of Landfill Gas.** The term "Additional Volume" shall mean the additional volume of Landfill Gas, measured on a MMBTU basis, to be supplied by Seller to Buyer in excess of the Base Volume, which amount, if any, shall be determined pursuant to Article 5.3 of this Agreement. Such Additional Volume is currently intended by Buyer to be used to operate Buyer's Facility, including, without limitation, operation of Buyer's bituminous concrete plants, other operations and for the treatment of condensate and may also involve other future applications and uses.

1.2    **Applicable Laws.** The term "Applicable Laws" shall mean any and all applicable federal, state, county and local laws, statutes, rules, regulations and permits, including, without limitation, any and all applicable Environmental Laws.

1.3    **Base Volume.** The term "Base Volume" shall mean 120,000 MMBTU of Landfill Gas.

1.4    **BTU.** The term "BTU" shall mean British Thermal Unit and is defined as a unit of energy equal to the heat needed to raise the temperature of one pound of water from sixty (60) degrees Fahrenheit to sixty-one (61) degrees Fahrenheit at a constant pressure of one standard atmosphere. The BTU equivalent on a dry basis at 14.65 psia may be obtained by multiplying the BTU so measured by the factor 1.012.

1.5    **Buyer's Facility.** The term "Buyer's Facility" shall mean and consist of Buyer's bituminous concrete and other concrete or asphalt products plants and other present or future operations of Buyer which are adjacent to the Landfill, including, without limitation, any additional metering stations installed by Buyer, any pipeline for the delivery of Landfill Gas after the Delivery Points and processing equipment.

1.6    **Commercial Quantities.** The term "Commercial Quantities" shall mean the amount of Landfill Gas that can be extracted from the Landfill by Seller of such quantity and/or quality that it is economically viable and profitable for Seller to sell the Landfill Gas to Buyer under this Agreement, as determined by Seller in its sole discretion.

2

1.7     Delivery Year.  The term "Delivery Year" shall mean a one year period commencing on each anniversary date of the First Delivery Date.  Each Delivery Year shall be calculated based on the then applicable anniversary date of the First Delivery Date.

1.8     Delivery Points A and B.  The term "Delivery Points" shall mean Delivery Point A and Delivery Point B, which shall have the following meanings: Delivery Point A shall mean the discharge side (or exit) of Seller's meter located immediately adjacent to Buyer's Facility; Delivery Point B shall mean the discharge side of Seller's meter located just before the Flare.  A diagram showing the approximate location of Buyer's Facility, Flare, the two meter locations, Delivery Point A and Delivery Point B, is set forth on Exhibit A.

1.9     Easements and Permits.  The term "Easements and Permits" shall mean all permits, licenses, approvals, consents, authorizations, easements from any third parties (including any governmental authorities), agreements and rights of way required for or reasonably necessary for either of the parties to perform their respective obligations under this Agreement, including, without limitation, all easements, approvals, consents, plant site designations and agreements to be obtained and/or executed by Seller under the Gas Rights Agreement.

1.10     Environmental Laws.  The term "Environmental Laws" shall mean any and all applicable federal, state, county, municipal and local laws, statutes, rules, regulations, ordinances, codes, restrictions, permitting requirements, licensing requirements and any other governmental requirements or obligations of any kind or nature relating to (i) environmental pollution, contamination or other impairment of any kind or nature, (ii) the construction, installation, repair, maintenance or operation of either Buyer's Facility or Seller's Facility and/or (iii) any hazardous waste or other toxic substances of any nature, whether liquid, solid and/or gaseous, including, without limitation, smoke, vapor, fumes, soot, radiation, acids, alkalis, chemicals, wastes, by-products and recycled materials.  These Environmental Laws shall include, but not be limited to, the Federal Solid Waste Disposal Act, the Federal Clean Air Act, the Federal Clean Water Act, the Federal Resource Conservation and Recovery Act of 1976, the Federal Comprehensive Environmental Responsibility Cleanup and Liability Act of 1980, all as amended from time to time, regulations of the Environmental Protection Agency, regulations of the Nuclear Regulatory Commission, regulations of any state department of natural resources or state environmental protection agency now or at any time hereafter in effect and all applicable local ordinances, rules, regulations and permitting or licensing requirements.

1.11     First Delivery Date.  The term "First Delivery Date" shall mean the date on which the Landfill Gas is first delivered to Delivery Point A and accepted by Buyer, as provided herein, or the date on which Landfill Gas is first delivered to Delivery Point B, whichever occurs first.

1.12   First Delivery Year. The term "First Delivery Year" shall mean the period of time commencing on the First Delivery Date and ending at midnight on the day before the one year anniversary date of the First Delivery Date.

1.13   Flare. The term "Flare" means the equipment used for the burning of Landfill Gas with subsequent emission into the atmosphere. Such Flare may also be used for the treatment of condensate.

1.14   Force Majeure. The term "Force Majeure" or "Force Majeure event(s)" shall mean acts of God; winds, hurricanes, tornadoes, fires, epidemics, landslides, floods; strikes, lock-outs; or other industrial disturbances; acts of public enemies; new laws and/or regulations and changes to existing laws and/or regulations if the same make it economically impractical to operate the Landfill, the gas collection system at the Landfill, or Seller's Facility or Buyer's Facility; acts, failures to act, or orders of any kind of any governmental authorities; insurrections; inability to procure materials or services; military action; war, whether or not it is declared; sabotage; riots; civil disturbances; explosions; equipment breakdowns; or if it is determined by mutual agreement of the parties who shall both be reasonable, after Buyer's best efforts to correct any technical problems or difficulties relating to the operations at Buyer's Facility, that it is technologically impractical to utilize Landfill Gas to operate Buyer's bituminous concrete plant in the same manner as it previously operated using Number 2 fuel oil or waste oil as the fuel source (i.e., assuming the same operating conditions, Buyer's bituminous concrete plant will produce the same product (i.e., bituminous concrete) using the Landfill Gas as a fuel source that such plant previously produced when the plant operated using Number 2 fuel oil or waste oil as the fuel source) (hereinafter referred to as a "Technological Force Majeure"); or any cause or event, not reasonably within the control of the party claiming Force Majeure other than the financial inability of such party caused by factors or events other than any of the factors and/or events set forth in this Article 1.14. In addition, the occurrence of any of the events set forth in Article 12.2(c) through Article 12.2(i) shall also constitute Force Majeure events for Seller under this Agreement, thereby providing Seller with right to suspend performance under this Agreement pursuant to and in accordance with Article X of this Agreement as well as the right to terminate this Agreement pursuant to and in accordance with Article 12.2 of this Agreement.

1.15   Gas Rights Agreement. The term "Gas Rights Agreement" shall mean the Prototype Landfill Gas Rights Agreement and Adoption and Modification Agreement dated December 30, 1995 between Biomass Energy Systems, Inc. ("Biomass") and BES/LES Gas Producers II, LLC ("BES/LES"), on the one hand, and Laidlaw, on the other hand, as the same may be amended from time to time. The interest of BES/LES has been assigned to Seller.

1.16   Landfill. The term "Landfill" shall mean the Plainville Landfill currently owned by Laidlaw in Plainville, Massachusetts.

4

1.17    Landfill Gas.  The term "Landfill Gas" shall mean landfill gas, consisting primarily of methane and carbon dioxide, that is produced from decomposing refuse within the Landfill.

1.18    MMBTU.  The term "MMBTU" shall mean one million BTUs.

1.19    Second Delivery Year.  The term "Second Delivery Year" shall mean the period of time commencing on the first anniversary date of the First Delivery Date and ending at midnight on the day before the two year anniversary date of the First Delivery Date.

1.20    Seller's Facility.    The term "Seller's Facility" shall mean a Landfill Gas transmission facility, a pipeline for delivery of Landfill Gas to Buyer at Buyer's Facility, metering equipment and any miscellaneous or ancillary equipment necessary for the transmission of the Landfill Gas.

## ARTICLE II

## PRELIMINARY ACTS OF THE PARTIES

2.1    Easements and Permits.    Upon execution of this Agreement, Buyer and Seller shall promptly apply for, seek to obtain, and/or enter into all Easements and Permits. Each party shall use reasonable efforts to support and assist the other party in obtaining all Easements and Permits.  Included, without limitation, among the Permits that Buyer shall obtain shall be the air permit that Buyer needs to obtain, maintain or update to use Landfill Gas as a fuel source (the "Air Permit").  Buyer shall pay for the cost of obtaining all of its Easements and Permits, except for out of pocket expenses in excess of Five Thousand and 00/100 ($5,000.00) Dollars incurred in connection with updating the Air Permit.  Costs in excess of Five Thousand and 00/100 ($5,000.00) Dollars with respect to updating the Air Permit shall be borne by Seller, except that if Seller's costs exceed Fifty Thousand and 00/100 Dollars ($50,000.00), Seller shall have the right to terminate this Agreement without any liability or obligation to Buyer.

Promptly after execution of this Agreement, Buyer and Seller shall execute, and Seller may record, an easement agreement granting to Seller an exclusive easement during the term of this Agreement, along a mutually agreeable route to be determined by Seller and Buyer, twenty-five feet in width, together with necessary access and working area, extending from the boundary of Buyer's Facility.  Such easement shall only be for the purpose of Seller complying with its obligations under this Agreement, including, but not limited to, constructing, operating, inspecting, maintaining, protecting, marking, relocating, repairing, replacing and changing the size of a pipeline to be constructed by Seller for the purpose of transporting Landfill Gas to the Delivery Points. Buyer shall also grant to Seller, reasonable right of ingress and egress to and from such easement, on, over and across Buyer's property, for the duration of said easement.

Such easement shall also provide that, upon termination of this Agreement, Seller shall, at its sole cost and expense, execute all documents necessary to terminate this easement, and shall properly close and seal or remove said pipeline consistent with all Applicable Laws and substantially restore Buyer's property to its original condition, normal wear and tear excepted. The easement shall not terminate until Seller completes these activities, which Seller agrees to conduct with all dispatch.

Upon execution of this Agreement, the parties agree to negotiate in good faith to enter into an easement agreement that complies with this Article 2.1, failing which either party may terminate this Agreement under Article XII of this Agreement.

2.2    **Public Utility Status**. Seller does not intend to be a public utility or public service corporation by reason of the extraction, delivery, sale or purchase of Landfill Gas under this Agreement or any other agreement or contract under the laws of the State of Massachusetts or be subject to the jurisdiction of the Massachusetts Department of Public Utilities. Seller may seek to obtain a ruling from the appropriate governmental or regulatory agency that Seller will not be regulated as a public utility or public service corporation.

2.3    **Supply of Landfill Gas**. Seller represents and warrants that, for the period of time covered by the term of this Agreement, Seller generally has the right to extract and sell all the Landfill Gas at the Landfill, pursuant to, subject to, and in accordance with the terms and conditions of the Gas Rights Agreement, including Laidlaw's obligation to control surface emission and subsurface migration of Landfill Gas for environmental reasons.

2.4    **Assumption of Risk by Buyer**. Notwithstanding anything in this Agreement to the contrary, Buyer understands and agrees that in entering into this Agreement, Seller is not guaranteeing the delivery of Landfill Gas to Buyer, that the supply of Landfill Gas may be interrupted or the delivery of the Landfill Gas may become commercially impracticable and Buyer willingly and knowingly accepts these risks.

## ARTICLE III

## FACILITIES AND RISK OF LOSS

3.1    **Seller's Facility**. Subject to the terms and conditions of this Agreement, Seller shall, at Seller's expense, construct, operate and maintain Seller's Facility in a manner reasonably necessary to deliver the Landfill Gas to Buyer at Buyer's Facility. Seller represents and warrants that Seller shall construct, operate and maintain Seller's Facility in material compliance with all Applicable Laws.

3.2    **Buyer's Facility**. Subject to the terms and conditions of this Agreement and subject to Seller's right to determine, in Seller's sole discretion, that such expenditures are reasonable, Seller agrees, at its expense, to make the necessary modifications to Buyer's Facility to allow Buyer to use the Landfill Gas at Buyer's Facility. If Seller deems such

6

expenditures not reasonable, Seller shall advise Buyer of such decision and request that Buyer make the requisite modifications at its expense. If the parties cannot agree on the modifications, the cost thereof, who should pay for such modifications or any other issues relating to any modification of Buyer's Facility, either party may terminate this Agreement as provided in Article XII below. The parties agree that they will resolve these issues as soon as possible, but in any event, Seller shall not be required or expected to expend any funds to construct Seller's Facility or any part thereof, including, without limitation, the pipeline or purchase or install any equipment necessary to deliver the Landfill Gas to Buyer at Buyer's Facility until (1) these issues are resolved and (2) Buyer obtains all its Permits and Easements, as set forth in Section 2.1. The parties will file an appropriate amendment to this Agreement setting forth the parties' agreement on these issues.

Buyer represents and warrants that Buyer shall construct, operate and maintain Buyer's Facility in material compliance with all Applicable Laws, including, without limitation, Buyer's metering stations, if any, and any modifications made to Buyer's Facilities to allow Buyer to use the Landfill Gas. Except for any expenses Seller agrees to pay under the first paragraph of this Article 3.2, Buyer shall bear all expenses of the construction, maintenance and operation of Buyer's Facility.

Any modification of Buyer's Facility, including, without limitation, any modification or replacement of the burners, shall be performed by contractor(s) reasonably acceptable to Buyer and Seller, at a time reasonably acceptable to Buyer and Seller, and pursuant to written contracts reasonably acceptable to Buyer and Seller, which contracts shall make Buyer a named intended beneficiary of any representations and warranties from such contractors.

3.3   Construction Schedule. The parties agree that they will cooperate with each other in good faith with respect to the construction of the Seller's Facility and the modifications to Buyer's Facility with the goal, but not the contractual commitment, to complete such construction by December 1, 1996. Each party shall have the right to inspect the other's Facility and the progress of construction during normal business hours upon reasonable notice, provided that such inspection does not interfere with the construction of the applicable Facility or normal business operations and provided further that a representative of both Buyer and Seller is present during such inspection.

3.4   Risk of Loss. For all Landfill Gas delivered to Delivery Point A, title, risk of loss and assumption of liability shall pass to Buyer when it passes through Delivery Point A and is accepted by Buyer. Buyer shall accept all Landfill Gas delivered to Delivery Point A that meet or exceed the quality and specifications set forth in Article 7.1. For all Landfill Gas delivered to Delivery Point B, title, risk of loss and assumption of liability shall pass to Buyer when it passes through Delivery Point B.

## ARTICLE IV

### TERM

This Agreement shall be effective from the date of this Agreement and, unless terminated as otherwise provided herein, shall continue in full force and effect until December 31, 2007. At the end of the original term of this Agreement (i.e., December 31, 2007), this Agreement shall automatically terminate, unless extended by mutual agreement of the parties; provided, however, if the original term of the Gas Rights Agreement is extended by Laidlaw and Seller, then this Agreement shall be extended for the same term that the Gas Rights Agreement is extended. This provision, however, shall not require Seller to extend the original term of the Gas Rights Agreement.

## ARTICLE V

### PURCHASE AND DELIVERY OBLIGATIONS

5.1    First and Second Delivery Years. Subject to the terms and conditions of this Agreement, Seller agrees to sell to Buyer, and Buyer agrees to buy from Seller, all of the Landfill Gas that is actually produced by Seller from the Landfill for the First Delivery Year and the Second Delivery Year and delivered to Delivery Point A or Delivery Point B.

5.2    Base Volume for Remaining Term of Agreement. Subject to the terms and conditions of this Agreement, Seller agrees to sell to Buyer, and Buyer agrees to buy from Seller, the Base Volume of Landfill Gas during each Delivery Year after the Second Delivery Year for the remaining term of this Agreement. The parties recognize and agree that the last Delivery Year of this Agreement may have less than twelve months, in which case the Base Volume shall be pro-rated based on the number of months remaining in the term of this Agreement.

5.3    Additional Volume of Landfill Gas. Before the commencement of the Third Delivery Year and before each Delivery Year thereafter, the parties shall negotiate in good faith in an attempt to reach a mutually acceptable agreement as to any Additional Volume of Landfill Gas to be sold by Seller to Buyer in excess of the Base Volume and the period of time for which the Additional Volume of Landfill Gas shall be sold by Seller to Buyer. The purpose of this provision is to allow the parties to periodically adjust the volumes based on the future demands of Landfill Gas at Buyer's Facility, subject to the terms and conditions of this Agreement.

5.4    Pricing of Base Volume and Additional Volume of Landfill Gas. The Base Volume and the Additional Volume of Landfill Gas for each Delivery Year shall be subject to the take or pay provisions set forth in Article VI below.

8

5.5    Buyer's Obligation to Buy All Fuel Requirements.  If Seller complies with the standards set forth in Article 7.1, Buyer agrees that, during the entire term of this Agreement, Buyer shall purchase all of its "fuel requirements" (as defined below) for Buyer's Facility from Seller (even if such requirements exceed the Base Volume and Additional Volume for a particular Delivery Year after Delivery Year Two) unless and only to the extent that Seller is not able to deliver the Landfill Gas or any part thereof at the rate needed for Buyer's fuel consumption at Buyer's Facility, and even in such circumstance, Landfill Gas will still be used by Buyer as the fuel source of first choice to the extent it is delivered by Seller and satisfies the standards of Article 7.1, regardless of the rate at which such Landfill Gas is delivered, except as provided in the last paragraph of this Article 5.5. This provision will not be interpreted as relieving Buyer of its obligation to buy all the Landfill Gas during Delivery Years One and Two (as provided in Article 5.1). This provision shall also not be interpreted to obligate Seller to supply volumes of Landfill Gas in excess of the Base Volume and Additional Volumes after Delivery Years One and Two ("Excess Volume") only that Buyer shall request that Seller supply such Excess Volume to meet its fuel requirements and Seller agrees to supply such Excess Volume, subject to the terms and conditions of this Agreement, if such Excess Volume is not otherwise committed by Seller to third parties and Seller is otherwise reasonably able to deliver such Excess Volume to Buyer. As used herein, the term "fuel requirements" shall mean the energy requirements of all of Buyer's Facility, excluding electricity, but specifically including, without limitation, waste oil, natural gas, Number 2 fuel oil and Landfill Gas.

Buyer and Seller agree that Buyer may need to use Number 2 fuel oil or waste oil (rather than Landfill Gas) in connection with (1) the starting-up of the operations at Buyer's bituminous cement plant(s) after a shutdown of such plant(s), (2) a situation where a future federal, state, local or county permit limits the usage of Landfill Gas, (3) periodic air emissions testing required under applicable law or (4) similar other unexpected limited circumstances, limited in terms of scope and duration, relating to technical, operational matters unique to the operation of Buyer's bituminous cement plant(s), and in such circumstances, the use of such alternative fuels (i.e. Number 2 fuel oil or waste oil) shall not be a violation of Buyer's obligations under this Article 5.5.  Buyer represents and warrants to the best of his knowledge none of Buyer's Facility is subject to any present state, federal, county or local permit limitations of any kind or nature that would restrict the use of Landfill Gas as Buyer's fuel source, except for certain limitations under their current air permit, which limitations the parties will use reasonable efforts to remove in the future.

5.6    Disclaimer Regarding Landfill Gas.    Notwithstanding anything in this Agreement to the contrary, nothing in this Article V or any other provision or Article of this Agreement shall be interpreted as Seller guaranteeing the quantity or quality of Landfill Gas or the rate at which Seller can supply Landfill Gas to Buyer, only that Seller will use reasonable efforts to supply such Landfill Gas to Buyer (as distinguished from another buyer) in the quantities set forth in Article 5.1, 5.2 and 5.3 of this Agreement (but not necessarily at the rate needed by Buyer) if Seller is reasonably able to produce and deliver the same to Buyer, and Seller's obligation to deliver Landfill Gas shall at all times be subject to the terms

and conditions of this Agreement. · Buyer and Seller acknowledge and agree that Buyer's demand for Landfill Gas fluctuates drastically based on its production schedule and that the rate of supply of Landfill Gas is not being guaranteed by Seller, and, as such, Seller may not be able to supply all of Buyer's needs for Landfill Gas necessary to operate Buyer's Facility for a particular period of time, and as a consequence, it is possible that the Base Volume of Landfill Gas may not be achieved for any particular Delivery Year. Moreover, Seller's failure to deliver Landfill Gas, in whole or in part, at any time during the term of this Agreement, including, without limitation, the failure to·deliver the quantity or quality of Landfill Gas to Buyer and the failure to deliver at the rate needed by Buyer, shall not be a breach of Seller's obligations under this Agreement, shall not be a default or event of default by the Seller under this Agreement, shall not entitle Buyer to terminate this Agreement and shall not give rise to any choses in actions, lawsuits or claims of any kind or nature by Buyer against Seller under this Agreement, at law or in equity or otherwise, including, without limitation, any claim for direct, consequential or special damages, which are hereby expressly excluded and disclaimed.

## ARTICLE VI

## PRICE, BILLING AND PAYMENT

6.1    Price

(a)    Landfill Gas Delivered to Delivery Point A.

(i)    Volume Up To Base Volume. During each Delivery Year during the term of this Agreement (including, without limitation, the First Delivery Year and Second Delivery Year), Buyer shall pay to Seller an amount equal to the Tier One Price (as defined below) per MMBTU for each MMBTU of Landfill Gas delivered by Seller to Buyer at Delivery Point A and accepted by Buyer (as defined in Section 6.1(c) below). The Tier One Price shall apply, on a MMBTU basis, to all volumes of Landfill Gas up to the Base Volume of Landfill Gas delivered to Delivery Point A and accepted by Buyer during each Delivery Year. The "Tier One Price" shall be the greater of (1) an amount equal to the price per gallon for Number 2 fuel oil published in Oil Price Information Services ("OPIS") Report applicable to truckload deliveries FOB Providence discounted by sixty-seven and 69/100 (67.69%) percent, with such price then converted to a price based on the BTUs per gallon of Number 2 fuel oil, pursuant to the calculations set forth below and (2) fifty cents (50¢) per MMBTU.

The calculations for pricing under Article 6.1(a)(i)(1) are as follows: The parties agree and stipulate that a gallon of Number 2 fuel oil contains 140,000 MMBTU. The price per MMBTU shall equal 32.31%, multiplied by the published price for the Number 2 fuel oil, multiplied by 7.143 to arrive at the price per MMBTU. For example, if the published price of Number 2 fuel oil is sixty-five cents ($.65) per gallon, the price per MMBTU under Article 6.1(a)(i)(1) would be $.65 x .3231 x 7.143 or $1.50 per MMBTU.

The price per MMBTU under Article 6.1(a)(ii)(1) shall be recalculated on the first business day of each month, using the most recently published prices, which price shall be applied prospectively for such monthly period.

(ii)    Volume In Excess Of Base Volume. During each Delivery Year during the term of this Agreement (including, without limitation, the First and Second Delivery Years), Buyer shall pay to Seller an amount equal to the Tier Two Price (as defined below) per MMBTU for each MMBTU of Landfill Gas delivered by Seller to Buyer at Delivery Point A and accepted by Buyer in excess of the Base Volume during each Delivery Year. The "Tier Two Price" shall be the greater of (1) an amount equal to the price per gallon for Number 2 fuel oil published in the OPIS Report applicable to truckload deliveries FOB Providence, discounted by eighty-two and 77/100 (82.77%) percent, with such price then converted to a price based on the BTUs per gallon of Number 2 fuel oil, pursuant to the calculations set forth below and (2) fifty cents (50¢) per MMBTU.

The calculations for pricing under Article 6.1(a)(ii)(1) are as follows: The parties agree and stipulate that a gallon of Number 2 fuel oil contains 140,000 MMBTU. The price per MMBTU shall equal 17.23%, multiplied by the published price for the Number 2 fuel oil, multiplied by 7.143 to arrive at the price per MMBTU. For example, if the published price of Number 2 fuel oil is sixty-five cents ($.65) per gallon, the price per MMBTU under Article 6.1(a)(ii)(1) would be $.65  x  .1723 x 7.143 or $.80 per MMBTU. The price per MMBTU under Article 6.1(a)(ii)(1) shall be recalculated on the first business day of each month, using the most recently published prices, which price shall be applied prospectively for such monthly period.

(iii)    No Taxes Included in Fuel Oil Price. The price of Number 2 fuel oil used to make the above calculations shall not include any taxes of any kind or nature with respect to the sale of Number 2 fuel oil, including, without limitation, any federal, state, municipal and local sales taxes, use taxes, transportation taxes, delivery taxes imposed upon the sale, use, transportation and/or delivery of Number 2 fuel oil (collectively, "Fuel Oil Taxes").

(b)    Landfill Gas Delivered to Delivery Point B.

(i)    During First and Second Delivery Years. During the First and Second Delivery Years, Buyer shall pay to Seller an amount equal to ten cents ($.10) per MMBTU for each MMBTU of Landfill Gas delivered by Seller to Buyer at Delivery Point B; provided, however, that in no event shall Buyer's total payment exceed Fifty Thousand and 00/100 Dollars ($50,000.00) in each such Delivery Year.

(ii)    After Second Delivery Year. For each Delivery Year after the Second Delivery Year during the term of this Agreement, Buyer shall pay to Seller an amount equal to ten cents ($.10) per MMBTU multiplied by the Committed Gas Volume (as defined hereafter). The "Committed Gas Volume" shall equal the sum of (1) the Base Volume

11

and (2) the Additional Volume, if any, of Landfill Gas for such Delivery Year, minus (3) the volume of Landfill Gas delivered by Seller to Delivery Point A and accepted by Buyer; but in no event shall the Committed Gas Volume be less than zero. For example, if the Additional Volume of Landfill Gas for the Third Delivery Year is 400,000 MMBTU and only 180,000 MMBTU are delivered by Seller to Delivery Point A and accepted by Buyer, Buyer shall pay to Seller under this Article 6.1(b) an amount equal to ten cents ($.10) multiplied by 340,000 MMBTU for the Landfill Gas that is delivered at Delivery Point B. The 340,000 MMBTU is calculated as follows: 120,000 (Base Volume) + 400,000 (Additional Volume) - 180,000 (the MMBTUs delivered to Delivery Point A and accepted by Buyer). This amount is in addition to the amount owed by Buyer to Seller for the 180,000 MMBTU delivered to Delivery Point A and accepted by Buyer, which would be paid for by Seller under Article 6.1(a); in this example, such amount would be the Tier One Price for the Base Volume of 120,000 MMBTU of Landfill Gas and the Tier Two Price for the additional 60,000 MMBTU of the Landfill Gas. Continuing this example, if Seller actually delivered 600,000 MMBTU of Landfill Gas to Delivery Point A, which was accepted by Buyer, during the Third Delivery Year, then Buyer would pay to Seller the Tier One Price for the Base Volume (i.e., 120,000 MMBTU) and the Tier Two Price for 400,000 MMBTU, with no payment under this Article 6.1(b) because the Landfill Gas delivered by Seller to Delivery Point A and accepted by Buyer exceeded the sum of the Base Volume and Additional Volume of Landfill Gas for such Delivery Year, and therefore, the Committed Gas Volume for such Delivery Year would be zero.

(c)    "Accepted by Buyer". As used in this Agreement, the term "accepted by Buyer" shall mean that Buyer shall accept the Landfill Gas at Delivery Point A if the Landfill Gas satisfies the requirements of Article 7.1, and Buyer shall not have the discretion to reject or to refuse to use such Landfill Gas as its energy source as Buyer has agreed in this Agreement to purchase and use the Landfill Gas as its fuel source pursuant to and as provided in Article V of this Agreement.

6.2    Taxes. Without any investigation whatsoever on the part of Buyer or Seller, neither party is aware of any taxes of any kind or nature with respect to the sale of Landfill Gas as contemplated by this Agreement, including, without limitation, any federal, state, municipal and local sales taxes, use taxes, transportation taxes, delivery taxes imposed upon the sale, use, transportation and/or delivery of Landfill Gas by Seller to Buyer under this Agreement, excluding, however, any taxes measured by Seller's income (collectively, "Landfill Gas Sales Taxes"). If there are any Landfill Gas Sales Taxes existing under applicable law as of the date of this Agreement ("Existing Landfill Gas Sales Taxes"), Seller shall pay such Existing Landfill Gas Sales Taxes. If any Landfill Gas Sales Taxes are enacted, imposed or assessed after the date of this Agreement ("Future Landfill Gas Sales Taxes"), Buyer shall pay or reimburse Seller for such Future Landfill Gas Sales Taxes, even if such Future Landfill Gas Sales Taxes are applied retroactively to sales of Landfill Gas occurring before the enactment, assessment or imposition of such Future Landfill Gas Sales Taxes. Future Landfill Gas Sales Taxes shall be paid by Buyer to Seller as part of the monthly invoices for the Landfill Gas. Upon request, Seller shall provide Buyer with reasonably

appropriate documentation that such taxes have been assessed or imposed and/or paid by Seller.

6.3    **Billing and Payment.**  Sales of Landfill Gas (including any taxes to be reimbursed under this Agreement) shall be invoiced monthly, which sales shall be measured and billed on a MMBTU basis by multiplying the BTU content of the Landfill Gas by the volume of Landfill Gas.  Payment is due within thirty (30) days from invoice date. Delinquent payments are subject to a late payment charge of one (1%) percent per month (commencing thirty days after the invoice date), and, subject to the provisions of Article XI, Buyer shall reimburse and indemnify Seller for all costs and expenses, including costs, expenses and reasonable attorney's fees, incurred by Buyer in collecting such amounts.

A sample of a monthly billing sheet and examples of the operation of the pricing formula are attached to this Agreement as Exhibit B.

## ARTICLE VII

## GAS QUALITY

7.1    Specifications With Respect to Delivery Point A and B.

(a)    Seller shall use reasonable efforts to deliver the Landfill Gas at Delivery Point A at a BTU content range of four hundred (400) to five hundred and fifty (550) BTU per cubic foot of Landfill Gas when the gas is saturated with water vapor, at a temperature of sixty degrees (60°) Fahrenheit and at an absolute pressure equivalent to thirty inches (30") of mercury at thirty-two degrees (32°) Fahrenheit.

(b)    Seller shall use reasonable efforts to deliver Landfill Gas to Buyer hereunder at a pressure of ten (10) psig at Delivery Point A, plus or minus twenty (20%) percent.

(c)    The parties will negotiate reasonable representations regarding the specifications for the Landfill Gas delivered to Delivery Point B at such time as the specifications for the treatment of condensate or other uses at Delivery Point B are developed by and known to the parties, provided however that in no event shall such specifications exceed those in Article 7.1 (a) and (b).

7.2    **Failure to Meet Quality Specification.**  If, after the First Delivery Date, the Landfill Gas delivered hereunder to Delivery Point A fails (i) to contain a minimum of four hundred (400) BTU per cubic foot of Landfill Gas, computed as provided above, or (ii) the Landfill Gas is delivered at a pressure that does not satisfy Article 7.1(b) ("Nonconforming Gas") for a period of time of not less than seven (7) consecutive days, either party shall immediately notify the other party orally (and in writing within five (5) days thereafter) of the Nonconforming Gas.  Buyer shall have the right to (i) purchase the Nonconforming Gas for

13

the purchase price set forth in Article VI or (ii) refuse to accept the Nonconforming Gas, in which event the Nonconforming Gas shall be diverted to Delivery Point B and Buyer shall not have to pay for any Nonconforming Gas so diverted, notwithstanding anything in Article VI to the contrary.  The parties agree to work in good faith and cooperate to remedy any problems that caused the Landfill Gas to become Nonconforming Gas.  If Buyer has previously elected not to purchase Nonconforming Gas, Buyer shall resume purchasing the Landfill Gas as soon as reasonable possible, but in no event more than seven (7) days after Buyer's receipt of notification from Seller that Seller is able to deliver Landfill Gas containing at least four hundred (400) BTU per cubic foot at the pressure set forth in Article 7.1(b), which notice need not be in writing.

Notwithstanding anything in this Agreement to the contrary,

(a)     Seller's delivery of Nonconforming Gas shall not be a breach of Seller's obligations under this Agreement, shall not be a default or event of default under this Agreement, shall not entitle Buyer to terminate this Agreement and shall not give rise to any choses in action, lawsuits or claims of any kind or nature by Buyer against Seller under this Agreement, at law or in equity or otherwise, including, without limitation, any claim for direct, consequential or special damages, which are hereby expressly excluded and disclaimed; and

(b)     In the event of delivery of Nonconforming Gas for seven (7) consecutive days and Buyer has elected not to purchase such Nonconforming Gas, all as provided above, Buyer's sole and exclusive remedy shall be to not pay for such Nonconforming Gas diverted to Delivery Point B until such time as and when, if ever, the Landfill Gas conforms to the specifications in Article 7.1.

7.3     Disclaimer of Warranties.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLER IS NOT MAKING ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE AS TO THE LANDFILL GAS, HEREBY EXCLUDING, WITHOUT LIMITATION, ANY AND ALL REPRESENTATIONS AND/OR WARRANTIES AS TO THE QUANTITY, THE RATE AT WHICH SELLER CAN PRODUCE AND/OR DELIVER LANDFILL GAS TO BUYER, THE QUALITY OF THE LANDFILL GAS DELIVERED BY SELLER TO BUYER PURSUANT TO THIS AGREEMENT AND SELLER'S ABILITY TO DELIVER ANY LANDFILL GAS DURING THE ENTIRE TERM OF THIS AGREEMENT.   THE PARTIES AGREE THAT ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, ARE EXCLUDED FROM THIS TRANSACTION AND DO NOT APPLY TO ANY LANDFILL GAS SOLD HEREUNDER.

ARTICLE VIII

UNIT OF VOLUME - MEASUREMENT

8.1   Unit of Volume. Except for the determination of heating value, the unit of volume for measurement of Landfill Gas delivered hereunder will be one (1) cubic foot of Landfill Gas at a base temperature of sixty degrees (60) Fahrenheit and at an absolute pressure of fourteen and seventy-three hundredths (14.73) pounds per square inch. All fundamental constants shall be in accordance with the standards prescribed in the American Gas Association Manual with any subsequent amendments which may be mutually acceptable to Buyer and Seller. All quantities set forth in this Agreement, unless otherwise expressly stated, are in terms of one thousand (1000) of such units (MCF).

8.2   Metering

    (a)   Meter Station. Seller shall, at its own expense, install two metering stations for the measurement of the Landfill Gas delivered under this Agreement; one metering station will be located at Delivery Point B and the other shall be located at Delivery Point A. The approximate location of the metering stations is set forth on Exhibit A. Such meter stations shall include a continuous recording device to measure heating value and a flow meter, compensated for pressure and temperature, capable of measuring the volume of Landfill Gas delivered each hour.

    Buyer may also install, at Buyer's expense, metering stations for the measurement of the Landfill Gas delivered to Buyer which shall not unreasonably interfere with Seller's metering stations nor interfere with the flow of the Landfill Gas. Each Party shall have access to the other's metering equipment at all reasonable times; provided, however, that Seller's metering station shall be controlling in determining the Landfill Gas volumes and MMBTUs delivered during a delivery period, unless such metering equipment is not accurate, in which event, the provisions of Article 8.2 (b) below shall govern.

    Buyer shall reimburse Seller for all reasonable costs and expenses incurred by Seller in connection with operation, maintenance, testing, readings, calibrations and adjustments of Buyer's meters (if Buyer has requested such services of Seller and Seller has agreed to perform such services), including, without limitation, salaries, engineering costs and the cost of repairing and maintaining Buyer's metering system.

    (b)   Meter Tests. Seller shall keep metering equipment accurate and in repair, making such periodic tests by a third party acceptable to both parties as Seller deems necessary, but at least once each year. At either parties' option and expense, a subsequent test in advance of the next scheduled test may be ordered, Seller shall give Buyer reasonable advance notice of any such test so that Buyer may have its representatives present. Buyer may request a special test of either parties' equipment at any time. The expense of such special test shall be borne by Buyer if the equipment is found to be inaccurate by less than

15

five (5%) percent. If, upon any test, the equipment is found to be inaccurate so that it affects the measurement accuracy by more than five (5%) percent, meter readings shall be corrected for a period extending back to the time such inaccuracy first occurred if that time can be ascertained. If that time is not ascertainable, corrections shall be made based upon Buyer's meters, provided they can be proven to be accurate for the period of time in dispute, failing which corrections shall be made based on one-half of the elapsed time since the last previous meter calibration of Seller's meters.

## ARTICLE IX

## OPERATIONS COORDINATION

Within sixty (60) days after execution of this Agreement, representatives of both parties shall meet and develop procedures for coordination of the parties' operations and maintenance of their respective facilities during the term of this Agreement. At that time each party shall designate the individual who should receive communications regarding operational matters, scheduling of maintenance, etc.

## ARTICLE X

## FORCE MAJEURE

If by reason of any Force Majeure event (including, without limitation, a Technological Force Majeure) either party is unable to carry out, either in whole or in part, its obligations herein contained, such party shall not be deemed in default during the continuation of such inability, provided that: (i) the non-performing party, within two weeks after the occurrence of the Force Majeure event, gives the other party written notice describing the particulars of the occurrence; (ii) the suspension of performance be of no greater scope and of no longer duration than is required by the Force Majeure event; (iii) no obligations of either party which arose prior to the occurrence causing the suspension of performance be excused as a result of the occurrence; and (iv) that the non-performing party shall use all reasonable efforts to remedy with all reasonable dispatch the cause or causes preventing it from carrying out its obligations. Notwithstanding the foregoing, the performing party may, at its option, terminate this Agreement after eighteen (18) months of any such suspension of performance. Neither party shall be required to settle strikes, lockouts, or other industrial disturbances by acceding to the demands of the opposing party or parties when such course is, in its judgment, not in its best interest.

In addition, with respect to a Technological Force Majeure, (1) Buyer agrees to not invoke the Technological Force Majeure until it has used its best efforts to resolve such Technological Force Majeure with respect to its operations at Buyer's Facility; (2) the parties will in good faith use all reasonable efforts to resolve such Technological Force Majeure as it relates to the supply of Landfill Gas and the use of Landfill Gas in Buyer's operations at Buyer's Facility and (3) during the period of time any Technological Force Majeure event is

16

in force, Buyer shall still be obligated to take and pay for Landfill Gas delivered to Delivery Point A to the extent it is accepted by Buyer and Buyer shall still be obligated to take and pay for all Landfill Gas delivered to Delivery Point B, pursuant to provisions of this Agreement.

## ARTICLE XI

## RIGHTS AND REMEDIES UPON DEFAULT

11.1    General Provisions.  Except for the failure of Buyer to pay any amounts owed to Seller under this Agreement ("Payment Default"), in the event of a breach of or default under this Agreement by either party, the non-defaulting party shall provide written notice to the breaching or defaulting party and allow such party ninety (90) days to cure such breach or default ("Cure Period").  If such breach or default is not cured within the Cure Period, the non-defaulting party shall have the right to pursue any and all rights and remedies available under this Agreement, at law or, in equity or otherwise, except to the extent that such right and remedies are limited, excluded or disclaimed by this Agreement. Subject to the exclusions and limitations set forth in this Agreement, all rights and remedies shall be cumulative and shall be in addition to, and not in lieu of, any other rights and remedies available to the non-defaulting party and the election to pursue one remedy shall not preclude the election to pursue another remedy.

Notwithstanding the first paragraph of the Article 11.1, if Buyer breaches or defaults under this Agreement by refusing to accept or to purchase the Landfill Gas or any part thereof in accordance with this Agreement, Buyer shall be liable to Seller solely for liquidated damages in an amount equal to all costs and expenses of any kind or nature incurred by Seller in connection with construction of Buyer's Facility and modifications to Seller's Facility, including, without limitation, all fees of engineers and consultants, permitting costs, attorneys fees, and all related costs and expenses, as well as all costs and expenses, including costs and reasonable attorneys fees and arbitrator fees incurred in collecting such liquidated damages.  The parties acknowledge and agree that at this time, it is not possible to determine accurately Buyer's actual damages with a reasonable degree of certainty, and therefore, these liquidated damages are reasonable under the circumstances and not a penalty.  The parties further acknowledge and agree that Seller shall not have any further liabilities or claims against Buyer under this Agreement, at law or in equity, including any claim for direct, special or consequential damages, which are hereby expressly excluded and disclaimed, except that Buyer shall be obligated to pay Seller any amounts otherwise owed to Seller under this Agreement as of the date of termination and the parties shall continue to be liable for those tort based actions, and only those tort based actions, for which indemnification is to be provided under Article XIII below.

Notwithstanding the first paragraph of the Article 11.1, Buyer's sole and exclusive remedy for Seller's breach or default (after the lapse of any applicable cure period) is to terminate this Agreement as provided for and subject to the limitations and exclusions

17

set forth in Article 12.1 below. The parties further acknowledge and agree that in light of Seller's incurrence of substantial financial obligations and the fact that it is not possible to determine accurately at this time Buyer's actual damages, if any, with a reasonable degree of certainty, Buyer's sole and exclusive remedy is reasonable under the circumstances and not a penalty.

11.2    Payment Defaults. With respect to any Payment Default by Buyer, Seller shall also have the rights and remedies referred to in the preceding paragraph of this Article and the following additional rights and remedies:

(a)    The right to suspend performance under this Agreement until payment is received by Seller, without terminating the Agreement and without any liability or obligation to Buyer; and

(b)    The right to obtain the amounts owed to Seller by proceeding to arbitration as provided in this Agreement, without terminating this Agreement and without any liability or obligation to Buyer.

With respect to a Payment Default by Buyer, Seller shall provide Buyer with written notice of such default and Buyer shall have a Cure Period of ten (10) days from the date of mailing such notice.

Buyer shall not be in Payment Default under this Agreement if Buyer timely pays the undisputed portion of any amount owed to Seller, and Buyer pays the disputed portion into escrow with the arbitrator within sixty (60) days of the invoice date, who shall resolve the dispute pursuant to the provisions of this Agreement; provided that Buyer's determination of the disputed portion of any amount owed to Seller must be made in good faith. The prevailing party in the arbitration proceeding with respect to the disputed portion of any amount owed to Seller shall be awarded all costs, expenses and reasonable attorney fees by the arbitrator, notwithstanding anything in this Agreement to the contrary.

All provisions of Article XI shall survive termination of this Agreement, by default or otherwise.

## ARTICLE XII

## RIGHTS TO TERMINATE; SPECIAL RIGHTS TO TERMINATE; LIMITATIONS ON REMEDY

12.1    Buyer's Right To Terminate. Buyer may terminate this Agreement by written notice to Seller submitted not later than ten (10) days following the occurrence of the initiation of any involuntary proceeding against Seller under the bankruptcy or insolvency laws, which involuntary proceeding is not dismissed for sixty (60) consecutive days, or the initiation by Seller of a voluntary proceeding under the bankruptcy or insolvency laws. Prior

18

to Construction of Seller's Facility, Buyer may also terminate this Agreement by providing Seller ten (10) days' written notice (1) if the parties can not execute a mutually satisfactory easement agreement under Article 2.1, (2) under Article 3.2, if the parties cannot resolve the issues regarding the modifications to Buyer's Facility and payment of such modifications, or (3) Buyer can not obtain any Easements or Permits required for or reasonably necessary for the operation of Buyer's Facility using the Landfill Gas as an energy source, including, without limitation, the Air Permit.

If Seller breaches or defaults under this Agreement, Buyer shall notify Seller in writing of such breach or default, whereupon Seller shall have the right to cure such breach or default as provided in Article XI above. If Seller does not cure such breach or default within the applicable Cure Period, Buyer's sole remedy shall be limited to terminating this Agreement by providing thirty (30) days written notice to Seller of Buyer's intention to terminate this Agreement, and Buyer shall not have any claim against Seller whatsoever for any damages, liabilities, losses, costs or expenses, whether direct, special or consequential, arising out of Seller's breach or default, whether such claim is based in contract, tort or another legal or equitable basis or otherwise. Buyer's sole and exclusive remedy in the event of default shall be to terminate this Agreement pursuant to Section 12.1 as full and final liquidated damages. If Buyer terminates this Agreement as a result of Seller's breach or default, neither party shall have any further obligations, liabilities or claims against the other party under this Agreement, at law or in equity or otherwise, including any claim for direct, special or consequential damages, which is hereby expressly excluded and disclaimed, except that Buyer shall be obligated to pay Seller any amounts owed to Seller under this Agreement as of the date of termination and the parties shall continue to be liable for those tort based actions, and only those tort based actions, for which indemnification is to be provided under Article XIII below.

12.2   **Seller's Right To Terminate**.   Seller may terminate this Agreement by written notice to Buyer following the occurrence of one or more of the following events:

(a)   Buyer breaches or defaults under this Agreement after notice from Seller and the lapse of the applicable Cure Period, if any, as provided in this Agreement; Seller shall provide thirty (30) days written notice of its intention to terminate this Agreement after lapse of the applicable Cure Period, if any, for any breaches or defaults by Buyer, except Payment Defaults, for which no further notice shall be required beyond the original ten (10) day notice required by Article XI;

(b)   The initiation of any involuntary proceeding against Buyer under the bankruptcy or insolvency laws, which involuntary proceeding is not dismissed for sixty (60) consecutive days, or immediately in the event of the initiation by the Buyer of a voluntary proceeding under the bankruptcy or insolvency laws;

19

(c)    At any time during the term of this Agreement, the Massachusetts Department of Public Utilities, or any other regulatory or governmental body asserts jurisdiction over Seller as a public utility or public service corporation;

(d)    Any change in the federal tax laws or regulations thereunder after the date of this Agreement relating to the availability of tax credits derived from producing fuel from a non-conventional source within the meaning of Section 29 of the Internal Revenue Code of 1986, as amended ("Production Tax Credits"), and such change affects in any respect the availability of such Production Tax Credits with respect to the sale of any Landfill Gas under this Agreement or the project at the Landfill;

(e)    Any change in any laws, rules, regulations, statutes or governmental orders that require Seller to modify its gas collection system or Seller's Facility to the extent that it would be economically impossible or unfeasible to operate a gas collection system or Seller's Facility at the Landfill, as determined by Seller in its sole discretion;

(f)    The failure of Seller to qualify for Production Tax Credits, in whole or in part, with respect to the sale of any Landfill Gas under this Agreement or Seller's project at the Landfill or the Internal Revenue Service determines or asserts that Production Tax Credits are not available, in whole or in part, for the sale of any Landfill Gas under this Agreement or Seller's project at the Landfill;

(g)    Seller loses its right to extract Landfill Gas at the Plainville Landfill for any reason whatsoever or Seller's right to extract such Landfill Gas is diminished or impaired for any reason whatsoever;

(h)    The Landfill ceases to produce Commercial Quantities of Landfill Gas, as determined by Seller in its sole discretion; and/or

(i)    Seller enters into a Gas Purchase Agreement To Supply Power Plant, and the supply of Landfill Gas is not, in the sole discretion of Seller, reasonably sufficient to supply Landfill Gas at the incremental rate, quality and quantity provided for under both this Agreement and such Gas Purchase Agreement To Supply Power Plant.

12.3    **Special Rights To Terminate**.  Seller shall have the right to terminate this Agreement at any time prior to the First Delivery Date of Landfill Gas if any of the following conditions precedent cannot be satisfied:

(a)    Seller is unable to resolve the issues under Article 3.2;

(b)    Seller fails to receive assurance that Seller will not be regulated as a public utility or public service corporation by the Massachusetts Department of Public Utilities or any other governmental entity, satisfactory to Seller in form and substance;

(c)     Seller fails to obtain or receive any or all Easements and Permits required for or reasonably necessary for the extraction, collection and/or delivery of Landfill Gas to Buyer's Facility or the parties are unable to execute a mutually satisfactory easement agreement pursuant to Article 2.1;

(d)     Seller is not satisfied in its sole discretion that Buyer has the financial resources to perform its obligations under this Agreement;

(e)     Buyer fails to enter into the Condensate Treatment Agreement with Laidlaw; and/or

(f)     Buyer fails to obtain or receive any Easements and Permits required for or reasonably necessary for the operation of Buyer's Facility using Landfill Gas as the energy source, including, without limitation, the Air Permit.

12.4    **Exclusion Of Damages**.  If Seller terminates this Agreement under Article 12.2 (c) through (i) or under Article 12.3, neither party shall have any further obligations, liabilities or claims against the other party under this Agreement, at law or in equity, including any claim for direct, special or consequential damages, which are hereby expressly excluded and disclaimed, except that Buyer shall be obligated to pay Seller any amounts owed to Seller under this Agreement as of the date of termination and the parties shall continue to be liable for those tort based actions, and only those tort based actions, for which indemnification is to be provided under Article XIII below.

12.3    **Survival**.  All provisions of this Article XII shall survive termination of this Agreement, by default or otherwise.

ARTICLE XIII

INDEMNIFICATION

Seller shall indemnify, hold harmless and, upon request, defend Buyer from and against any and all claims, demands, actions, proceedings, liabilities and losses of any kind or nature (including reasonable attorney fees, costs and expenses) arising out of or relating to any injury, illness or death to persons or any damage or loss to tangible property occurring during the performance of this Agreement and resulting from the negligence or willful misconduct of Seller, its contractors, subcontractors, agents or employees.

Buyer shall indemnify, hold harmless and, upon request, defend Seller from and against any and all claims, demands, actions, proceedings, liabilities and losses of any kind or nature (including reasonable attorney fees, costs and expenses) arising out of or relating to any injury, illness or death to persons or any damage or loss to tangible property

21

occurring during the performance of this Agreement and resulting from the negligence or willful misconduct of Buyer, its contractors, subcontractors, agents or employees.

The parties agree that (1) their respective indemnification obligations under this Article XIII shall only apply to tort based actions arising out of the negligent or willful misconduct of the parties and their respective contractors, subcontractors, agents and employees and (2) this Article XIII does not, and shall not be interpreted to, modify the disclaimers, exclusions and limitations of liability set forth elsewhere in this Agreement.

All provisions of this Article XIII shall survive termination of this Agreement, by default or otherwise.

## ARTICLE XIV

## INSURANCE

Buyer shall, at its cost and expense, at all times during the term of this Agreement, maintain in force, for the joint benefit of Buyer and Seller, a broad form comprehensive coverage policy of public liability insurance by the terms of which Buyer and Seller are named as an additional insured and are indemnified against liability for damage or injury to the property or person (including death) of any employee or invitee of Seller or any other person entering upon or using Buyer's Facility, or any structure thereon, or any part thereof. Such insurance policy or policies shall be maintained on the maximum basis of $5,000,000 for damage to property and $5,000,000 for bodily injury or death in any one accident. Such insurance policy or policies shall be stated to be primary and noncontributing with any insurance which may be carried by Seller. Buyer shall deliver to Seller the certificate of each insurance carrier as to each such insurance policy.

Seller shall, at its cost and expense, at all times during the term of this Agreement, maintain in force, for the joint benefit of Buyer and Seller, a broad form comprehensive coverage policy of public liability insurance by the terms of which Buyer and Seller are named as an additional insured and are indemnified against liability for damage or injury to the property or person (including death) of any employee or invitee of Seller or any other person entering upon or using Seller's Facility, or any structure thereon, or any part thereof. Such insurance policy or policies shall be maintained on the maximum basis of $5,000,000 for damage to property and $5,000,000 for bodily injury or death in any one accident. Such insurance policy or policies shall be stated to be primary and noncontributing with any insurance which may be carried by Buyer. Seller shall deliver to Buyer the certificate of each insurance carrier as to each such insurance policy.

Each party shall use reasonable efforts to obtain from their respective insurers under all policies set forth above a waiver of all rights of subrogation which the insurer might have against the other party. So long as such waiver is outstanding and valid, the parties waive, to the extent of the proceeds received under such policy, any right of recovery against the

22

other party for any loss for which it receives payment under the policy containing such waiver. Provided, however, that if at any time the insurer(s) shall refuse to permit waivers of subrogation or such waivers of subrogation cannot be obtained or are not effective, the waiver of rights of subrogation under this Article XIV shall be of no force and effect whatsoever.

All provisions of this Article XIV shall survive termination of this Agreement, by default or otherwise.

## ARTICLE XV

## ARBITRATION AND CHOICE OF FORUM

Any and all controversies, claims or disputes arising out of or relating to this Agreement or a breach of this Agreement shall be resolved by binding arbitration in the metropolitan area in which the Landfill is located in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The determination of the arbitrators shall be final and binding on the parties, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof, pursuant to applicable law. The parties agree that after an arbitration notice has been filed, they shall, before the hearing, make discovery and disclosure of all matters relevant to such dispute. All questions that may arise with respect to discovery and disclosure obligations (including the assertion of any privileges and protective orders regarding such discovery material) shall be referred to the arbitrator(s), whose determination shall be final and conclusive. Notwithstanding the foregoing, a party may request that the arbitrator grant a claim for specific performance of this Agreement or other form of equitable relief (the parties hereby stipulating that such arbitrator shall have such authority) or such party may file a claim for equitable or injunctive relief in the appropriate forum specified below. The arbitrator shall have the authority to award costs and expenses, including, without limitation, reasonable attorneys fees, to the prevailing party.

Subject to the preceding paragraph of this Article XV, Seller and Buyer agree and consent to the jurisdiction of the United States Federal District Court in which the Landfill is located as the exclusive forum to resolve any disputes arising out of or relating to this Agreement as they relate to claims for equitable or injunctive relief or to enforce any arbitration award or to resolve any dispute as to whether the claim should be arbitrated, regardless of whether Seller and Buyer are corporations formed under the laws of another state. Both parties further acknowledge and agree that service may be affected upon them by serving the complaint or other legal document, together with the summons, by certified mail, return receipt requested, to the address indicated in this Agreement. If either party institutes a lawsuit in any jurisdiction other than such United States Federal Court, the other party shall have the right to terminate such lawsuit and remove the same to the above court and the party initially filing the lawsuit shall be responsible for all costs and expenses,

23

including reasonable attorney fees, incurred by the party removing the case to the forum agreed upon in this Agreement.

All provisions of this Article XV shall survive termination of this Agreement, by default or otherwise.

## ARTICLE XVI

## MISCELLANEOUS

16.1   Notices.  Any notice, request, demand, statement and or payment provided for in this Agreement shall be in writing and, except as otherwise provided herein, shall be sent to the parties hereto at the following address:

Seller:

Curtis Ranger, P.E.
Plainville Gas Producers, Inc.
425 S. Main Street, Suite 201
P. O. Box 8614
Ann Arbor, Michigan 48107

With copy to:

Stephen Carpman, Esq.
DTE Energy Company
2000 Second Avenue 688 WCB
Detroit, Michigan 48226-1297

Buyer:

Gerard Lorusso
President
Lorusso Corporation
3 Belcher Street
Plainville, Massachusetts  02762

With copy to:

Steven Ferrey, Esq.
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
260 Franklin Street
Boston, Massachusetts 02110

Such notices, etc. shall be deemed to have been given and received when personally delivered or upon receipt as evidenced by a U.S. Postal Service Receipt for Certified Mail or evidence of delivery by a private express mail service.  Either party may change the address to which notices, etc. are to be sent by written notice to the other party.

16.2   Severability.  Each term, provision and Article of this Agreement shall be valid and be enforceable to the fullest extent permitted by law. If any term, provision or Article of this Agreement or the application thereof to any person or circumstance is invalid or unenforceable to any extent, the remainder of this Agreement and the application of such

24

terms, provisions and Articles to persons or circumstances (other than those to which it is held invalid or unenforceable) shall not be affected thereby, and the remaining terms, provisions and Articles of this Agreement shall continue to be enforced, with such invalid or unenforceable term, provision or Article deemed to be deleted from this Agreement.

16.3  **Headings**.  The headings appearing int his Agreement are intended for convenience and reference only, and are not to be considered in construing this Agreement.

16.4  **Disclaimer Of Joint Venture, Partnership And Agency**.  This Agreement shall not be interpreted or construed to create an association, joint venture or partnership between Buyer and Seller or to impose any partnership obligation or liability upon such parties. Neither Buyer nor Seller shall have any right, power or authority to enter into any agreement or undertaking for, or act on behalf of, or to act as or be an agent or representative of, or to otherwise bind, the other party.

16.5  **Governing Law**.  All questions with respect to the construction of this Agreement and the rights and liabilities of the parties hereunder shall be determined in accordance with the laws of the State of Massachusetts.

16.6  **Amendment To Agreement**.  This Agreement may be amended or modified only by a written instrument signed by both parties.

16.7  **Entire Agreement**.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written agreements and understandings between the parties relating to the subject matter hereof.

16.8  **Successors And Assigns**.  All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto and their respective permitted successors and assigns.

16.9  **Assignment**.  Except as expressly provided herein, this Agreement may not be transferred or assigned by one party without the prior written consent of the other party, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing, Seller may assign this Agreement without Buyer's consent to (i) Biomass or any subsidiary, parent or affiliated company or any limited liability company, partnership, corporation or other entity in which Biomass has an interest of 50% or more (collectively, "Related Entity"), (ii) any limited liability corporation, partnership, corporation or other entity controlled by Seller and/or any Related Entity or (iii) a lending institution pursuant to a collateral assignment; provided that any such assignment shall not unduly interfere with Buyer's rights under this Agreement, and further provided that such assignee (except a lending institution) agrees to be bound by the terms of this Agreement to the same extent as Seller.  No assignment by Seller shall relieve Seller of its obligations under this Agreement.  Seller shall give Buyer thirty (30) days prior notice of its intent to assign that interest, which notice shall contain the

25

name and address of the proposed assignee, purchaser or successor in interest, which information shall be kept confidential by Buyer.

16.10 Authorization. Each individual signing this Agreement warrant and represents that he has carefully read this Agreement, understands its terms and conditions and executes the same of his own free will. Any corporation or limited liability company signing this Agreement, and each person signing on behalf of such corporation or limited liability company, represents and warrants, jointly and severally, that the execution, delivery and performance of this Agreement by such corporation or limited liability company has been duly authorized by all necessary action of such corporation or limited liability company and is valid and binding upon such corporation or limited liability company. Upon request, each party will provide appropriate resolutions to the other party which authorize the execution of this Agreement by the individuals signing this Agreement.

16.11 Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute one and the same instrument. Each party shall receive a duplicate original of the counterpart copy or copies executed by it.

16.12 Further Assurances. In addition to the agreements and notices to be delivered as herein provided, each of the parties hereto shall, from time to time upon the reasonable request of the other party, execute and deliver such additional certificates, notices and documents and shall take such other action as may reasonably be required to more effectively carry out the terms of this Agreement.

16.13 Survival. All provisions of this Article XVI shall survive termination of this Agreement, by default or otherwise.

IN WITNESS WHEREOF, the parties hereto have caused the execution of this contract by the authorized representatives whose names appear below as of the date first written above.

WITNESS:

PLAINVILLE GAS PRODUCERS, INC.,
a Michigan corporation

By: _____
Curtis T. Ranger, P.E.
Its:    President and Authorized
Representative

"Seller"

LORUSSO CORPORATION,
a Massachusetts corporation

By: _____

Its: _____ and Authorized
Representative

"Buyer"

27

EXHIBIT A

DIAGRAM

EXHIBIT B

SAMPLE BILLING SHEET

MONTH: July 1997

REFERENCE PRICE: $0.67 ($ Per Gallon #2 Fuel Oil)

LFG PRICE:   TIER 1  $1.5463  $/MMBTU

             TIER 2  $0.8246  $/MMBTU

TOTAL MMBTU DELIVERED TO 'A' YEAR TO DATE:
       To June 30, 1997    108,000

| | |
|---|---|
| METER 'A' READING END OF MONTH: | 256,000 MCF |
| METER 'A' READING BEGINNING OF MONTH: | 216,000 MCF |
| TOTAL VOLUME DELIVERED: | 40,000 MCF |
| AVERAGE BTU/SCF IN MONTH: | 510 BTU/SCF |
| TOTAL MMBTU'S DELIVERED: | 20,400 MMBTU |
| TOTAL MMBTU'S DELIVERED YTD AT END OF MONTH: | 128,400 MMBTU |

## BILLING

| | Price | Volume | Cost |
|---|---|---|---|
| TIER 1: | $1.5463 | 12,000 | $18,555.60 |
| TIER 2: | $0.8246 | 8,400 | $6,926.69 |
| TOTAL COST: | | | $25,487.29 |

29

EXAMPLES OF PRICING FORMULA

| | Price | 1 | | 2 | | 3 | | 4 | |
|---|---|---|---|---|---|---|---|---|---|
| | $/MMBTU | Vol. | Cost | Vol. | Cost | Vol. | Cost | Vol. | Cost |
| Base Volume | | 120 | | 120 | | 120 | | 120 | |
| Additional Volume | | 400 | | 400 | | 200 | | 0 | |
| Committed Volume | | 520 | | 520 | | 320 | | 120 | |
| Delivered to A (0-120,000) | $1.50 | 120 | 180,000 | 100 | 150,000 | 120 | 180,000 | 0 | |
| Delivered to A (greater than 120,000) | $0.80 | 60 | 48,000 | 0 | 0 | 220 | 176,000 | 0 | |
| Delivered to B | $0.10 | 340 | 34,000 | 420 | 42,000 | 0 | 0 | 120 | 12,000 |
| TOTAL VOLUME | | 520 | | 520 | | 340 | | 120 | |
| TOTAL COST | | | $262,000 | | $192,000 | | $356,000 | | $12,000 |

99-676 2gksju8 2gM9279051