# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

PLAINVILLE GENERATING CO., LLC,    )
                                   )
                        Plaintiff, )
                                   )
vs.                                )        **Case No. 05-11210-GAO**
                                   )        **Case No. 05-12168-GAO**
DTE BIOMASS ENERGY, INC. and       )
PLAINVILLE GAS PRODUCERS, INC.,    )
                                   )
                       Defendants. )

## AFFIDAVIT OF W.C. BLANTON RELATING TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

W.C. Blanton, being first duly sworn, states as follows:

1.      The statements made herein are based upon my personal knowledge, and I am competent to testify thereto.

2.      I am one of the attorneys for Defendants DTE Biomass Energy, Inc. ("DTE Biomass") and Plainville Gas Producers, Inc. ("Plainville Gas") in the civil action encaptioned Plainville Generating Co., LLC v. DTE Biomass Energy, Inc. and Plainville Gas Producers, Inc., C.A. No. 05-11210-GAO, now pending in the United States District Court for the District Court of Massachusetts ("Lawsuit").

3.      On Tuesday, November 8, I deposed Gerard C. Lorusso in connection with the Lawsuit. Excerpts from the transcript of this deposition are attached hereto as Exhibit A.

4.      On Tuesday, November 8, I also deposed David E. Adams in connection with the Lawsuit. Excerpts from the transcript of this deposition are attached hereto as Exhibit B.

5.     On Thursday, November 10, I deposed David LaFlamme in connection with the Lawsuit.  Excerpts from the transcript of this deposition are attached hereto as Exhibit C.

6.     A copy of Plainville Generating Co., LLC's Initial Disclosures Pursuant To Fed. R. Civ. P. 26(a), dated November 14, 2005, is attached hereto as Exhibit D.

Further Affiant sayeth not.

_____
W.C. Blanton

STATE OF MISSOURI          )
                           ) ss.
COUNTY OF JACKSON          )

Subscribed and sworn to before me, a notary public in and of said County and State, this 15th day of November, 2005.

_____
Notary Public

My Commission Expires:  August 25, 2007

ANGELA M. MAYS
Jackson County
My Commission Expires
August 25, 2007

— **<u>Exhibit A</u>** —

**Excerpts From The Deposition Of Gerard C. Lorusso**

Page 1

1        UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF MASSACHUSETTS

3

4

5    *********************************

6   PLAINVILLE GENERATING CO., L.L.C.,

7             Plaintiff

8       vs.              No. 05CV12168 GAO

9   DTE BIOMASS ENERGY, INC. and

10  PLAINVILLE GAS PRODUCERS, INC.,

11            Defendants

12  *********************************

13

14

15

16                    VOLUME:   I

17                    PAGES:   1-231

18

19

20

21     DEPOSITION OF GERARD C. LORUSSO

22       TUESDAY, NOVEMBER 8, 2005

23

24

EXHIBIT A

Page 2

1  DEPOSITION OF GERARD C. LORUSSO, a witness
2  called on behalf of the Defendants,
3  pursuant to the Federal Rules of Civil
4  Procedure, before Judith McGovern
5  Williams, Certified Shorthand Reporter
6  No. 130993, Registered Professional
7  Reporter, Certified Realtime Reporter,
8  Certified LiveNote Reporter, and Notary
9  Public in and for the Commonwealth of
10 Massachusetts, at the offices of Looney &
11 Grossman L.L.P., 101 Arch Street, Boston,
12 Massachusetts 02110, on Tuesday,
13 November 8, 2005, commencing at 2:45 p.m.
14
15
16
17
18
19
20
21
22
23
24

Page 4

1  APPEARANCES (Continued):
2
3     - and -
4  DAVID JOEST, ESQUIRE
5   DTE Energy
6   425 South Main Street
7   Suite 201
8   Ann Arbor, Michigan  48104
9   734-913-2083
10  joestd@dtecs.com
11  all on behalf of the Defendants
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1  APPEARANCES:
2
3  LeBOEUF, LAMB, GREENE & MacRAE, L.L.P.
4   Steven E. Ferrey, Esquire
5   260 Franklin Street
6   Boston, Massachusetts  02110-3173
7   617-439-9500
8   sferrey@llgm.com
9   on behalf of the Plaintiff
10
11 BLACKWELL, SANDERS, PEPER, MARTIN, L.L.P.
12  W.C. Blanton, Esquire
13  4801 Main Street
14  Suite 1000
15  Kansas City, Missouri  64112
16  816-983-8151
17  wblanton@blackwellsanders.com
18    - and -
19 LOONEY & GROSSMAN L.L.P.
20  Wesley S. Chused, Esquire
21  101 Arch Street
22  Boston, Massachusetts  02110-1112
23  617-951-2800
24  wchused@lgllp.com

Page 5

1        I N D E X
2  Witness              Page
3  GERARD C. LORUSSO
4   Direct Examination by Mr. Blanton   13
5
6
7
8
9      E X H I B I T S
10 Number               Page
11 20   Three-page Affidavit of Gerard  17
12    Lorusso
13
14 21   Plaintiff's Opposition to      75
15    Defendants' Motion to Dismiss
16
17 22   Multipage Affidavit of Gerard  17
18    Lorusso in Support of Motion
19    for Injunction
20
21 23   Plaintiff's Motion for        127
22    Preliminary Injunction
23
24 24   Memorandum of Law in Support  127

2 (Pages 2 to 5)

Page 10

```
1        October 27, 2004, to
2        Mr. Lorusso from Mr. Ranger
3
4    50   Exhibit 50 not marked
5
6    51   One-page letter dated        149
7        December 13, 2004, to
8        Mr. Lorusso from Mr. Russell
9        and attachment
10
11   52   Two-page letter dated        150
12       December 20, 2004, to
13       Mr. Russell from Mr. Ferrey
14
15   53   One-page letter dated        152
16       December 20, 2004, to
17       Mr. Ferrey from Mr. Endler
18
19   54   Three-page letter dated      153
20       December 21, 2004, to
21       Mr. Ferrey from Mr. Joest
22
23   55   One-page letter dated        154
24       January 6, 2005, to Mr. Ferrey
```

Page 11

```
1        from Mr. Russell
2
3    56   One-page letter dated        155
4        January 14, 2005, to Mr. Ranger
5        from Mr. Grilli
6
7    57   Four-page letter dated       225
8        April 15, 2003, to Mr. Larimore
9        from Mr. Chapin and attachment
10
11   58   Four-page letter dated       226
12       July 11, 2003, to Mr. Larimore
13       from Mr. Chapin and attachment
14
15   59   Four-page letter dated       226
16       October 24, 2003, to
17       Mr. Larimore from
18       Mr. Chapin and attachment
19
20   60   Four-page letter dated       226
21       April 28, 2004, to Mr. Larimore
22       from Mr. Chapin
23
24   61   Four-page letter dated       227
```

Page 12

```
1        August 17, 2004, to
2        Mr. Larimore from
3        Mr. Chapin and attachment
4
5    62   Four-page letter dated       227
6        December 15, 2004, to
7        Mr. Larimore from
8        Mr. Chapin and attachment
9
10   63   Four-page letter dated       227
11       April 26, 2005, to
12       Mr. Larimore from
13       Mr. Chapin and attachment
14
15
16
17
18
19
20
21
22
23
24
```

Page 13

```
1                P R O C E E D I N G S
2                        - - -
3            It is hereby stipulated and
4        agreed by and between counsel for the
5        respective parties that the witness will
6        read and sign the deposition transcript
7        before any notary public within 30 days of
8        receipt of same.  The filing of the
9        deposition is waived.
10           It is further stipulated and
11       agreed that all objections, except as to
12       the form of the questions, and motions to
13       strike are reserved until the time of
14       trial.
15                       - - -
16           GERARD C. LORUSSO, first having
17       been duly sworn, testified as follows in
18       answer to direct examination by
19       MR. BLANTON:
20                       - - -
21   Q.  Mr. Lorusso, as you know, I am W.C.
22       Blanton.  I am counsel to the defendants
23       in the lawsuit that Plainville Generating
24       Company has filed against DTE Biomass
```

Page 14

1  Energy and Plainville Gas Producers that
2  is pending in the United States District
3  Court for the District of Massachusetts.
4  I understand you are familiar with that
5  litigation; is that correct?
6  A.  I am.
7         MR. BLANTON:  Before we begin
8  your actual testimony, I want to confirm
9  on the record with Mr. Ferrey that we have
10  the same sets of stipulations and
11  procedural agreements with respect to
12  Mr. Lorusso's deposition that we had with
13  that of Mr. Adams just concluded.  Is that
14  correct?
15        MR. FERREY:  That's correct.
16 BY MR. BLANTON:
17 Q.  Mr. Lorusso, have you ever been deposed
18  before?
19 A.  I believe I was.
20 Q.  What was the context in which you were
21  deposed?  What was going on?  Why did you
22  have your deposition taken?
23 A.  Gee, I have to remember back.  You know, I
24  can't recall the nature of the suit.

Page 15

1  Q.  Were you a party?
2  A.  Yes.
3  Q.  Was it a business dispute?
4  A.  Yes.
5  Q.  Between one of your companies or a company
6  you are affiliated with and somebody else?
7  A.  That's correct.
8  Q.  Do you recall generally what the subject
9  matter was?
10 A.  I think it had to do with a land dispute.
11 Q.  Okay.  And you are familiar generally that
12  the court reporter takes down everything
13  that everyone in the room says during the
14  course of the deposition, so it is
15  important that only one person speak at a
16  time.  I will try not to step on your
17  answers, but my questions, as everyone
18  else now knows, tend to go on for some
19  length sometimes, so please be sure that I
20  am done before you start answering.  Okay?
21 A.  Yes.
22 Q.  And it is important that you answer
23  questions audibly rather than with hand or
24  head gestures.  All right?

Page 16

1  A.  Yes.
2  Q.  If you are answering yes or no, just the
3  full words or something similar to yes and
4  no rather than um-hmms and uh-huhs, which
5  are hard to distinguish.  Okay?
6  A.  Certainly.
7  Q.  Do you have any conditions of any sort
8  that would interfere with your ability to
9  understand questions and answer accurately
10  during the course of your deposition?
11 A.  I don't believe so.
12 Q.  Are you taking any medications that would
13  interfere in any way with your ability to
14  participate in the deposition?
15 A.  No, I am not.
16 Q.  If during the course of the deposition you
17  can't -- you don't understand my question
18  or I'm not speaking up, could you please
19  let me know?  Because it is important that
20  we are talking about the same thing.  I
21  want to make sure you at least think you
22  have made yourself clear about what I am
23  asking.  All right?
24 A.  Yes.

Page 17

1         (Three-page Affidavit of Gerard
2           Lorusso marked Exhibit No. 20
3           for identification.)
4  BY MR. BLANTON:
5  Q.  I want to first show you a document that
6  has been marked in this case as
7  Exhibit 20.
8         (Handing Exhibit No. 20 to the
9  witness.)
10 Q.  I ask if this is an affidavit that you
11  executed in connection with the lawsuit
12  involved here.
13        (Pause.)
14        (The witness viewing Exhibit
15  No. 20.)
16 A.  Yes, it is.
17        (Multipage Affidavit of Gerard
18          Lorusso in Support of Motion
19          for Injunction marked Exhibit
20          No. 22 for identification.)
21 BY MR. BLANTON:
22 Q.  I am going to show you a document that has
23  been marked as Exhibit 22.
24        (Handing Exhibit No. 22 to the

Page 38

1      MR. FERREY:  Objection on
2   relevancy to this, to anything in the
3   affidavit.
4   A.  I don't recall.
5   Q.  Who would know?
6   A.  Mr. Grilli.
7   Q.  What is the company that is currently
8       operating the landfill gas collection and
9       delivery system at the Plainville
10      Landfill?
11  A.  It was recently formed.
12  Q.  What is the name of it?
13  A.  I don't recall.
14  Q.  What is your best guess?
15  A.  I wouldn't.
16  Q.  Who would know?
17  A.  Mr. LaFlamme would know.
18  Q.  Why was a new company formed?
19  A.  It was decided to form a new company to
20      do --
21  Q.  Was it in order to take advantage of tax
22      credits that might be available under the
23      U. S. Tax Code?
24  A.  I am far from an expert on the tax code.

Page 39

1   Q.  I know.  But you would know in your
2       business.  If you are doing renewable
3       energy tax credits, they are a big deal,
4       so I would think you would know whether
5       you are trying to take advantage of tax
6       credits in your business now that you have
7       the rights to collect the gas at the
8       landfill.
9   A.  And the question again was?
10  Q.  Was it formed in part to be able to take
11      advantage of tax credit possibilities for
12      renewable energy?
13  A.  Yes.
14  Q.  Okay.  Do you know whether there has been
15      an assignment of the contract between
16      Allied Waste Management -- Allied Waste
17      Systems and Lorusso Corp.?
18          Let me back up.
19          On July 27, 2005, you signed the
20      assignment of DTE Biomass' or Plainville
21      Gas Producers' contract with Allied Waste
22      Systems for the gas collection and
23      delivery system at the Plainville
24      Landfill, correct, on behalf of Lorusso

Page 40

1   Corp.?
2   A.  Yes.
3   Q.  Has that contract been subsequently
4       assigned to this newly-formed company?
5   A.  I'm not sure.
6   Q.  Is it intended to be assigned to the new
7       company?
8   A.  Yes.
9   Q.  And is it correct that the new company was
10      formed at least in part for the purpose of
11      being able to receive that assignment?
12  A.  Yes.
13  Q.  And one of the benefits of having a new
14      company receive the assignment was to take
15      advantage of the tax credit possibilities
16      for operating a landfill gas collection
17      and delivery system; correct?
18  A.  I have not -- again I have not gone
19      through all of the tax ramifications.
20  Q.  Okay.  Mr. LaFlamme and Mr. Grilli would
21      know that?
22  A.  I expect they would.
23  Q.  Who handled the creation of what -- was a
24      lawyer involved in setting up the new

Page 41

1   corporation, outside counsel?
2   A.  I'm not sure.
3   Q.  Sometime ago, I believe that Lorusso Corp.
4       notified Plainville Gas Producers and/or
5       DTE Biomass Energy that Lorusso Corp. was
6       going to assign to Plainville Generating
7       Company the contract between Lorusso Corp.
8       and DTE Biomass for the delivery of gas to
9       the generating plant; is that right?
10  A.  Who was assigning what?
11  Q.  Lorusso Corp. told DTE or Plainville Gas
12      Producers -- I don't remember which --
13      that Lorusso Corp. intended to assign the
14      gas supply agreement to an affiliate,
15      which we understand to be Plainville
16      Generating Company.  Do you recall that?
17  A.  Yes.
18  Q.  And was that assignment made eventually?
19  A.  I believe it was.
20  Q.  Okay.  And who would have copies of that
21      assignment?
22  A.  Who physically?
23  Q.  Yes.
24  A.  I don't know who physically would have

Page 42

1    them.
2    Q.   But Plainville -- both Lorusso Corp. and
3         Plainville Generating Company would have
4         copies in their corporate records;
5         correct?
6    A.   If there was an assignment made, there
7         would be a record.
8    Q.   Does Mr. Grilli have the responsibility
9         for the accounting and tax functions for
10        all of the Lorusso businesses?
11   A.   Yes.
12   Q.   Can you describe for me the -- how the
13        generating plant operates, what sort of
14        equipment it has, what it does, the
15        electrical generating plant that
16        Plainville Generating Company owns and
17        operates?
18   A.   What would you like to know about it?
19   Q.   Just a general description of the
20        facility, how it is -- what is there, what
21        it does.
22   A.   It is a concrete block building with a
23        flat roof.  There are seven 3516 CAT
24        engine generator sets in it that are

Page 43

1    modified to run on methane gas.  It has a
2    gas cleanup system that cleans most -- a
3    significant amount of the water moisture
4    out of the gas.
5    Q.   Anything else?
6    A.   That's about it.
7    Q.   What do these engines -- these generators
8         produce electricity; correct?
9    A.   Yes.
10   Q.   Does Plainville Generating sell the
11        electricity generated that it generates?
12   A.   Yes.
13   Q.   Does it have a specific customer to whom
14        it delivers electricity?
15   A.   Yes, it does.
16   Q.   Who is that?  What is that is probably a
17        better question.
18   A.   I don't recall the name.
19   Q.   With all due respect, that is pretty hard
20        to believe.  It is a major revenue source
21        for your businesses; right?
22   A.   Yes, it is.
23   Q.   And you don't know who you are doing
24        business with to sell your electricity in

Page 44

1    this lawsuit that you are claiming
2    millions of dollars in damages for not
3    being able to sell as much electricity as
4    you want to to this unknown entity?  Come
5    on.  Who is it?
6    A.   I knew at the time that we negotiated the
7         agreement.
8    Q.   Okay.  Is it a public utility?
9    A.   I don't believe it is.
10   Q.   Is it a co-op?
11   A.   I don't know what -- I don't recall the
12        structure.
13   Q.   Do you sell electricity to this unknown
14        entity by -- pursuant to a written
15        contract?
16   A.   It is not an unknown.
17   Q.   I am sorry.  You are right.  I apologize.
18        Do you sell electricity to this
19        customer via a written contract?
20   A.   Yes.
21   Q.   Who has possession of the contract, your
22        copy or your company's copy?
23   A.   It would be in the office.
24   Q.   Okay.  What are the general terms upon

Page 45

1    which you sell electricity to this
2    customer?
3    A.   They take our output.
4    Q.   All of it?
5    A.   I believe so.
6    Q.   And what is the price at which they
7         purchase electricity from you?
8    A.   It varies year to year.
9    Q.   What is the price per unit amount of
10        electricity?
11   A.   I wouldn't -- I wouldn't recall.
12   Q.   What is the range of payment -- of revenue
13        that Plainville Generating has generated
14        from the sales of electricity in the years
15        since it was -- began operating the plant?
16   A.   I would have to add it up.
17   Q.   What is the approximate amount per year?
18   A.   Several million dollars.
19        (Interruption at the door.)
20        MR. BLANTON:  Let's go off the
21   record for a second.
22        (Discussion off the record,
23   followed by a recess taken at 3:23 p.m.)
24        (Recess ended at 3:28 p.m.)

Page 82

1  A.  That's confusing.
2  Q.  If he is operating Plainville Generating
3      Company for Plainville Generating Company,
4      it is still Plainville Generating Company
5      that is generating electricity, isn't it?
6  A.  Yes.
7  Q.  And if there is somebody from DTE who is
8      operating the landfill collection system
9      on behalf of Plainville Gas Producers, it
10     is still Plainville Gas Producers that is
11     running the collection system, isn't it?
12         MR. FERREY:  Objection.  That is
13     a legal conclusion.
14 Q.  In the way you would think of things?
15 A.  I wouldn't know.
16 Q.  Let me have you look at Exhibit 22, your
17     other affidavit.
18         (Handing Exhibit No. 22 to the
19     witness.)
20 A.  Yes.
21         (Witness complying.)
22 Q.  If you would look at paragraph 5 beginning
23     on page 3.
24         (Witness complying.)

Page 83

1  A.  Yes.
2  Q.  At the bottom of that page, the last
3      sentence, carrying over to pages 4 and 5,
4      the rest of the paragraph, could you
5      review that, please?
6  A.  Starting with:  "None of the essential
7      information"?
8  Q.  Yes.
9         (Pause.)
10        (The witness viewing Exhibit
11     No. 22.)
12 Q.  How did you -- how was this list of items
13     necessary for the contractual obligations
14     and complying with the law developed?
15 A.  I'm not sure.
16 Q.  Before you executed -- did you execute
17     this affidavit on October 11, 2005?
18 A.  Yes, I did.
19 Q.  How did you know that what you said in
20     this paragraph starting with the last
21     sentence on page 3 was correct and
22     accurate?
23 A.  I spoke with my attorney about it.
24 Q.  Did he tell you where he had gotten this

Page 84

1      list?
2  A.  I don't think I asked him, and I don't
3      think he said to me where it came from.
4  Q.  Did he tell you that this was an accurate
5      statement?
6  A.  Yes.
7  Q.  Do you know how any of these documents are
8      necessary for operating the collection and
9      delivery system in accordance with
10     contractual obligations and requirements
11     of law?
12 A.  Do I know how they're important?
13 Q.  Yes.
14 A.  Yes.
15 Q.  Okay.  Can you explain how they're
16     important in as much detail as you know
17     personally?
18 A.  Certainly.  As-built drawings would be
19     required so that we could determine where
20     the collection system was out on the
21     landfill.
22 Q.  Go ahead.
23 A.  We would need current air and solid waste
24     operating permits to make sure that

Page 85

1      whatever we were responsible for we were
2      complying with permit requirements.
3         Whatever O and M plan existed
4      for the facility, we would have wanted to
5      make certain that we continued or we
6      performed whatever was required between
7      the owner of the landfill and the operator
8      of the system.
9         Keys and locks we would want to
10     have access.
11 Q.  Go ahead.
12 A.  The existing gas collection site plan
13     would be required also to operate the
14     system so we knew where all the components
15     of it were.
16 Q.  Let me interrupt you.  Would it be fair to
17     say that it is -- it was your opinion at
18     the time that you executed this affidavit
19     that there would be activities carried out
20     at the landfill by Lorusso-connected folks
21     that required all of these materials in
22     order to actually do the activities
23     necessary to operate and maintain the gas
24     collection and delivery system at the

22 (Pages 82 to 85)

Page 90

1    in the office at the landfill, an office
2    that Biomass was, I guess, allowed to use.
3  Q.  Anything else?
4  A.  I recall there being some old paper charts
5    from one of the flares and some, I
6    believe, original collection system
7    drawings for early portions of the
8    collection system, but nothing current.
9  Q.  Anything else?
10  A.  That's all I presently recall.
11  Q.  Do you recall there being an operations
12    manual created after the generating plant
13    was built, and there were certain changes
14    to the gas collection delivery system
15    instructed by Plainville Gas Producers?
16    Were you aware that there was an
17    operations manual created in connection
18    with the transition from the asphalt plant
19    to the generating plant?
20  A.  I am not.
21  Q.  Who would know whether -- who on your
22    behalf would have known whether or not
23    there was such a manual and who would have
24    been responsible for obtaining and

Page 91

1    maintaining it on behalf of your
2    companies?
3  A.  As to the first part of that question, was
4    who would have?
5  Q.  Who on your behalf would have been
6    responsible for obtaining and maintaining
7    any operations manuals provided to your
8    company in connection with the transition
9    to the generating plant?
10  A.  Both Dave LaFlamme and Henry Grilli.
11  Q.  And you have never heard of them being
12    provided such a manual?
13  A.  That's correct.
14  Q.  Since September 1 -- or since July 27,
15    2005, have you made -- has your company
16    made any effort to obtain any of the
17    materials listed in your affidavit from
18    Allied?
19  A.  Yes, we have.
20  Q.  Have you obtained some of those materials
21    from them?
22  A.  I don't believe we have.
23  Q.  Have you had -- can you describe for me
24    the contact that your company

Page 92

1    representatives have had with Allied
2    representatives since July 27, 2005,
3    regarding your assuming responsibility for
4    operating the landfill gas collection and
5    delivery system?
6  A.  I know I have been personally involved in
7    phone calls, conference calls with Allied,
8    and Dave has been in contact with several
9    people at Allied.
10  Q.  What has been the nature of the
11    discussions with Allied?
12  A.  The conference calls I was involved in
13    were just talking about the transition.
14  Q.  What aspects of the transition?
15  A.  Operational.
16  Q.  Has Plainville Generating been operating
17    the collection and delivery system since
18    September 1, 2005?
19  A.  Yes.
20  Q.  Has the -- do you know what the delivery
21    rate has been for September and October of
22    2005?
23  A.  Off the top of my head, I do not.
24  Q.  Do you know if there have been any

Page 93

1    significant changes in it, either up or
2    down, since the period May through August
3    of 2005?
4  A.  Not significant.
5  Q.  Have you all done any repairs to the gas
6    collection and delivery system since
7    taking over on September 1?
8  A.  No.
9  Q.  Have you all done any maintenance -- what
10    would be considered maintenance on that
11    system?
12  A.  We're developing a plan.
13  Q.  But you haven't done anything yet
14    physically to the system?
15  A.  To maintain it?
16  Q.  Yes.
17  A.  I can't -- I can't say with certainty we
18    have done nothing.
19  Q.  Okay.  What have you done, if you know?
20  A.  Dave LaFlamme would be handling that
21    aspect of it.
22  Q.  Okay.  Do you know whether you have done
23    any modifications to the system?
24  A.  I wouldn't know.

Page 94

1   Q.   Have you hired any consultants to advise
2     you on possible repairs or modifications
3     to the system?
4   A.   No.
5   Q.   Did you personally have any discussions
6     with anybody affiliated with Biomass or
7     Plainville Gas Producers regarding the
8     transition -- the assignment of
9     responsibility to operate the landfill
10     collection and delivery system?
11   A.   I don't recall.
12   Q.   Do you know if anyone else affiliated with
13     your company has had any discussion with
14     the Biomass or Plainville Gas Producers
15     people about the transition?
16   A.   I don't recall specifically.
17   Q.   Could you go back to paragraph 5 on page 3
18     of your exhibit -- your affidavit that is
19     Exhibit 20. Maybe it is 22. I can't read
20     my own writing. The one in support of
21     motion for injunction.
22   A.   22?
23   Q.   Yes, sorry.
24       (Pause.)

Page 95

1       (The witness viewing Exhibit
2     No. 22.)
3   Q.   It is about the third sentence of that
4     paragraph, "An officer of plaintiff wrote
5     to Rick DiGia" ?
6   A.   Yes.
7   Q.   Do you know of any written communication
8     from anybody affiliated with your
9     companies to the DTE or Plainville Gas
10     Producers people before that letter?
11   A.   I don't recall at this moment.
12   Q.   Do you know of any efforts folks on --
13     what efforts your folks made between
14     July 27th and August 23rd, 2005, to get
15     themselves ready to take over the gas
16     collection and delivery system?
17   A.   As my affidavit said, we made the request
18     for information.
19   Q.   Okay. Do you know who made it?
20   A.   I believe it was Mr. Grilli.
21   Q.   Do you know who he contacted?
22   A.   I believe it was Rick DiGia.
23   Q.   Do you remember about when that was or any
24     of the details of the conversation?

Page 96

1   A.   I wasn't involved.
2   Q.   The first sentence of paragraph 5, who is
3     your counsel that is referenced in that
4     paragraph?
5   A.   Attorney Ferrey.
6   Q.   And who is defendants' counsel that is --
7   A.   I don't know.
8   Q.   Tell me as much as you remember about the
9     conversation in which Mr. Ferrey told you
10     the things that supposedly happened in
11     this first sentence.
12   A.   Just as it states. We had a conversation
13     and -- on any number of matters.
14   Q.   Did you understand when he told you
15     "defendants' counsel" that he was talking
16     about the lawyers representing the
17     defendants in this lawsuit or somebody
18     else?
19   A.   This lawsuit.
20   Q.   And do you know whether in your contact
21     with Allied involving the transition
22     whether they ever expressed any views
23     about whether or not DTE folks and
24     Plainville Gas Producers people should be

Page 97

1     involved in a three-way meeting about the
2     transition or whether they thought that
3     was not necessary or they preferred
4     otherwise?
5   A.   I don't recall that coming up.
6   Q.   Okay.
7       MR. BLANTON: Can we take about
8     a five-minute break?
9       (Recess taken at 4:54 p.m.)
10       (Recess ended at 5:02 p.m.)
11   BY MR. BLANTON:
12   Q.   Okay. New topic. In connection with the
13     transition to the generator plant, we
14     already indicated there were some changes
15     to the gas collection and delivery system
16     that needed to be done; right?
17   A.   Transitioning from the asphalt plant to
18     the?
19   Q.   From the asphalt to the generating plant.
20   A.   Yes.
21   Q.   And I think there was a schedule of things
22     to be done attached to the contract, the
23     new contract, that is Exhibit B to the new
24     Complaint that is Exhibit 25. Can you

1   electricity since the generating plant
2   went into effect?
3   A.   That's correct.
4   Q.   Can you be more accurate than millions?
5        That is a pretty big range.  How much --
6        what are the total revenues to Lorusso
7        companies from this generating plant since
8        it began operation in 2003?
9   A.   I would have to add it up on kind of a
10       month-by-month basis and do some
11       arithmetic.
12  Q.   I assume that somebody has done that,
13       because one of your affidavits said you
14       had damages, losses, of $300,000 as of
15       late 2004.
16  A.   That's correct.
17  Q.   And I assume that is based upon we
18       generated and sold this much electricity
19       and made this much, and if this had gone
20       on, we would have done that much more;
21       right?
22  A.   That's correct.
23  Q.   All right.  What was the first number, the
24       amount that you actually made?

1   A.   At the risk of sounding stupid, I don't --
2        I don't retain all of that information in
3        my head.
4   Q.   Okay.  Would it be less than $10 million?
5   A.   Since inception?
6   Q.   Yes.
7   A.   The gross revenues generated?
8   Q.   Right.
9   A.   Yes.
10  Q.   Between five and ten?
11  A.   Yes.
12  Q.   Who calculated the a little more than
13       $300,000 in damages number?
14  A.   Mr. Grilli and I put that number together.
15  Q.   Is there a direct proportion between the
16       amount of electricity generated and the
17       amount of revenues off of the generating
18       plant?
19  A.   Yes.
20  Q.   Is there a direct proportion between the
21       amount of gas delivered to the generating
22       plant and the amount of electricity
23       generated up to the capacity of the seven
24       generators?

1   A.   It is not a -- it is not a perfect ratio
2        -- not a perfectly proportional analysis.
3   Q.   But it would be roughly directly
4        proportional?
5   A.   Yes.  Gas quality enters into it.
6   Q.   Okay.  Assuming that the gas quality were
7        equivalent, were the same, --
8   A.   Yes.
9   Q.   -- you held that constant, then there
10       would be a direct -- roughly a direct
11       proportion between the amount of gas
12       delivered and the amount of electricity
13       generated and, therefore, the amount of
14       revenue generated?
15  A.   There should be.
16  Q.   Okay.  Is there -- in your affidavit
17       roughly you had said that there had been
18       about double the amount of damages as of I
19       think the time you sought the preliminary
20       injunction; is that correct?
21  A.   Correct.
22  Q.   And that would be based on the same
23       principle that the reduced gas delivery
24       resulted in less electricity being

1        generated and, therefore, less revenue?
2   A.   That's correct.
3   Q.   Can you explain -- okay.  I will come back
4        to that.
5             What is the -- how much was the
6        capital investment to build the generating
7        plant?
8   A.   Approximately $6 million.
9   Q.   What generally is the depreciation
10       schedule?  Do you have different -- do you
11       know what the overall time period is to
12       depreciate that amount?  I assume there
13       are different amounts -- different
14       schedules for different pieces of
15       equipment, --
16  A.   Yes.
17  Q.   -- the structure and stuff?
18  A.   Right.  It is an assumption on my part.
19       It would be a seven to ten year on the
20       operating equipment.
21  Q.   How much have you paid Plainville Gas
22       Producers for the gas used at the
23       generating plant since inception roughly?
24  A.   From memory?

Page 114

1   Q.   Yes.
2   A.   Since the inception of the plant?
3   Q.   Generating plant.
4   A.   It's an estimate on my part.
5   Q.   Roughly?
6   A.   A few hundred thousand dollars.  I am
7        sorry.  It stopped in the end of July.
8   Q.   Right.
9   A.   So maybe $175,000.
10  Q.   What are the categories of other operating
11       expenses that you have at the generating
12       plant?
13  A.   Typical production costs:  labor,
14       maintenance -- labor, parts, there is a
15       small electric bill, fluids, insurance,
16       you know, the typical production-related
17       expenses.
18  Q.   Okay.  What are your total operating
19       expenses since inception roughly?
20  A.   I wouldn't know off the top of my head.
21  Q.   What would be your best estimate of the --
22       now we are off into accounting, which is
23       something I really don't know anything
24       about, and so, you know, I don't know what

Page 115

1        all the acronyms are -- but for before tax
2        net profit, what roughly would you have
3        made off of this generating plant since
4        inception?
5   A.   I wouldn't have that number in my head.
6   Q.   Also millions of dollars?
7   A.   Could it be over a million dollars?  It
8        could be over a million dollars.
9   Q.   One of your contentions in this lawsuit is
10       that the defendants are responsible for
11       landfill gas migrating offsite and,
12       therefore, not being available for the
13       collection system to deliver it to your
14       generating facility; right?
15  A.   Yes.
16  Q.   Why do you contend that it is the
17       defendants' responsibility?
18            MR. FERREY:  Objection.  That
19       may mischaracterize the claim, but you can
20       answer.
21  A.   Why am I contending that?
22  Q.   Yes.
23  A.   I think in a simple understanding of the
24       way the system should work would suggest

Page 116

1        it.
2   Q.   Okay.  Explain it to me.
3   A.   Gas is produced.  If a collection system
4        is working properly, not only will the gas
5        be produced, but it will be collected in
6        the collection -- the collection system
7        and delivered to whatever the end use may
8        be, whether it is flares or whether it is
9        a generating plant or an asphalt plant.
10  Q.   Are you aware of any reasons why gas would
11       migrate offsite other than the collection
12       system is not properly functioning?
13  A.   It's beyond my area of expertise.
14  Q.   Do you know of any contractual -- do you
15       know who the entity is that under the
16       environmental laws has the responsibility
17       of making sure that there is not migration
18       of landfill gas offsite above a certain
19       level?
20  A.   It would be the owner.
21  Q.   Are you aware of any contractual
22       obligations of the landfill gas collection
23       and delivery system to the owner that the
24       owner of the system would assume those

Page 117

1        legal responsibilities?
2   A.   I mean I think that is an interpretation
3        that is beyond me.
4   Q.   Are you aware that Allied received a
5        notice from the Massachusetts Department
6        of Environmental Protection in the summer
7        of 2004 in which the department alleged
8        that there was migration offsite of
9        landfill gas in excess of what was allowed
10       under the laws?
11  A.   I'm aware of that.
12  Q.   Are you aware that Allied and its
13       consultant, URS, has been working since
14       then to address that issue?
15  A.   I'm aware of that.
16  Q.   Has anyone at Allied suggested to anyone
17       at the Lorusso companies that now that
18       Lorusso is responsible for the gas
19       collection and delivery system that it is
20       Lorusso's responsibility to at least
21       participate in addressing this issue with
22       the DEP?
23  A.   That has not come up at this point.
24  Q.   Since September 1, 2005, has any of your

30 (Pages 114 to 117)

Page 226

1    marked Exhibit No. 57 for
2    identification.)
3        MR. FERREY:  That is 57?
4        MR. BLANTON:  Yes.  Here they
5    are.  You have got your set; right?
6        MR. FERREY:  Yes.
7        MR. BLANTON:  Okay.  Exhibit 58
8    is the July 11, 2003 document.
9        (Four-page letter dated
10        July 11, 2003, to Mr. Larimore
11        from Mr. Chapin and attachment
12        marked Exhibit No. 58 for
13        identification.)
14        MR. BLANTON:  Exhibit 59 is the
15    October 24, 2003 document.
16        (Four-page letter dated
17        October 24, 2003, to
18        Mr. Larimore from
19        Mr. Chapin and attachment
20        marked Exhibit No. 59 for
21        identification.)
22        MR. BLANTON:  Exhibit 60 is the
23    April 28, 2004 document.
24        (Four-page letter dated

Page 227

1        April 28, 2004, to Mr. Larimore
2        from Mr. Chapin marked Exhibit
3        No. 60 for identification.)
4        MR. BLANTON:  Exhibit 61 is the
5    August 17, 2004 document.
6        (Four-page letter dated
7        August 17, 2004, to
8        Mr. Larimore from
9        Mr. Chapin and attachment
10        marked Exhibit No. 61 for
11        identification.)
12        MR. BLANTON:  Exhibit 62 is the
13    December 15, 2004 document.
14        (Four-page letter dated
15        December 15, 2004, to
16        Mr. Larimore from
17        Mr. Chapin and attachment
18        marked Exhibit No. 62 for
19        identification.)
20        MR. BLANTON:  Exhibit 63 is the
21    April 26, 2005 document.
22        (Four-page letter dated
23        April 26, 2005, to
24        Mr. Larimore from

Page 228

1        Mr. Chapin and attachment
2        marked Exhibit No. 63 for
3        identification.)
4        MR. BLANTON:  And that's all of
5    them.
6        (Whereupon, at 8:37 p.m., the
7    deposition was adjourned.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 229

1        DEPONENT'S ERRATA SHEET
2        AND SIGNATURE INSTRUCTIONS
3    The original of the Errata Sheet has been
4    delivered to Steven E. Ferrey, Esq.
5    When the Errata Sheet has been completed
6    by the deponent and signed, a copy thereof
7    should be delivered to each party of
8    record and the ORIGINAL delivered to W.C.
9    Blanton, Esq., to whom the original
10    deposition transcript was delivered.
11
12        INSTRUCTIONS TO DEPONENT
13
14        After reading this volume of
    your deposition, indicate any corrections
15    or changes to your testimony and the
    reasons therefor on the Errata Sheet
16    supplied to you and sign it.  DO NOT make
    marks or notations on the transcript
17    volume itself.
18    REPLACE THIS PAGE OF THE TRANSCRIPT WITH
19    THE COMPLETED AND SIGNED ERRATA SHEET WHEN
20    RECEIVED.
21
22
23
24

58 (Pages 226 to 229)



Page 230

1  ATTACH TO DEPOSITION OF: GERARD C.
   LORUSSO
2
   CASE: PLAINVILLE GENERATING CO., L.L.C.
3  VS. DTE BIOMASS ENERGY, INC. and
   PLAINVILLE GAS PRODUCERS, INC.
4
5      ERRATA SHEET
6  INSTRUCTIONS: After reading the
   transcript of your deposition, note any
7  change or correction to your testimony and
   the reason therefor on this sheet. DO NOT
8  make any marks or notations on the
   transcript volume itself. Sign and date
9  this errata sheet (before a Notary Public,
   if required). Refer to Page 229 of the
10 transcript for errata sheet distribution
   instructions.
11
   PAGE LINE
12
       CHANGE:
13     REASON:
       CHANGE:
14     REASON:
       CHANGE:
15     REASON:
       CHANGE:
16     REASON:
       CHANGE:
17     REASON:
       CHANGE:
18     REASON:
19
20 I have read the foregoing transcript
   of my testimony, and except for any
21 corrections or changes noted above, I
   hereby subscribe to the transcript as an
22 accurate record of the statements made by
   me.
23
24     GERARD C. LORUSSO
       CERTIFICATE

Page 231

1  Commonwealth of Massachusetts
2  Plymouth, ss.
3
4      I, Judith McGovern Williams, a
5  Registered Professional Reporter and
6  Notary Public in and for the Commonwealth
7  of Massachusetts, do hereby certify:
8      That GERARD C. LORUSSO, the
9  witness whose deposition is hereinbefore
10 set forth, was duly sworn by me and that
11 such deposition is a true record of the
12 testimony given by the said witness.
13     IN WITNESS WHEREOF, I have
14 hereunto set my hand this      day of
15         , 2005.
16
17
18
       Judith McGovern Williams
19     Registered Professional Reporter
       Certified Realtime Reporter
20     Certified LiveNote Reporter
       Certified Shorthand Reporter No. 130993
21
22 My Commission expires:
23 April 2, 2010
24

59 (Pages 230 to 231)

# — **Exhibit B** —

**Excerpts From The Deposition Of David E. Adams**

```
 1          UNITED STATES DISTRICT COURT

 2       FOR THE DISTRICT OF MASSACHUSETTS

 3

 4

 5    ********************************

 6    PLAINVILLE GENERATING CO., L.L.C.,

 7                  Plaintiff

 8        vs.              No. 05CV12168 GAO

 9    DTE BIOMASS ENERGY, INC. and

10    PLAINVILLE GAS PRODUCERS, INC.,

11                  Defendants

12    ********************************

13

14

15

16                  VOLUME:   I

17                  PAGES:  1-200

18

19

20

21       DEPOSITION OF DAVID E. ADAMS

22         TUESDAY, NOVEMBER 8, 2005

23

24
```

EXHIBIT B

Page 2

1    DEPOSITION OF DAVID E. ADAMS, a witness
2    called on behalf of the Defendants,
3    pursuant to the Federal Rules of Civil
4    Procedure, before Judith McGovern
5    Williams, Certified Shorthand Reporter
6    No. 130993, Registered Professional
7    Reporter, Certified Realtime Reporter,
8    Certified LiveNote Reporter, and Notary
9    Public in and for the Commonwealth of
10   Massachusetts, at the offices of Looney &
11   Grossman L.L.P., 101 Arch Street, Boston,
12   Massachusetts  02110, on Tuesday,
13   November 8, 2005, commencing at 9:15 a.m.
14
15
16
17
18
19
20
21
22
23
24

Page 4

1    APPEARANCES (Continued):
2
3       - and -
4    DAVID JOEST, ESQUIRE
5     DTE Energy
6     425 South Main Street
7     Suite 201
8     Ann Arbor, Michigan  48104
9     734-913-2083
10    joestd@dtecs.com
11    all on behalf of the Defendants
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1    APPEARANCES:
2
3    LeBOEUF, LAMB, GREENE & MacRAE, L.L.P.
4     Steven E. Ferrey, Esquire
5     260 Franklin Street
6     Boston, Massachusetts  02110-3173
7     617-439-9500
8     sferrey@llgm.com
9     on behalf of the Plaintiff
10
11   BLACKWELL, SANDERS, PEPER, MARTIN, L.L.P.
12    W.C. Blanton, Esquire
13    4801 Main Street
14    Suite 1000
15    Kansas City, Missouri  64112
16    816-983-8151
17    wblanton@blackwellsanders.com
18     - and -
19   LOONEY & GROSSMAN L.L.P.
20    Wesley S. Chused, Esquire
21    101 Arch Street
22    Boston, Massachusetts  02110-1112
23    617-951-2800
24    wchused@lgllp.com

Page 5

1              I N D E X
2    Witness                    Page
3    DAVID E. ADAMS
4    Direct Examination by Mr. Blanton    10
5
6
7
8
9
10            E X H I B I T S
11   Number                     Page
12
13   1   One-page letter dated        13
14      November 7, 2005, to Mr. Chused
15      from Mr. DeMayo
16
17   2   One-page letter of transmittal 74
18      dated September 20, 2005, to
19      Mr. Ferrey from Mr. Adams
20
21   3   One-page cover sheet entitled  76
22      References to Tax Credits and
23      attached two pages
24

Page 6

```
1    4  One-page cover sheet entitled   83
2       DTE Biomass Energy References
3       and attached 10 pages
4
5    5  One-page cover sheet entitled   88
6       Current Air Pollution Control
7       Permit and multipage attachment
8
9    6  One-page cover sheet entitled   89
10      Wellfield Maintenance Records
11
12   7  One-Page cover sheet entitled   99
13      Gas Generation Estimates and
14      attached seven pages
15
16   8  One-page cover sheet entitled  102
17      Site Plans and attached plans
18
19   9  One-page 2004/2005 Correction  108
20      Action URS Corp.
21
22  10  One-page letter dated          108
23      November 1, 2004, to Mr. Dakers
24      from Mr. Garfield
```

Page 7

```
1   11  Multipage Corrective Action   108
2       Alternatives Analysis
3       (Report #1)
4
5   12  Nine-page letter dated June 18, 109
6       2004, to Mr. Larimore from
7       Mr. Ellis
8
9   13  Ten-page letter dated March 21, 109
10      2005, to Mr. Larimore from
11      Mr. Ellis
12
13  14  Multipage Major Permit         109
14      Modification Report (Report #1)
15
16  15  Two-page letter dated          109
17      June 1, 2005, to Mr. Dakers from
18      Mr. Ellis
19
20  16  Two-page letter dated June 1,  109
21      2005, to Mr. Dakers from
22      Messrs. Bellerose and Garfield
23      and multipage attachments
24
```

Page 8

```
1   17  Three-page letter dated        109
2       June 20, 2005, to Mr. Dakers
3       from Messrs. Bellerose and
4       Garfield and multipage
5       attachments
6
7   18  Two-page letter dated          110
8       July 12, 2005, to Mr. Dakers from
9       Messrs. Bellerose and Garfield
10      and multipage attachments
11
12  19  Affidavit of David E. Adams    145
13      in Support of Motion for
14      Injunction
15
16
17
18
19
20
21
22
23
24
```

Page 9

```
1            P R O C E E D I N G S
2                  - - -
3           It is hereby stipulated and
4    agreed by and between counsel for the
5    respective parties that the witness will
6    read and sign the deposition transcript
7    before any notary public within 30 days of
8    receipt of same.  The filing of the
9    deposition is waived.
10          It is further stipulated and
11   agreed that all objections, except as to
12   the form of the questions, and motions to
13   strike are reserved until the time of
14   trial.
15                - - -
16          MR. BLANTON:  Before we begin, a
17   couple of preliminary things.  Let the
18   record show that this deposition is being
19   taken by agreement of the parties in
20   connection with plaintiff's application
21   for preliminary injunction and other
22   relief.  The parties have agreed that the
23   witnesses who are -- that Mr. Adams and
24   the other witnesses being produced today
```

3 (Pages 6 to 9)

Page 10

1  and the defense witnesses who are being
2  produced in Ann Arbor next week are being
3  deposed with the understanding that in the
4  later course of the litigation in the
5  normal course of discovery these witnesses
6  may be redeposed, either as individuals or
7  as Rule 30(b)(6) designees, whichever the
8  case might be, and that these depositions
9  are without prejudice to the other rights
10  to depose them under the rules.
11         Also before we begin, I think
12  you took down a statement from Mr. Chused
13  about the normal stipulations for
14  depositions in this venue.
15         Is that right, Mr. Ferrey?
16         MR. FERREY:  That is correct.
17  Yes.  And the witness will take the 30
18  days to read and sign.
19         MR. BLANTON:  Okay.
20              - - -
21         DAVID E. ADAMS, first having
22  been duly sworn, testified as follows in
23  answer to direct examination by
24  MR. BLANTON:

Page 11

1              - - -
2  Q.   State your name, please.
3  A.   David Adams.
4  Q.   Have you been deposed before, Mr. Adams?
5  A.   I have.
6  Q.   How many times?
7  A.   I believe three times.
8  Q.   Okay.  Well, then what I am about to say
9       and our following colloquy will probably
10      be old news to you, but as you know, the
11      court reporter writes down everything that
12      everyone in the room says during the
13      course of the deposition.  It is extremely
14      difficult to keep track of what more than
15      one person is saying, so as we go along, I
16      will try to not step on any of your
17      answers, and can you please wait until you
18      are sure that I am done with my question
19      before you begin your response?
20  A.   Yes.
21  Q.   As I am thinking, I tend to trail off, and
22      my voice gets soft and mumbly, and
23      sometimes I get lost in my own questions,
24      so if you do not hear me or you don't

Page 12

1  understand the question, will you please
2  let me know that so I can rephrase it or
3  try again?
4  A.   Yes.
5  Q.   Because the transcript is of what people
6       say and not what they do, it is important
7       that you answer questions audibly and not
8       with hand gestures or head gestures.
9       Okay?
10  A.   Yes.
11  Q.   When you answer a yes or no question,
12      could you please say yes, no, affirmative,
13      negative, something like that, rather than
14      um-hmms and uh-huhs, which are easily
15      confused?
16  A.   Yes.
17  Q.   Do you have any physical problems that
18      would interfere with your ability to
19      understand and accurately answer questions
20      today?
21  A.   No.
22  Q.   Are you on any medication that would
23      affect your ability to testify accurately
24      and fully today?

Page 13

1  A.   No.
2  Q.   All right.  Then did you bring with you
3       today your file on your work on behalf of
4       Plainville Generating Company and/or
5       Lorusso Corporation or any other entities
6       represented by Mr. Ferrey?
7  A.   Mr. Ferrey brought along this information.
8  Q.   Okay.  You produced your full file
9       relating to your work on this case to
10      Mr. Ferrey earlier?
11  A.   Mr. Ferrey and I copied files from the
12      Massachusetts DEP, and that is essentially
13      my full file for that case -- for this
14      case.
15  Q.   Okay.
16              (One-page letter dated
17           November 7, 2005, to Mr. Chused
18           from Mr. DeMayo marked Exhibit
19           No. 1 for identification.)
20         MR. BLANTON:  And then for the
21  record, I note that Mr. DeMayo provided
22  some documents yesterday to Mr. Chused,
23  and there is a letter going along with
24  that.  It is marked as Exhibit 1.  It was

4 (Pages 10 to 13)

Page 70

1 toward another collection well that has
2 some degree of vacuum in it?
3 A. Some of the factors are the -- well, the
4 major factor is the permeability of the
5 waste and/or soil and/or cap material that
6 would restrict the flow of that gas. The
7 less permeable material would be the
8 material through which the gas would
9 likely flow.
10 Q. Earlier you told me a number of things
11 that could be occurring at any landfill
12 that would account for a reduction in gas
13 being delivered to a commercial facility;
14 right?
15 A. Yes.
16 Q. How would you determine whether or not it
17 is because of your working hypothesis that
18 at Plainville at least a contributing
19 factor is inadequate maintenance or repair
20 of the collection wells?
21 A. Primarily from reports prepared by URS,
22 which indicate that as much as half of the
23 gas extraction wells are compromised in
24 some manner, either through liquid

Page 71

1 blockage of the screen portion of the
2 wells or in fact breakage or some other
3 type of blockage of the wells.
4 Q. Assuming that that is -- if one were to
5 assume that that is so, that that is at
6 least part of why the delivery of gas has
7 been reduced since the first of -- roughly
8 the first of 2004, how would you go about
9 restoring the historical levels of gas
10 delivery?
11 A. There are several ways in which that could
12 be done. One is to install additional
13 wells as replacement wells.
14 Another way would be to install
15 well pumps to pump the liquid out of those
16 wells and if necessary based on blockage
17 of header or lateral pipe, to replace
18 those portions of pipe to allow vacuum to
19 be imparted to the entire gas collection
20 system.
21 Q. What would be the approximate cost of an
22 additional well at the Plainville
23 Landfill?
24 MR. FERREY: If you know.

Page 72

1 A. I don't know offhand. One rule of thumb
2 that is used is approximately $100 per
3 foot of well installed.
4 Q. And what is the --
5 A. For simply for the installation of the
6 well, not the connection of that system to
7 other header pipe or lateral pipe.
8 That -- I am sorry -- is in a
9 system without a synthetic cap. Costs
10 increase significantly with the
11 installation of a well through a cap that
12 has to then be repaired.
13 Q. And what would be the -- you know the
14 locations and physical characteristics of
15 the wells that URS was describing;
16 correct?
17 A. I know some of the information about the
18 wells from well logs that were included in
19 those reports.
20 Q. What is the range of depths of the well
21 logs that you looked at?
22 A. I don't remember specifically, but I would
23 say some of the wells may be installed as
24 shallow as 20 feet, and some of them may

Page 73

1 be as deep as 100 feet or more.
2 Q. So for some of the wells, you would be
3 talking $10,000 just to drill -- just to
4 put in the well; right?
5 A. That's possible.
6 Q. And what would be the cost roughly of
7 hooking it up to the system?
8 MR. FERREY: If you know.
9 A. I don't know enough details about how deep
10 the header pipe is within the waste, let's
11 say, which would dictate the level of
12 trenching or other means of connecting the
13 well to the vacuum system, so I can't give
14 a very -- a reasonably accurate estimate
15 of that cost.
16 Q. So what is your hand grenades estimate?
17 MR. FERREY: Excuse me?
18 Q. Roughly? Close enough for hand grenades?
19 A. No.
20 Q. Any idea?
21 A. No.
22 Q. Any idea of what it would cost to repair
23 the synthetic liner that you would have to
24 go through to put in another well?

19 (Pages 70 to 73)

Page 74

1  A.  It depends.  For one particular well, that
2     may be several thousand dollars.
3  Q.  How much would it cost to put well pumps
4     in a well that has water in it?
5  A.  On the order of five to eight thousand
6     dollars per well.
7  Q.  How many wells did you determine appear to
8     have some sort of problem at this system?
9  A.  I didn't determine any.
10  Q.  I am sorry.  Based upon your reading of
11     URS's reports?
12  A.  Approximately half of the 117 wells, so
13     somewhere on the order of 50 to 60 wells.
14        MR. BLANTON:  What time is it?
15        THE REPORTER:  10:39.
16        MR. BLANTON:  Do you need a
17     break?
18        MR. FERREY:  I could use a
19     break.
20        MR. BLANTON:  Okay.  Let's take
21     five.
22     (Recess taken at 10:39 a.m.)
23     (Recess ended at 10:46 a.m.)
24     (One-page letter of transmittal

Page 75

1        dated September 20, 2005, to
2        Mr. Ferrey from Mr. Adams
3        marked Exhibit No. 2 for
4        identification.)
5  BY MR. BLANTON:
6  Q.  Mr. Adams, I show you what has been marked
7     as Exhibit 2.
8        (Handing Exhibit No. 2 to the
9     witness.)
10  Q.  I ask if this is a transmittal document
11     with which you sent some materials to
12     Mr. Ferrey.
13        (Pause.)
14        (The witness viewing Exhibit
15     No. 2.)
16  A.  Yes.
17        (Handing Exhibit No. 2 back to
18     Mr. Blanton.)
19  Q.  I am going to show you the documents that
20     have been marked as Exhibits 3 through 8.
21     I ask you if these are the documents that
22     were sent to him by this transmittal
23     document.
24        THE WITNESS:  Can I see that

Page 76

1     just so I --
2        (Handing Exhibit No. 2 back to
3     the witness.)
4        MR. FERREY:  I will mark our
5     copies as I go through here.
6        MR. BLANTON:  This is my
7     assumption, based on the strategic
8     placement of the paper clip.
9        (Pause.)
10        (The witness viewing Exhibits
11     Nos. 3 through 8.)
12  A.  Yes.
13        (Handing Exhibit No. 3 to
14     Exhibit No. 8 back to Mr. Blanton.)
15        (One-page cover sheet entitled
16        References to Tax Credits and
17        attached two pages marked
18        Exhibit No. 3 for
19        identification.)
20  BY MR. BLANTON:
21  Q.  Let me show you what has been marked as
22     Exhibit 3.  Could you tell me first what
23     is the -- you have a description on the
24     cover sheet; right?

Page 77

1        (Handing Exhibit No. 3 to the
2     witness.)
3  A.  Yes.
4  Q.  What is the document that is attached to
5     the cover sheet?
6  A.  Technical Due Diligence Investigation For
7     Landfill Gas Recovery prepared by SCS
8     Engineers in August 1996 for Biomass
9     Energy Systems.
10  Q.  Where did you obtain that?
11  A.  I don't recall if I obtained that from the
12     Massachusetts DEP files, but I think more
13     than likely I received that from Lorusso
14     Corporation through Mr. Ferrey.
15  Q.  Is that your handwriting on the upper
16     right-hand corner of the first page of the
17     letter?
18  A.  Yes.
19  Q.  Can you read it?  Or do you remember it?
20     Because my photocopy is not very good.
21  A.  Yes.  I believe I had noted that I
22     reviewed the report and made two notes to
23     myself, one, indicating that it was no new
24     information relative to the draft report

Page 166

1    to the environment?
2    A.   I don't think I -- I think the -- as I
3    stated, the improper operation of the gas
4    extraction wells is an explanation for why
5    gas is migrating from the landfill.
6    Q.   Can you think of any other reasons why it
7    is based upon the information that is
8    available to you?
9    A.   No.
10   Q.   Would you look at Exhibit 14, page 7?
11            (Handing Exhibit No. 14 to the
12   witness.)
13   Q.   Let me have those others back, before they
14   get completely --
15            (Handing Exhibits Nos. 11 and 17
16   back to Mr. Blanton.)
17   Q.   The last paragraph before section 3.2, the
18   second paragraph of the document, do you
19   see the first sentence in that paragraph?
20            (Pause.)
21            (The witness viewing Exhibit
22   No. 14.)
23   A.   Yes.
24   Q.   Do you disagree with that statement?

Page 167

1    A.   No.
2    Q.   If that is true, that is not related to
3    improper functioning of the gas collection
4    system, is it?
5    A.   I think it may be related to that in that
6    if well pumps were installed in wells,
7    liquid level could be dropped below the
8    screened portion of that -- of that well,
9    and gas could be extracted from the
10   landfill.
11   Q.   When did the water table come up to where
12   it was at the time this May of 2005 report
13   was issued?
14            MR. FERREY:  If you can answer.
15   A.   If you are referring to there are two
16   dates by which the water table is
17   indicated:  on April 6th and April 25th.
18   I guess it is 2005.
19   Q.   Right.  So in less than a month, the water
20   table varied three and a half feet; right?
21   A.   Yes.
22   Q.   And after the water went down the next
23   week, the methane went up, the water table
24   went down; right?

Page 168

1    A.   Yes.
2    Q.   Are you suggesting that it is a
3    malfunction of the gas collection system
4    to not have pumps in when the water table
5    fluctuates that much in the course of
6    three or four weeks?
7    A.   I would say in order to extract the gas
8    from the gas collection system -- from the
9    landfill in those areas, when the water
10   table fluctuates to that degree, it would
11   be prudent to install well pumps to be
12   able to extract that gas.
13   Q.   Do you have any opinion as to the amount
14   of gas that left the landfill through
15   preferential gas migration pathways below
16   the water table?
17   A.   No.
18   Q.   Do you know of any way that one could make
19   that determination?
20   A.   I think it would be very difficult.
21   Q.   And do you know -- do you have any opinion
22   as to the economic value of the gas you
23   would collect by putting in pumps to take
24   care of this fluctuating water table

Page 169

1    compared to the cost of pumping the water
2    table down?
3    A.   I'm not familiar with the economics of
4    this project.
5    Q.   And do you know whether the water table
6    has ever fluctuated this much before
7    April 6th of 2005?
8    A.   No, I don't.
9    Q.   Do you know whether any landfill gas left
10   the landfill by this pathway before early
11   2004 ever?
12   A.   I do not know.
13   Q.   Look at Exhibit 18, please.
14            (Witness complying.)
15            MR. BLANTON:  Off the record a
16   second.
17            (Discussion off the record.)
18   BY MR. BLANTON:
19   Q.   You were saying you thought this was sort
20   of the overall summary of the URS workup
21   to this point in time?
22   A.   This work, and then there was a June --
23   Q.   And the June 20th?
24   A.   And the June 20th.  Yes.

43 (Pages 166 to 169)

1    Q.   So in forming your opinions as stated
2         earlier today and in your affidavit, you
3         would have relied upon these documents in
4         large measure?
5    A.   Yes.
6    Q.   Look at the third page of Exhibit 18.
7              (Witness complying.)
8    Q.   The first paragraph under "Conceptual
9         Model," read the third sentence out loud.
10   A.   "Based on this information, URS believes
11        that it is likely that the clay liner that
12        was placed directly onto the bedrock
13        surface has been compromised."
14   Q.   And go ahead and read the rest of the next
15        sentence.
16   A.   "It appears that LFG migration has been
17        occurring through the clay liner into the
18        bedrock cracks and fissures."
19   Q.   Go on.
20   A.   Once the LFG has entered the cracks and
21        fissures, it migrates both horizontally
22        (in bedrock) and vertically (in bedrock
23        and overburden sand) through preferred
24        pathways until the pressure driving the

1         LFG dissipates."
2    Q.   Read the last sentence.
3    A.   "To date, LFG has been detected in gas
4         probes up to 250 feet east of the landfill
5         footprint."
6    Q.   Do you have any reason to disagree with
7         this statement -- these statements by URS?
8    A.   I haven't personally investigated the
9         subsurface or the stratigraphy of the
10        site, so I can't comment on that.
11   Q.   Do you have any other explanation for why
12        you would be detecting gas -- LFG gas and
13        gas probes up to 250 feet east if it
14        wasn't getting out of the landfill by
15        either means that they have suggested?
16   A.   That seems like a likely means for the gas
17        to migrate from the landfill, assuming
18        there isn't another source of methane.
19   Q.   The clay liner is not part of the gas
20        collection system, is it?
21   A.   No.
22   Q.   It is not the purpose of the gas
23        collection system to seal up cracks and
24        fissures underneath the compromised clay

1         liner, is it?
2    A.   I think it is the purpose of the gas
3         collection system to induce a vacuum
4         within the landfill to draw gas into the
5         gas collection system.
6    Q.   And you can only put so much vacuum on
7         those wells without creating fire hazards
8         and other problems; correct?
9    A.   Judicious adjustment of the wells allows
10        you to place as much vacuum as feasible in
11        various areas of the landfill, but, yes,
12        it is important to keep a review of the
13        oxygen concentration and temperature.
14   Q.   And depending on the extent to which the
15        clay liner directly on the bedrock has
16        been compromised and the gas has access to
17        cracks and fissures, it may or may not be
18        possible to keep the gas from leaving
19        through those cracks and fissures by
20        putting a vacuum on the wells; correct?
21   A.   I'm not sure that's true, because there
22        are other means to limit the potential for
23        oxygen to be entrained into the landfill
24        such as installing vertical gas wells with

1         perforations only in the bottom third of
2         the well or bottom half of the well to
3         limit the potential for oxygen to be drawn
4         into the landfill and rather to extract
5         the gas from those deep portions
6         preferentially.
7    Q.   What would that cost?
8    A.   The same type of costs that are associated
9         with installing conventional wells.
10   Q.   What is your understanding as to whose
11        responsibility out of all of these parties
12        that you have investigated, whose
13        responsibility was it to have a proper
14        clay liner at this site?
15            MR. FERREY:  Just note an
16        objection.  Calling for a legal
17        conclusion.
18   Q.   You can answer.
19   A.   It is not clear to me whose responsibility
20        that is.
21   Q.   Would you agree in light of the two
22        documents that we just looked at and the
23        statements made by URS in those two
24        documents with which you agreed that there

1    are at least three reasons why or possible
2    reasons why LFG has been escaping into the
3    environment, that is:  malfunctioning
4    wells; faulty liner installation; and
5    cracks in the bedrock; and at least
6    periods of time in which the water table
7    has come up so that the gas is going out
8    through preferential pathways?
9  A.  I think those all explain how gas could be
10    migrating from the landfill.  It is my
11    contention that maintenance -- operation
12    and maintenance of the gas collection
13    system could prevent some, if not all, of
14    those pathways or reasons for migration.
15 Q.  Is it correct you have no knowledge or
16    opinion at this point what that would cost
17    to control all of these factors by
18    additional wells, additional well types,
19    additional well auxiliary equipment?
20 A.  I have not tried to estimate that cost.
21 Q.  So your opinions -- is it fair to say then
22    that your opinion about the role of the
23    wells is simply without regard for the
24    cost?

1  A.  Correct.
2  Q.  If one has no financial restraints, you
3    can do a lot with the wells; correct?
4  A.  You sure can.
5  Q.  If you are in an economic enterprise, some
6    of those things may be reasonable and some
7    may not; correct?
8  A.  Spending less money on gas collection
9    system modifications could likely have
10    less impact than if you were to spend more
11    money.
12 Q.  And it may well take a lot more money to
13    catch every bit of the gas than the
14    economic value of the gas you are catching
15    as a result of those efforts; correct?
16 A.  I think that is a possibility, but I'm not
17    familiar with the economics for this
18    project.
19 Q.  In paragraph 7 of your affidavit on
20    page 5, the first full paragraph, it
21    begins: "The apparent deterioration"; do
22    you see that?
23 A.  Yes.
24 Q.  In the second sentence of that paragraph,

1    please tell me what is the reasonably
2    expected maintenance and repair of the
3    system that did not take place, and be
4    very specific, as specific as you can.
5  A.  Based on information included in several
6    of URS's reports, there appears to be
7    significant amounts of liquid in many of
8    the wells at the site.  I believe it would
9    have been wise and be considered
10    reasonably expected maintenance to install
11    liquid well pumps to remove some of that
12    liquid to improve the gas extraction
13    efficiency.
14        It may also be considered
15    reasonable maintenance to install
16    replacement wells, particularly in cases
17    where there is gas migration from the
18    site.
19 Q.  Anything else?
20 A.  No.  I think those are the two major
21    reasonably expected maintenance items.
22 Q.  And as I recall, the well pumps you think
23    would cost at least $5,000 and as much as
24    $8,000 per well; correct?

1  A.  Yes.
2  Q.  And the replacement wells would have been
3    approximately $10,000 for the well,
4    several thousand dollars to repair the
5    liner after putting in the new well, and
6    some unknown amount to connect the new
7    well to the collection system; correct?
8  A.  The only question is on -- those numbers I
9    believe are accurate with the exception
10    that some wells may be less expensive to
11    install if they were shallower than
12    100 feet.
13 Q.  So the shortest ones would have been
14    $2,000?  Two to ten thousand dollars per
15    well plus several thousand dollars for the
16    liner, several thousand dollars to repair
17    the liner, plus some other amount to
18    connect them to the collection system?
19 A.  Correct.
20 Q.  And tell me how much more gas would have
21    been collected had that been done.
22 A.  I can't tell you that, but I can tell you
23    the collection rate earlier on in the
24    history of the project based on some of

Page 178

1　　　the information that was included in these
2　　reports.
3　Q.　So the best case would have been
4　　20 percent more, correct, --
5　A.　No.
6　Q.　-- based upon your chart in --
7　A.　20 percent more just for that time period,
8　　but a closer look on historical gas
9　　collection rates early on, I believe there
10　　was even more gas generated -- collected
11　　years earlier.  While it is true that the
12　　gas would typically decline over time, the
13　　rate of decline has -- that has been
14　　documented is quite a bit more significant
15　　than what has been represented in models
16　　prepared by others and what is commonly
17　　expected at sites.
18　Q.　And you still concur with the statement in
19　　one of these reports that actual
20　　generation of gas can vary substantially
21　　from the predicted models?
22　A.　Yes.
23　Q.　And you still stand by your original
24　　statement from your original testimony

Page 179

1　　　that the decrease in the amount of gas
2　　delivered in addition to the decrease due
3　　to bad maintenance and bad repair could
4　　also be in part due to decreased
5　　generation of gas in the first place?
6　A.　Yes.
7　Q.　And the other factors you talked about?
8　A.　Correct.
9　Q.　Okay.  And it is correct that you cannot
10　　quantify the extent to which any of these
11　　factors contribute to the observed
12　　decrease in gas delivery; is that correct?
13　A.　That's correct.
14　Q.　And you can't quantify the extent to which
15　　the escape of gas from the landfill due to
16　　poor maintenance of the collection system
17　　is due to that as compared to the other
18　　factors; correct?
19　A.　Correct.
20　Q.　And you have no opinion as to the cost of
21　　putting the gas collection system in a
22　　state of perfect function at every well
23　　compared to the value of the gas being
24　　collected as a result of that expenditure;

Page 180

1　　　correct?
2　A.　Correct.
3　Q.　Now in the bottom of page 5 of your
4　　affidavit -- excuse me -- the next to last
5　　paragraph, it says your opinion is that
6　　reasonably expected maintenance could have
7　　improved the collection efficiency so that
8　　sufficient quantifies of LFG could
9　　currently be delivered to operate the
10　　seven engine/generator sets.
11　A.　Yes.
12　Q.　What do you base that on?
13　A.　Based on the fact that gas being delivered
14　　to the facility now is decreased to the
15　　point where there is less than a couple
16　　hundred cubic feet per minute of gas shy
17　　of what would be required to operate the
18　　facility at full capacity, and my
19　　experience is based on how much gas has
20　　been documented to be delivered to the
21　　facility in the past and the rapid decline
22　　of gas delivered to the facility over the
23　　past several years, that it is likely that
24　　that quantity of gas could be captured

Page 181

1　　　through proper maintenance of the gas
2　　collection system.
3　Q.　Without regard for cost?
4　　　Before you answer that, can you
5　　please convert the 200 cubic feet of gas
6　　that you were just talking about to the
7　　millions of BTUs per day that is in your
8　　chart in paragraph 3?
9　A.　Sure.  Assuming the gas is -- the
10　　concentration of methane in the gas is
11　　approximately 50 percent, 1,000 cubic feet
12　　per minute represents 700 million BTUs per
13　　day.  Therefore, a quick calculation in my
14　　head, 200 CFM represents approximately
15　　140 million BTUs per day.
16　Q.　There are still a number of factors that
17　　can explain the total decreased delivery
18　　of BTUs to the generating plant; correct?
19　A.　Yes.
20　Q.　And you still can't calculate how much of
21　　the total decrease is due to any of the
22　　factors; correct?
23　A.　Correct.
24　Q.　But you just have a feeling that you could

Page 198

```
1       DEPONENT'S ERRATA SHEET
2    AND SIGNATURE INSTRUCTIONS
3         The original of the Errata Sheet
4    has been delivered to Steven E. Ferrey,
5    Esq.
6         When the Errata Sheet has been
7    completed by the deponent and signed, a
8    copy thereof should be delivered to each
9    party of record and the ORIGINAL delivered
10   to W.C. Blanton, Esq., to whom the
11   original deposition transcript was
12   delivered.
13
14       INSTRUCTIONS TO DEPONENT
15
16         After reading this volume of
     your deposition, indicate any corrections
17   or changes to your testimony and the
     reasons therefor on the Errata Sheet
18   supplied to you and sign it.  DO NOT make
     marks or notations on the transcript
19   volume itself.
20
21   REPLACE THIS PAGE OF THE TRANSCRIPT WITH
22   THE COMPLETED AND SIGNED ERRATA SHEET WHEN
23   RECEIVED.
24
```

Page 200

```
1              CERTIFICATE
2    Commonwealth of Massachusetts
3    Plymouth, ss.
4
5         I, Judith McGovern Williams, a
6    Registered Professional Reporter and
7    Notary Public in and for the Commonwealth
8    of Massachusetts, do hereby certify:
9         That DAVID E. ADAMS, the witness
10   whose deposition is hereinbefore set
11   forth, was duly sworn by me and that such
12   deposition is a true record of the
13   testimony given by the said witness.
14        IN WITNESS WHEREOF, I have
15   hereunto set my hand this      day of
16        , 2005.
17
18
19
           Judith McGovern Williams
20         Registered Professional Reporter
           Certified Realtime Reporter
21         Certified LiveNote Reporter
           Certified Shorthand Reporter No. 130993
22
23   My Commission expires:
24   April 2, 2010
```

Page 199

```
1    ATTACH TO DEPOSITION OF:  DAVID E. ADAMS
2
3    CASE:  PLAINVILLE GENERATING CO., L.L.C.
     VS. DTE BIOMASS ENERGY, INC. and
4    PLAINVILLE GAS PRODUCERS, INC.
5
          ERRATA SHEET
6
     INSTRUCTIONS:  After reading the
7    transcript of your deposition, note any
     change or correction to your testimony and
8    the reason therefor on this sheet.  DO NOT
     make any marks or notations on the
9    transcript volume itself.  Sign and date
     this errata sheet (before a Notary Public,
10   if required).  Refer to Page 198 of the
     transcript for errata sheet distribution
11   instructions.
12   PAGE  LINE
13        CHANGE:
          REASON:
14        CHANGE:
          REASON:
15        CHANGE:
          REASON:
16        CHANGE:
          REASON:
17        CHANGE:
          REASON:
18        CHANGE:
          REASON:
19
20       I have read the foregoing transcript
     of my testimony, and except for any
21   corrections or changes noted above, I
     hereby subscribe to the transcript as an
22   accurate record of the statements made by
     me.
23
24          DAVID E. ADAMS
```

51 (Pages 198 to 200)

## — **Exhibit C**—

**Excerpts From The Deposition Of David LaFlamme**

Page 1

1          UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF MASSACHUSETTS

3

4

5     ********************************

6    PLAINVILLE GENERATING CO., L.L.C.,

7              Plaintiff

8        vs.             No. 05CV12168 GAO

9    DTE BIOMASS ENERGY, INC. and

10   PLAINVILLE GAS PRODUCERS, INC.,

11             Defendants

12   ********************************

13

14

15

16                  VOLUME:  I

17                  PAGES:  1-184

18

19

20

21     DEPOSITION OF DAVID J. LaFLAMME

22       THURSDAY, NOVEMBER 10, 2005

23

24

EXHIBIT C

Page 2

1    DEPOSITION OF DAVID J. LaFLAMME, a witness
2    called on behalf of the Defendants,
3    pursuant to Federal Rules of Civil
4    Procedure, before Judith McGovern
5    Williams, Certified Shorthand Reporter
6    No. 130993, Registered Professional
7    Reporter, Certified Realtime Reporter,
8    Certified LiveNote Reporter, and Notary
9    Public in and for the Commonwealth of
10   Massachusetts, at the offices of Looney &
11   Grossman L.L.P., 101 Arch Street, Boston,
12   Massachusetts  02110, on Thursday,
13   November 10, 2005, commencing at 1:20 p.m.
14
15
16
17
18
19
20
21
22
23
24

Page 3

1    APPEARANCES:
2    LeBOEUF, LAMB, GREENE & MacRAE, L.L.P.
3     Steven E. Ferrey, Esquire
4     260 Franklin Street
5     Boston, Massachusetts  02110-3173
6     617-439-9500
7     sferrey@llgm.com
8     on behalf of the Plaintiff
9
10   BLACKWELL, SANDERS, PEPER, MARTIN, L.L.P.
11    W.C. Blanton, Esquire
12    4801 Main Street
13    Suite 1000
14    Kansas City, Missouri  64112
15    816-983-8151
16    wblanton@blackwellsanders.com
17     - and -
18   LOONEY & GROSSMAN L.L.P.
19    Wesley S. Chused, Esquire
20    101 Arch Street
21    Boston, Massachusetts  02110-1112
22    617-951-2800
23    wchused@lgllp.com
24    both on behalf of the Defendants

Page 4

1             I N D E X
2    Witness                    Page
3    DAVID J. LaFLAMME
4     Direct Examination by Mr. Blanton    6
5
6
7
8
9          E X H I B I T S
10   Number                     Page
11
12   64   One-page note dated 11/9/05   101
13        to Mr. Chused from
14        Mr. Ferrey
15
16   65   Four-page letter dated       101
17        May 26, 2005, to Mr. Ferrey
18        from Mr. Adams
19
20   66   Multipage schematics         102
21
22   67   Plan                    51
23
24   68   Multipage Operations Manual   104

Page 5

1    69   Multipage Project Report     104
2
3    70   2002 Modifications Process       106
4         and Instrumentation Diagram
5
6    71   2002 Modifications Process       107
7         and Instrumentation Diagram
8
9    72   Group of documents, first    111
10        page Check No. 001958
11
12
13
14
15
16
17
18
19
20
21
22
23
24

G&M Court Reporters, Ltd.
617-338-0030

Page 6

```
 1              P R O C E E D I N G S
 2                     - - -
 3              It is hereby stipulated and
 4     agreed by and between counsel for the
 5     respective parties that the witness will
 6     read and sign the deposition transcript
 7     before any notary public within 30 days of
 8     receipt of same.  The filing of the
 9     deposition is waived.
10              It is further stipulated and
11     agreed that all objections, except as to
12     the form of the questions, and motions to
13     strike are reserved until the time of
14     trial.
15                     - - -
16              DAVID J. LaFLAMME, first having
17     been duly sworn, testified as follows in
18     answer to direct examination by
19     MR. BLANTON:
20                     - - -
21     Q.   Mr. LaFlamme, as you know I am W. C.
22     Blanton.  I represent the defendants in
23     the lawsuit that Plainville Generating
24     Company brought in District Court here
```

Page 7

```
 1     against DTE Biomass Energy, Inc. and
 2     Plainville Gas Producers, Inc.
 3              Are you familiar with that
 4     litigation generally?
 5     A.   I know of it, yes.
 6     Q.   Have you ever been deposed before?
 7     A.   Have I ever been?
 8     Q.   Have you ever been deposed before?
 9     A.   Yes.
10     Q.   You have given a deposition?
11     A.   Yes.
12     Q.   How many times?
13     A.   Once.
14     Q.   And what was involved in that case?
15     A.   It was an industrial accident.
16     Q.   Then you're familiar generally with the
17     process.  The reporter writes down
18     everything everyone says.  So it is
19     important that only one person speak at a
20     time.  My questions tend to get long, so
21     be sure I am done before you start your
22     answer, and make sure I don't step on your
23     answer.  Okay?
24     A.   Um-hmm.
```

Page 8

```
 1     Q.   The next one is you do have to answer
 2     audibly.  Head gestures and hand
 3     gestures --
 4     A.   Right.
 5     Q.   -- don't pick up.
 6     A.   All right.
 7     Q.   So you do have to say them audibly.  All
 8     right?
 9     A.   Yes.
10     Q.   And um-hmms, like you just did --
11     A.   Yes.
12     Q.   -- are ambiguous.
13     A.   Okay.
14     Q.   If you could do yeses and noes, that would
15     be helpful.
16              Is there any medical or physical
17     reason that you have difficulty either
18     understanding questions or being able to
19     respond or recall things today?
20     A.   As long as it is audible, because I do
21     have a hearing problem, slight.
22     Q.   Sometimes I trail off, and sometimes I
23     mumble.
24     A.   Okay.
```

Page 9

```
 1     Q.   So if you can't tell what I am trying to
 2     find out, please let me know.  Don't
 3     guess.  All right?
 4     A.   Okay.
 5     Q.   Okay.
 6              MR. BLANTON:  Could we go off
 7     the record?
 8              (Discussion off the record.)
 9     BY MR. BLANTON:
10     Q.   Mr. LaFlamme, could you tell me what your
11     general educational background is?
12     A.   My only formal education is high school.
13     Q.   And did you go to school in this area?
14     A.   Needham, the town of Needham.
15     Q.   Okay.
16     A.   Massachusetts.
17     Q.   And after high school, what did you do?
18     A.   I worked.
19     Q.   And where did you first work full time
20     after high school?
21     A.   A place in Somerville called Cox
22     Engineering.  It was a sheet metal,
23     ventilation, air conditioning type,
24     fabrication shop.
```

1  landfills worked?
2  A.  I did nothing at that time about learning
3      about the landfill, because I had no -- I
4      had no connection with that other than to
5      take the gas that came out of the pipe on
6      our property.
7  Q.  So as of the 1996 beginning of the
8      relationship between the DTE/Plainville
9      Gas Producers and the Lorusso entities,
10     your job started at the intake pipe at the
11     asphalt plant roughly?
12 A.  Correct.
13 Q.  Okay.  How did it work, getting -- fueling
14     the asphalt plant with gas from the
15     landfill?
16 A.  At first there were a lot of problems for
17     -- for DTE to supply us with gas.  It
18     wound up requiring that they had to turn
19     the line pressure up to between 14 and 15
20     psi to supply adequate gas to the burners.
21 Q.  How does the line pressure -- how is that
22     created and adjusted, regulated?
23 A.  It is created and regulated by positive
24     displacement blowers that were installed

1      at the landfill in the flare station.
2  Q.  Had there been any such blowers there
3      before the hookup to the asphalt plant?
4  A.  Not of that type.  There were centrifugal
5      blowers for the flares.
6  Q.  Who made the decisions about what sort of
7      blowers to put there to deliver the gas to
8      the asphalt plant?
9  A.  DTE.
10 Q.  Did, if you know, did any of the Lorusso
11     entities have to bear any of the cost of
12     those --
13 A.  No.
14 Q.  -- modifications?
15 A.  Did not to my knowledge.
16 Q.  What was there about the delivery of
17     methane to the asphalt plant that required
18     the pressure to go up?  How much pressure
19     did you require and why?
20 A.  It was I'm going to say at a mean average
21     of 14 and a half psi.
22 Q.  That's what you needed to make your
23     burners work?
24 A.  Of gas.  Correct.

1  Q.  Okay.  And they were having trouble doing
2      that, getting it?
3  A.  At first, yes.
4  Q.  How long did that last that there were
5      problems?
6  A.  I'm going to say a month and a half, two
7      months, something along that line.
8  Q.  Who did you work with on the other side?
9  A.  Rick Jasack.
10 Q.  Anybody else?
11 A.  I mean there were other people around, but
12     I don't remember who.
13 Q.  Do you know what the fix was?
14 A.  Yes.  They -- they did something to the
15     blowers to turn them up.
16 Q.  But you weren't involved in any technical
17     discussions --
18 A.  No.
19 Q.  -- about how to do that?
20 A.  No.
21 Q.  Did you have an understanding as to
22     whether they had to modify the equipment
23     in any way or whether they just had to
24     turn it up?

1  A.  I don't -- I can't actually explain to you
2      what they did, but they did increase the
3      pressure.
4  Q.  Okay.  After that, how did it go with the
5      asphalt plant?
6  A.  Pretty good.
7  Q.  Until the asphalt plant went out of
8      operation, generally that 1996 to 2001
9      period it was okay?
10 A.  Yes.  When the plants were sold, Aggregate
11     Industries opted at that time not to use
12     landfill gas.
13 Q.  Was the sale of the asphalt plants a
14     consequence of the decision to build an
15     electric-generating plant or the
16     motivation for building the electric-
17     generating plant if you know?
18 A.  The electric-generating plant was
19     something that was going to be built all
20     along.  We had been in discussions about
21     that, "we" meaning people within our
22     company, and consulting with Biomass or
23     DTE people.  That had been in discussion
24     for quite some time.

Page 98

1    two.
2             MR. BLANTON: Okay.
3    BY MR. BLANTON:
4    Q.   Tell me what caused -- okay. Tell me what
5         causes the condensate, where was the
6         condensate appearing, and how did that
7         affect you?
8    A.   In the piping underneath the landfill.
9    Q.   Generally through the piping?
10   A.   Correct.
11   Q.   So the general condensation process was
12        blocking the delivery lines; correct?
13        That's what Mr. Lorusso told me, I think.
14   A.   The lack of removing the condensation from
15        the piping would fill the pipes with
16        water, and, therefore, gas couldn't get
17        through.
18   Q.   How often did that happen after May of
19        2003?
20   A.   Periodically through August, September.
21   Q.   2003?
22   A.   Correct.
23   Q.   What was the fix, if you know, for the
24        system shutting you down automatically

Page 99

1         those first couple of months? Did you
2         ever find out what was causing that?
3    A.   It was the computer that was causing it.
4         I don't know what would tell the computer
5         to shut the gas off, but it would shut the
6         gas off. It would tell the valve to
7         close.
8    Q.   Somebody disconnected the computer from --
9    A.   They disconnected it from the valve
10        completely.
11   Q.   You know that?
12   A.   Yes.
13   Q.   Who did it and how do you know?
14   A.   Jim Van Hoy or they had an electrical
15        engineer Russ Grimes.
16   Q.   And did they --
17   A.   They disconnected it so it had no control
18        over the valve until they made some
19        changes in the logic of the computer
20        system.
21   Q.   Was the condensate situation fixed --
22        improved or solved?
23   A.   Not by that change, no.
24   Q.   I understand that. But was there a fix

Page 100

1         for that later?
2    A.   Yes.
3    Q.   Do you know what was done to fix that?
4    A.   I know that they wound up replacing pumps
5         or something out there. I don't know
6         specifically. But they did make some
7         correction on the landfill.
8    Q.   During the time that -- between May and
9         September of 2003, how many times were you
10        shut down because of condensate blockage?
11   A.   I would be guessing if I -- if I gave you
12        a number. It was quite a few times.
13   Q.   More than a dozen?
14   A.   Yes.
15   Q.   More than 20?
16   A.   Maybe not.
17   Q.   How long would you be down when that
18        happened?
19   A.   Sometimes you would be down 20 minutes.
20        Sometimes you would be down an hour.
21   Q.   Okay.
22             MR. BLANTON: All right. Let's
23        take a break.
24             (Recess taken at 2:56 p.m.)

Page 101

1             (Recess ended at 4:09 p.m.)
2             MR. BLANTON: A couple of things
3         that should have been preliminary but now
4         are mid course deviations, Mr. Ferrey.
5         Are you agreeable that the same ground
6         rules and stipulations for this deposition
7         are the same as we agreed to yesterday for
8         those of Mr. Adams and Mr. Lorusso?
9             MR. FERREY: I am, Mr. Blanton.
10            MR. BLANTON: All right.
11            (One-page note dated 11/9/05 to
12         Mr. Chused from Mr. Ferrey
13         marked Exhibit No. 64 for
14         identification.)
15            MR. BLANTON: And then following
16        up with Mr. Adams, I have marked for the
17        record as Exhibit 64 a copy of your note
18        of yesterday to Mr. Chused transmitting
19        Mr. Adams' preliminary opinion letter.
20            (Four-page letter dated May 26,
21         2005, to Mr. Ferrey from
22         Mr. Adams marked Exhibit No. 65
23         for identification.)
24            MR. BLANTON: And I have marked

26 (Pages 98 to 101)

Page 110

1   A.  He is the electrician.
2   Q.  Is he assigned to the generating plant?
3   A.  No.
4   Q.  Who is he assigned to?
5   A.  I believe he is assigned to Lorusso
6       Materials.
7   Q.  Has he worked on a regular basis at the
8       generating plant?
9   A.  On and off.  He has not -- he is not
10      100 percent full time there.  When we
11      require his services, he comes in and
12      helps.
13  Q.  Has he done any services on behalf of
14      Lorusso Corp. or for Plainville Gas
15      Producers at the flare station?
16  A.  Yes, he has.
17  Q.  Can you describe generally what he has
18      done?
19  A.  He was involved at the latter part of the
20      project, completing the flare station
21      electrical work.
22  Q.  Do you know whether in the course of that
23      work he developed an understanding of the
24      operation of the flare station?

Page 111

1   A.  Oh, he may well have.  He was intricately
2       involved in it.
3   Q.  Did you have any involvement in -- do you
4       know what the -- was he doing that work
5       for Lorusso Corporation, or was he doing
6       it for DTE or Plainville Gas Producers, or
7       do you know what the arrangement was by
8       which he did that work?
9           MR. FERREY:  If you know.
10  A.  He -- he was working -- he was providing
11      service for DTE --
12  Q.  Okay.
13  A.  -- and being paid by Lorusso.
14  Q.  And do you know whether DTE or Plainville
15      Gas Producers reimbursed Lorusso --
16  A.  No.
17  Q.  -- for his services?
18  A.  No, not to my knowledge.  No.
19          (Group of documents, first page
20           Check No. 001958 marked Exhibit
21           No. 72 for identification.)
22  BY MR. BLANTON:
23  Q.  I am going to show you what I have marked
24      as 72, which I understand relates to

Page 112

1       reimbursement for services of Mr. Lincoln.
2       I want to know whether you have seen this
3       information.
4   A.  Oh, this is after it was built.
5   Q.  Okay.
6   A.  This is for maintenance.  This is a
7       maintenance contract that they had.
8   Q.  Tell me about that.
9           MR. FERREY:  Do you have a copy
10      of that for me?
11          MR. BLANTON:  It is on the
12      bottom of your stack.
13          MR. FERREY:  Okay.
14          MR. BLANTON:  It is underneath
15      volume 2 of the operations manual, I
16      think.
17  A.  They had to have a Massachusetts licensed
18      electrician to perform services,
19      maintenance or what have you, at their
20      facility.
21  Q.  Okay.  And --
22  A.  And they requested us to provide George
23      Lincoln, and we agreed when they needed --
24      when they needed an electrician over there

Page 113

1       that we would do so.  So, hence, George
2       Lincoln went and pulled maintenance
3       permits for the facility under his name
4       and license.
5   Q.  Okay.
6   A.  Yes, but that was well after the facility
7       was built.
8   Q.  Did he continue to provide maintenance
9       services for Plainville Gas Producers up
10      through August 31, 2005?
11  A.  No.
12  Q.  When did he stop?
13  A.  I don't exactly remember when he stopped.
14  Q.  Do you know why he stopped?
15  A.  They no longer wanted to pay for the
16      service.
17  Q.  Okay.  Do you know whether there was
18      anything in particular that prompted that
19      decision?
20  A.  No, I don't.
21  Q.  Okay.  When did you learn that the
22      contract between Plainville Gas Producers
23      and Allied Waste Systems for the right to
24      collect the landfill gas was being

29 (Pages 110 to 113)

Page 114

1  assigned to Lorusso Corp.?
2       MR. FERREY:  If you know.
3  A.  I want to say the mid to latter part of
4     August.
5  Q.  And did you understand, were you told that
6     you were going to -- that the Lorusso
7     Corp. would be responsible -- was taking
8     over the gas collection and delivery
9     system as of September 1?
10 A.  Yes.
11 Q.  Were you given any responsibilities in
12    connection with that transition?
13 A.  With the transition?
14 Q.  Yes.
15 A.  No.
16 Q.  Were you asked to in any way assume
17    operation responsibilities for the gas
18    collection and delivery system?
19 A.  Yes.
20 Q.  When?
21 A.  After -- as of September 1.
22 Q.  Well, were you -- what were you asked to
23    do and what have you done since
24    September 1?

Page 115

1  A.  Go out and try to assess what needs to be
2     done on the hill to correct the problems.
3  Q.  And what have you done in that regard so
4     far?
5  A.  I'm trying to acquire information.
6     Physically we haven't done a lot.
7  Q.  Have you done anything physically since
8     September 1?
9  A.  Other than hire a -- other than hire an
10    environmental firm to monitor and tune the
11    wellfield, we have only done a couple of
12    small items.
13 Q.  Who is that company?
14 A.  Shaw Group.
15 Q.  Who is the person there who has been
16    responsible for assisting Lorusso Corp.?
17 A.  Dan Leahy.
18 Q.  L-E-A-H-Y?
19 A.  Yes.
20 Q.  Do you know his phone number by any
21    chance?
22 A.  No.
23 Q.  Is --
24 A.  Well, a cell phone.

Page 116

1  Q.  The wonders of modern technology.  There
2     goes the old I will have to look that up
3     that and get back to you.
4  A.  401-341-0384.
5  Q.  Where is that?  Where is he based?
6  A.  Rhode Island.
7  Q.  Okay.
8  A.  That's all I know.
9  Q.  Are they doing monitoring work at the
10    landfill on a regular basis?
11 A.  Yes.
12 Q.  Do they generate written reports of any
13    sort?
14 A.  Yes.
15 Q.  Do you have access to those -- well, do
16    they come to you or do they come to
17    someone else?
18 A.  I get them once a month.  They give their
19    weekly reports to their supervisor at Shaw
20    who puts all of the information together
21    and gives me a report once a month.
22 Q.  So at this point, this falls into the
23    category of project other than operations?
24    This is your -- are you the person at

Page 117

1     Lorusso who is responsible for getting
2     this transition implemented --
3  A.  Yes.
4  Q.  -- at least initially?
5  A.  (The witness nodding his head.)
6  Q.  That was a yes?
7  A.  Yes.  That was a yes.
8  Q.  The "yes" came before I finished.
9  A.  Sorry.
10 Q.  I wanted to make sure it was still yes
11    after I got that.
12       Do you know what Shaw Group has
13    done in terms of tuning the landfill?
14 A.  They are charged with -- they have to
15    visit every well or -- every well in the
16    course of a month, so they do X amount of
17    wells per week.  They come usually one day
18    a week.  They do X amount of wells.  So
19    that by the end of the month, they have
20    covered the entire wellfield.
21 Q.  And do they do written reports -- what is
22    involved in the tuning process?
23 A.  They go to each well with an instrument,
24    take measurements, and either adjust or

30 (Pages 114 to 117)

Page 118

```
1        don't adjust, depending on the flow and
2        the gas quality and temperature.
3    Q.  Do they provide -- do they make a written
4        record of what they have done?
5    A.  Yes.
6    Q.  And is that provided to you also?
7    A.  Monthly.
8    Q.  That is part of the report that comes to
9        you?
10   A.  Correct.
11   Q.  Are there other folks with Lorusso who are
12       working with you to implement the
13       transition?
14   A.  Only when I request additional help.
15   Q.  And that is on a specific task basis?
16   A.  Right.
17   Q.  Who have you called upon to do specific
18       things?
19   A.  George Lincoln has been out there with me.
20   Q.  Doing electrical work?
21   A.  No.
22   Q.  What does he do?
23   A.  He -- he was working with me on some
24       piping systems blocking up, setting
```

Page 119

```
1        surface lines that were not pitched
2        properly at the correct pitch so they
3        drain.
4    Q.  Anything else?
5    A.  Not that I can think of at this time.
6    Q.  When you say "piping systems blocked," are
7        you talking about the vertical wells or
8        the laterals?
9    A.  Lateral lines that are temporary lines,
10       repair lines, whatever they are, on the
11       surface above grade on the landfill.
12   Q.  So that would be above the liner?
13   A.  Oh, yes.
14   Q.  And so are these the lines also that -- so
15       those, the ones that were blocked, would
16       be aboveground?
17   A.  No.
18   Q.  Or above the -- excuse me -- above the
19       liner?
20   A.  No.
21   Q.  Where --
22   A.  They are above and below.
23   Q.  Have you had to breach the liner to do any
24       of this work?
```

Page 120

```
1    A.  No.
2    Q.  How do you deal with things that are below
3        the liner?
4    A.  I don't. Allied does.
5    Q.  Okay. Who are you -- in terms of working
6        with Allied, could you explain to me
7        generally how the transition process has
8        gone, not qualitatively what do you think
9        of it, but what do you think of Allied in
10       taking over?
11   A.  We have had a couple of meetings, general
12       meetings, to discuss conditions on the
13       landfill and what everybody expects, and I
14       -- I confer with Ralph Larimore, who is
15       the area manager for Allied.
16   Q.  Have the meetings been -- where they have
17       taken place?
18   A.  At the landfill.
19   Q.  And how many do you remember there being
20       there?
21   A.  I believe so far we have had three.
22   Q.  And do you remember when they were?
23   A.  Not exactly.
24   Q.  Can you tell me in as much detail as you
```

Page 121

```
1        can recall what subjects you addressed?
2    A.  We have requested information on
3        maintenance logs and what have you from --
4        from Allied, which they have not been able
5        to provide. We kind of discussed with
6        them what they expect, asked what, if any,
7        issues were outstanding that needed to be
8        addressed. They have given us a couple,
9        but no great amount.
10   Q.  What are the issues that they say need to
11       be addressed?
12   A.  Well, the one outstanding was the
13       shimmying of these pipes so they drain
14       properly. They claimed that Biomass or
15       DTE never did.
16   Q.  And so this is basically just setting the
17       pitch, which direction things are flowing?
18   A.  Correct.
19   Q.  Do you have like long lines that are
20       pitched the wrong way, or do you have them
21       running into each other, or what is the
22       situation?
23   A.  There are some long lines. It can be as
24       much as maybe 150, 200 feet. There are
```

31 (Pages 118 to 121)

1    some short lines.  There are all different
2    kinds of lines up there.
3  Q.   Any other issues?
4  A.   Other than -- other than the routine --
5    they haven't brought any others to my
6    attention.  I have asked for a list, but I
7    haven't received it yet.
8  Q.   Okay.  What other things have come up at
9    the meetings?
10  A.   They just generally ask how things are
11    going.  They get their monthly reports.
12    They seem to be satisfied.
13  Q.   Do you make monthly reports to Allied --
14  A.   I --
15  Q.   -- or do the Shaw reports go to them
16    directly?
17  A.   Well, I give them the Shaw report, as well
18    as I keep a copy, and I give them the copy
19    of the monthly download from the gas
20    analyzer.
21  Q.   When you said they haven't been able to
22    provide maintenance logs, is this -- to
23    your understanding this is they don't have
24    them or they just haven't given them to

1    you?
2  A.   I honestly don't know which it is.
3  Q.   All right.
4  A.   I know that I haven't received any.
5  Q.   Do you know when you asked for them?
6  A.   We asked -- one of the meetings we had was
7    the last week in August.  I don't remember
8    the day.  That was the first -- actually
9    the first time we asked for them was a
10    conference call before any of these
11    meetings.
12  Q.   Okay.  And that would have been in August?
13  A.   Yes.
14  Q.   And then you had a meeting in late August?
15  A.   We had a meeting the last week of August.
16    It was just before September 1st.  We
17    actually had a face-to-face meeting at the
18    landfill.
19  Q.   Who was present besides Mr. Larimore and
20    you?
21  A.   Henry Grilli; Henry LaDuke, Nicky -- the
22    name begins with the a W, and I'm not
23    going to remember, because it is about as
24    long as this table; and Brian Card.  I

1    think that was all.
2  Q.   Who is Henry LaDuke?  Is that an Allied
3    person?
4  A.   Yes.
5  Q.   What is his role?
6  A.   He is the site attendant.  I don't know
7    what his official title is, but.
8  Q.   He is there all the time?
9  A.   He is there all the time.
10  Q.   And Nicky W.?
11  A.   She takes care of their environmental
12    work.  She does -- she is -- she is -- I
13    believe she is from the New York office,
14    but I'm not positive about that.
15  Q.   And Brian Card is?
16  A.   He is the area engineer, and I believe he
17    is based in Rhode Island somewhere.
18  Q.   And he is an Allied person, too?
19  A.   Yes.
20  Q.   Okay.  Then you said there were two other
21    meetings, one at the end of August, and
22    then what?
23  A.   One -- we had a meeting with, Henry and I
24    -- Henry Grilli, and myself, Henry LaDuke

1    and Brian Card.
2  Q.   Okay.  So everybody except Nicky?
3  A.   Ralph was not at that meeting.
4  Q.   Ralph wasn't there?
5  A.   No.  Nicky wasn't at that meeting.  No.
6  Q.   And when was this approximately?
7  A.   Towards the end of September.
8  Q.   And what was the subject of that meeting?
9  A.   Just to check in with each other and see
10    how things were going, to see if anybody
11    had any comments or anything to add.  It
12    was a relatively short meeting.
13  Q.   And then the third meeting?
14  A.   I believe that was also with just Brian
15    Card and Henry LaDuke.
16  Q.   And what was the subject of that one?
17  A.   Just another basic check-in.
18  Q.   You and Mr. Grilli together again?
19  A.   Yes.
20  Q.   Since the beginning on September 1, 2005,
21    has the movement of gas from the landfill
22    to the generating station continued
23    without interruption?
24  A.   Yes.

Page 126

1   Q.   Do you know how the volume or energy level
2     from September 1, 2005, to present
3     delivered to the gas -- to the generating
4     station compares to what the levels were
5     immediately before September 1, 2005?
6   A.   It is approximately the same.
7   Q.   In your judgment, are you and the folks at
8     Lorusso who are working with you able to
9     do the basic operations necessary to
10    deliver gas from the landfill system to
11    the generating plant at this time? You
12    have done it for two months.
13   A.   We have basically monitored. We haven't
14    done, other than shimmying a couple of
15    pipes, we haven't done a lot out there.
16   Q.   Tell me --
17   A.   Okay.
18   Q.   Go ahead. I didn't mean to cut you off.
19   A.   No. Go ahead.
20   Q.   What is it that you haven't done?
21   A.   Because of lack of information, I haven't
22    done anything yet as far as well
23    condition, corrective activity for wells.
24   Q.   Any other things generally that you

Page 127

1    believe need to be addressed at the
2    wellfield at the landfill?
3   A.   Yes.
4   Q.   What else?
5   A.   I believe something has to be done there
6    for an increased blower size at the flare
7    station.
8   Q.   And that goes back to the initial problem
9    that has been existing all along; right?
10   A.   Yes, it does.
11   Q.   Is there any particular reason why from
12    the Lorusso folks' standpoint, now that
13    you have both the gas collection and
14    delivery system and the generating plant,
15    is there some particular reason why you
16    want to have pressure generated from the
17    blowers at the flare rather than at the
18    generating plant?
19   A.   Yes.
20   Q.   Why?
21   A.   Because the flares are not capable of
22    running while their -- while the original
23    flare blowers are trying to push gas to
24    the generating plant.

Page 128

1   Q.   What are the circumstances under which you
2    would want the flares operating at the
3    same time that the gas is going to the
4    generating plant?
5   A.   If not all the engines are running, there
6    is -- there is excess gas to be burned.
7   Q.   Under what circumstances would you not
8    have all the engines running?
9   A.   Maintenance.
10   Q.   If all seven -- if there are no engines
11    down for maintenance, how many engines
12    operate?
13   A.   Usually six.
14   Q.   How long -- was there ever a time when you
15    were running all seven?
16   A.   When we first started up, we ran all
17    seven, until June of 2003. We had to take
18    one offline for a lack of gas.
19   Q.   Starting in June of 2003?
20   A.   June of 2003. That's correct.
21   Q.   Yes?
22   A.   Yes.
23   Q.   I was getting a head nod, but not a yes.
24   A.   Okay.

Page 129

1   Q.   Any time after June of 2003, did you run
2    the seventh engine?
3   A.   Yes. We had -- well, we ran it partially
4    on and off when we could get, not full
5    load, but on a light load, when we had --
6    when we were told we had extra gas. We
7    ran it the latter part of 2003, the latter
8    part meaning December, and early January
9    of 2004.
10   Q.   Do you have records of when the engines
11    are running?
12   A.   Yes.
13   Q.   And are they -- what time units? Are they
14    by hour? Are they continuous or what?
15   A.   By hour usually.
16   Q.   Do you usually take more than one out for
17    maintenance at a time?
18   A.   I won't say it hasn't happened, but we try
19    not to do that as a scheduled routine, no.
20   Q.   So if you have seven engines and only
21    enough gas for six and you take one out,
22    why would you then take gas to the flare
23    rather than running it to the engine that
24    is there and wasn't running before one was

Page 130

1    taken out for maintenance?
2  A.  Well, we wouldn't in the case of a
3    six-engine run plant with one standing by.
4    We would not have to.
5  Q.  So there are some times now when you would
6    have enough gas to run seven when one had
7    maintenance?
8  A.  We have done that. Yes.
9  Q.  Are there operational manuals for
10    equipment at the flare?
11  A.  There are flare operational manuals. Yes.
12  Q.  Do you have those?
13  A.  They are in the office of the landfill.
14  Q.  Okay. Are there any manuals that you know
15    of that you would expect to have
16    associated with any aspect of the landfill
17    gas collection and delivery system that
18    you do not have?
19  A.  I don't have or have not seen -- I don't
20    know if you would call it a manual -- any
21    information as to gas well configuration,
22    sump -- out on the landfill now -- sump
23    configurations, which are part of the
24    condensate collection system. I have no

Page 131

1    idea of what type of equipment is
2    underground there, meaning pumps, no
3    knowledge, and I have seen -- personally I
4    have seen no information on that.
5  Q.  Is there anything in terms of day-to-day
6    ongoing delivery of gas, moving gas from
7    the system to the generating plant, that
8    are necessary to have?
9  A.  Well, in the ongoing? They are not
10    necessary unless I have a problem on the
11    landfill and I don't know where the
12    problem is or what is out there for
13    equipment.
14  Q.  Have you encountered that to date?
15  A.  Not yet.
16  Q.  Is there anything else -- let me try to
17    distinguish between two types of
18    information for operation. I would like
19    to try to distinguish between information
20    that you think would be necessary or even
21    just useful in trying to evaluate the
22    condition of the system, which would be
23    historical in nature and the sorts of
24    things you have said here now, knowing

Page 132

1    exactly physically what is out there and
2    where it is located and so forth. That's
3    one thing of that you would need there to
4    take care of existing problems at the
5    landfill and to identify what might be
6    going on if new problems develop. Okay?
7    That phalanx of things. Do you understand
8    what I am trying to get to?
9  A.  Yes.
10  Q.  And then there are the what do I need to
11    know and have in order to bring the gas
12    that is generated at the landfill through
13    the piping system in its current condition
14    to my generating plant to change the
15    vacuum and do whatever else needs to be
16    done at the individual wells out in --
17  A.  I don't know that.
18  Q.  And Shaw is doing that for you; right?
19  A.  Yes.
20  Q.  And they apparently seem to know enough
21    from some way to be able to carry that out
22    satisfactorily?
23  A.  Well, their employers are certified to do
24    that type of work.

Page 133

1  Q.  And then there is whatever is going on at
2    the flares on the landfill side; correct?
3  A.  Correct.
4  Q.  And you believe you have the information
5    necessary to know what is going on in the
6    flares -- at the flares from an
7    operational standpoint, whatever goes on
8    in there; is that right?
9  A.  I would not say at this point I have
10    everything I need.
11  Q.  Okay. What else do you need for the --
12  A.  I don't know everything I need because I
13    haven't seen what is available.
14  Q.  Okay. But so far at least, you have not
15    -- the gas has continued to flow at
16    approximately the same rate as it did
17    before September 1, and you haven't
18    encountered a problem that you have not
19    had sufficient information to address to
20    date?
21  A.  To date, that's correct.
22  Q.  Okay. Have you provided or tried to -- of
23    the things that you believe exist but you
24    don't have, have you recorded those

Page 134

```
1        somewhere and memorialized them and said
2        to anyone, "I need the following things"?
3    A.  Yes.  We did put a list together.
4    Q.   Okay.  I saw a list that was put together
5        by Mr. Adams, which was then copied
6        verbatim into Mr. Lorusso's -- one of
7        Mr. Lorusso's affidavits.  Are there -- do
8        you know of that list?
9    A.  No.
10            MR. FERREY:  So you are up to
11       speed, here is that list.
12            (Handing Exhibit No. 22 to the
13       witness.)
14            MR. BLANTON:  And Mr. Ferrey is
15       handing you exhibit?
16            MR. FERREY:  Exhibit 22 that was
17       marked.
18            MR. BLANTON:  Exhibit 22.
19            (Pause.)
20            (The witness viewing Exhibit
21       No. 22.)
22            MR. BLANTON:  Oh, and I am aware
23       of another list.
24       BY MR. BLANTON:
```

Page 135

```
1    Q.   There was a list put together in a letter
2        that came to Plainville Gas Producers, and
3        I don't remember who signed it, but it was
4        August 23.  There was a letter that went
5        to I think Curt Ranger or Rick DiGia -- it
6        went to Rick DiGia.
7    A.  That would probably be part and parcel of
8        the list I was looking for.
9    Q.   Okay.
10   A.  This, I would have to read.
11            (Pointing to Exhibit No. 22.)
12   Q.   But in late August before you took over,
13       you put together a list for someone, "This
14       is the list of things I think I need"?
15   A.  I put together a list of the things that I
16       thought I would need, and I submitted it
17       to my superiors.
18   Q.   Who specifically did you give it to?
19   A.  Henry Grilli.
20   Q.   Okay.  And that would have been before
21       September 1?
22   A.  Correct.
23   Q.   Okay.  Have you seen anything that would
24       be characterized as the as-built drawings
```

Page 136

```
1        of the collection system and flare station
2        with detailed drawings?  I would guess
3        those would be the sorts of things --
4    A.  No.
5    Q.   -- that were Exhibit 66.
6    A.  I have certainly not seen a finished
7        drawing.
8    Q.   Okay.  What is out there that is under
9        lock and key?  Is there a locked desk to
10       get into the landfill --
11   A.  The flare station is locked, is
12       encompassed by a chainlink fence.  The
13       gate to the landfill is locked, has a
14       lock.
15   Q.   Do you know who put those locks on --
16   A.  The --
17   Q.   I am sorry.  Go ahead.
18   A.  No.  I don't.  It -- it could -- I believe
19       probably Allied.
20   Q.   Okay.  You have keys to all of those
21       locks?
22   A.  I do now.
23   Q.   Where did you get them?
24   A.  From Allied.
```

Page 137

```
1    Q.   All right.  Are there any other locked --
2        are there any locked areas anywhere out
3        there that you need access to for which
4        you do not now have keys?
5    A.  None that I have encountered so far.
6    Q.   I think you told me earlier there was a
7        site plan with gas extraction points.  It
8        wasn't the one that I had shown you,
9        but --
10   A.  Right.  Yes.
11   Q.   -- is that still around?
12   A.  Yes.
13   Q.   Okay.  Is there an electronic flare
14       monitoring system?
15   A.  Yes.
16   Q.   Is all the hardware for that present?
17   A.  Is it all there?
18   Q.   Yes.  I mean that is what it is; right?
19   A.  Yes.  I believe it to be there.
20   Q.   And that is run by computer?
21   A.  Correct.
22   Q.   And the computer is there?
23   A.  Yes.
24   Q.   Do you have instructions on how the system
```

35 (Pages 134 to 137)

Page 138

1   works?
2   A.   On the monitoring device?
3   Q.   Yes.
4   A.   Yes.  There was a book for that.
5   Q.   Do you know of any mechanical drawings or
6        electrical schematics that you have?
7   A.   There are piece -- I will call them
8        piecemeal drawings, not very many.  My
9        electrician has a set of drawings.  There
10       is a set of drawings when they came first
11       to -- with the project, but they were
12       modified so many times, I'm not -- I'm not
13       aware of seeing a finished as-built
14       electrical schematic, as built and as
15       modified.
16  Q.   What about as-built drawings for the flare
17       control systems?
18  A.   That's what we're talking about.
19  Q.   Okay.
20  A.   The electrical control systems.
21  Q.   That's the same thing?
22  A.   Yes.
23  Q.   Do you have specifications for the blower
24       system that is at the flares?

Page 139

1   A.   Yes.  Those -- those are in the respective
2        flare manuals.
3   Q.   Okay.  So you have the flare and blower --
4   A.   Yes.
5   Q.   -- operation and maintenance manuals?
6   A.   Yes.  Yes, we do.
7   Q.   And then these are taken from the list you
8        are looking at.  There are also
9        manufacturer and O and M manuals for all
10       equipment and information systems.  Are
11       there any such equipment or systems that
12       you don't have manuals for?
13  A.   I don't have any information on any of the
14       pumps, condensate pumps.
15  Q.   Anything else you can think of that you
16       don't have the manuals for?
17       MR. FERREY:  If you know.
18  A.   I'm not quite sure.  There are some
19       electric or electronic valves out there.
20       I don't know.  I don't think I have seen
21       any information on.
22  Q.   Is that part of what your folks have to
23       deal with, or is that part of what Shaw is
24       doing?

Page 140

1   A.   No.  That is part of what I have to deal
2        with.
3   Q.   Okay.
4   A.   That is in the flare station controls.
5   Q.   Some electronic valves?
6   A.   Electric.  Electronic.  Electrically-
7        driven motorized valves.  Yes.
8   Q.   Does someone in your organization know how
9        to operate those, at least basic
10       operations, without the manuals?
11  A.   The basic operation, the computer operates
12       the valve.  There is a manual bypass on
13       the valve that is quite obvious.  But if
14       there is anything wrong with the valve,
15       there is no information as to what is
16       inside, you know, like an owner's manual.
17  Q.   Do you have someone who knows how to
18       operate the condensate pumps?
19  A.   No.
20  Q.   Okay.  Does Shaw do that?
21  A.   No.
22  Q.   Or do you do it?
23  A.   Well, the condensate pumps operate
24       automatically, until they fail.

Page 141

1   Q.   Okay.
2   A.   It is not a manual setup.  And thus far,
3        they haven't failed.
4   Q.   Okay.  What plans do you have for
5        addressing conditions at the landfill
6        collection system, gas collection system,
7        you know, overall and as specific as you
8        know at this time?
9   A.   I have -- I have a plan of the piping as
10       it was done.  I don't have, to my
11       knowledge, any other plan.
12  Q.   Okay.
13  A.   Except one similar to yours that doesn't
14       show the piping and only shows well
15       location.
16  Q.   I used an ambiguous -- a word with
17       multiple definitions.
18       Have you as yet given thought to
19       what you might do to address the
20       conditions that exist there now that were
21       the subject of discussion and dispute
22       between the parties from at least early
23       2004 until the end of the relationship?
24  A.   I have thoughts of directions I want to go

36 (Pages 138 to 141)

Page 142

1    in. Yes.
2  Q.  Mr. Lorusso indicated that you all were
3      developing plans for how you would address
4      the situation?
5  A.  Yes. That's correct.
6  Q.  Tell me how far along are you with that.
7      What have you got in mind so far?
8  A.  Well, as I said before, I'm still trying
9      to accumulate information on the
10     wellfield. We have contacted
11     representatives of Siemens group, who are
12     the manufacturers of the gas analyzer that
13     doesn't work properly. We have contacted,
14     although we have not met with yet,
15     representatives of the company LFG
16     Specialties that manufactures the large
17     flare that is in that compound.
18 Q.  And for what purpose?
19 A.  We would like them to come out onsite and
20     evaluate the flare with us and help us to
21     decide the best route in order to be able
22     to operate the flare and partial
23     generation plant at the same time when it
24     becomes necessary.

Page 143

1  Q.  What is the last thing you said?
2  A.  Partial, meaning some percent of the
3      generation plant, maybe 50 percent. If we
4      have a problem, a major problem over
5      there, I have to be able to flare gas and
6      still operate some engines.
7  Q.  I see.
8  A.  And that flare cannot do it presently.
9  Q.  What are the problems with the gas
10     analyzer?
11 A.  It is old and outdated.
12 Q.  Any reason to think it is providing
13     inaccurate data at present?
14 A.  Oh, I know it is providing inaccurate
15     data.
16 Q.  In what way?
17 A.  It's not functioning.
18 Q.  At all?
19 A.  It is not -- it is not -- it is not
20     providing methane percentage. It is
21     providing cubic foot of flow, but not
22     methane percentage.
23 Q.  Is there any other way to determine that?
24 A.  I average the readings that are taken by

Page 144

1      the Shaw Group to compensate for the time
2      being.
3  Q.  Do you have any idea how long that has
4      been a problem?
5  A.  It would be a guess at best. I would say
6      well over a year.
7  Q.  Did Plainville Gas Producers have to
8      provide methane percentage information to
9      Lorusso?
10 A.  Yes.
11 Q.  Did they do that? Did they provide you
12     with numbers?
13 A.  Yes. But they were getting them from the
14     Shaw Group.
15 Q.  The same way?
16 A.  Yes.
17 Q.  All right.
18 A.  And sometimes they didn't get them from
19     the Shaw Group, and they asked me to give
20     it to them, because my plant monitors
21     that.
22 Q.  Do you know who at the Shaw Group they
23     were getting them from?
24 A.  Joel Falbo was the technician at that

Page 145

1      time.
2  Q.  All right. Did they have a specific, the
3      Shaw Group, have a specific technician who
4      is doing this work out at the landfill
5      now?
6  A.  Dan Leahy.
7  Q.  So he did it from Rhode Island?
8  A.  Well, he is in Rhode Island. He comes to
9      the landfill and does the work. Yes.
10 Q.  How often?
11 A.  Once a week.
12 Q.  Do you know what he charges Lorusso Group
13     to do that?
14 A.  I have that information, but I can't
15     recite it to you right now. I don't
16     remember what the --
17 Q.  Do you remember approximately how much it
18     is for his services?
19 A.  I would be guessing. Not accurate. And
20     it is not he that charges. It is the Shaw
21     Group. He is an employee of the Shaw
22     Group.
23 Q.  Okay. But I interrupted you. You said
24     Siemens, the LFG folks. What else do you

37 (Pages 142 to 145)

Page 146

1      have in mind of doing?
2    A.   I want to do wellfield analysis to see
3      what -- what the condition of every well
4      is.
5    Q.   Do you know yet how you would undertake
6      that effort?
7    A.   Well, I have been trying to accumulate
8      information.
9    Q.   Did the -- go ahead.
10   A.   I recently -- recently meaning last Friday
11      afternoon -- received a copy of a report
12      from URS that was done for Allied and DTE,
13      I believe.
14   Q.   Did you --
15   A.   And I have -- I have been analyzing that.
16      I have not completed it yet, but looking
17      at that to try and determine what my best
18      move would be to make a correction.
19   Q.   Do you remember the date of the report?
20   A.   June 20, 2005.
21   Q.   Are you aware --
22        MR. BLANTON: Well, I will get
23      that first.
24   Q.   I show you what has been marked -- I show

Page 147

1      you, this is a copy of Exhibit 17.
2        (Handing Exhibit No. 17 to the
3      witness.)
4    Q.   Is that it?
5        (Pause.)
6        (The witness viewing Exhibit
7      No. 17.)
8    A.   Yes.
9    Q.   I will give you a copy of --
10   A.   It appears to be it.
11   Q.   I will give you a copy of what appears to
12      be marked Exhibit 18, which is a followup
13      dated July 12th.
14        (Handing Exhibit No. 18 to the
15      witness.)
16   Q.   Have you seen that?
17        (Pause.)
18        (The witness viewing Exhibit
19      No. 18.)
20   A.   No, I have not.
21   Q.   Other than the July 20 report, have you
22      seen any reports or correspondence between
23      URS and the Massachusetts Department of
24      Environmental Protection?

Page 148

1    A.   No, I have not.
2    Q.   Have you discussed any of the URS reports
3      to the Massachusetts Department of
4      Environmental Protection with Mr. Adams or
5      anyone else?
6    A.   No, have not.
7    Q.   There is a reference in the Complaint --
8      and because we are pressed for time, I
9      can't find it immediately -- that there is
10      a reference to a report, I think, from
11      November that there was a draft and a
12      final report detailing conditions of wells
13      that supposedly DTE and Plainville
14      Producers know about. Have you seen any
15      reports about well conditions other than
16      this June 20th report?
17   A.   We did -- I assisted -- I assisted in a
18      camera survey of 17 wells.
19   Q.   And Shaw put that out, is that right, I
20      think?
21   A.   Shaw did the survey.
22   Q.   All right.
23   A.   I assisted the man, because they had
24      problems getting the second guy on the

Page 149

1      site.
2    Q.   Did you ever see any report of the results
3      of that?
4    A.   No.
5    Q.   Did you ever hear what the results of that
6      were?
7    A.   I did -- I didn't hear a formal report. I
8      mean I obviously watched the video,
9      because I was the one sticking the camera
10      down the well.
11   Q.   And who at Shaw were you working with?
12   A.   Joel Falbo.
13   Q.   And was there anyone from Plainville Gas
14      Producers there?
15   A.   No.
16   Q.   Did you discuss with Mr. Falbo what the
17      camera was seeing down there?
18   A.   Yes.
19   Q.   And what did he tell you that he was
20      seeing generally? Not well by well.
21   A.   Obstructions and collapses and pinching
22      pipes and just blockages.
23   Q.   Other than that experience and what you
24      saw on the June 20, 2005 letter from URS

38 (Pages 146 to 149)

Page 182

```
1        DEPONENT'S ERRATA SHEET
2      AND SIGNATURE INSTRUCTIONS
3            The original of the Errata Sheet
4    has been delivered to Steven E. Ferrey,
5    Esq.
6            When the Errata Sheet has been
7    completed by the deponent and signed, a
8    copy thereof should be delivered to each
9    party of record and the ORIGINAL delivered
10   to W.C. Blanton, Esq., to whom the
11   original deposition transcript was
12   delivered.
13
14        INSTRUCTIONS TO DEPONENT
15
16           After reading this volume of
17   your deposition, indicate any corrections
     or changes to your testimony and the
     reasons therefor on the Errata Sheet
18   supplied to you and sign it.  DO NOT make
     marks or notations on the transcript
19   volume itself.
20
21   REPLACE THIS PAGE OF THE TRANSCRIPT WITH
22   THE COMPLETED AND SIGNED ERRATA SHEET WHEN
23   RECEIVED.
24
```

Page 184

```
1             CERTIFICATE
2    Commonwealth of Massachusetts
3    Plymouth, ss.
4
5          I, Judith McGovern Williams, a
6    Registered Professional Reporter and
7    Notary Public in and for the Commonwealth
8    of Massachusetts, do hereby certify:
9          That DAVID J. LaFLAMME, the
10   witness whose deposition is hereinbefore
11   set forth, was duly sworn by me and that
12   such deposition is a true record of the
13   testimony given by the said witness.
14         IN WITNESS WHEREOF, I have
15   hereunto set my hand this      day of
16        , 2005.
17
18
19
20           Judith McGovern Williams
             Registered Professional Reporter
             Certified Realtime Reporter
21           Certified LiveNote Reporter
             Certified Shorthand Reporter No. 130993
22
23   My Commission expires:
24   April 2, 2010
```

Page 183

```
1    ATTACH TO DEPOSITION OF:  DAVID J.
     LaFLAMME
2
3    CASE:  PLAINVILLE GENERATING CO., L.L.C.
     VS. DTE BIOMASS ENERGY, INC. and
4    PLAINVILLE GAS PRODUCERS, INC.
5
6         ERRATA SHEET
7    INSTRUCTIONS:  After reading the
     transcript of your deposition, note any
     change or correction to your testimony and
8    the reason therefor on this sheet.  DO NOT
     make any marks or notations on the
9    transcript volume itself.  Sign and date
     this errata sheet (before a Notary Public,
10   if required).  Refer to Page 182 of the
     transcript for errata sheet distribution
11   instructions.
12   PAGE  LINE
13        CHANGE:
          REASON:
14        CHANGE:
          REASON:
15        CHANGE:
          REASON:
16        CHANGE:
          REASON:
17        CHANGE:
          REASON:
18        CHANGE:
          REASON:
19
20        I have read the foregoing transcript
21   of my testimony, and except for any
     corrections or changes noted above, I
22   hereby subscribe to the transcript as an
     accurate record of the statements made by
     me.
23
24        DAVID J. LaFLAMME
```

47 (Pages 182 to 184)

# — <u>Exhibit D</u> —

**Plainville Generating Co., LLC's Initial Disclosures Pursuant
To Fed. R. Civ. P. 26(a), Dated November 14, 2005**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PLAINVILLE GENERATING CO., LLC,          )
                                         )
    Plaintiff,                           )
                                         )
vs.                                      )
                                         )
DTE BIOMASS ENERGY, INC.                 )          C.A. 05-12168GAO
AND                                      )
PLAINVILLE GAS PRODUCERS, INC.,          )
                                         )
    Defendants.                          )
                                         )

ORIGINAL

PLAINVILLE GENERATING CO., LLC'S
INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(a)

Pursuant to Fed. R. Civ. P. 26(a), Plaintiff Plainville Generating Co., LLC ("PGC")

hereby submits its initial disclosures to Defendants, DTE Biomass Energy, Inc. and Plainville

Gas Producers, Inc. PGC reserves the right to supplement or amend these disclosures.

## INITIAL DISCLOSURES

**Fed. R. Civ. P. 26(a)(1)(A): [T]he name and, if known, the address and telephone number
of each individual likely to have discoverable information that the disclosing party may use
to support its claims or defenses, unless solely for impeachment, identifying the subjects of
the information.**

    1.    Gerard C. Lorusso, 3 Belcher Street, Plainville, Massachusetts, Tel: (508) 695-

3252. Mr. Lorusso has information about the contractual and other aspects of the relationship

with defendants at issue in the litigation.

    2.    Henry G. Grilli, 3 Belcher Street, Plainville, Massachusetts, Tel: (508) 695-3252.

Mr. Grilli has information about the financial losses incurred by Plaintiff at issue in the litigation.

    3.    David J. LaFlamme, 3 Belcher Street, Plainville, Massachusetts, Tel: (508) 695-

3252. Mr. LaFlamme has information about the technical operation of Plaintiff's renewable

1



electricity generation facility and former asphalt facility at issue in the litigation.

PGC's investigations are continuing. PGC reserves the right to supplement this answer should additional witnesses become known to it.

**Fed. R. Civ. P. 26(a)(1)(B):** **[A] copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

PGC possesses documents regarding the following topics:

1.  All attachments to the Complaint;

2.  All documents marked as exhibits in the Deposition of Mr. Adams

3.  All documents marked as exhibits in the Deposition of Mr. Lorusso;

4.  All documents marked as exhibits in the Deposition of Mr. LaFlamme;

5.  July 29, 2005 letter from Richard DiGia to Vice President, Laidlaw Waste Systems assigning contract.

6.  August 23, 2005 letter from Henry Grilli to Richard DiGia requesting information in one-page attachment.

7.  August 22, 1996 letter from SCS Engineers to Curtis Ranger entitled Final Report – Technical Due Diligence Investigation for Landfill Gas Recovery with attachments.

8.  February 2, 2000 letter from James Pena to David LaFlamme regarding landfill gas supply to Lorusso facilities.

9.  Chart dated June 23, 2004 of Video Well Survey Results.

10. April 27, 2004 letter from DiGia to D. LaFlamme.

11. Electricity Power Sale Confirmation Agreement and first amendment thereto between PGC and Constellation New Energy, Inc.

12. Certificate Purchase Agreement between PGC and Massachusetts Electric Co., et al, and Amendment thereto.

13. PGC Energy and Emissions Reports for 2003, 2004, 2005.

14. September 14, 2004 letter from Massachusetts DEP, David Ellis, to Ralph Larrimore, Allied.

15. LFG Generation and Collection Estimates, Plainville Sanitary Landfill.

16. July 7, 2004 fax from Mr. Van Hoy to Mr. LaFlamme.

17. April 27, 2004 faxed letter from R. DiGia to D. LaFlamme.

18. April 12, 2004 fax from Mr. Van Hoy to Mr. LaFlamme.

19. August 26, 2004 fax from Mr. Van Hoy to Mr. LaFlamme.

These documents are available at the offices of PGC's counsel, LeBoeuf, Lamb, Greene & MacRae, LLP, 260 Franklin St., Boston, Massachusetts, and will be provided upon request.

PGC's investigations are continuing. PGC reserves the right to supplement this answer should additional documents become known to it.

**Fed. R. Civ. P. 26 (a)(1)(C):** **[A] computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.**

PGC has suffered damages that are ongoing. Non-privileged documents supporting PGC's damage claims will be made available for inspection and copying at a time and place mutually convenient for the parties. These damages include, but are not limited to, the payments made to Defendants for the Agreed Modifications, the additional costs incurred for the failure of the Agreed Modifications, lost profits from reduced sales of energy and renewable energy credits which losses have been running at more than $300,000 annually, the added cost of payments to Allied in the amount of $210,000 annually and the cost of necessary consultants to assist with the Collection System, internal staff costs incurred, the cost of necessary repairs and deferred

maintenance, future damages, in addition to damages for tort and unfair and deceptive acts and practices. PGC reserves the right to supplement and amend these ongoing damages upon ongoing operation relating to the monetary value of internal costs such as lost productivity, reassignment of employees incurred due to Defendants' conduct.

PGC also seeks recovery of attorneys' fees, expert witness fees, and costs in an amount to be proven at trial, as well as exemplary damages to the full extent permitted by law.

**Fed. R. Civ. P. 26 (a)(1)(D):** [F]or inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

Not applicable to PGC.

Respectfully submitted,
**PLAINVILLE GENERATING CO., LLC**
By its counsel

Steven Ferrey, Consulting Counsel
(BBO No. 163600)
Christopher L. DeMayo (BBO No. 653481)
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
260 Franklin Street
Boston, MA 02110
(617) 748-6800

Dated: November 15, 2005

4

## CERTIFICATE OF SERVICE

I, Christopher L. DeMayo, hereby certify that this 14th day of November, 2005, I caused a true copy of the foregoing Plainville Generating Co., LLC's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a) to be served on counsel of record for Plainville Gas Producers, Inc. and DTE Biomass Energy, Inc. at the following addresses:

Wesley S. Chused, Esq.
Looney & Grossman, LLP
101 Arch Street
Boston, MA 02110
(617) 951-2800
**(via US mail)**

W.C. Blanton, Esq.
Blackwell, Sanders, Peper & Martin, LLP
4801 Main Street
Suite 1000
Kansas City, MO 64112
816-983-8000
**(via US mail)**

_____
Christopher L. DeMayo